# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| ──────────────────── : | |
| : | |
| KYLE FELLERS, ANTHONY FOOTE, : | |
| NICOLE FOOTE, and ELDON RASH, : | |
| : | Case No. |
| Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| MARCY KELLEY, Superintendent of : | |
| Schools, State Administrative Unit 67, in : | |
| her official and individual capacities; : | |
| MICHAEL DESILETS, Athletic : | |
| Director, Bow High School, in his official : | |
| and individual capacities; MATT FISK, : | |
| Principal, Bow High School, in his : | |
| official and individual capacities; : | |
| PHILLIP LAMY, Lieutenant, Bow Police : | |
| Department, in his individual capacity; : | |
| STEVE ROSSETTI, soccer referee, New : | |
| Hampshire Interscholastic Athletic : | |
| Association, in his individual capacity; : | |
| and BOW SCHOOL DISTRICT; : | |
| : | |
| Defendants. : | |
| : | |
| ──────────────────── : | |

# COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

## INTRODUCTION

Public schools are charged with educating children about America's basic civic

values, its Constitution, and the fundamental rights it guarantees. But when an

opportunity arose to teach students about how important the First Amendment is to

American liberty, Bow School District officials did the opposite—acting as though

the First Amendment does not apply in public school buildings, on school grounds, at playing fields, or even during off-campus extracurricular activities. According to these officials, Bow School District property is a First Amendment free zone, from which they can banish parents who speak in ways the government dislikes. And that's exactly what they did.

When several parents and a grandfather decided to wear pink wristbands at their children's soccer game in support of protecting women's sports for biologically female athletes, school officials threatened to have them arrested for trespass and nearly forced their children to forfeit the game. They conspired with a local police officer and soccer referee to intimidate parents, enforce the school's unconstitutional rules, and prevent anyone from exercising their rights to speech, petition, and assembly. Following that game, the school banned those who dared to take a stand from not just future games, but from all other school property as well.

But public-school facilities are not private property. As the Supreme Court held over fifty years ago, the Constitution protects the rights of all "persons"—parents and students alike—to express their opinions, even on controversial subjects "in school as well as out of school," "in the cafeteria, or on the playing field, or on the campus." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 511, 512-13 (1969). And Bow School District's ban on demonstrations criticizing the decision to allow biological boys to play girls' soccer—cloaked in the language of "disruption" and "harassment"—is unconstitutional viewpoint discrimination.

The First Amendment does not allow state-operated schools to become "enclaves of totalitarianism." *Tinker*, 393 U.S. at 511. Plaintiffs are entitled to relief securing their fundamental rights to free expression, petition, and assembly.

THE PARTIES

1.     Plaintiff Kyle Fellers is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint.

2.     Plaintiff Anthony "Andy" Foote is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint

3.     Plaintiff Nicole Foote is a natural person and a citizen of New Hampshire and the United States. She resides in Bow and has resided in Bow during all times relevant to her past actions mentioned in this complaint

4.     Plaintiff Eldon Rash is a natural person and a citizen of New Hampshire and the United States. He resides in Bedford and has resided in Bedford during all times relevant to his past actions mentioned in this complaint

5.     Defendant Marcy Kelley is the Superintendent of Schools of State Administrative Unit 67, which is made up of the Bow and Dunbarton School Districts, and has held that position during all times relevant to the events in this complaint. She is sued in her official and individual capacities.

6.     Defendant Michael Desilets is the Athletic Director of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

7.     Defendant Matt Fisk is the principal of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

8.     Defendant Phillip Lamy is a Lieutenant in the Bow Police Department and has held that position during all times relevant to the events in this complaint. He is sued in his individual capacity.

9.     Defendant Steve Rossetti is a soccer referee with the New Hampshire Interscholastic Athletic Association (NHIAA) and has held that position during all times relevant to the events in this complaint. He is sued in his individual capacity.

10.    Defendant Bow School District is a New Hampshire school district and part of School Administrative Unit 67 (Bow & Dunbarton School Districts).

JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because this action presents questions of federal law and challenges Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

12.    Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and

are occurring in this judicial district and because Defendants all reside in this district.

STATEMENT OF FACTS

*Bow School District Policies on Speech at Extracurricular Events*

13.    Bow School District, the public school district in the town of Bow, New Hampshire, has a school board policy (Policy KFA) on "Public Conduct at School Property." This policy regulates the behavior of "all individuals on school property or at a school event" in "any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private."

14.    Exhibit A is a true and correct copy of Policy KFA. The policy is also available on Bow School Board's website at https://sites.google.com/a/bownet.org/bow-school-board/policies_1.

15.    Although entitled a policy on "conduct," Policy KFA regulates speech as well as conduct. Policy KFA states that "[t]he School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." The policy mandates, among other things, that no person shall "1. Injure, threaten, harass, or intimidate . . . any other person" or "7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner)."

16.    Bow School District enforces Policy KFA by ordering alleged violators to leave school grounds, by contacting law enforcement, and by issuing "No Trespass" letters.

5

17.     Bow High School's Athletics Handbook also regulates the speech and conduct of spectators at Bow High School games. The Handbook states that "[p]oor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands." It also tells spectators to avoid certain kinds of speech such as "cheering *against* the team," "us[ing] the names or numbers of opposing teams," or "trying to directly communicate" with players.

18.     As a member of the NHIAA, Bow High School annually commits itself to follow all guidelines and policies set forth by the NHIAA. Failure to comply with NHIAA guidelines can, among other things, cause Bow High School to forfeit games or become ineligible to compete in post-season tournaments.

19.     Under the 2024 NHIAA Soccer Policies and Procedures, "[a]ll teams must complete their entire schedule submitted to the NHIAA" and an NHIAA committee determines "if [scheduled] games not played will be considered a forfeit(s) or a no game(s)."

*The September 17 Soccer Game*

20.     On September 10, 2024, this Court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to biological females. *See Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024).

21.     One of the plaintiffs in *Tirrell v. Edelblut* is a biological male who plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's

soccer team was scheduled to play the Plymouth Regional team on September 17, 2024.

22.     On or about September 13, Nicole Foote, the mother of a player on the Bow High School girls' soccer team, met in person with Bow High School's Athletic Director, Mike Desilets, to complain about the competitive unfairness and injury risk to female athletes inherent in allowing biological males participate in women's sports. Desilets told Nicole that the court decision prevented the school district from doing anything about the situation.

23.     On September 16, the evening before the game, Desilets emailed soccer families, warning them that "Bow High School's status as a member of the NHIAA" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets also claimed that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

24.     Exhibit B is a true and correct copy of Desilets' email.

25.     Desilets attached to his email a document containing relevant extracts from the Athletics Handbook and the 2024 NHIAA Soccer Policies and Procedures.

26.     Exhibit C is a true and correct copy of this extracts document.

27.     People attending soccer games and other extracurricular activities on Bow School District property regularly wear apparel showing support for political and

social causes, such as shirts supporting political candidates, displaying the Pride Flag, or expressing messages about global warming.

28.    Two parents whose daughters play on the girls' soccer team, Kyle Fellers and Anthony "Andy" Foote (Nicole's husband), decided to attend the game and silently express their opinion about the importance of reserving women's sports for biological females. They agreed to wear pink wristbands, purchased off Amazon.

29.    As purchased, these wristbands were the type of pink bands that athletes often wear to raise awareness about breast cancer and had no writing on them. The night before the game, Andy Foote decorated their wristbands with two black Xs, symbolizing the female chromosomes.

30.    Exhibit D is a true and correct photograph of one of these wristbands.

31.    Andy Foote posted on Facebook that night, stating that he would be attending the September 17 game to show solidarity with the girls' team.

32.    Exhibit E is a true and correct photograph of this Facebook post.

33.    Foote's and Fellers' daughters asked if any of their teammates wanted to wear a wristband in support women's sports. But, since they could not get the full support from the team, no one on the team wore wristbands.

