UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH, | : | |
| Plaintiffs, | : | Case No. 1:24-cv-00311-SM-AJ |
| v. | : | |
| MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT. | : | |
| Defendants. | : | |

DECLARATION OF KYLE FELLERS

I, Kyle Fellers, declare the following based on my personal knowledge:

1. I live in Bow, New Hampshire. I have two children who attend public schools in the Bow School District, within State Administrative Unit 67. My daughter is a senior at Bow High School, and my son is an eighth grader at Bow Memorial School.

KF

2. My daughter plays on the Bow High School varsity girls' soccer team and swims for the Bow High School varsity girls' swim team.

3. As a single father, I am heavily involved in my children's schooling and extracurricular activities. I attend games regularly and often must drive my children to practices, games, and other events.

4. I am a proponent of restricting girls' and women's sports teams to biological girls and women. I believe that allowing males to play girls' and women's sports undermines fair competition, puts female athletes at risk for physical and mental injury, and undermines much of the social progress that women have made over the last fifty years.

5. I do not believe in gender ideology, that is, the belief that that people can change their gender or biological sex based on how they feel about their own sex or gender. I understand that some people disagree with me and that is fine. The First Amendment protects their right to disagree with me too.

6. On or about September 13, 2024, *The Bow Times*, a free local newspaper, published a letter to the editor I wrote in which I criticized the recent decision in *Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024). In this decision, the federal court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to females. My letter to the editor criticized this decision as unscientific and harmful to the progress women have made towards equality.

*ICF*

7.    I am aware that Parker Tirrell, a male and one of the plaintiffs in *Tirrell v. Edelblut*, plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's soccer team was scheduled to play the Plymouth team on September 17, 2024. Prior to the game on September 17, I did not know Parker's name, although I did know that a male played for Plymouth Regional.

8.    On September 16, the evening before the game, Bow High School's Athletic Director Mike Desilets emailed all soccer families, warning them that "Bow High School's status as a member of the [New Hampshire Interscholastic Athletic Association]" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets claimed, however, that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

9.    Although I am a father of a soccer player, I do not seem to have received Desilets' email, for whatever reason. After the soccer game, however, other parents made me aware of its contents and eventually forwarded me a copy.

10.    Andy Foote and I decided to silently express our opinion about the importance of reserving women's sports for females at the game. We agreed to wear pink wristbands that I had purchased off Amazon.

11.    The wristbands I purchased were pink and had no writing on them: the kind that athletes often wear to raise awareness about breast cancer. However,

KF

3

after we bought them, Andy Foote decorated our wristbands with two black Xs, symbolizing the female chromosomes.

12. Exhibit D is a true and correct photograph of one of these wristbands.

13. Because Foote's daughter is the captain of the team, I gave the wristbands to Foote on the night of September 16. My daughter and Foote's daughter asked the team if any players wanted to wear a wristband in support girls' and women's sports. The next day, however, my daughter informed me that the soccer team had decided not to wear the wristbands.

14. On September 17, I attended Bow High School's varsity girls' soccer game, with my children and sister. I did not have any wristbands with me when I arrived at the field, as Foote was bringing them. I did, however, have a poster that said, "Protect Women's Sports for Female Athletes." But I left the poster inside my car in the parking lot when I arrived at the game.

15. The soccer game occurred at Bow High School's soccer field, which is public property and part of the public high school's campus.

16. I stood on the parents' sidelines, close to mid-field, and watched the first half of the game with other parents. My in-laws (Eldon Rash and his wife) were sitting in lawn chairs in front of me, so we talked, between play, about financial investments. I cheered for both teams but did not shout, chant, march, or waive signs about biological males playing girls' and women's sports during the game.

17. At halftime, I went back to my car and met with Foote. We put our pink wristbands on and returned to the sidelines.

18. For the first ten minutes of the second half, I watched the game without incident or disruption. Foote and I did not shout, chant, march, or waive signs about biological boys and men playing girls' and women's sports. Beyond our wristbands, nothing indicated that we were protesting at all.

19. Ten minutes into the second half, Athletic Director Mike Desilets approached me from behind and whispered that I needed to remove the wristband because protests are not allowed. At first, I thought he was joking. I only realized he was not when he repeated himself. I refused to take my wristband off.

20. Desilets walked about 10 feet away to where Principal Matt Fisk and Bow Police Lieutenant Phil Lamy were standing and spoke with them. A little later, Fisk approached me and told me to remove the wristband or leave the game. After heated words with the principal, I again refused to remove my wristband.

21. Prior to Desilets and Fisk confronting me about removing the wristband, I was quietly wearing it on the sidelines. I did not shout any political slogans, talk about the First Amendment, verbalize my opinions about women's sports, or direct any comments toward Parker Tirrell. All I did was wear a pink wristband. If Desilets and Fisk had just left me alone, there would not have been a verbal confrontation. They were the ones who came up to me.

