# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

---

|  |  |  |
|---|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:24-cv-311-SM-AJ |
| v. | : | |
| | : | |
| MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; PHILLIP LAMY, Lieutenant, Bow Police Department, in his individual capacity; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT; | : | |
| | : | |
| Defendants. | : | |

---

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................ii

TABLE OF AUTHORITIES .........................................................................iii

INTRODUCTION........................................................................................ 1

STATEMENT OF FACTS ............................................................................. 2

ARGUMENT............................................................................................. 10

    I.    PLAINTIFFS WILL SUCCEED ON THE MERITS ..................................... 11

        A.  Defendants' application of their policies violates the
First Amendment....................................................................... 11

        B.  Defendants violate the First Amendment freedoms of assembly
and petition by preventing silent protestors from accessing
school grounds that are otherwise open to the public ............................ 18

        C.  Defendants' actions constitute a conspiracy to violate Plaintiffs'
First Amendment rights ............................................................. 22

    II.  DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS BY DENYING FELLERS
ACCESS TO BOW SCHOOL DISTRICT PROPERTY AND PROHIBITING ALL
PLAINTIFFS FROM SILENTLY PROTESTING ........................................ 23

    III. PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC
INTEREST, SO THE BALANCE OF EQUITIES FAVORS PLAINTIFFS ...................... 24

    IV. THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT........... 25

CONCLUSION ......................................................................................... 25

CERTIFICATE OF SERVICE......................................................................... 26

ii

TABLE OF AUTHORITIES

## Cases

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) .................................................... 15

*Bd. of Airport Comm'rs v. Jews for Jesus,*
    482 U.S. 569 (1987) .................................................... 21

*Bl(a)ck Tea Soc'y v. City of Bos.,*
    378 F.3d 8 (1st Cir. 2004).......................................... 23

*Borough of Duryea v. Guarnieri,*
    564 U.S. 379 (2011) .................................................... 19

*Comcast of Me./New Hampshire, Inc. v. Mills,*
    435 F. Supp. 3d 228 (D. Me. 2019) ......................... 11

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
    473 U.S. 788 (1985) .............................................. 11, 12

*De Jonge v. Oregon,*
    299 U.S. 353 (1937) .................................................... 19

*Doe v. Hopkinton Pub. Schs.,*
    19 F.4th 493 (1st Cir. 2021) ................................. 14, 15

*Doe v. Mills,*
    16 F.4th 20 (1st Cir. 2021) ....................................... 24

*Doe v. Portland Pub. Schs.,*
    701 F. Supp. 3d 18 (D. Me. 2023) ........................... 16

*Estate of Bennett v. Wainwright,*
    548 F.3d 155 (1st Cir. 2008)..................................... 22

*Frierson v. Reinisch,*
    806 F. App'x 54 (2d Cir. 2020) ............................... 12

*Gonzalez v. Rosello-Nevarez,*
    No. 19-1414 (JAG), 2021 U.S. Dist. LEXIS 209637 (D.P.R. Oct. 29, 2021) ........... 20

iii

*Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*,
   201 F. App'x 7 (1st Cir. 2006) ............................................................................... 16

*Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*,
   421 F. Supp. 2d 410 (D.N.H. 2006) ....................................................................... 16

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988) ............................................................................................... 12

*Iancu v. Brunetti*,
   588 U.S. 388 (2019) ......................................................................................... 12, 13

*Karlsen v. Town of Hebron*,
   No. 18-cv-794-LM, 2018 U.S. Dist. LEXIS 243323
   (D.N.H. Sep. 28, 2018) ........................................................................................... 10

*Mahanoy Area Sch. Dist. v. B.L.*,
   594 U.S. 180 (2021) ................................................................................... 1, 14, 17

*McBreairty v. Sch. Bd. of RSU22*,
   616 F. Supp. 3d 79 (D. Me. 2022) ......................................................................... 11

*Norris v. Cape Elizabeth Sch. Dist.*,
   969 F.3d 12 (1st Cir. 2020) .................................................................................... 10

*Papineau v. Parmley*,
   465 F.3d 46 (2d Cir. 2006) ..................................................................................... 19

*Peña-Peña v. Figueroa-Sancha*,
   866 F. Supp. 2d 81 (D.P.R. 2012) .......................................................................... 19

*Police Dep't of Chicago v. Mosley*,
   408 U.S. 92 (1972) ................................................................................................. 11

*Rosenberger v. Rector & Visitors of the Univ. of Va.*,
   515 U.S. 819 (1995) ............................................................................................... 13

*Sánchez v. Foley*,
   972 F.3d 1 (1st Cir. 2020) ...................................................................................... 22

*Sindicato Puertorriqueño de Trabajadores v. Fortuño*,
   699 F.3d 1 (1st Cir. 2012) ............................................................................... 10, 23

iv

*Thomas v. Collins,*
   323 U.S. 516 (1945) ............................................................................. 18, 19

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
   393 U.S. 503 (1969) ................................................. 2, 13, 14, 15, 16, 20

*Tirrell v. Edelblut,*
   Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185
   (D.N.H. Sept. 10, 2024) ............................................................................. 3

*Westernbank P.R. v. Kachkar,*
   No. 07-1606 (ADC/BJM), 2008 U.S. Dist. LEXIS 109809
   (D.P.R. July 23, 2008) ............................................................................. 25

