UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kyle Fellers, Anthony Foote, Nicole Foote, and Eldon Rash,<br><br>Plaintiffs,<br><br>v.<br><br>Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District, Philip Lamy & Steve Rossetti,<br><br>Defendants. | Case No.  1:24-cv-311-SM-AJ |

**OBJECTION OF BOW SCHOOL DISTRICT TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

NOW COMES Defendant Bow School District ("District"), through its attorneys Cullen Collimore Shirley PLLC, and objects to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. [Doc. 14.] Although the two forms of relief are interrelated, this Objection focuses on the request for a temporary restraining order ("TRO"), which was filed on Friday afternoon (October 4, 2024) seeking relief before this Tuesday evening (October 8, 2024). The District requests that it be permitted to respond more fully to the request for a preliminary injunction in accordance with L.R. 7.1(b) (providing 14 days to respond to motions).

**INTRODUCTION**

While Plaintiffs strive to portray their past actions as a "silent protest in support of protecting women's sports" to be viewed through the prism of *Tinker v. Des Moines Indep. Cmty Sch. Dist.*, 393 U.S. 503 (1969), this case is decidedly different, asking the Court to regulate how schools can work to protect students and staff alike from harassment by adult non-students. The simple fact is that Plaintiffs Andrew Foote and Kyle Fellers chose not to silently protest in a

1

recognized public forum but to direct their protest at a 15-year-old player on a visiting team from the sidelines and adjacent parking lot. They did so despite express warning that such conduct would not be tolerated on the school grounds. The school rightly curtailed such behavior and sanctioned the two men in a reasonable manner. The Court should uphold the District's actions.

## STATEMENT OF FACTS

*HB 1205 and Tirrell v. Edelblut*

As recounted by this Court, in July the New Hampshire legislature enacted House Bill 1205 ("HB 1205"). "In general terms, HB 1205 prohibits transgender girls from participating in girls' school sports." *Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 DNH 069 (Aug. 22, 2024) ("*Tirrell* TRO Order") at 6 (citing RSA 193:41). Two high school students, Parker Tirrell and Iris Turmelle, challenged the application of the law to them. Parker, who had played soccer on the Plymouth Regional High School's (winless) junior varsity team the previous year as a high school freshman, hoped to be able to play again this fall on the upper team. In her Complaint, Parker noted that she was just 15 years old and because of hormone therapy had not and will not undergo male puberty. As this court summarized:

> Sports have always been a big part of Parker's life. She has played in elementary, middle, and high school and in town recreational leagues. Sports are how Parker makes friends and connects with others. While she has participated in a variety of school sports, soccer is her passion. In eighth grade, she played on the girls' soccer and track teams at Plymouth Elementary School. In ninth grade, she played on the girls' soccer team at Plymouth Regional High School. Her high school soccer team is her primary social outlet, both on and off the field. Most of her friends are her teammates, and they have given Parker an important source of acceptance, belonging, and emotional support.

*Tirrell* TRO Order at 5 (footnote omitted). Parker included in her Complaint a recent photograph of herself. *See* Complaint, *Tyrrell v. Edelblut*, at ¶71, a copy of which reproduced here:

2



Parker filed simultaneously with her Complaint a motion for temporary restraining order and a motion for preliminary injunction. On August 19, 2024, this Court (McCafferty, J.) orally granted the motion for temporary restraining order, which was followed by a written decision on August 22, 2024. The Court held a further hearing on the motion for preliminary injunction and issued an order granting the injunction on September 10, 2024. Therein, the Court noted that Parker's mother attested that Parker would be devastated if she was not permitted to play on the

team, which has given her "an important source of acceptance, belonging, and emotional support." Order on Motion for Preliminary Injunction, Sept. 10, 2024, at p.6.