*Events at the September 17 Soccer Game*

34.    On September 17, Fellers, Andy Foote, and Nicole Foote attended Bow High School's varsity girls' soccer game, along with other family members. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus.

35.     None of these parents wore a wristband during the first half. Andy Foote distributed wristbands to his wife (who did not put it on) and to around half a dozen other spectators who requested one—although Foote told them not to put the bands on until the second half.  Fellers and the Footes watched the first half with other parents and cheered for the teams. They did not shout, chant, march, or waive signs about the biological males competing in women's sports.

36.     At halftime, Andy Foote went to the parking lot and put a sign of Riley Gaines on his Jeep's windshield. Both he and Fellers wore the pink wristbands at the sidelines at the beginning of the second half.

37.     For the first ten minutes of the second half, the two men continued to watch the game without incident or disruption. They did not shout, chant, march, or waive signs about the biological males competing in women's sports. Beyond these wristbands, nothing indicated that any of the parents were protesting.

38.     Approximately ten minutes into the second half, Athletic Director Desilets approached Andy Foote to tell him that he was not allowed to protest at the game and had to take off the wristband. Foote objected, citing the First Amendment. But when Desilets persisted, Foote removed the wristband.

39.     Desilets then told Fellers that he was not allowed to protest at the game and had to take off the wristband. When Fellers refused to obey, Desilets walked a short distance away to speak with Principal Matt Fisk and Bow Police Lieutenant Phil Lamy. Fisk then approached and repeated that Fellers had to remove the wristband or leave the game. After heated words, Fellers again refused.

40.     Lt. Lamy then told Fellers that he had to either leave the game or remove the wristband. According to Lamy, the First Amendment did not apply as Fellers was on private property. The interaction between Fellers and the school officials and police officer grew heated. Lamy wore a body camera, which should have recorded this interaction.

41.     Fellers finally removed his wristband but continued to hold it in his hand.

42.     Eldon Rash, Feller's former father-in-law (his ex-wife's stepfather) observed some of the commotion caused by officials and asked what was happening. Rash and Fellers did not attend the game together, and Rash was until that point unaware of the wristband demonstration.

43.     After Fellers explained the situation, Rash took the wristband from Fellers' hand and put it around his own wrist. Fisk and Desilets then pressured Rash into leaving the game or taking off the wristband. Andy Foote filmed some of this interaction on his cellphone camera. Fellers eventually left to go to his car, where he remained for the rest of the game.

44.     Steve Rossetti, the head referee, stopped play and told both teams to return to their benches. According to Rossetti, he stopped the game because the soccer players could overhear "you guys arguing" about "the First Amendment thing." The game did not restart for about 15 minutes. Speaking to the spectators on the sidelines, Rossetti stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if the wristbands were not all removed. Rossetti said that Rash had "no right to embarrass the kids" and that if he did not take the

10

wristband off "the game is over." Rash did take off the wristband and put it on his lap.

45.     Eventually, Rossetti, Desilets, Fisk, and at least one other person, had an on-field meeting and decided to resume play. The game continued without further incident.

*Events in the Parking Lot after the Game*

46.     Fellers watched the rest of the game from his car, in the parking lot next to the soccer field. Once the game ended, Fellers stood by his car, holding a hand-written poster reading "Protect Women's Sports for Female Athletes" over his head. The same poster had been displayed on his parked car during the game.

47.     Fellers has observed other vehicles parked at Bow School facilities bearing bumpers stickers and political and social messages, including expressing support for political candidates and the pro-liberty motto "Live Free or Die."

48.     As the spectators and teams left to go to their vehicles, some expressed support for Fellers' message while others criticized him. Rossetti, the referee who had threatened to cancel the game and make Bow forfeit, called Fellers a "f***ing a**hole" and told him that his daughter would hate him.

49.     Lamy approached Fellers and demanded to know why he had not already left the grounds. Fellers replied that he only been told to leave the soccer game—not the parking lot. Nonetheless, Lamy insisted that Fellers immediately leave all school property.