22. Lt. Lamy then came up to me, told me that I was being recorded on his body camera, and told me to either remove the wristband or leave the game. He implied that if I disobeyed, he would arrest me for trespassing. I objected that I was



exercising my First Amendment rights. Lamy asserted that the First Amendment did not apply as I was on private property.

23. At this point, I decided to remove the wristband, although I continued to hold it in my hand.

24. Eldon Rash, my daughter's grandfather (my ex-wife's stepfather), heard some of the commotion. Rash came up to me to find out what the commotion was about. Rash and I did not attend the game together, and, up until then, I had not spoken to him about the wristband protest.

25. I explained the situation to Rash and said that I had to not wear the wristband or I would be kicked out of the game. Rash took the wristband that I had been wearing from my hand and put it around his own wrist.

26. Principal Fisk and Director Desilets then began to pester Rash into leaving the game or taking off the wristband. My former father-in-law is in his 80s and has significant health problems, so I worried about his safety.

27. Steve Rossetti, the head referee, then came over. He stopped the game and told both teams to return to their benches. The game did not restart for about 15 minutes.

28. To prevent the situation from escalating further, I left the field and returned to my car in the parking lot. I watched the rest of the game from my car. I am aware that, after I left, Rossetti stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if the wristbands were not removed.

29. After the game, I stood by my car in the parking lot next to the soccer field, holding my "Protect Women's Sports" poster over my head while the spectators and teams were leaving to go to their vehicles.

30. Many, but not all, of the people leaving the game expressed support for my message, including one of the opposing players on the Plymouth team. But when Steve Rossetti, the head referee, came out to his car (which was parked near mine), he called me a "f***ing a**hole" and told me that my daughter would hate me.

31. Lt. Lamy approached me in the parking lot, stood very close to me, and loudly demanded to know why I was still there. He claimed that he had told me to leave the grounds. I reminded the officer that I had only been told to leave the soccer game—not the parking lot. Nonetheless, Lt. Lamy insisted that I had to get off school property.

32. I refused and explained to Lt. Lamy that my children and sister (who has special needs) were still at the school and needed me to drive them home. My children's mother was at work and could not drive them. Lt. Lamy told me that my children and sister could walk. A second Bow police officer, Sergeant Robert Welch, and Andy Foote both then arrived and sought to de-escalate the situation, so I was never arrested.

33. I left without my children. Instead, my other sister drove my children and my special needs sister home.

34. On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the night before. According to Kelley, "late in the

KF

game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"—presumably referring to Desilets' email.

35.  Exhibit F is a true and correct copy of Kelley's statement.

36.  Kelley attached to her statement the Bow School Board's policy KFA on "Public Conduct on School Property."

37.  Exhibit A is a true and correct copy of Policy KFA.

38.  Kelley attached to her statement a document containing quotations from the New Hampshire Interscholastic Athletic Association's policies and from the Bow High School Athletics Handbook.

39.  Exhibit C is a true and correct copy of the document that Kelley attached.

40.  On September 20, I received a "No Trespass Order" in the mail from Superintendent Kelley, which is in effect "for the remainder of the fall sports season" and "may also be extended until the end of the school year."

41.  The fall soccer season ends around November 1, depending on whether the team makes the playoffs or not.

42.  The No Trespass Order states that I am "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until further notice. According to the

KCF

Order, the reason for my ban is that I "led a protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

43. Exhibit H is a true and correct copy of my No Trespass Order.

44. On September 25, Kelley sent me an "Addendum" to the No Trespass Order, clarifying that the order did not prevent me from entering school grounds "for the limited purpose of participating in middle school parent pick-up" as well as for various administrative purposes such as voting or school board meetings. Games, sports practices, extracurricular activities, drop-off, and high school pick-up all were not included in the list of permitted purposes.

45. Exhibit I is a true and correct copy of the Addendum that I received.

46. After I emailed Kelley about the difficulties that I was having getting my children to school because of the No Trespass Order, Kelley sent a second Addendum on September 26. The Second Addendum added pick-up and drop-off from both the middle school and high school to the list of permitted reasons to enter school grounds. However, the Second Addendum expressly stated that pick-up and drop-off for soccer remained prohibited. And, implicitly, entering school grounds for soccer games, cross county meets, concerts, and other extracurricular activities, remained forbidden.

47. Exhibit J is a true and correct copy of the Second Addendum

48. Although it is difficult for me, with two children in Bow School District schools, I have obeyed the No Trespass Order and its Addenda since receiving it.

9                                ILF

This has forced me to arrange for other people to shuttle my children to and from school and their extracurricular activities.

49. My daughter does not have her own car and is an inexperienced driver. For safety reasons, I do not want her driving herself and my son with my car alone, in rush hour traffic.