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
   249 F. Supp. 2d 98 (D. Mass. 2003) ................................................. 24, 25

*Worthley v. Sch. Comm. of Gloucester,*
   652 F. Supp. 3d 204 (D. Mass. 2023) ..................................................... 12

## Other Authorities

Jeffrey M. Jones, *More Say Birth Gender Should Dictate Sports
   Participation,* GALLUP (June 12, 2023), https://perma.cc/Z64V-5NEU ................... 3

NIH-NATIONAL HUMAN GENOME RESEARCH INSTITUTE, *Sex Chromosome,*
   https://perma.cc/J8LD-JKZN ..................................................................... 5

## INTRODUCTION

"America's public schools are the nurseries of democracy." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021). All school personnel have a duty to educate children about America's civic values, as well as its Constitution and the fundamental rights it guarantees. As a result, "schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Mahanoy*, 594 U.S. at 190.

When several parents and a grandfather decided to wear pink wristbands at their children's soccer game as a silent protest in support of protecting women's sports, Bow School District officials could have used the event as an opportunity to teach students how freedom of speech, assembly, and petition operates in a healthy democracy. Instead, school officials threatened to cancel the game and have the parents arrested for trespass if they did not refrain from silently, but visibly expressing their views. Worse still, school officials conspired with a local police officer and a soccer referee to prevent parents from passively expressing a disfavored viewpoint: that women's sports should be reserved for biological women. And after the game, the school banned two parents from even entering school property, as punishment for their speech.

"[T]eacher, student, and parent" alike do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines*

1

*Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). All "persons under our Constitution" —students, parents, and spectators alike—possess First Amendment rights, which the government must respect, "in school as well as out of school," "in the cafeteria, or on the playing field, or on the campus." *Tinker*, 393 U.S. at 511, 512-13 (1969) (internal quotation marks omitted). Just as students have the right to silently protest the Vietnam War by wearing a black armband to school, so too do parents have the right to silently protest gender ideology by wearing a pink wristband on the soccer field sidelines or holding a poster in the parking lot. Just like the students in *Tinker,* the Bow parents and grandparent did not "disrupt" a school event by quietly wearing wristbands—Defendants' unconstitutional reaction did. Over half a century after *Tinker* was decided, the color of the bands, and the nature of the debate may differ, but First Amendment rights remain the same.

Plaintiffs are entitled to a preliminary injunction securing their fundamental First Amendment rights to silently protest and to a temporary restraining order allowing Plaintiffs to attend and protest at all upcoming Bow High School girls' varsity soccer games, including the away game on October 8 at 6:45 PM and the next home game on October 11 at 4:00 PM.

## STATEMENT OF FACTS

Bow School District's written Policy KFA regulates the speech and behavior of "all individuals on school property or at a school event," including school sporting events, in "any buildings, vehicles, property, land, or facilities used for school

2

purposes or school-sponsored events, whether public or private." Ex. A. According to

Policy KFA, "[t]he School District expects mutual respect, civility, and orderly

conduct among all individuals on school property or at a school event" and prohibits

people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing] . . . any other

person" or "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any

school activity or function." *Id*. As a member of the New Hampshire Interscholastic

Athletic Association (NHIAA), Bow High School complies with NHIAA guidelines

and policies. Ex. C. To ensure that the school's NHIAA "Sportsmanship Ratings"

remain high, the Bow High School Athletics Handbook states that "[p]oor

sportsmanship in any form will not be tolerated on the field of play, on the sidelines,

or in the stands." *Id*.

Although this Court preliminarily enjoined enforcement of a state law limiting

participation in interscholastic girls' sports teams to biological females, *Tirrell v.

Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept.

10, 2024), the participation of biological men in women's sports remains

controversial, with a large majority of Americans oppose forcing women to compete

against biological males.[1] The debate about trans athletes is far from settled.

---

[1] *See, e.g.,* Jeffrey M. Jones, *More Say Birth Gender Should Dictate Sports Participation,* Gallup (June 12, 2023), https://perma.cc/Z64V-5NEU.

On September 17, 2024, Bow High School's girls' varsity soccer team was scheduled to play against Plymouth Regional High School, which has a biological male on its team. Fellers Decl., ¶ 7; N. Foote Decl., ¶¶ 7-8. Parents of some players on the Bow team—including Kyle Fellers, Anthony "Andy" Foote, and Nicole Foote—believe that allowing biological males to play girls' and women's sports destroys fair competition, puts female athletes at risk for physical and mental injury, and undermines women's social progress. Fellers Decl., ¶¶ 4-5; N. Foote Decl., ¶¶ 4-5, 9. In the days leading up to the game, these parents publicly spoke against male participation in girls' and women's sports by, among other things, writing in a local newspaper, posting on social media, and meeting with school officials. *See, e.g.*, Ex. E; Fellers Decl., ¶¶ 6; A. Foote Decl., ¶¶ 13, 15, 21-22; N. Foote Decl., ¶¶ 8, 10.