*School District learns of planned protest*

The passage of HB 1205 and the *Tirrell* orders garnered media attention nationally.  *See, e.g.*  https://fox59.com/news/national-world/ap-us-news/ap-2-transgender-new-hampshire-girls-can-play-on-girls-sports-teams-during-lawsuit-a-judge-rules/.  It did not take long to get the attention of New Hampshire residents, including Bow residents such as Plaintiff Anthony Foote. *See* Complaint Ex. E [Doc. No. 1-5].  In fact, the day after the *Tirrell* TRO Order, a parent of a Bow High School ("BHS") student contacted Bow Athletic Director Michael Desilets, informing him that she had heard several Bow parents discussing protesting the decision when Parker's Plymouth team was scheduled to play Bow on September 17, 2024.  *See* Declaration of Michael Desilets ("Desilets Dec."), attached hereto as Exhibit 1, at ¶ 3.  The plans discussed reportedly included wearing dresses to the game, buying anti-trans gear, making signs, and generally heckling and intimidating the player.  *Id.*

The District has a policy addressing conduct on school grounds entitled "Public Conduct on School Property" ("Policy KFA").  *See* Declaration of Marcy Kelley ("Kelley Dec."), attached hereto as Exhibit 2 and Ex. A thereto.  The policy conveys that the District expects "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event."  *Id.*  It also prohibits visitors to school property from engaging in conduct that would "threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person" or "delay, disrupt, or otherwise interfere with any school activity."  *Id.*  The policy forbids persons from violating other school policies or regulations or the directive of an authorized District employee and puts visitors on notice that violation of the policy could lead to being ordered to

4

leave school grounds and the issuance of a "no trespass" order. *Id*. The plans discussed by the various parents at the previous game would violate the policy. Kelley Dec. ¶ 5.

As would be expected, school administrators, including the Superintendent Marcy Kelley, Principal Matthew Fisk, and Desilets, discussed the information received by Desilets and considered how to protect the visiting student from harassment. Kelley Dec. ¶ 6. Because they did not know exactly what to expect from the parents, they also advised the local police of their concerns and asked if they could have an officer in the area. Kelley Dec. ¶ 6. Lt. Philip Lamy later informed the school that he would be at the game. Kelley Dec. ¶ 6. Desilets also reached out to and met with Nicole Foote to hear her concerns about the upcoming game. Desilets Dec. ¶ 4.

In addition, on September 16, 2024, Desilets emailed the soccer team parents to remind them of the rules that apply to those attending school sporting events. Desilets Dec. ¶ 6; Complaint Ex. B [Doc. No. 1-2]. He wrote, "I understand that there are some differing opinions regarding tomorrow's game, and that is perfectly fine. Please understand that any inappropriate signs, references, language or anything else present at the game will not be tolerated." *Id*. He attached to his email a summary of the District's obligation under the New Hampshire Interscholastic Athletic Associate ("NHIAA") to follow NHIAA guidelines and policies, which include a commitment to play the teams on their schedule and a prohibition on forfeiting games. Desilets Dec. ¶ 6; Complaint Ex. C [Doc. No. 1-3]. He also included language from the BHS Athletics Handbook, which provides: "It is the expectation of every fan to maintain a positive attitude, to treat players, coaches and officials with respect" and to "[s]trive to maintain positivity and not make it about anything or anyone else." *Id*.

Anthony Foote responded by email to Desilets at 7:55 AM the next morning (September 17, 2024 – the day of the game). Desilets Dec. ¶ 7 and Ex. A thereto. Foote stated: "I'm a leader,

5

and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males – who are stronger, faster, and more physically dominant – compete against women. And you don't sit around waiting for someone to get hurt before you take action." *Id*. He added, "I'm sick of your cowardice and your pandering" and warned, "Stand up for women, for real women, or get out of the way." *Id*.

Subsequently, Desilets and Fisk observed photographs of wristbands that Foote posted on social media. Desilets Dec. ¶ 8; Declaration of Matthew Fisk ("Fisk Dec."), attached hereto as Exhibit 3, at ¶ 4. These included not only those adorned with the "XX" shared with the Court but others that were marked with a female gender symbol and some bearing the term "NAD" – shorthand for "gonad." Desilets Dec. ¶ 9 and Ex. B thereto.

*Events at the Game*

On the afternoon of September 17 Anthony Foote arrived at the game early with a bag. Desilets Dec. ¶ 10. He stood at the midfield sideline, where he was seen handing wristbands out to adults as they arrived for the game. Desilets Dec. ¶ 10. He attempted to do this discreetly, apparently recognizing that his actions would violate school standards. Fisk Dec. ¶ 10. After the first half ended, Foote went to his Jeep and put a poster of Riley Gaines, an outspoken critic of trans participation in women's sports, on the windshield facing the field. Desilets Dec. ¶ 11. When Foote returned, he and Fellers put the wristbands on and stayed prominently at the sideline. Desilets Dec. ¶ 11.