11

50.     Because Fellers still had to pick up his children and sister—who had attended the game—he refused to leave without them. Lamy said that the children and sister could walk. A second Bow police officer, Sergeant Robert Welch, and Andy Foote both then arrived and de-escalated the situation. Fellers was not arrested.

### *The No Trespass Orders*

51.     On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the night before. According to Kelley, "late in the game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"— presumably referring to Desilets' email.

52.     Exhibit F is a true and correct copy of Kelley's statement.

53.     Kelley attached to her statement Policy KFA and the same document of extracts from NHIAA's Soccer Policies and from the Bow High School Athletics Handbook that Desilets had sent two days before. *See* Exs. A and C.

54.     On September 19, Andy Foote received a "No Trespass Order" in the mail from Superintendent Kelley. This Order stated that Foote was "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until further notice.

55.     According to the Order, the reason for Foote's ban is that "prior to and during the soccer game" he "brought and distributed pink armbands to parents and other attendees to protest" and "participated and led the protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

56.     The Order stated that Foote's behavior violated Policy KFA's requirement "that attendees at sporting events and extracurricular activities demonstrate mutual respect, civility, and orderly conduct," as well as Policy KFA's prohibition of "threatening, harassing, or intimidating . . . any other person" and of conduct that shall "impede, delay, disrupt, or otherwise interfere with any school activity."

57.      Although the Order was originally only in effect "through September 23, 2024," Kelley noted that the Order "will be extended for the duration of the fall sports seasons" if Foote did anything to violate it and that it "may potentially be extended until the end of the season" even if Foote obeyed.

58.     Exhibit G is a true and correct copy of the document the No Trespass Order that Foote received.

59.     On September 20, Kyle Fellers received a "No Trespass Order" in the mail from Superintendent Kelley. This order is essentially identical to Foote's order, with two main differences.

60.     First, the Order gives a different reason for Fellers' ban: that Fellers had "led a protest . . . [which] was designed to and had the effect of intimidating,

threatening, harassing, and discouraging" a student on the other team from
playing.

61.     Second, Fellers' order is in effect "for the remainder of the fall sports
season" and "may also be extended until the end of the school year" if violated.

62.     Exhibit H is a true and correct copy of the No Trespass Order that Fellers
received.

63.     On September 25, Fellers received an "Addendum" to the No Trespass
Order in the mail from Superintendent Kelley. The Addendum clarified that the
original Order did not prevent Fellers entering school grounds "for the limited
purpose of participating in middle school parent pick-up" as well as for various
administrative purposes such as voting or school board meetings. Notably absent
from the list of permitted purposes, however, were games, sports practices,
extracurricular activities, drop-off, and high school pick-up.

64.     Exhibit I is a true and correct copy of the Addendum.

65.     After Fellers emailed Kelley about the difficulties that the trespass order
caused him in transporting his kids to and from school, Kelley sent him a second
Addendum on September 26. The Second Addendum added pick-up and drop-off
from both the middle school and high school to the list of permitted reasons to enter
school grounds. However, the Second Addendum expressly stated that Fellers
remains prohibited from picking up and dropping off his child for high school soccer
events. And, implicitly, Fellers remains prohibited from entering school grounds for

cross county drop-off or pick-up, and for any other games, sports practices, and extracurricular activities.

66.     Exhibit J is a true and correct copy of the Second Addendum.

*The Immediate Impact of Defendants' Actions on Plaintiffs*

67.     Andy Foote obeyed the No Trespass Order through its expiration on September 23, 2024. As a result, he could not attend Bow High School's homecoming game on September 20, in which his daughter played, the football homecoming game, or his youngest daughter's soccer game on September 23.

68.     After the No Trespass Order expired, Andy and Nicole Foote attended the soccer game on September 24. They wore pink wristbands to the game, but because of their long-sleeved shirts, they do not believe these wristbands were visible or easy to see. Many other people, including a large group from the nationally known organization Moms for Liberty, were protesting at the game by wearing pink wristbands. No disruption or incident occurred.