50. On September 25, 2024, for example, I could not attend my son's cross country meet and had to arrange for family members to pick him up at school and drive him two towns away to attend the meet. This was an away meet that did not even occur on Bow School District property.

51. My son has early morning violin practice at the middle school before the school bus arrives. Before the No Trespass Order, I drove him to practice and attended his concerts. My son is also captain of the cross country team, which competes in the fall sports season. Because of the No Trespass Order, I have not been able to attend his meets. In the spring, he plays on a community baseball team that sometimes practices on the middle school's field. Not only have I historically driven him to practice but I have coached the baseball team for approximately the past five years. Now, because of the No Trespass Order, I am unable to do these things and potentially will remain unable to do them for the entire school year.

52. My daughter practices with the soccer team until 5:30pm each day. She does not have a car of her own. When her mother is working, my daughter does not have a ride home after her soccer practice. Because I can no longer drive her, I have been forced to let her drive my car. In the winter, she will compete on the varsity

swim team which practices offsite at a YMCA in Concord. I would previously pick her up in the evening from these practices. Now, because of the No Trespass Order, I am unable to do any of these things and potentially will remain unable to do them for the entire school year.

53. If Defendants permitted me, I would continue attending sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season and the school year as a whole.

54. If permitted, I would come onto school property to drop off or pick up my children from practices, games, concerts, and other events. I believe, however, that if I did, I would be arrested and prosecuted for criminal trespass. This would also cause the No Trespass Order to be extended until the end of the school year. *See* Exhibit H.

55. If permitted, I would attend each of the remaining soccer games on the schedule, as well as swim meets, cross country meets, and other sporting events or extracurriculars. I would also silently protest on the sidelines at each of the remaining soccer games, as well as other events for the foreseeable future during this and future school years, in defense of girls' and women's sports, by wearing a wristband, by distributing wristbands, or by holding signs. I do not intend to sit in a designated protest area but to protest by wearing a wristband silently and visibly near the field of play as before. I believe, however, that these would all violate the No Trespass Order (and Defendants' policy against protesting in defense of girls'



11

and women's sports), lead to my arrest, and potentially cause Bow High School sports teams to forfeit games.

56. If permitted, I would also silently protest on the sidelines at each of the remaining soccer games, as well as swim meets, cross country meets, and other sporting events or extracurriculars for the foreseeable future during this and future school years, against Defendants' violation of the First Amendment, by wearing a wristband on the parents' sidelines, by distributing wristbands on the parents' sidelines, or by holding signs in the parking lot. I believe, however, that this would violate the No Trespass Order (and Defendants' policy against protesting in defense of girls' and women's sports), lead to my arrest, and potentially cause Bow School District sports teams to forfeit games.

57. Whenever my current No Trespass Order expires, I wish to begin silently protesting on the sidelines at sporting events or other extracurricular activities again. I do not intend to sit in a designated protest area but to protest by wearing a wristband silently and visibly near the field of play as before. I reasonably believe, however, that doing so will cause Defendants to take out another No Trespass Order against me because it violates Defendants' policy against protesting in defense of girls' and women's sports. As a result, even when the present order expires, I intend to avoid protesting so long as Defendants enforce the policy against protesting in defense of girls' and women's sports.

58. I find it frustrating and degrading to have my viewpoint, and even presence, prohibited by my children's school district and its officials, especially

12 

when I see other spectators being allowed to promote their viewpoints and opinions at school events. When I visited Bow High School property in the past for concerts, games, sports banquets, and other events in the past, I have seen, for instance, Pride Flags and global climate change posters displayed.

59.   After we filed this lawsuit, I learned from an official email that the Bow Schools were designating an area by the scoreboard as the only area where parents can protest in any form, before and after the girls' soccer games. That location is far away from the parents' sidelines, and I do not want to have my right to wear a pink wristband in support of women's sports be restricted to that location or those times.

60.   On September 20, 2024, I sent a right-to-know (RTK) request to the Bow Police Department. On October 1, 2024, in response to my RTK request, the Bow Police sent me an email thread between the Bow schools officials and Lt. Lamy and a police call log list Lt. Lamy's description of the interactions with me and Eldon Rash at the September 17 soccer game. The Bow PD refused to give me a copy of the body camera video of my interactions between Lt. Lamy and me.

61.   Exhibit N is a true and correct copy of the email string between school officials and Lt. Lamy that was produced to me by the Bow PD. The discussion is in it is about the September 17 soccer game.

62.   Exhibit O is a true and correct copy of the police call log from the September 17 soccer game produced to me by Bow PD. I disagree that I was being disruptive—it was the officials that started a verbal confrontation by insisting that



I remove my wristband. But the call log accurately describes that the referee stopped the game until Eldon removed the pink wristband.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2024.

_____
Kyle Fellers