Officials were determined to prevent parents at the game from expressing their views in favor of women's sports. On September 12, Superintendent Marcy Kelley emailed Bow Police Lieutenant Lamy that she and other school officials "caught wind that our families plan to protest in some way" and requested a meeting to plan for "extra support." Ex. N. Four days later, the evening before the game, Bow High School's Athletic Director Mike Desilets emailed soccer families, warning them that Bow High School's NHIAA membership and Athletics Handbook impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not

4

be tolerated." Ex. B. Desilets asserted, however, that "some differing opinions regarding tomorrow's game . . . is perfectly fine." *Id.*

Kyle Fellers and Andy Foote decided to silently express their support for reserving girls' and women's sports to females by attending the September 17 soccer game and wearing pink wristbands in silent protest on the sidelines. Fellers Decl., ¶ 10; A. Foote Decl., ¶¶ 13, 15, 21. The men purchased breast cancer awareness wristbands off Amazon and added iconography symbolizing biological women to the bands. Fellers Decl., ¶¶ 10-11; A. Foote Decl., ¶¶ 16-17, 19. Both the wristbands that Fellers and Andy Foote wore featured two black Xs, representing the female chromosomes.[2] Ex. D; Fellers Decl., ¶ 11; A. Foote Decl., ¶¶ 19-20.

On September 17, Fellers, Andy Foote, and Nicole Foote attended the varsity girls' soccer game, which occurred on public property at the Bow High School soccer field. Fellers Decl., ¶¶ 14-15; A. Foote Decl., ¶¶ 23-24; N. Foote Decl., ¶ 13. During the first half, Andy distributed pink wristbands to his wife and around half a dozen other spectators, telling them not to put the bands on until halftime. A. Foote Decl., ¶¶ 26-27; N. Foote Decl., ¶¶ 14-15.

---

[2] "Humans and most other mammals have two sex chromosomes, X and Y, that in combination determine the sex of an individual. Females have two X chromosomes in their cells, while males have one X and one Y." NIH-NATIONAL HUMAN GENOME RESEARCH INSTITUTE, *Sex Chromosome,* https://perma.cc/J8LD-JKZN (last visited Oct. 3, 2024).

At halftime, Fellers and Andy Foote met in the parking lot, where they put on wristbands and placed a poster in support of reserving girls' and women's sports for females on the windshield of Foote's Jeep. Ex. M; Fellers Decl., ¶ 17; A. Foote Decl., ¶ 28. The two men then returned to the sidelines and continued to watch the game in the same way that they watched the first half. Fellers Decl., ¶¶ 16, 18; A. Foote Decl., ¶¶ 27, 29. Beyond the wristbands, nothing indicated that they were protesting. Fellers, Foote, and the other parents did not shout, chant, march, or waive signs on the sidelines. Fellers Decl., ¶¶ 16, 18; A. Foote Decl., ¶¶ 27, 29. No disturbance or commotion occurred during the first ten minutes of the second half; if not for Defendants' actions, many spectators or players at the game likely would never have noticed the silent protest. N. Foote Decl., ¶ 18; Rash Decl., ¶¶ 4, 6.

Approximately ten minutes into the second half, Defendant Desilets approached Foote to tell him that he was not allowed to protest and had to either remove the wristband or leave the game. A. Foote Decl., ¶ 30; N. Foote Decl., ¶ 17. Foote initially refused, but he gave in and took off the wristband once it was clear that Desilets would not stop his demands. A. Foote Decl., ¶¶ 30-31. Desilets, and later Bow High School Principal Matt Fisk and Bow Police Lieutenant Phil Lamy, also insisted that Fellers either remove the wristband or leave the game. Fellers Decl., ¶¶ 20-22; A. Foote Decl., ¶¶ 32-34; N. Foote Decl., ¶ 17. According to Lamy, the First Amendment did not apply as the soccer field was "private property." Fellers

Decl., ¶ 22; A. Foote Decl., ¶ 32; *cf.* Rash Decl., ¶ 10. Fellers eventually removed the wristband but held it in his hand. Fellers Decl., ¶ 23.

Eldon Rash—Feller's former father-in-law—came over to ask why there was a commotion. Fellers Decl., ¶ 24; Rash Decl., ¶¶ 4-7. After Fellers explained the situation, Rash took the wristband from Fellers' hand and put it around his own wrist to demonstrate his support both for women's sports and for the freedom to express one's beliefs without harassment. Fellers Decl., ¶ 25; Rash Decl., ¶¶ 7-9. Desilets, Fisk, and Steve Rossetti, the head referee, all pressured Rash to remove the wristband. Fellers Decl., ¶¶ 26-27; A. Foote Decl., ¶¶ 34-35; N. Foote Decl., ¶ 17; Rash Decl., ¶¶ 10-12. Rossetti stopped the soccer game for 15 minutes and threatened to have Bow High School forfeit if Rash did not obey. A. Foote Decl., ¶¶ 35-36; Rash Decl., ¶ 12. Rash took the wristband off. Rash Decl., ¶ 13. After an on-field meeting, Rossetti, Desilets, and Fisk permitted the game to resume, which finished without further incident. A. Foote Decl., ¶¶ 36-37; Rash Decl., ¶¶ 13-14.

In the parking lot, after the game, Fellers stood beside his car, holding a poster reading "Protect Women's Sports for Female Athletes" over his head. Fellers Decl., ¶¶ 14, 29-30. Fellers had left the soccer field at Defendants' order, in the middle of the second half before play resumed. Ex. H at 1; Fellers Decl., ¶¶ 28, 31; A. Foote Decl., ¶ 36. Nevertheless, Lamy approached Fellers in the parking lot and ordered him to leave school grounds immediately, without waiting to pick up his children and sister. Fellers Decl., ¶¶ 31-33; A. Foote Decl., ¶ 38.