Desilets approached Foote and advised him that he could not protest at the game and instructed him to take off the wristband. Desilets Dec. ¶ 12. Foote initially refused, challenging the basis for the request. Desilets Dec. ¶ 12. Foote eventually removed the wristband and threw

6

it at Desilet's feet. Desilets Dec. ¶ 12. Foote was not ejected and stayed through the remainder of the game. Desilets Dec. ¶ 12.

Desilets then approached Fellers and asked him to remove his wristband. Desilets Dec. ¶ 13. Fellers refused to do so. Desilets Dec. ¶ 13. Principal Fisk then approached Fellers and likewise instructed him to remove the wristband or leave the game. Fisk Dec. ¶ 8. Fellers repeatedly and loudly challenged Fisk, calling Desilets and Fisk "Nazis." Fisk Dec. ¶ 8. Fellers' tone was elevated and angry. Fisk Dec. ¶ 8. Fellers removed the wristband, only to pass it to his former father-in-law, Eldon Rash. Fisk Dec. ¶ 8. Fellers was not asked to leave the game at that time. Fisk Dec. ¶ 8.

Rash was sitting in a chair approximately fifteen feet from the playing field. Fisk Dec. ¶ 9. Fisk saw that he was now wearing the wristband and directed him to remove it, which he repeatedly refused to do. Fisk Dec. ¶ 9. Fellers, who had not been asked to leave the game, began to interrupt and argue with Desilets and Fisk on the sideline right behind Rash. Fisk Dec. ¶ 9.

Bow police Lieutenant Philip Lamy observed the exchange and approached the men. Declaration of Philip Lamy ("Lamy Dec."), attached hereto as Exhibit 4, at ¶ 5. Fellers continued to argue with Desilets, Fisk, and now Lamy that Rash did not have to remove the wristband, citing the First Amendment and comparing the situation to Germany in the 1930's and 1940's. *Id.*[1]

As Fellers and Rash continued to argue with the officer and school administrators on the sideline, referee Steve Rossetti stopped the game. Desilets Dec. ¶ 15. Desilets approached Rossetti, who asked what was going on. Desilets Dec. ¶ 15. Desilets explained the situation and asked for time to try to reason with Rash. Desilets Dec. ¶ 15. Desilets returned to the sideline

---

[1] This entire interaction with Fellers and Rash at the sideline was captured on Lt. Lamy's body-worn camera, as was the officer's subsequent interaction with Fellers in the parking lot. Lamy Dec. ¶ 9.

7

where he continued to wait for Rash to comply.  Desilets Dec. ¶ 16.  Fellers continued to argue with Desilets, Fisk, and Lt. Lamy, seeking at one point to bring other spectators into the confrontation, while Rash refused to remove the wristband.  Fisk Dec. ¶ 10.  At one point, Fellers claimed the wristband was to "protest breast cancer."  Fisk Dec. ¶ 10.  Fellers later told Fisk and/or Desilets that he should be supporting women and called them cowards.  Desilets Dec. ¶ 16.  Desilets then asked Lt. Lamy to remove Fellers from the game.  Desilets Dec. ¶ 16.  Fellers left the sidelines at that point.  Desilets Dec. ¶ 16.  Rash, however, persisted in his refusal to remove his wristband.  Desilets Dec. ¶16.

Fisk and Desilets informed Rossetti of Rash's insistence on wearing the wristband.  Desilets Dec. ¶ 17.  Desilets also informed the Plymouth coach on the field of the circumstances.  Desilets Dec. ¶ 17.  The coach stated that if Parker learned the issue stopping the game was about her she would be devastated.  Desilets Dec. ¶ 17.  Rosetti then came to the sideline and informed Rash that the behavior had disturbed the game causing him to stop play and that Rash needed to remove the wristband.  Fisk Dec. ¶ 11.  Rash ignored him.  Fisk Dec. ¶ 11.  In fact, he only eventually removed the wristband when other spectators beseeched him to do so.  Fisk Dec. ¶ 11.