69.     Fellers has also obeyed the No Trespass Order since receiving it. This has been difficult and inconvenient, as Fellers has two children in Bow School District schools. He has been forced to arrange for other people to shuttle his children to and from school and their extracurricular activities.

70.     On September 25, for example, Fellers could not attend his son's cross country meet and had to arrange for family members to pick his son up at school and drive him two towns away to attend the away meet.

71.     Likewise, Fellers could not attend Bow High School's homecoming game on September 20, in which his daughter played.

72.     Fellers' children also both have late afternoon sports practices. As a result, they must be picked up when the school buses are not operating. Fellers has been forced to let his daughter drive his car.

*The Continuing Impact of Defendants' Actions on Plaintiffs*

73.     If Bow School District permitted them to do so, Plaintiffs would continue attending sporting events and other extracurricular events, on and off school grounds, throughout not only the fall sports season but throughout the current school year and the years to come. If permitted, Plaintiffs would silently protest in support of women's sports at some of these events, including by wearing pink wristbands of the sort that Defendants forbid.

74.     If permitted, Fellers would come onto school property to drop off or pick up his children from practices, games, concerts, and other events. He believes, however, that such action would lead to his arrest and prosecution for criminal trespass. He also fears such action would also cause Defendants to extend the No Trespass Order until the end of the school year. *See* Exhibit H.

75.     If permitted, Fellers would attend each of the remaining soccer games on the schedule through October 25 and any playoff games, as well as swim meets, cross country meets, and other sporting events or extracurricular activities, this year and in future years. He would also silently protest at each of the remaining soccer games, as well as other events, in defense of women's sports, by wearing a

16

pink wristband, by distributing wristbands, or by holding signs in the parking lot. He believes, however, that these actions would all violate the No Trespass Order, lead to his arrest, and potentially cause Bow High School sports teams to forfeit games or impair their chances of making the playoffs.

76.     If permitted, Fellers would also silently protest at each of these soccer games, as well as swim meets, cross country meets, and other sporting events or extracurriculars against Bow School District and Bow Police Department's violation of the First Amendment. He believes, however, that this would violate the No Trespass Order and the school's policy against protesting in defense of women's sports, lead to his arrest, and potentially cause Bow School District sports teams to forfeit games or impair their chances of making the playoffs.

77.     Once his current No Trespass Order expires, Fellers wishes to begin visibly but silently protesting at sporting events or other extracurricular activities. He reasonably believes, however, that such action will cause Bow School District to take out another No Trespass Order because it violates Bow School District's policy against protesting in defense of women's sports. As a result, even when the present Order expires, Fellers intends to avoid silently protesting so long as Bow School District enforces its policy against protesting in defense of women's sports.

78.     Andy Foote intends to attend sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season and the school year, including the upcoming soccer games on October 1, October 5, October 8,

17

October 15, October 18 and October 25 and any playoff games, as well as sporting events and other extracurricular events in future years.

79.     If permitted, Andy Foote would visibly but silently protest at some of these events, including the soccer games scheduled on October 1, October 5, October 8, October 15, October 18 and October 25 and any playoff games, in defense of women's sports, by wearing a wristband on the sidelines, by distributing wristbands, or by holding signs in the parking lot. He believes, however, that protesting in a silent but visible way during this and future school years could potentially cause Bow School District to take out a new No Trespass Order against him, perhaps lasting through the end of the season as the original No Trespass Order threatened. As a result, he is only willing to show his support for girls' and women's supports in more subtle ways or in circumstances where he is not likely to be singled out, as he did at the September 24 game.

80.     Andy Foote also worries that protesting in a silent but visible way during this and future school years could potentially cause Bow School District sports teams to forfeit games and be ineligible for the playoffs, as the referee stated.

81.     Nicole Foote intends to attend sporting events and other extracurricular events, on and off school grounds, not only throughout the fall sports season but throughout the school year and future school years, including the upcoming soccer games on October 1, October 5, October 8, October 15, October 18 and October 25 and any playoff games.