On September 18, Superintendent of Schools Marcy Kelley released a statement about the previous night's events. Ex. F. Kelley claimed that Fellers' and Andy Foote's protest "did not abide by our public conduct on school property policy," attaching Policy KFA and excerpts from the Athletics Handbook to her email. *See id.*; Ex. A; Ex. C. The next day, Andy Foote received a "No Trespass Order" from Kelley that prohibited Foote "from entering the buildings, grounds, and property of the Bow School District" including "parking lots[] and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" through September 23. Ex. G. Kelley justified the ban by saying that Foote violated Policy KFA when he "brought and distributed pink armbands to parents and other attendees to protest" and "participated and led the protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing. *Id.*

Kyle Fellers received a "No Trespass Order" similar to that issued Foote, but which bars him for the whole fall sports season and "may also be extended until the end of the school year." Ex. H. On September 25 and 26, Kelley sent Fellers two Addenda to the Order, which reiterate that Fellers is banned from sporting events and other extracurriculars but allows him to enter school property for limited purposes (such as voting and parent-teacher conferences). *See* Ex. I; Ex. J.

These No Trespass Orders have already prevented Fellers and Andy Foote from attending their children's extracurricular events (including the soccer homecoming

8

game) and forced them to alter routines and transportation arrangements. Fellers Decl., ¶¶ 48-52; A. Foote Decl., ¶ 47; N. Foote Decl., ¶ 20. Although Foote's order has expired, see Ex. G, Fellers is still unable to attend his children's extracurricular events. *See* Ex. H, Ex. J, Fellers Decl., ¶¶ 42-47. Both remain concerned that such orders could be re-imposed or extended if they show up with pink wristbands. Fellers Decl., ¶¶ 40, 54, 57; A. Foote Decl., ¶¶ 44, 52, 57.

On October 1, the day after this lawsuit was filed, Superintendent Kelley sent an email informing parents that future protests at school events must occur in a designated protest area or they "may be deemed as disruptive and result in the game being suspended." Ex. K. The Designated Protest Area is located in front of the scoreboard—about 50 yards further from the soccer field than where parents normally sit—and is only open "for 30 minutes before and 30 minutes after" girls' soccer games. Ex. L; *see also* A. Foote Decl., ¶¶ 50-55; Ex. M (map).

Plaintiffs intend to and would silently protest on the sidelines at a variety of Bow School District extracurricular events, if Defendants allowed it, by wearing pink wristbands, distributing wristbands, or holding signs. Fellers Decl., ¶ 53-57; A. Foote Decl., ¶¶ 47, 56-58; N. Foote Decl., ¶¶ 23-25; Rash Decl., ¶ 16. If given permission, for example, some or all the Plaintiffs would silently protest on the sidelines at all of the remaining games of the girls' varsity soccer season, including the away game on October 8, 2024, and the home game on October 11, 2024. Fellers Decl., ¶¶ 55-56; A. Foote Decl., ¶¶ 57-58; N. Foote Decl., ¶¶ 23-24; Rash Decl., ¶ 16.

Plaintiffs find it degrading that Defendants prohibit them from expressing their viewpoint about girls' and women's sports at Bow School District events, while other residents are allowed to promote their viewpoints and opinions on school property. Fellers Decl., ¶ 58; A. Foote Decl., ¶¶ 59-60; N. Foote Decl., ¶ 26. Plaintiffs reasonably expect that without judicial relief, any future silent, but visible, protests on the sidelines at Bow School District events will cause Defendants to determine that Plaintiffs violated district policies and put them at risk of arrest, game suspension or cancellation, or a renewed No Trespass order. Fellers Decl., ¶ 57; A. Foote Decl., ¶¶ 52, 57-58; N. Foote Decl., ¶¶ 22, 25; Rash Decl., ¶ 16.

ARGUMENT

When assessing temporary restraining order or preliminary injunction motions, a court must consider: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm; (3) whether the balance of equities favors the injunction; and (4) whether the injunction is in the public interest. *See Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020); *Karlsen v. Town of Hebron*, No. 18-cv-794-LM, 2018 U.S. Dist. LEXIS 243323, at *1 (D.N.H. Sep. 28, 2018). "In the First Amendment context, the likelihood of success on the merits is the linchpin." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012).

Once Plaintiffs "show that the state law infringes on their First Amendment rights," the burden on a motion for preliminary relief shifts to the government to "justify its restriction on speech under the appropriate constitutional standard."

10

*Comcast of Me./New Hampshire, Inc. v. Mills*, 435 F. Supp. 3d 228, 233 (D. Me. 2019) (citations and internal quotation marks omitted). Defendants cannot sustain their burden to establish the legality of restricting adults from silent, but visible, expression on an issue of public importance.

I.   PLAINTIFFS WILL SUCCEED ON THE MERITS

A.   Defendants' application of their policies violates the First Amendment

Defendants cannot prohibit individuals from silently wearing a pink wristband at a soccer game on public property to express their view that biological boys should not play girls' or women's sports. Nor can they prohibit individuals from displaying a sign in the parking lot after the game has ended. Doing so discriminates based on viewpoint in violation of the First Amendment.