*Parking Lot Incident*

Fellers, as it happens, went only as far as his car, which he then drove to a more prominent position by the roadway.  Kelley Dec. ¶ 8.  There, he removed a handwritten sign from his car reading "Protect Women Sports for Female Athletes" and held it above his head.  Complaint ¶46; Kelley Dec. ¶ 8.  He was situated in an area where his sign would be visible to the Plymouth bus as it left the school with the Plymouth team on board.  Kelley Dec. ¶ 8 .  Learning of this, Desilets asked Lt. Lamy to instruct Fellers to leave the premises.  Desilets Dec. ¶ 8.  Lt. Lamy approached Fellers in the parking lot and asked him to leave.  Lamy Dec. ¶ 7.  Contrary to Fellers' claims,

8

Fellers' Declaration at ¶ 31, Lt. Lamy was neither particularly close to Fellers nor did he raise his voice. Lamy Dec. ¶ 7. Despite Lt. Lamy's repeated instructions to leave the premises, Fellers refused to do so. Lamy Dec. ¶ 8. In fact, Fellers tried to provoke the officer into arresting him. *Id*. Lt. Lamy chose not to do so. Lamy Dec. ¶ 8. After Fellers put his sign away Lt. Lamy left the scene. *Id*.

*No Trespass Orders*

Kelley issued no trespass orders to Anthony Foote and Fellers. Kelley Dec. ¶ 10; Complaint Exs. G & H. She based the Foote No Trespass order on the fact that he had been expressly reminded of the school policy on civility and had nevertheless organized and participated in a protest and behavior that targeted a specific opposing player, here 15-year-old Parker Tirrell. Kelley Dec. ¶ 10. Feller received a longer No Trespass Order – the remainder of the soccer season – because of his abuse of school administrators, his prolonged refusal to remove his wristband, his refusal to follow the directions of Lt. Lamy, and his targeting of 15-year-old Parker Tirrell both at the game and in the parking lot. Kelley Dec. ¶ 10.

Foote, through counsel, notified Kelley that he intended to challenge the No Trespass order before it expired but subsequently notified her that he would not be doing so. Kelley Dec. ¶ 11. Fellers communicated with Kelley several times about the impact of the No Trespass order on his ability to pick up and drop off his children and attend events. Kelley Dec. ¶ 11. Based on those discussions, Kelley twice amended the order to permit Fellers to attend school and activities unrelated to soccer. Kelley Dec. ¶11; Complaint Exs. I & J. Neither Fellers nor Foote approached Kelley about additional requests prior to the filing of this suit. Kelley Dec. ¶ 11. By Foote's admission, he has been attending games since his No Trespass order expired. Foote Declaration at ¶¶48-49 [Doc No. 14-4].

9

After the September 17 game, the District designated an area by the field where those who wished to protest the administration – not players – could gather. Kelley Dec. ¶12. The area was just in front of the scoreboard from which the games can be viewed. Kelley Dec. ¶ 12. Protesters can gather there from 30 minutes before a game until 30 minutes after the game. Kelley Dec. ¶ 12. Protesters are still obligated to follow the applicable school policies, including policy KFA. Kelley Dec. ¶ 12. Kelley circulated notice of the designated area to the soccer families. Kelley Dec. ¶ 12 and Exhibit A thereto.

*BHS Fall Sports Calendar*

The BHS fall sports calendar was set and released to the public in the summer. Desilets Dec. ¶19. Plaintiffs were thus aware of – or at least had available to them – the dates of each game the Bow girls soccer team would be playing throughout the regular season. Desilets Dec. ¶19. Those included not only the game against Plymouth on September 17, 2024, but games on September 20, 24, and October 1, 5, and the upcoming game on October 8, 2024. *See* Desilets Dec. ¶ 19.