18

82.     If permitted, Nicole Foote would visibly but silently protest at some of
these events, including the soccer games scheduled on October 1, October 5, October
8, October 15, October 18 and October 25 and any playoff games, in defense of
women's sports, by openly wearing a pink wristband with the letters XX visible on it
in black ink. Nicole Foote believes, however, that for the foreseeable future during
this and future school years, protesting in a silent but visible way would cause
Defendants to take out a No Trespass Order against her, as they did with her
husband. As a result, Nicole Foote is only willing to show her support for girls' and
women's sports in more subtle ways, as she did at the games on September 20,
September 23, and September 24.

83.     Rash intends to attend several of the remaining soccer games on the
schedule, as well as swim meets, cross country meets, and other events that his
grandchildren are competing in. If permitted, he would silently protest the
government's decision to allow biological boys and men to play girls' and women's
sports and to prohibit parents and others from non-disruptively demonstrating
about this issue on school property by wearing a pink wristband at future
extracurricular events. He believes, however, that doing so would violate Bow
School District policy and that Bow School District would take out a No Trespass
Order against him as well.

84.     Plaintiffs find it frustrating and degrading to have their viewpoints, and
even presence, prohibited by Bow School District, especially when they see other
spectators being allowed to promote their viewpoints and opinions at school events.

85.     Unless this Court grants relief, Plaintiffs expect to be unable to express their views on women's sports on Bow School District property or at any Bow School District sports or extracurricular events, whether home or away.

COUNT ONE
VIEWPOINT DISCRIMINATION
AS-APPLIED CHALLENGE TO SCHOOL POLICIES
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

86.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 85.

87.     Plaintiffs have a First Amendment right to access public school sporting events and other extracurricular activities, which are open to the public, including Bow High School soccer games. Plaintiffs also have a First Amendment right to speak in both a limited public forum and a nonpublic forum, free from viewpoint discrimination.

88.     During school hours, a public school is typically a nonpublic forum, but it becomes a public forum if opened to the public by policy or practice. *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988); *see also Pitta v. Medeiros*, No. 22-11641-FDS, 2023 U.S. Dist. LEXIS 87864, at *16 (D. Mass. May 19, 2023); *Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020). When a school holds an event that is otherwise open to public, it is "at least a limited public forum." *Worthley*, 652 F. Supp. 3d at 212. Bow High School has a policy and practice of allowing parents and other spectators to watch sporting events and other extracurriculars.

89.     Under the First Amendment, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to

express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "[I]n a limited public forum, government '[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 806 (1985)). Likewise, access to a nonpublic forum can only be restricted "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 97 (1st Cir. 2004) (cleaned up).

90.     Defendants have relied on four policies to prevent Plaintiffs from expressing their views on school property:

> (1) the KFA policy requiring "mutual respect, civility, and orderly conduct" on school property;
>
> (2) the KFA policy prohibiting people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing]" any person on school property;
>
> (3) the KFA policy prohibiting people from "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function"; and
>
> (4) the Bow High School Athletics Handbook policy governing "sportsmanship and sideline behavior."

91.     These four policies, both together and separately, unconstitutionally discriminate based on viewpoint when applied to prohibit attendees at an extracurricular event from expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys or men playing in girls' and women's sports, by silently wearing a wristband or displaying a sign in the parking lot.

92.     Defendants do not prohibit attendees at extracurricular events from expressing all viewpoints on political or social issues, allowing individuals to wear apparel showing support for politicians and other causes. By singling out those opposed to biological boys playing in girls' and women's sports, Defendants have applied their policies in a way that discriminates based on viewpoint in violation of the First Amendment.

93.     By enforcing these policies against Plaintiffs to prohibit them from wearing their wristbands or displaying their signs in the parking lot in support of girl's and women's sports, and against the inclusion of biological males in such sports, Defendants under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to compensatory or nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants'

unconstitutional customs, policies, and practices; and attorney fees and expenses

pursuant to 42 U.S.C. § 1988.

COUNT TWO
CONSPIRACY TO VIOLATE FIRST AMENDMENT RIGHTS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

94.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 85.