*1.  Defendants' extracurricular events are a limited public forum*

Under the First Amendment, the "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "[I]n a limited public forum, government '[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Likewise, access to a nonpublic forum can only be restricted "as

11

long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Cornelius*, 473 U.S. at 800 (cleaned up). So, in both a limited public forum and a nonpublic forum, the government can never discriminate on the basis of viewpoint.

During school hours, a public school is typically a nonpublic forum, but it becomes a public forum if opened to the public by policy or practice. *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988)). A school event that is "otherwise open to public," such as "a basketball game to which the public was invited," is "at least a limited public forum." *Id.* at 212; *see also Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020) (school opens limited public forum when it "invites parents and other spectators to attend sporting events").

>    2. *Defendants' restriction against Plaintiffs silently protesting discriminates based on viewpoint*

Defendants' policy prohibiting Plaintiffs from wearing a pink wristband during varsity soccer games or other extracurriculars discriminates based on viewpoint. It bans Plaintiffs from wearing clothing simply because it expresses a viewpoint about whether biological boys should be allowed to play girls' and women's sports. But "[t]he government may not discriminate against speech based on the ideas or opinions it conveys"—even "ideas that offend." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (cleaned up).

Bow School District banned Plaintiffs from wearing a pink wristband only because of the "opinions it convey[ed]." *Brunetti*, 588 U.S. at 393. No policy prohibits individuals from wearing pink wristbands on school property or at school events. Defendants do not regulate "the length of skirts or the type of clothing" that spectators wear. *Tinker*, 393 U.S. at 507-08. Rather, Defendants banned the wristbands because the act of wearing one was a "passive expression of opinion" that Defendants wanted to suppress. *Id.* at 508.

This is viewpoint discrimination. Bow School District does not prohibit spectators at extracurricular events from wearing clothing that expresses views on social or political issues. It is not uncommon for people to wear apparel supporting their favorite politician, N. Foote Dec., ¶ 26, or political cause like global warming, Fellers Dec., ¶ 58. And that includes Pride flags or other symbols supporting LGBTQ rights. N. Foote Dec., ¶ 26; A. Foote Dec., ¶ 59. Nothing stops individuals from wearing a shirt *supporting* trans athletes from competing in their sport of choice. But Bow School District banned Plaintiffs and others from wearing clothing that expresses the opposite view. That violates the First Amendment. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829-30 (1995).

The same is true for Bow School District's ban on displaying a sign supporting women's sports in the parking lot after an extracurricular activity has ended. Bow has no policy prohibiting signs or bumper stickers that express political or social messages in its parking lot. But it has banned parents from expressing their views

13

in the parking lot when that view criticizes the policy allowing biological males to compete in girls' sports.

To avoid this obvious First Amendment problem, Defendants invoked policies that primarily target conduct—harassment, disruption, and similar behavior. But silently wearing a wristband is neither harassment nor disruptive. *See Tinker*, 393 U.S. at 508. Indeed, Fellers and Foote wore their wristbands without incident for about ten minutes before officials singled them out. Fellers Dec., ¶¶ 18-19, 21; A. Foote Dec., ¶¶ 29-30, 33. Before officials intervened, nothing happened. No one chanted or shouted about women's sports. The game did not stop. There was no "aggressive, disruptive action." *Tinker*, 393 U.S. at 508. Both Fellers and Foote silently stayed on the parents' sideline and watched the game.

The only disruption came *after* Defendants confronted Fellers, Foote, and Rash and ordered them to remove their wristbands. Foote Dec., ¶¶ 29-30; Fellers Dec., ¶¶ 18-19; Rash Dec., ¶ 9. Many people might not have been aware of the silent wristband protest had Defendants left Plaintiffs alone. N. Foote Dec., ¶ 18; Rash Dec., ¶¶ 4-6. The wristbands did not disrupt the game—Defendants did.

Nor do Defendants help themselves by mislabeling Plaintiffs' silent protest "harassment." "[S]chools have a significant interest in regulating 'serious or severe bullying or harassment' that invades the rights of others," but that does not include "criticism of the rules of a community of which [Plaintiffs] form[] a part." *Doe v. Hopkinton Pub. Schs.*, 19 F.4th 493, 506 (1st Cir. 2021) (quoting *Mahanoy*, 594 U.S.

14

at 190). Wearing a pink wristband does nothing more than express the view that officials in Plaintiffs' community are wrong for allowing biological boys to play against biological girls—their daughters and granddaughters included. If silently expressing that view is "harassment" and thus outside the bounds of the First Amendment, every disagreement about public policy that may offend a listener is unprotected speech. *Cf. Tinker,* 393 U.S. at 509 n.3 (noting that the school unsuccessfully argued it could ban armbands because a former student died in Vietnam and the deceased's friends at the school might respond negatively to the armband protest). But "the First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." *303 Creative LLC v. Elenis*, 600 U.S. 570, 571-72 (2023) (cleaned up).