*Disruption of Education*

Given the compressed schedule on this Motion, with papers filed late Friday seeking a ruling by Tuesday, Defendant has not fully developed facts demonstrating the impact of targeted (or even non-targeted) harassment on trans students. The Center for Disease Control and Prevention ("CDC"), however has noted that LGBQ+ students have significantly higher incidents of depression, "poor mental health," and suicidal ideation than their peers. *Youth Risk Behavior Survey: Data Summary & Trends Report, 2011-2021*, Ctrs. for Disease Control & Prevention, 4, 60-64, (2023), https://www.cdc.gov/healthyyouth/data/yrbs/pdf/YRBS_Data-Summary-Trends_Report2023_508.pdf (stating that schools bear "the responsibility to ensure that all

10

learning is done in a safe and supportive school environment"). The First Circuit appears to have recognized that harassment of such students disrupts their education even there the student is not specially targeted:

> [W]e find it strange that school authorities could respond to demeaning speech when its "psychological effects," *Nuxoll*, 523 F.3d at 674, are strong enough to provoke "violent resentment" by other students, *cf. Gooding v. Wilson*, 405 U.S. 518, 528, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (describing fighting words as language that "when used to or of another person, and in his presence, naturally tend to provoke violent resentment"), but not when those effects are strong enough to "crush a child's sense of self-worth," Muller, 98 F.3d at 1540, and so impede that child's ability to learn, *see Trachtman v. Anker*, 563 F.2d 512, 520 (2d Cir. 1977) (Gurfein, J., concurring) (observing in applying *Tinker* in a high-school setting that "a blow to the psyche may do more permanent damage than a blow to the chin"), or otherwise "poison the educational atmosphere," *Nuxoll*, 523 F.3d at 676, and so lead to "symptoms of a sick school," *id*. at 674.

*L.M. v. Town of Middleborough*, 103 F.4th 854, 876 (1st Cir. 2024). For purposes of this Motion it does not appear that Plaintiffs are contesting that targeted harassment of Parker would interfere with her psyche and could impact her education.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on Monday, September 30, 2024, and served it later that evening in advance of the Bow School Board meeting (after having distributed it broadly to the press). Although they pled a claim for injunctive relief in their Complaint, Plaintiffs did not file a motion in support of their request until approximately 2:30 PM on Friday, October 4, 2024.

## STANDARD OF REVIEW

The standard of review on a motion for a temporary restraining order was recently set out by this Court in the *Tirrell* TRO Order:

> "A temporary restraining order 'is a provisional remedy imposed to maintain the status quo until a full review of the facts and legal arguments is available.'" *Ginzburg v. Martínez-Dávila*, 368 F. Supp. 3d 343, 347 (D.P.R. 2019) (quoting *ProChoice Network v. Schenck*, 67 F.3d 377, 388-89 (2d Cir. 1995)). A temporary restraining order ("TRO") is nevertheless an extraordinary remedy which must be granted "sparingly and only in cases where the need for extraordinary equitable

11

relief is clear and plain." *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 333, 338 (D.N.H. 2006) (quotation omitted).

*Id.* at 2. The Court continued:

> In evaluating a motion for a TRO, the court considers the same four factors that apply to a motion for a preliminary injunction. *Karlsen v. Town of Hebron*, Civ. No. 18-cv-794-LM, 2018 WL 11273651, at *1 (D.N.H. Sept. 28, 2018). Those factors are: the movant's likelihood of success on the merits; the movant's likelihood of irreparable harm in the absence of relief; the balance of equities; and whether injunctive relief is in the public interest. *Id*. Likelihood of success and irreparable harm are the most important factors. *Strahan v. McNamara*, 642 F. Supp. 3d 204, 207 (D.N.H. 2022). When, as here, the defendants are government entities or officials sued in their official capacities, the balance of equities and the public interest factors merge. *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021).

*Id.*

## ARGUMENT

Plaintiffs have the burden of establishing their entitlement to the "extraordinary remedy" of a restraining order. They do not, and cannot, meet that burden here. Indeed, they cannot satisfy any of the prerequisites for such relief. Plaintiffs' motion should be denied.

### I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

Plaintiffs assert that their First Amendment rights have been violated because their conduct on the sidelines of the September 17 soccer game was no different than the black armbands worn by students in *Tinker,* which the Supreme Court held to be protected speech. Doc. 15 at 7. Yet Plaintiffs largely elide the Supreme Court's acknowledgement in *Tinker* that schools have a special interest in regulating student speech that "intrudes upon the work of the schools or the rights of other students." 393 U.S. at 508. Plaintiffs also ignore that a school's regulatory interests remain significant in circumstances "such as serious or severe bullying or harassment targeting particular individuals [or] threats aimed at teachers or other students," even when the circumstances arise off campus. *Mahoney Area School Dist. v. B.L.*, 141 S.Ct. 2038, 2045, 210 L.Ed.2d 403 (2021).