95.     A civil rights conspiracy is a combination of two or more persons acting in

concert to commit an unlawful act, or to commit a lawful act by unlawful means, the

principal element of which is an agreement between the parties to inflict a wrong

against or injury upon another, and an overt act that results in damages. *Sánchez v.*

*Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Conspiracy is a matter of inference, which can

be shown through direct or circumstantial evidence of an agreement among

Defendants to inflict harm upon Plaintiffs. *See Estate of Bennett v. Wainwright*, 548

F.3d 155, 178 (1st Cir. 2008).

96.     Both before and during Plaintiffs' September 17 silent demonstration,

Defendants consulted with each other and agreed to take overt acts together to

prevent Plaintiffs' demonstration by threatening to arrest Plaintiffs, expel them

from events open to the public, stop Plaintiffs' children and the other members of

the girls' soccer team from playing, or force the team to forfeit its game. These

threats were both intended to and did have the effect of causing Plaintiffs to stop

demonstrating on the sidelines, thus abridging their federally secured rights.

97.     For example, during the game, Defendant Rossetti used his authority as

referee to threaten to abandon the game, which would have caused the Bow team to

23

forfeit their playoff spot, unless Defendants removed their wristbands. After Plaintiff Rash removed his wristband, Rossetti conferred with Defendants Fisk and Desilets, before allowing the game to resume. This is evidence that Rossetti participated in the agreement to stop Plaintiffs from wearing the pink wristbands as a social and political statement.

98.     Defendants continue to conspire to deprive Plaintiffs of their rights by enforcing No Trespass Orders against them and threatening to extend or renew such Orders if Plaintiffs protest again.

99.     By conspiring to unlawfully prohibit Plaintiffs from silently demonstrating in support of girls' and women's sports, and against the inclusion of biological males in such sports, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to compensatory or nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

24

1. Orders preliminarily and permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:

   a. Enforcing those parts of Policy KFA – Public Conduct on School Property that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;

   b. Enforcing the Bow High School's Athletics Handbook to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;

   c. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as suppress

non-disruptive expression of political or social views based on audience

reaction or a heckler's veto.

    d. Enforcing the No Trespass Orders issued against Fellers and Foote on

September 19, 2024.

2. Declaratory relief consistent with the injunction, to the effect that:

    a. Those parts of Policy KFA that (1) require "mutual respect, civility,

and orderly conduct among all individuals on school property or at a

school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or

intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing],

or otherwise interfer[ing] with any school activity or function" violate

the First Amendment and Fourteenth Amendment when applied to

prevent attendees at an extracurricular event from non-disruptively

expressing disfavored viewpoints on political or social issues, including

protesting against allowing biological boys playing in girls' and

women's sports, by silently wearing a wristband on the sidelines or

displaying a sign in the parking lot; and

    b. The Bow High School's Athletics Handbook violates the First

Amendment and Fourteenth Amendment when applied to prevent

attendees at an extracurricular event from non-disruptively expressing

disfavored viewpoints on political or social issues, including protesting

against allowing biological boys playing in girls' and women's sports,

by silently wearing a wristband on the sidelines or displaying a sign in the parking lot.

3. An award of compensatory damages to each Plaintiff for the extra costs and inconvenience that each Plaintiff incurred complying with the No Trespass Orders;

4. An award of nominal damages from each Defendant to each Plaintiff in the amount of $17.91;

5. Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988; and

6. Any other relief as the Court deems just and appropriate.

Dated: September 30, 2024                    Respectfully submitted,

                                     By:   */s/ Richard J. Lehmann*
Endel Kolde*                               Richard J. Lehmann
DC Bar No. 1782129                         New Hampshire Bar No. 9339
Brett Nolan*                               LEHMANN MAJOR LIST, PLLC
DC Bar No. 90014964                        6 Garvins Falls Rd,
Nathan Ristuccia*[1]                       Concord, NH 03301
Virginia Bar No. 98372                     603.731.5435
INSTITUTE FOR FREE SPEECH                  rick@nhlawyer.com
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
202.301.3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

* Application pro hac vice to be filed

---

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).