Cases involving real harassment contrast sharply with this case. In *Doe v. Hopkinton Public Schools*, the First Circuit upheld a school's decision to punish students for bullying on social media. 19 F.4th at 497. The bullying included months of derogatory comments about another student and his family, as well as circulating nonconsensual photos and videos for ridicule. *Id.* at 498-502. The First Circuit held that such "pervasive" bullying falls outside the First Amendment. *Id.* at 509. Likewise, in *Doe v. Portland Public Schools*, a district court found a student engaged in "serious or severe bullying or harassment" because he "sent texts to classmates that suggest he knows where they live and that he wants to commit

15

violent acts." 701 F. Supp. 3d 18, 36-37 (D. Me. 2023). This "understandably created fear and apprehension on the part of their recipients," and allowed the school to regulate the student's speech. *Id.*

And in *Governor Wentworth Regional School District v. Hendrickson*, this Court upheld a school's decision to prohibit a student from wearing a "No Nazis" patch only after the school experienced a "continuous pattern of hostility and incidents of provocation, harassment, and threats" between two groups of students during the year. 421 F. Supp. 2d 410, 423 (D.N.H. 2006), *vacated as moot*, 201 F. App'x 7, 8 (1st Cir. 2006). After months of these two groups bullying each other and threatening violence (including a "telephone threat to burn down [a student's] house" and another "threat to carve initials in a student's head"), *id.* at 415, the Court upheld the school's determination that the "No Nazis" patch was not "a passive symbolic statement" but rather "a taunt, aimed directly at the opposing group of students." *Id.* at 423. "[S]chool authorities," the Court explained, "did not act precipitously, nor did they overreact to a single incident." *Id.* at 424.

That is a far cry from what happened here. First, the Plaintiffs are all adults, attending an after-school public event, not students speaking in the classroom or hallway during the school day.[3] While the school in *Hendrickson* laudably did not

---

[3] The cases above arose under *Tinker* and illustrate the high bar that schools face for proving harassment in a nonpublic forum involving student speech. But this case is about "adults" engaged in "pure speech" at a limited public forum, and so the

"overreact to a single incident," *id.*, Defendants' here overreacted to no incident at all. Bow School District has not experienced months of confrontation between parents or students over this issue. Nor did Plaintiffs ridicule or threaten any particular students.[4] The notion that Plaintiffs were harassing a student by silently wearing a pink wristband is untethered from reality.

Worse, Bow School District's post-litigation conduct undermines its claim that the ban is targeted toward harassment or disruption, rather than Plaintiffs' viewpoint. Immediately after Plaintiffs sued, Bow School District announced a new policy requiring spectators at *all* extracurricular activities to limit any "protests" or "other free speech exercises" to a designated area near the soccer-field parking lot. If Defendants were concerned about harassing a specific student-athlete during the Plymouth game, why continue banning parents from wearing pink wristbands at other games as well? And is it more disruptive to silently wear a pink wristband on the parents' sideline while watching the game than to gather a group of 50 protestors to chant beside the scoreboard?

---

First Amendment "provide[s] strong protection" beyond that given to students during school. *Mahanoy Area Sch. Dist.*, 594 U.S. at 191.

[4] Andy Foote went out of his way to deflect criticism away from the student. Foote's off-school-property, pre-game Facebook post—the same post that Desilets referred to—stated that this disagreement is "not the athlete's fault." Ex. E; A. Foote Dec., ¶ 21, 30. Fellers did not even know the player's name until the game started. Fellers Dec., ¶ 7.

The school's new protest zone also contradicts Defendants' prohibiting Fellers from quietly displaying a sign in the parking lot after the game. Now, Bow School District not only allows protests after the game, it requires those protests occur right next to the parking lot where Fellers held his sign. *See* Ex. M. It is nonsensical for the school assert that holding a sign in the parking lot after the game is disruptive or harassment and then ten days later tell parents to do exactly that.

> 3.  *Spectators are expected to express themselves at sports events*

Defendants' policy applications are unreasonable in light of the forum's purposes. Soccer bleachers are not a monastery. Spectators attend games to express themselves: to cheer, to clap, to honor or chastise good or bad sportsmanship or refereeing. Fan expression about the safety and integrity of the game, and yes, who belongs on the field, is an inseparable aspect of every sports event. However else Defendants might regulate it, game-related expression serves a key forum purpose.

> B.  Defendants violate the First Amendment freedoms of assembly and petition by preventing silent protestors from accessing school grounds that are otherwise open to the public

Defendants' policies and practices restricting protesting and "other free speech exercises" at public events violates not only the Free Speech Clause but also the rights to peaceably assemble and petition the government. *See* Ex. L. The freedoms to speak, assemble, and petition are "cognate rights," so "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Thomas v. Collins*, 323 U.S. 516, 530 (1945).

The right to petition is "integral to the democratic process," for it "allows citizens to express their ideas, hopes, and concerns to their government." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 388 (2011). Although freedom of petition usually employs the same analysis as freedom of speech, there "may arise cases where the special concerns of the Petition Clause would provide a sound basis for a distinct analysis" and extends "further than the right to speak." *Id.* at 388-89.

Likewise, when freedom of speech is "exercised in conjunction with peaceable assembly," "our tradition [] allow[s] the widest room for discussion, the narrowest range for its restriction." *Thomas*, 323 U.S. at 530. The government cannot punish people for "mere participation in a peaceable assembly." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). "Well-settled law" prohibits the government from "interfering with orderly, nonviolent protests merely because they disagree with the content of speech or because they simply fear possible disorder." *Peña-Peña v. Figueroa-Sancha*, 866 F. Supp. 2d 81, 88 (D.P.R. 2012) (cleaned up) (citing *Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (Sotomayor, J.)).