Indeed, under *Tinker*, schools are permitted to restrict student speech in two broad sets of circumstances: if the speech "might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities," or, alternatively, if the speech "collides 'with the rights of other students to be secure and to be let alone.'" *Wynar v. Douglas County School District*, 728 F.3d 1062, 1070 (9th Cir. 2013) (quoting *Tinker*, 393 U.S. at 508). "[C]onduct by [a] student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is ... not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513.

The special character of the school setting has thus prompted courts to find, for example, that discipline imposed by schools on students for online harassment and intimidation of peers is allowed. *See, e.g., Kutchinski v. Freeland Community School District*, 69 F.4th 350 (6th Cir. 2023) (student social media account impersonating teacher using graphic, harassing and threatening posts); *Kowalski v. Berkeley County Schools*, 652 F.3d 565, 573 (4th Cir. 2011) (student social media account ridiculing fellow student); and *Castro v. Clovis Unified School District*, 604 F. Supp.3d 944, 952 (E.D. Cal. 2022) (student social media account using racial slur against fellow student).

More recently, courts have also sustained school districts that have regulated speech surrounding the issue of gender identity, including speech that is supposedly "silent" and not directed at a particular peer. *See, e.g.*, *L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854 (1st Cir. 2024) (sustaining school district decision to bar student from wearing shirt to school with the words "There Are Only Two Genders" even though no peer specially targeted); *Parents Defending Education v. Olentany Local School Dist. Board of Educ.*, 109 F.4th 453 (6th Cir. July

13

29, 2024) (upholding constitutionality of school district policy that prohibits students from repeatedly and intentionally using non-preferred pronouns to refer to classmates).

Courts have also sustained enforcement of school policies aimed at preventing harassment and intimidation by parent spectators at athletic events. *Blasi v. Pen Argyl Area School Dist.*, F. App'x 173 (3d. Cir. Jan. 30, 2013); *Foote v. Board of Educ. of Whitehall Central School Dist.*, 1:22-CV-0815, 2024 WL 3376651 (N.D.N.Y. July 11, 2024). In *Blasi*, plaintiff, the father of two high school basketball players, sued the school district when he was banned from attending a game after he sent numerous "emails to coaches complaining about their coaching methods, the behavior of his sons' teammates towards them, and alleged favoritism toward white, inferior players." 512 F. App'x at 175. Noting that plaintiff's First Amendment claim was "made in the context of an athletic program in which his sons' participation, and by extension his own, is voluntary," and that "[p]laintiff was aware of and agreed to the standards required of students, and their parents, in order to participate in the School District's basketball program, including restrictions on the manner and tone of speech used with respect to coaches and other players," *id.* at 175, the Third Circuit found dismissal warranted. Among other things, the court noted that "[t]he narrower goals of an athletic team differ from those of academic pursuits and are not always consistent with the freewheeling exchange of views that might be appropriate in a classroom debate," and that "[s]chool officials have a legitimate interest in affording student athletes 'an educational environment conducive to learning team unity and sportsmanship and free from disruptions that could hurt or stray the cohesiveness of the team.'" *Id.* at 175.

The court in *Foote* reached a similar conclusion on similar facts. Foote, the father of a player on a high school basketball team, was banned by the school district from attending games for the remaining season because Foote had angrily confronted the coach and the coach's son on

14

the gymnasium floor following a loss. *Foote*, 2024 WL 3376651, *3-12. The school district found the father had violated policies of the school and athletic league requiring, among other things, that spectators not engage in uncivil and disrespectful behavior on school property and show cordial courtesy to visiting teams and officials. Id. at *8-9. The court held that the conduct polices were not only reasonable and view point neutral, but that the school district's enforcement of the polices was constitutional. *Id*. at 18-19. "[A] rule is neutral as to viewpoint if it is 'based only upon the manner in which the speakers transmit their messages . . ., and not upon the messages they carry.'" *Id*. at 19. The court found no evidence the father's viewpoint precipitated his expulsion. *Id*. Rather, it was the obstreperous manner by which the father communicated his viewpoint that justified the school district banning him. *Id*.