Plaintiffs assembled with half a dozen likeminded parents and distributed wristbands. Fellers Decl., ¶¶ 17-18; A. Foote Decl., ¶¶ 16, 21, 27-29; N. Foote Decl., ¶¶ 14-16. These actions were part of a larger process of petitioning Bow School District to stop allowing biological males compete in girls' and women's sports, which included emailing and meeting with school officials. *See* Ex. E; A. Foote Decl., ¶¶ 13, 15, 21; N. Foote Decl., ¶¶ 8, 10. Instead of tolerating the nonviolent protest,

19

as the First Amendment requires, Defendants subjected Plaintiffs to "retaliatory actions for participating." *Gonzalez v. Rosello-Nevarez*, No. 19-1414 (JAG), 2021 U.S. Dist. LEXIS 209637, at *9 (D.P.R. Oct. 29, 2021) (citation and internal quotation marks omitted). Plaintiffs were harassed and threatened by school officials and a police officer, their daughters' game was suspended and nearly cancelled, and two Plaintiffs were banned from school property for days or months.

Defendants admit, moreover, that Plaintiffs were punished because they "participated and led the protest" designed to change government policy regarding the participation of biological males in girls' and women's sports. Ex. G; Ex. H. Tellingly, Defendants have not claimed, and cannot claim, that the protesting parents constituted a clear and present danger of riot or any kind of threat to public safety. *See* Ex. G; Ex. H; Ex. F. The viewpoint of the protest—not its orderliness—caused Defendants to crackdown.

Additionally, Defendants have doubled down on their unconstitutional practices by herding dissenters into a designated protest area near the soccer scoreboard, as the sole location where "protests and other free speech exercises" may occur "on any school District properties." Ex. L; Ex. K. Everywhere else on Bow School District grounds, the First Amendment supposedly does not apply. "Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots." *Tinker*, 393

20

U.S. at 513. While the Defendant officials may view Plaintiffs as "crackpots," their views are widely shared by New Hampshire residents and other Americans.

The designated protest area, moreover, makes speech and assembly unreasonably difficult, if not impossible. No more than 50 people can peaceably assemble to protest and only during the half hour before or half hour after girls' soccer games. Ex. L. Yet, this school policy applies to every protest on school grounds, even ones unrelated to girls' soccer occurring at, for instance, a cross-country meet or a swim meet. *See id.*; Fellers Decl., ¶¶ 51-52, 55-57, 59; A. Foote Decl., ¶¶ 56-58. Anyone wanting to engage in "free speech exercises" at a cross-country meet must travel to the soccer field before or after a soccer game.

This policy could never be enforced as written, as it bans not only silent, nonviolent protesting outside the designated area but also private conversations, wearing clothing with any message on it, or even cheering from the sidelines during the game. Those are all "free speech exercises" outside the designated area, and Defendants have shown here that expressive clothing like a pink wristband fits the bill. But Defendants never intend to actually enforce this "sweeping ban" against all protests or free speech exercises, which would create "obvious" constitutional problems for the school. *See Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 574-75 (1987). That would mean requiring people wearing an American flag t-shirt to stay in the designated area because of its patriotic message. Rather, Defendants

21

only intend to enforce it against Plaintiffs and other protestors advocating for female-only sports. Viewpoint discrimination is the goal.

C.  Defendants' actions constitute a conspiracy to violate Plaintiffs' First Amendment rights

School officials in this case colluded with a police officer and a soccer referee to repress Plaintiffs' First Amendment rights, constituting a civil rights conspiracy under Section 1983. A civil rights conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages. *Sánchez v. Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Conspiracy is a matter of inference, which can be shown through direct or circumstantial evidence of an agreement among Defendants to inflict harm upon Plaintiffs. *See Estate of Bennett v. Wainwright*, 548 F.3d 155, 178 (1st Cir. 2008).

There is abundant direct and circumstantial evidence that Defendants agreed to prevent a constitutionally protected protest. Prior the soccer game, Defendant Kelley had emailed with Lt. Lamy about "extra support" at the game because "families are going to protest in some way." Ex. L at 3; Fellers Decl., ¶¶ 60-61. Lamy, Desilets, and Fisk all arrived at the soccer field well in advance of the game, gathered together, and coordinated with each other when pressuring Fellers, Rash, and Andy Foote to remove their wristbands. *See, e.g.*, Fellers Decl., ¶¶ 19-22; A.

22

Foote Decl., ¶¶ 25, 30-32; N. Foote Decl., ¶¶ 15, 17-18. The school officials also coordinated with Defendant Rossetti, the game referee, who suspended the game when he saw Fellers arguing with Desilets and Fisk, threatened to cancel the game if the wristbands were not removed, and did not restart the game until meeting with school officials at center field. *See, e.g.*, Fellers Decl., ¶¶ 27-28, 30; A. Foote Decl., ¶¶ 35-37; Rash Decl., ¶¶ 10-13. Kelley has stated that future protests outside the designated area may "result in the game being suspended," suggesting that she continues to coordinate with Rossetti or other NHIAA referees. Ex. K.

Defendants' agreement and overt acts forced all the Plaintiffs to remove, or decline to wear (*see* N. Foote Decl., ¶¶ 15-17), their wristbands and led to Fellers and Andy Foote being banned from school property threatened with arrest for criminal trespass if they did not surrender their rights.