*L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024) is also particularly instructive. There, the First Circuit upheld a restriction barring a T-shirt bearing the words "There are only two genders." The Court noted that the broad ruling of *Tinker* could be limited where speech would invade the rights of others or would cause a material disruption. 103 F.4th at 866. The Court opted to pursue the material disruption analysis and found that the shirt could properly be barred by the school. The Court concluded:

> The question here is not whether the t-shirts should have been barred. The question is who should decide whether to bar them -- educators or federal judges. Based on *Tinker*, the cases applying it, and the specific record here, we cannot say that in this instance the Constitution assigns the sensitive (and potentially consequential) judgment about what would make "an environment conducive to learning" at NMS to us rather than to the educators closest to the scene.

*Id*. at 886. This Court reached a similar conclusion in *Governor Wentworth Sch. Dist. v. Hendrickson*, 421 F.Supp.2d 401, 425 (USDC- NH 2006) ("School authorities are generally in a far better position to understand their students and the students' likely response to various modes of intervention. They are entitled to a healthy measure of deference when exercising judgment,

15

drawing inferences, and reaching conclusions about what is actually going on in their schools and classrooms."). So, too, here.

In this case, the District's actions at the September 17 soccer game and subsequent no trespass orders to Foote and Fellers were justified and constitutionally permissible under *Tinker* and its progeny, exemplified by the ruling in *L.M. v. Town of Middleborough*. The "XX" wristbands are no different and send the same message as LM's "two gender" T-shirt. If the T-shirt can be banned from the school grounds, certainly the XX wristbands (and "NAD" wristbands) can be. The fact that it is parents – invitees to the property, not students compelled to be in school – who are being regulated only gives more weight to the District's actions.

Moreover, although Plaintiffs cast their conduct at the September 17 game as "silent protest," the District reasonably viewed it as harassment and intimidation aimed at 15 year old Parker Tirrell. Moreover, the District was also on alert for Plaintiffs to become actively disruptive during the game, having earlier heard that Plaintiffs were mulling plans to dress in women's clothes, wave signs, and heckle from the sidelines. With this Court declaring only days earlier that Parker Tirrell was entitled as a matter of constitutional right to play on the Plymouth girls varsity soccer team, the District interceded with Plaintiffs at the September 17 game before their conduct grew more threatening or the circumstances devolved into disorder.

The No Trespass Orders the District issued to Foote and Fellers were also entirely appropriate. Foote was barred from District property for four days – from September 19 through September 23 – because he had been reminded of the school policy on the civility and sportsmanship expected from everyone attending the September 17 soccer game, including player parents and spectators. Foote nevertheless organized and participated in conduct during the game that targeted Parker Tirrell for her gender identity.

16

For his part, Fellers received a No Trespass Order of longer duration because he became obstreperous when he was told to remove his wristband: he refused to comply despite repeated requests by school officials and a police officer, he verbally attacked school administrators by calling them Nazis, and he hoisted a sign in the parking lot reading "Protect Women Sports for Female Athletes" so that it would be seen by the Plymouth team as they exited the school grounds in their bus. Thus, Fellers' violative conduct on September 17 was especially egregious and it merited a more significant sanction.

Plaintiffs have no First Amendment claim arising from the events of the September 17 game because the District properly exercised its authority – as recognized in *Tinker, Blasi and Foote* – to protect Paker Tirrell from intimidation and harassment during the game, and it issued reasonable sanctions against Foote and Fellers – in the form of No Trespass Orders – for conduct they knew violated the school's policies governing athletic events.

As for upcoming soccer games, there, too, Plaintiffs lack a cognizable First Amendment claim. The No Trespass Order that issued to Foote is expired and Foote is allowed to attend the remaining Bow varsity girls' soccer games. To the extent Anthony Foote, Nicole Foote, or Eldon Rash want to wear the protest wristbands again at Bow home games, they can do so in a protest zone the District has now established near the playing field.[2] For Fellers, however, the District's No Trespass Order from September 19 continues in effect and he is not permitted to attend any Bow varsity girls' soccer games for the remaining season. Thus, Fellers' First Amendment rights are not at risk of additional infringement this season because, simply put, Fellers will not be present for the games.

---

[2] The District is allowing such protest to occur in the protest zone because Bow is not scheduled to play the Plymouth team again this season and, thus, Parker Tirrell will not be present on the field.