II.     DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS BY DENYING FELLERS ACCESS TO BOW SCHOOL DISTRICT PROPERTY AND PROHIBITING ALL PLAINTIFFS FROM SILENTLY PROTESTING

"A burden on protected speech always causes some degree of irreparable harm." *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 15 (1st Cir. 2004); *see also Sindicato*, 699 F.3d at 10-11. Injunctive relief is required to address the irreparable injury that Plaintiffs presently suffer. Plaintiffs have testified about silent protests on the sidelines and elsewhere that they would make over the next year and in future years, if permitted, such as wearing pink wristbands, distributing wristbands, and holding signs at all remaining girls' soccer games this fall. Fellers Decl., ¶¶ 53-57;

A. Foote Decl., ¶¶ 56-58; N. Foote Decl., ¶¶ 23-26; Rash Decl., ¶ 16. Fellers,

moreover, is currently prohibited from attending soccer games or other

extracurriculars, whether he silently protests at those events or not. *See* Ex. J;

Ex. H. Absent injunctive relief, Defendants will continue to prohibit Plaintiffs' silent

protests on the sidelines and deny Fellers access to extracurricular events.

III.    PROTECTING FIRST AMENDMENT RIGHTS IS ALWAYS IN THE PUBLIC INTEREST,
        SO THE BALANCE OF EQUITIES FAVORS PLAINTIFFS

"When the Government is the opposing party," courts "merge" the "balancing of

the equities and analysis of the public interest together." *Doe v. Mills*, 16 F.4th 20,

37 (1st Cir. 2021) (cleaned up). "Protecting rights to free speech is *ipso facto* in the

interest of the general public" as "First Amendment rights are not private rights . . .

so much as they are rights of the general public." *Westfield High Sch. L.I.F.E. Club

v. City of Westfield*, 249 F. Supp. 2d 98, 128 (D. Mass. 2003) (citation omitted).

Denying injunctive relief would leave Defendants free to violate Plaintiffs' rights

by enforcing their policies unconstitutionally to suppress silent protests. In contrast,

enjoining Defendants would not prevent them from running schools or performing

any legitimate government function. Defendants can hold soccer games and other

extracurriculars with a protest on-going. At the September 24 soccer game, the

national group Moms for Liberty conducted a larger and more boisterous

demonstration in support of reserving girls' and women's sports for biological

females. A. Foote Decl., ¶ 48; *cf.* N. Foote Decl., ¶¶ 21-22; Ex. L. This

24

demonstration, however, did not disrupt the game, and Defendants did not act against it. A. Foote Decl., ¶ 48. An injunction securing First Amendment rights would not bar Defendants from enforcing reasonable and viewpoint-neutral time, place, and manner restrictions at extracurricular events, to prevent true disruption.

IV.    THIS COURT SHOULD WAIVE THE RULE 65(C) SECURITY REQUIREMENT

"[T]he First Circuit has recognized an exception to the security bond requirement in Fed. R. Civ. P. 65(c) in suits to enforce important federal rights or public interests." *Westfield High Sch.*, 249 F. Supp. 2d at 129 (citation and internal quotation marks omitted). "The bond amount may be zero if there is no evidence the party will suffer damages" for "the burden is on the party seeking security to establish a rational basis for the amount." *Westernbank P.R. v. Kachkar*, No. 07-1606 (ADC/BJM), 2008 U.S. Dist. LEXIS 109809, at *47 (D.P.R. July 23, 2008) (cleaned up). Defendants will incur no harm—monetary or non-monetary—from allowing Fellers to enter school grounds or from permitting Plaintiffs to exercise their right to silently protest. This Court should impose no bond requirement.

CONCLUSION

This Court should grant Plaintiffs' motion for a temporary restraining order and preliminary injunction.

Dated: October 4, 2024                    Respectfully submitted,

*/s/ Richard J. Lehmann*
Richard J. Lehmann                        Endel Kolde*
New Hampshire Bar No. 9339                DC Bar No. 1782129
LEHMANN MAJOR LIST PLLC                   Brett R. Nolan*
6 Garvins Falls Road                      DC Bar No. 90014964
Concord, New Hampshire 03301              Nathan J. Ristuccia*††
Tel: (603) 731-5435                       Virginia Bar No. 98372
Fax: (720) 995-9156                       INSTITUTE FOR FREE SPEECH
rick@nhlawyer.com                         1150 Connecticut Ave., NW
                                          Suite 801
                                          Washington, D.C. 20036
                                          Tel: (202) 301-3300
                                          Fax: (202) 301-3399
                                          dkolde@ifs.org
                                          bnolan@ifs.org
                                          nristuccia@ifs.org

                                          *Pro hac vice status pending*

                                          *Counsel for Plaintiff*

## CERTIFICATE OF NOTICE

I hereby certify that, on October 4, 2024, I emailed notice of Plaintiffs' intent to

seek this motion to Bow School District General Counsel Matt Upton and Lt.

Lamy's counsel Eric Maher. Immediately after motion is filed in ECF, I will email

---

†† Not a D.C. Bar Member but providing legal services in the District of Columbia
exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

both counsel filed copies of the motion, memorandum, and supporting filings. I have also requested that local counsel mail copies of the same to Steve Rossetti today.

Executed under penalty of perjury.

Dated: October 4, 2024

_s/Endel Kolde_