17

Because Plaintiffs lack a credible claim that they have suffered – or will suffer – violations of their First Amendment rights at the hands of Defendants, their demand for the extraordinary relief of a temporary restraining order must necessarily fail.

## II. PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM.

Plaintiffs cannot demonstrate a likelihood of irreparable harm in the absence of injunctive relief because, as just discussed, Anthony Foote, Nicole Foote, and Eldon Rash are permitted to attend future games of the Bow varsity girls' soccer team, and they can even wear their protest wristbands so long as they do so in the designated protest zone the District has established near the playing field. While they complain that the protest zone offers a less advantageous view of game play, Plaintiffs mount no serious argument that the protest zone is not a valid exercise of the District's authority to place reasonable time, place, and manner restrictions on protests during athletic competitions. *See, e.g., Pitta v. Medieros*, 90 F.4th 11, 23 (1st Cir. 2024). *Bl(a)ck Tea Society of City of Boston*, 378 F.3d 8 (1st Cir 2004), is instructive. There, plaintiffs challenged the City's restrictions on protestors seeking to demonstrate in public areas during the 2004 Democratic National Convention. For security purposes, the City had designated the area immediately adjacent to the Convention a "hard zone" – which was separated from protestors and others by two row of jersey barriers, chain link fencing, and mesh fabric that effectively blocked any interaction between protestors and attendees. Protestors were effectively limited to a "soft zone" further from the area. The Court determined that the restrictions on protestors limited their ability to interact with convention goers, although an "imperfect" opportunity for expression, was nevertheless constitutional.

18

While the issue in this case is not security related, the District has a significant interest in limiting the interruption of school-sponsored athletic events and sheltering students in protected class. The protest zone is a justified restriction that is both narrowly tailored and viewpoint neutral.

As for Kyle Fellers, he has been ordered not to attend any remaining soccer games for the season as a sanction for his conduct at the September 17 game, which not only involved the harassment and intimidation of Parker Tirrell but disorderly conduct and the harassment of school officials. Fellers is not at risk of irreparable harm to his First Amendment rights at upcoming soccer games because he will not be attending those games under the terms of the preexisting No Trespass Order that bars his attendance.

### III. PUBLIC INTEREST DOES NOT FAVOR A RESTRAINING ORDER, SO THE BALANCE OF EQUITIES DO NOT FAVOR PLAINTIFFS.

As Plaintiffs correctly observe, courts merge the balancing of the equities and analysis of public interest together when the government is the opposing party. *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021). In this case, neither the public interest nor the balance of equities is served by granting the temporary restraining order sought by Plaintiffs.

A TRO does not serve the public interest because there is no ongoing threat to Plaintiffs' First Amendment rights. The September 17 game against Plymouth is done and over, and the rights of Parker Tirrell that the District sought to protect during the game are no longer at stake. Moreover, except for Fellers, Plaintiffs are permitted to attend the upcoming soccer games, and they can wear their protest wristbands in the protest zone the District has established at the playing field.

As for the balance of equities, Plaintiffs come before the Court with unclean hands. Foote and Fellers knew the school's policy against intimidation and harassment of players and yet they stood on the sidelines of the September 17 game with their wristbands knowing Parker Tirrell

would be participating. They refused to remove the wristbands at the request of school administrators and a police officer, Fellers berated the administrators as "Nazis," and Fellers relocated to the parking lot so he could raise a protest sign that would be visible to the Plymouth team as they departed the game.

Plaintiffs tried stomping on the right of Parker Tirrell to be left alone to play soccer and now have the gall to paint themselves as victims. Plaintiffs are nowhere close to deserving equity from this Court.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

BOW SCHOOL DISTRICT

By its attorneys,

CULLEN COLLIMORE SHIRLEY PLLC

Dated: October 7, 2024            /s/ Brian J.S. Cullen
                                  Brian J.S. Cullen, NH Bar 11265
                                  Jonathan M. Shirley, NH Bar 16494
                                  37 Technology Way, Suite 3W2
                                  Nashua, NH 03060
                                  (603) 881-5500
                                  bcullen@cullencollimore.com
                                  jshirley@cullencollimore.com

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: October 7, 2024            /s/ Brian J.S. Cullen
                                  Brian J.S. Cullen