**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 1/13/25**

```
 1

 2

 3                    UNITED STATES DISTRICT COURT
                              FOR THE
 4                     DISTRICT OF NEW HAMPSHIRE

 5    KYLE FELLERS, ANTHONY FOOTE,    )
      NICOLE FOOTE, and ELDON RASH,   )
 6                                    )
                 Plaintiffs,          )
 7         v.                         ) Case No. 1:24-cv-311-SM-AJ
                                      ) October 8, 2024
 8    MARCY KELLEY, Superintendent    )
      of Schools, State              )
 9    Administrative Unit 67, in her )
      official and individual        )
10    capacities; MICHAEL DESILETS,  )
      Athletic Director, Bow High    )
11    School, in his official and    )
      individual capacities; MATT    )
12    FISK, Principal, Bow High      )
      School, in his official and    )
13    individual capacities; PHILLIP )
      LAMY, Lieutenant, Bow Police   )
14    Department, in his individual  )
      capacity; STEVE ROSSETTI,      )
15    soccer referee, New Hampshire  )
      Interscholastic Athletic       )
16    Association, in his individual )
      capacity; and BOW SCHOOL       )
17    DISTRICT,                      )
                                      )
18               Defendants.          )
                                      )
19    _____

20               VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE STEVEN J. McAULIFFE
21               UNITED STATES DISTRICT JUDGE

22    _____

23

24

25    Jan-Marie Glaze, CCR, RPR, CRR       Certified Court Reporter
```

```
 1                          APPEARANCES

 2    FOR THE PLAINTIFFS:

 3    ENDEL KOLDE
      NATHAN JOHN RISTUCCIA
 4    Institute for Free Speech
      1150 Connecticut Avenue NW, Suite 801
 5    Washington, D.C.  20036

 6    RICHARD J. LEHMANN
      Lehmann Major List, PLLC
 7    6 Garvins Falls Road
      Concord, New Hampshire  03301
 8

 9

10    FOR DEFENDANTS KELLEY, DESILETS, FISK, ROSSETTI,
           BOW SCHOOL DISTRICT:
11
      BRIAN J.S. CULLEN
12    JONATHAN M. SHIRLEY
      Cullen Collimore Shirley
13    37 Technology Way, Suite 3W2
      Nashua, New Hampshire  03060
14

15    FOR DEFENDANT LAMY:

16    ERIC A. MAHER
      Donahue Tucker and Ciandella, PLLC
17    83 Clinton Street
      Concord,  NH 03301
18

19

20

21

22

23

24

25
```

```
 1                                    OCTOBER 8, 2024

 2                                    AFTERNOON SESSION

 3              THE CLERK:  The Court is in session and has

 4      for consideration a motion hearing in the matter of

 5      Kyle Fellers, et al. vs. SAU 67 Superintendent, et al.

 6      Case No. 24-cv-311-SM.

 7              THE COURT:  How do you pronounce your name,

 8      Mr. Kolde?

 9              MR. KOLDE:  Endel Kolde or Kolde; Kolde is

10      fine.

11              THE COURT:  What do you prefer?

12              MR. KOLDE:  Kolde is fine, Your Honor; it's

13      easier.

14              THE COURT:  But what do you prefer?

15              MR. KOLDE:  Kolde a little bit.

16              THE COURT:  Kolde?

17              MR. KOLDE:  Yeah.

18              THE COURT:  Okay.  Mr. Kolde, it's your

19      motion.

20              MR. KOLDE:  Thank you, Your Honor.  And

21      before I begin, I just want to introduce my clients

22      that are in the courtroom.  We've got Nicole Foote,

23      Andy Foote, Kyle Fellers, and Eldon Rash.

24          May it please the Court.  A lot of ink has been

25      spilled about *Tinker* and with good reasons.
```

```
 1              THE COURT:  Not enough.  Do you think Tinker
 2    applies?  I don't think it does.
 3              MR. KOLDE:  Well, I think I agree with you.
 4    I think in some ways it does, and in other ways it does
 5    not.  The similarities are somewhat obvious, at least
 6    on the surface.
 7              THE COURT:  Well, it's not student speech,
 8    right?
 9              MR. KOLDE:  I agree with that.
10              THE COURT:  All right.  So...
11              MR. KOLDE:  I think that matters.  Both do
12    involve passive silent protest by wearing a piece of
13    cloth on the wrist, color symbolizing viewpoint, black
14    in Tinker; pink for women's sports in our case.
15        The Tinker armbands also had a peace symbol on
16    them, and some of our wristbands had the symbol XX for
17    female chromosomes.  Both involve a contentious social
18    and political issue that divides Americans, and in both
19    cases there was fear of possible disruption but no
20    evidence of actual disruption.  Both cases involve an
21    overreaction by school officials.
22        But as I think this Court's question pointed out,
23    this case is -- our case is fundamentally stronger than
24    the plaintiffs in Tinker in ways the defendants have
25    largely ignored.  Our plaintiffs are adults, not
```

1    students.  And unlike the students in *Tinker*, they are

2    not speaking in the classroom or a hallway during

3    school hours.  They are speaking in a limited public

4    forum after school.

5           And, you know, we didn't really get the benefit of

6    their briefing until yesterday, but they don't engage

7    with this issue, and we didn't have time to reply, but

8    if the Court wants a case on the notion that adults

9    have more rights than students, there's the *Mcelhaney*

10   case --

11                THE COURT:  I would say different.

12                MR. KOLDE:  Different?

13                THE COURT:  Different rights.

14                MR. KOLDE:  Yes.

15                THE COURT:  Yeah.

16                MR. KOLDE:  81 F. 4th 550 at 558.

17                THE COURT:  No, I'm familiar with *Mcelhaney*.

18                MR. KOLDE:  Okay.  Very good, Your Honor.

19          So First Amendment cases rise and fall, ordinarily

20   on forum analysis.  As the Court knows, we start with,

21   What is the forum?  This is an after-school sporting

22   event, a limited public forum.  Clear case law cited in

23   our brief supports that.  They don't really talk about

24   forum analysis, but even the *Foote* case, no relation to

25   our Footes, says that sporting events, school sporting

1    events are a limited public forum.  That's important.

2    Limited public forums are not subject to the same

3    kind of balancing test that in-school student speech

4    is.  In a limited public forum, the government can have

5    reasonable content-based restrictions if they are

6    related to the purposes of the forum and viewpoint

7    neutral.  They must be viewpoint neutral.  Defendants

8    have essentially done no forum analysis.  They've

9    treated my clients like students, but they're adults.

10    Importantly, Defendants all but admit they were

11    engaging in viewpoint discrimination.  The whole point

12    of their free speech crackdown was to prevent my

13    clients from expressing their views about reserving

14    women's sports for biological women.  Everyone in this

15    courtroom knows that if my clients had worn rainbow

16    wristbands to celebrate trans inclusion or blue and

17    white wristbands to support Ukrainian resistance to

18    Russian aggression, nothing would have happened.

19    They have no argument that what they did was

20    viewpoint neutral.  And in a limited public forum, what

21    they did is per se illegal.  There is no viewpoint

22    discrimination allowed.  In a classroom, schools are

23    allowed to engage in some viewpoint discrimination.

24    For example, you cannot promote drugs or substance

25    abuse.

1          Here, my clients wanted to quietly express their

2     views about women's sports at a women's sporting event.

3     Their speech was not off topic.  It was just her own

4     point of view that the defendants wanted to prevent

5     from being expressed, and they are open about it.  They

6     describe my clients like criminals, furtively

7     distributing wristbands like drugs or contraband, or

8     pamphlets denouncing the monarchy or taxation without

9     representation.  And they treated the pink wristbands

10     as beyond the pale because of their viewpoint.

11          What is also interesting is that defendants appear

12     to concede that there was no actual disruption until

13     school officials began confronting my clients and

14     forcing them to remove their wristbands.

15     Understandably, my clients didn't like being told that

16     they couldn't wear the wristbands, and they voiced

17     their opposition to it.

18          Americans don't have to be nice to government

19     officials, especially when their rights are being

20     violated.  It is the birthright of all Americans to

21     talk back to the government.  That's why we have the

22     First Amendment.  Our country was founded on people who

23     were literally committing treason to found the United

24     States.

25          Now, there are numerous cases that stand for the

1    proposition that Americans can speak disrespectfully to

2    government officials.  I've litigated some of them:

3    *Mama Bears of Forsyth County* --

4            THE COURT:  Do you think -- is it your

5    contention that the protest, such as it was, was aimed

6    at who?  Because, as I understand the context, which

7    is *Everly* --

8            MR. KOLDE:  Yeah.

9            THE COURT:  -- there's nothing the school

10    district could do about transgender girls playing on

11    girls' teams.  There was a Federal Court injunction,

12    and the particular plaintiff in that case was an actual

13    player at that event.

14        What was the -- you said criticizing officials,

15    but who was it aimed at, the Court?

16            MR. KOLDE:  Okay.  I think there's a fair

17    clarification.  So the wristbands are -- themselves,

18    are an expression of support for women's sports.  They

19    are also an expression of opposition to including

20    biological men in women's sports.  They were not

21    directed at any particular player on the other team,

22    and there's no evidence that it was directed at Parker

23    Tirrell, for example.  There's been no evidence

24    submitted by Defendants in this case.

25            THE COURT:  What's your position?  It would

1       be, Yes, there's a lot more -- there's a lot more

2       leeway to criticize government officials --

3                   MR. KOLDE:  I'm sorry, Your Honor, I'm having

4       a tough time hearing the Court with the background

5       noise.

6                   THE COURT:  Oh, it's all right.  It's a kid;

7       it's not a problem.

8           There's a lot more leeway, as I read the case law,

9       for an adult to criticize government officials than,

10      certainly, to criticize a student engaged in a school

11      activity.  We agree with that.  You can't harass a kid

12      during a school --

13                  MR. KOLDE:  We agree, you can't harass a kid

14      during school.

15                  THE COURT:  You can, however, you have great

16      leeway of criticizing government officials.

17                  MR. KOLDE:  Yes, and I think --

18                  THE COURT:  Now -- I'm not finished.

19                  MR. KOLDE:  Oh, yeah.  Fair enough.

20                  THE COURT:  So we agree there.

21                  MR. KOLDE:  Yeah.

22                  THE COURT:  So then the question is:  What is

23      your view of what the protests consist of?  Protests in

24      space?  In other words, I'm just broadcasting to the

25      universe that this is our view, or is it aimed at

1    somebody?

2         MR. KOLDE:  So a couple things, Your Honor.

3    There's no evidence it was aimed at anybody in

4    particular.

5         THE COURT:  That is your position.

6         MR. KOLDE:  That is our position.

7         THE COURT:  Not aimed in the anyone in

8    particular.

9         MR. KOLDE:  Not aimed at anyone in

10    particular.  It was merely an expression of how they

11    felt about it.

12         THE COURT:  Okay.  Fair enough.

13         MR. KOLDE:  It was aimed at the community in

14    general.  It was aimed at the community in general,

15    including other parents who were present.  It could be

16    aimed at school officials who were present.

17         THE COURT:  Semi-persuasive advocatory.

18         MR. KOLDE:  I would say it's a passive

19    expression of support for women's sports and for

20    opposition --

21         THE COURT:  The point being, garner support

22    for my view.  I want garnered support among those who

23    have input for our view.

24         MR. KOLDE:  Yes.  And we disagree with --

25         THE COURT:  Advocatory in a way.

1          MR. KOLDE:  We disagree with the Court's

2     ruling in the *Tirrell* case, which will certainly be

3     appealed, and may not be the last word on the New

4     Hampshire state law.

5          THE COURT:  Courts don't care.

6          MR. KOLDE:  Yeah, right.

7          THE COURT:  But what I'm trying -- so that's

8     your position.  So here's the real question:  In

9     context, doesn't the factual record have to be

10    developed before I, or a jury, could determine whether

11    that's the case?

12         MR. KOLDE:  I don't think they --

13         THE COURT:  It wasn't directed at the other

14    player.  I'm going to guess and say the school district

15    takes a different view of that.

16         MR. KOLDE:  They have not said anything to

17    that effect, Your Honor, and if you look at their

18    declarations, there's no evidence anything was directed

19    to the other player.

20         THE COURT:  Okay.  Well, we'll see.

21    Supposing they do, doesn't that factual issue have to

22    be developed and resolved?

23         MR. KOLDE:  We would argue that --

24         THE COURT:  Because you've agreed you can't

25    direct that kind of protest at a kid.

1            MR. KOLDE:  It depends on what it is, Your

2     Honor.  It depends on what the conduct is.  If it's

3     harassing -- and I'm using the definition of harassment

4     that is in the *Doe vs. Portland Public Schools*, 701 F.

5     Supp 3d 18 at 36.

6            THE COURT:  You're familiar with the *L.M.*

7     case, I assume?

8            MR. KOLDE:  Of course.

9            THE COURT:  Judge Barron there talks about

10    demeaning speech towards an immutable characteristic of

11    someone's personal identity, that sort of thing.

12    Wouldn't this fall into that category, if it were

13    directed at the student?

14            MR. KOLDE:  Well, first of all, you could

15    argue about whether it's an immutable characteristic or

16    not, and, you know, we can get into gender ideology and

17    feelings about gender and feelings about biological

18    sex, you know, which is -- and queer theory which

19    underlies a lot of trans ideology.  We don't need to

20    get into that.

21            THE COURT:  That makes -- requires even more

22    factual development.

23            MR. KOLDE:  So *L.M.* is in a school setting,

24    and we all agree, and I think the Court would agree,

25    that the school officials have a lot more leeway to

1    regulate student speech in a school setting.  This is

2    adult speech in a limited public forum, and there's no

3    evidence in any of their declarations that any speech

4    was directed at Parker Tirrell.

5        If we look at the facts, Parker Tirrell didn't

6    even know what was going on.  The -- when Rossetti, the

7    referee, stopped play -- if you look at their

8    declarations, they're talking about, you know, What's

9    going on?  Why is play being stopped?  Well, they won't

10   take the wristbands off.  This had nothing to do with

11   Parker Tirrell expressing any concerns or feeling that

12   comments were directed at Parker.  Parker didn't even

13   know what was going on.  And nothing in their

14   declarations indicates that Parker did know.

15       They do talk about a concern that other types of

16   potentially harassing behavior was going to occur at

17   that game that did not occur.  They talk about rumors.

18   They talk about hearsay.  They don't say who said them

19   or where they got the information about people wearing

20   dresses.  Didn't happen.  About people shouting things.

21           THE COURT:  Before we stray too far, I think

22   I agree with you that this -- *Tinker* is not the

23   analytical approach to take in this case.  It's limited

24   public forum --

25           MR. KOLDE:  Correct.

1          THE COURT:  -- analysis.

2     But doesn't *Tinker* inform us as to the nature and

3     scope of the school district's duty with respect to

4     students engaged in school activities?

5          MR. KOLDE:  If they're in the classroom, yes.

6          THE COURT:  Well, no.  They're under school

7     supervision in all kinds of extracurricular activities

8     on school property; for example, athletics.  They're

9     still -- they're still under school supervision and

10    direction, aren't they?  The only difference being that

11    now is you have adult invitees into the limited public

12    forum, but their duty to the students doesn't change;

13    it doesn't become less because they're playing soccer

14    than they are in drama club or something, or does it?

15    You think it does?

16         MR. KOLDE:  Well, I think it depends on what

17    you're saying, Your Honor.  I'm coming at it from the

18    plaintiffs' --

19         THE COURT:  Well, *Tinker* says, Look, schools

20    are different because educators have a responsibility

21    to mold and direct and educate children and protect

22    them.  That's why they can limit speech, to a greater

23    extent.  An adult is different.  An adult in a limited

24    public forum is different, different rights, but the

25    duty to the students translates to the limited public

1      forum.

2              MR. KOLDE:  Well, I don't think you can use

3      the duty to the students as --

4              THE COURT:  Duty to protect.

5              MR. KOLDE:  But protect from what?  Harmful

6      ideas?

7              THE COURT:  Harassment, intimidation,

8      threats, disruption.

9              MR. KOLDE:  There are no facts supporting

10     that.

11             THE COURT:  I know that.  We're talking about

12     law here; we're not talking this case.

13             MR. KOLDE:  I mean, in theory, if somebody

14     is --

15             THE COURT:  I'm trying to find out what -- do

16     we have a ground for agreement that *Tinker* sets the

17     standard for a school's obligation towards students.

18     It doesn't -- I agree with you, I think; it doesn't

19     dictate the analysis for determining the extent of

20     adult rights attending an event.

21             MR. KOLDE:  I don't think *Tinker* sets the

22     standard.  I think *Tinker* provides some persuasive

23     authority in this case because, in *Tinker*, you had a

24     similar concern about potential disruption that never

25     occurred.  I would point the Court to Footnote 3 in

1    *Tinker* where there was a discussion about concern, for

2    example, that other students would respond by wearing

3    different color wristbands or armbands, as if that were

4    a big deal.

5    THE COURT:  Your argument is, they couldn't

6    restrict the symbols in *Tinker*; they sure as heck can't

7    restrict the symbols in the limited public forum.

8    MR. KOLDE:  You got it, Your Honor.

9    THE COURT:  But in my mind, it raises a

10    question that says, Well, to what degree can the school

11    limit the public -- the semi- -- the limited public

12    forum?  What restrictions on speech can they impose?

13    And that might turn on, What's their aim?  What's their

14    goal?  What authority, what duty are they vindicating

15    in imposing an instruction?  And you seem to be saying,

16    No, no, that doesn't have anything to do with it.

17    MR. KOLDE:  Well, I didn't say that.

18    Two-part answer, Your Honor.  Number one, inherent in

19    the proposition that my clients were engaging in a

20    passive, quiet protest by wearing wristbands is that

21    they were not directing harassing comments at any

22    particular player.  So I think -- I think that's very

23    important.

24    Might there be a different situation if my clients

25    had directed comments at Parker Tirrell or any

1    particular player?  Yeah, this would be a different

2    case.  But there is no evidence of that in this case.

3    And I think it's very important, all the things they

4    have said, they have not pointed to one act of a

5    particular comment being directed, derogatory comment,

6    being directed at Parker Tirrell specifically.  It's

7    not in their declarations.  They talk about things they

8    were worried about that might happen but did not

9    happen, and that's not good enough to censor speech.

10        I think another thing where the Court may have

11    misunderstood me earlier is that we didn't learn until

12    we got their declarations and responsive filings is

13    part of what seems to be motivating them here is that

14    they are upset that our clients talked back to them

15    when they asked them to remove the wristbands.  And

16    they seem to be particularly upset that Kyle Fellers

17    said that they were acting like Nazis.

18        And this is what I was talking about specifically,

19    about talking back to officials, Your Honor.  Okay?

20    They got mad because my clients didn't comply right

21    away.  And, particularly, Kyle Fellers talked to them

22    and called them Nazis, which he is entirely entitled to

23    do.

24        And this is my point in citing *Marshall vs. Amuso*,

25    my case, 571 F. Supp. 3d 412 at 422.  That's a

1          Pennsylvania case, also school boards; *Mama Bears of*

2     *Forsythe County*, also my case, school boards case, 642

3     F. Supp. 3rd 1338, 1350.  That one is the Northern

4     District of Georgia.  Not my case but a very important

5     case, *Ison*, 6th Circuit, 3 F. 4th 887 at 895.  All

6     cases where school board officials got upset because

7     parents were criticizing them in ways they didn't like,

8     and they overreacted by censoring speech.  That does

9     seem to be playing a role here.  That was my point.

10          The wristbands are, in part, directed at the

11     school officials but not specifically.  They don't have

12     their names on them.  My clients weren't waving them in

13     their faces.  They are directed at the community at

14     large.  Many people that were at that event had no idea

15     my clients were wearing the wristbands or what they

16     stood for.  There only was any attention drawn to them,

17     almost like the Streisand effect, when Defendant

18     officials came over and singled them out and made them

19     remove the wristbands.  If they would have just left my

20     clients alone, there wouldn't have been any problem.

21     Likely Parker Tirrell wouldn't have even know that

22     people were wearing these wristbands because, guess

23     what, people wear pink wristbands all the time for

24     different reasons -- breast cancer awareness or just

25     because they want to wear a wristband.

```
1              THE COURT:  The record suggests one of your

2        clients held up a sign, I can't remember what it said,

3        but a sign about this issue aimed at the opposing

4        school bus when it was leaving.  Does that change

5        anything?  That's not a passive wristband.

6              MR. KOLDE:  I would say our focus is on the

7        wristband, Your Honor.

8              THE COURT:  I know.  My focus at the moment

9        is on the sign.  Does that change anything?

10             MR. KOLDE:  So -- I don't think so because

11       the sign didn't say anything --

12             THE COURT:  Clearly, it was directed at

13       students.

14             MR. KOLDE:  It was out in the parking lot.

15       There's no evidence the students saw it.  There was

16       a --

17             THE COURT:  I thought he was holding it up at

18       the bus as it left.

19             MR. KOLDE:  That's what they thought would

20       happen, but the bus wasn't going by; and, you know, my

21       client, if he were to testify, would say, I moved my

22       car so I could watch my daughter's soccer game.  I

23       couldn't see it where my car was parked before.  By the

24       way, I had the sign in my windshield during the entire

25       first half.  It was a positive message about women's
```

1    sports.  It said nothing about Parker.  It said nothing

2    specifically about trans people or trans athletes.

3              THE COURT:  What did it say?

4              MR. KOLDE:  I would have to look at the

5    declaration to get the exact language of it.  Give me a

6    moment, Your Honor.

7         "Protect women's sports for female athletes."

8    It's a handwritten poster.  That's it.  And he would

9    testify the reason he held it up was because he had

10   been excluded from the game and forced to remove the

11   wristband which, obviously, he didn't like and was

12   upset about to the point that he called the school

13   officials Nazis, which they didn't like and almost led

14   to them arresting him.  And by the way, I understand

15   why people wouldn't want to be called Nazis, but

16   Americans have a First Amendment right to say that to

17   government officials.

18        So -- and let's look at what their response has

19   been post this event.  They've created this no-protest

20   zone, or this protest zone, and presumably outside of

21   the protest zone no free speech activity of any kind is

22   allowed.  Presumably, my client if he were to come back

23   to soccer games, and he's not, which is why we're here,

24   could go to the scoreboard area now, the designated

25   protest area, and hold up his sign.  He would actually

1    be closer to the field than he would have been -- than

2    he was on that day.  So, really, their argument doesn't

3    really make any sense.  Again, there's no evidence that

4    Parker --

5              THE COURT:  Do you agree that this -- it

6    turns on a limited public forum analysis, and that, it

7    seems to me at the moment, turns on the extent to which

8    adult speech can be limited in that forum; and that, it

9    seems to me, turns on the extent of the scope of the

10   school district's obligation or authority to protect

11   children.  Isn't that how the analysis would go?

12             MR. KOLDE:  Not in any case I've ever seen,

13   Your Honor.  Not in any case I've ever seen.  In a

14   limited public forum, there is no viewpoint

15   discrimination.

16             THE COURT:  No.  No.  Assuming it's content,

17   not viewpoint; it's no --

18             MR. KOLDE:  What would that be, Your Honor?

19             THE COURT:  I agree it's hard -- well, no

20   protest of any kind with respect to transgender

21   athletes playing on school teams.

22             MR. KOLDE:  That's viewpoint.  That's

23   obviously viewpoint.

24             THE COURT:  No, it's content.  No.  No

25   viewpoint.  Not for.  Not against.  No demonstrations

1    at our school event.

2         MR. KOLDE:  But the record is that people

3    have worn Pride pins and have been observed wearing

4    pro-LGBT messages on school grounds.  So, I mean,

5    clearly, positive messages are allowed, and we all know

6    this wouldn't have happened if somebody was wearing a

7    Pride pin.

8         THE COURT:  I understand that this was a

9    specific restriction tied to the context of the current

10   events; it wasn't -- it wasn't generalized.  It was --

11        MR. KOLDE:  I would disagree, Your Honor.

12   And I would say that it's clear here that the

13   defendants retaliated against my clients for expressing

14   their speech rights and for talking back to them when

15   they were asked to remove the wristbands.  Parker

16   Tirrell --

17        THE COURT:  What evidence is there that they

18   opposed the viewpoint?  I mean, I think there's a note

19   or something that was sent to all the parents by the

20   athletic director.  I agree it wasn't very clear.  It

21   wasn't very effective perhaps, but it had something to

22   the effect of, Hey, different viewpoints are perfectly

23   fine, just don't -- as I read it, just don't bring any

24   demonstration to an activity related to this subject.

25   It's all inferential.  It refers to that game, but I

1    think we agree, in context, we understand that game was

2    about transgender girls participating in girls' sports,

3    right?  Everybody understood that.

4              MR. KOLDE:  May I answer the question, Your

5    Honor, or...?

6              THE COURT:  Yeah.

7              MR. KOLDE:  Okay.  So I would say there's a

8    number of pieces of evidence that show that it was

9    viewpoint discrimination.

10             THE COURT:  No, no, no.  The last question.

11    We all understand and agree, do we not, that the

12    context was this game was significant in that it was a

13    transgender girl playing on a girls' sports team and

14    they were playing in Bow on Tuesday or whatever.

15             MR. KOLDE:  That was part of the context and

16    that made the --

17             THE COURT:  So I'm trying to, in other words,

18    set a context for the athletic director's e-mail he

19    sent to everybody.  When he said, You can have a

20    different view, either side, that's what he was talking

21    about.

22             MR. KOLDE:  Yeah, but that's not how they

23    acted.

24             THE COURT:  Okay.  But do we agree that's

25    what he was talking about?

1    MR. KOLDE:  That you can have a different

2    view?  No, I think that he didn't mean it because --

3    THE COURT:  No.  No.  You're missing the

4    point.

5    MR. KOLDE:  Okay.  I'm missing the point.

6    THE COURT:  Try again.  Do we agree that when

7    he wrote that -- I agree, unspecific, perhaps not

8    effective -- memo to all the parents, when he said, You

9    can have different viewpoints on this and that's okay,

10   do we agree that what he's talking about is transgender

11   girls playing on girls' sports teams?

12   MR. KOLDE:  Probably.  Probably.

13   THE COURT:  Okay.  Good.  That's all I was

14   trying to get.

15   MR. KOLDE:  Okay.  Good.  But you asked me

16   what is the evidence that this is viewpoint

17   discriminatory.

18   THE COURT:  Right.

19   MR. KOLDE:  There's several pieces.  One, it

20   starts with the e-mail sent by Marcy Kelley several

21   days ahead of time when they say, "We've caught wind of

22   a protest, and we want extra support."  So they caught

23   wind of a protest and they understand people are going

24   to express opposition to the inclusion of biological

25   males in female sports.  All right?  So that's a

1    viewpoint.  Clearly, it's a viewpoint.  It's viewpoint

2    based.  It's only because this one trans player is

3    going to be present there.

4        In the actual no trespass notices that were issued

5    by Marcy Kelley, there is a reference to the speech

6    activities of my clients, which shows that it

7    was the -- their protest, their silent protest, which

8    was the problem.  "The reason for this action is your

9    conduct during the girls' varsity soccer game on

10   Tuesday, September 17th, specifically prior to and

11   during the soccer game, you brought and distributed

12   pink armbands to parents and other attendees to protest

13   the participation of a transgender female on the other

14   team."

15       That is absolutely viewpoint.  I mean, they put it

16   in writing on an official document.  It's in both of

17   the no trespass orders.  It's just -- is refutable.

18   And they are proud of it, Your Honor.  They think

19   they're right, and they have the right to do this.  And

20   you know what?  People can disagree, and they can have

21   their view, but my clients have a right to passively

22   express their views on this issue in a way that did not

23   interfere with the game and did not impinge on Parker

24   Tirrell's rights, or anyone else's rights there,

25   because it was an open, public forum.

```
 1            This is viewpoint discrimination.  It's
 2     automatically --
 3            THE COURT:  I tend to agree with you and
 4     then -- your comment raises, again, that specter of
 5     doesn't this factual record require development, and
 6     don't factual findings have to be made as to exactly
 7     what you described?  Was that, in fact, the case, or
 8     was it in fact --
 9            MR. KOLDE:  Not for a TRO and not given that
10     they actually don't dispute that this was viewpoint
11     based.  They haven't disputed that and, like I said,
12     they're proud of it, and they said, This is why we did
13     it.
14        I want to address just one other issue because
15     it's part of the posture of why we're here on the TRO,
16     Your Honor.  There's limited time left in the season.
17     Some of my clients have already lost the right to be
18     present at numerous games -- in Kyle Fellers' case,
19     five games, to support his daughter.  There are five
20     games left in the regular season, including one
21     tonight.  Please note that the no trespass order is
22     extraterritorial; it applies to away games also, so he
23     would be risking arrest or extension of that order if
24     he goes to the away game.
25            THE COURT:  How does that work?  How does the
```

1      Bow School District prohibit attendance at a

2      Winnacunnet School District game?

3              MR. KOLDE:  They may have interlocal

4      agreements.  I don't know.  "You are also prohibited

5      from attending any Bow School District athletic or

6      extracurricular event on or off school grounds."  It

7      applies to away games.  That's what they said.  And I

8      could not, in good conscience, advise my client to go

9      and get arrested.

10             THE COURT:  Right.

11             MR. KOLDE:  Okay?  So there's a game tonight.

12     There's four more games after this, and, potentially,

13     there's playoffs.  So we need short-term relief to

14     allow him to go back to the games.  He does want to

15     express his views through passive, silent protests by

16     wearing the pink wristbands.  That's the most important

17     part.  You know, he would like to also display signs in

18     the parking lot, but the wristbands are the most

19     important part and being able to display them on

20     sidelines.

21         And here's what I think is very important.  There

22     is no evidence in the record, and that's because there

23     isn't evidence to that effect, that there are going to

24     be any trans players at any of these games.  Okay?

25     Plymouth is not on the schedule.  Parker Tirrell --

1          THE COURT:  Just so I have your position

2     because I'm writing now --

3          MR. KOLDE:  Yeah?

4          THE COURT:  -- your position is, your client

5     seeks an injunction that would -- or a restraining

6     order that would permit him to not only attend these

7     games but to protest in support of, or against, the

8     inclusion of transgender girls on girls' sports teams.

9          MR. KOLDE:  Yes, and to protest in support of

10    women's sports.  There's multiple messages.  Part of it

11    is, we want to celebrate women's sports; and part of

12    that celebration is, we don't want, you know,

13    biological men included in competing in women's

14    sports --

15         THE COURT:  Right.  Okay.

16         MR. KOLDE:  -- but passively, by wearing the

17    pink wristband.

18       Importantly, if this is about protecting Parker

19    Tirrell, Parker Tirrell is not going to be there.

20    Parker Tirrell is not going to be at any of the games

21    that are going to be on the schedule.  Not tonight.

22    Not at the end of the week.  Not through the end of the

23    season.  Plymouth is not on the schedule.  No evidence

24    that any trans player is going to be there.

25       So if their real goal was to protect Parker

1  Tirrell, that is not met by excluding my client Kyle

2  Fellers or by preventing my other clients from

3  passively expressing their viewpoint by displaying

4  their pink wristband.  It does show to me, however, and

5  I would urge the Court to take note of this, that this

6  is punitive, and that is shown by the tone and the

7  actions of Marcy Kelley specifically.

8      She all but admits this in her declaration.  She

9  uses very paternalistic language almost like my clients

10  are children in one of her classes.  The gist of her

11  response is, Speech has consequences.  We told you not

12  to express your views.  You didn't listen to us.  We

13  saw your pink wristbands, and even though nobody else

14  knew what was going on, we swooped in, asked you nicely

15  to take them off, and then you said mean things to us.

16  You accused us of violating First Amendment rights, and

17  you called us members of a foreign political party not

18  known for tolerating dissent.

19      History, Your Honor, does not always repeat

20  itself, but it does sometimes rhyme.  It rhymes here.

21  We are not in New Zealand or Continental Europe.

22  Americans are allowed to engage in speech that

23  government officials disagree with.  We're allowed to

24  criticize government officials specifically including

25  in ways that are unkind.

1          Let's engage in a thought experiment.  If their

2     speech crackdown was really about protecting Parker

3     Tirrell, why is Kyle Fellers banned from attending

4     soccer games in which Parker Tirrell is not playing in?

5     This is retaliation, First Amendment retaliation.

6          We all know the reason.  Marcy Kelley is sending a

7     message:  If you cross me, there will be consequences.

8     I'll punish you by keeping you from being able to watch

9     your kid or even picking up your kid.  My client can't

10    even pick up his daughter from soccer practice.  What

11    does that have to do with protecting Parker Tirrell?

12    Parker Tirrell is not at the Bow High School soccer

13    practice.

14               THE COURT:  Was that not modified?

15               MR. KOLDE:  No.

16         The day after we filed this lawsuit, they also

17    doubled down on their speech restrictions by appointing

18    a designated protest area by the scoreboard and away

19    from the sidelines.  It's wholly unnecessary for a

20    silent protest wearing wristbands.  Also doesn't make

21    any sense.  Let's say that somebody wanted to protest

22    in favor of trans rights by wearing a Pride flag pin to

23    a girls' cross-country event on the sidelines -- which,

24    by the way, we would defend their right to do that --

25    can't do it under this policy.  If you want to do that

1     at a cross-country event, silently express support for

2     trans rights, you have to go to the designated protest

3     area by the soccer field, and you can only do it before

4     and after a girls' soccer game, not during the

5     cross-country event or maybe a swimming event or some

6     other sport.  It's clearly targeted at my clients.

7     Just the whole zone is viewpoint discriminatory.

8          If you want to express your support for the

9     Harris/Walz ticket or Kelly Ayotte for Governor by

10    wearing a t-shirt, you can only do it in the designated

11    protest area.  You can't wear it anywhere on school

12    property, and you can only do it during girls' -- or

13    right before and after girls' soccer games.  Makes no

14    sense.

15         Also, look at the e-mail from Marcy Kelley

16    transmitting the notice, Your Honor.  She threatens to

17    suspend soccer games if parents don't comply.  She even

18    suggests spectators will be banned altogether, no

19    spectators, even in the complete absence of any other

20    disruption, holding the parents' First Amendment rights

21    hostage to their wish to support their own kids on the

22    athletic field.  Why is that?  Because she wants to

23    control their speech.  The creation of the designated

24    protest area itself is evidence of viewpoint

25    discrimination, as if we needed any more.

1          So I have focused on our request for relief

2     already.  We want both the ability for Kyle Fellers to

3     return to the soccer games and to pick his daughter up

4     from soccer practice.  We also, in particular, wanted

5     the right to silently and passively protest by wearing

6     the pink wristbands and also by displaying signs in the

7     parking lot.

8          The second component here is that my clients are

9     self-censored, Your Honor.  They have been deprived of

10    their right to silently and passively express their

11    support for women's sports.  That harm is ongoing,

12    being the right to speak is, per se, irreparable harm.

13    Any reasonable person under these circumstances would

14    not want to risk getting banned or arrested or cause

15    any Bow soccer team to forfeit a playoff spot because

16    Marcy Kelley is unhappy with parents who were

17    expressing a viewpoint that she disagrees with.

18         I think I want to close, Your Honor, by just

19    pointing out the definition of harassment in the *Doe*

20    *vs. Portland Public Schools,* that's the 701 F. Supp 3rd

21    18 at 36, District of Maine case, fairly recent.  It

22    quotes from the Merriam-Webster dictionary definition.

23    "Harassment" means to annoy persistently, to create an

24    unpleasant or hostile situation for, especially by

25    invited and unwelcome verbal or physical contact.  Goes

1    on to Black's Law Dictionary likewise defines

2    "harassment" as words, conduct or action, usually

3    repeated or persistent; that being directed at a

4    specific person, annoys, alarms or causes substantial

5    emotional distress to that person and serves no

6    legitimate purpose.

7        There is no evidence of any of that in this case.

8    Even they admit that.  They talk about speculation

9    about disruption that they feared might happen.  They

10    don't actually provide any evidence of disruption; that

11    it actually happened, and any evidence that Parker

12    Tirrell even knew what was going on when my clients

13    were passively expressing their viewpoint on these

14    issues.

15        If the Court doesn't have any further questions,

16    I'll --

17            THE COURT:  Just a few, and I probably will

18    later, but whatever the result on the TRO, you know,

19    you included a claim for minor compensatory and nominal

20    damages and so on.  That's a jury issue.  What I

21    propose is, whatever the result on the TRO, maybe an

22    expedited evidentiary hearing on a preliminary

23    injunction, combine the permanent injunction with the

24    preliminary, do it quickly and get it done.  But that

25    would -- you would still have those claims for monetary

 1    damages on there.  One -- go ahead.

 2              MR. KOLDE:  Your Honor.

 3              THE COURT:  I won't confuse it.

 4              MR. KOLDE:  I do a lot of these; this is my

 5    job.  Usually, if there's preliminary injunction, not

 6    always, but usually people work things out and they

 7    resolve it, and we have resolved some cases of minor

 8    compensatory damages.  My clients have been

 9    inconvenienced by this.  That's why we put it in there.

10    We're not talking about large dollar amounts.

11              THE COURT:  No.  No.  I know, but it's

12    procedurally a nit.  So I'm proposing that whatever the

13    result on the TRO, we have a preliminary injunction

14    hearing reasonably quickly, whenever it's convenient,

15    have an evidentiary hearing, combine the permanent

16    injunction hearing with the preliminary and get it

17    done.

18              MR. KOLDE:  We're good with that.

19              THE COURT:  You're good with that?  Okay.

20    Good.  Darn it.  I forgot the second one.  Let's see.

21        Oh, you have the police officer --

22              MR. KOLDE:  Lamy.

23              THE COURT:  -- and the NHIAA official, which

24    is fascinating, legally interesting to me probably not

25    to everybody else, but, you know, the NHIAA in New

1    Hampshire is a quasi-state agency with their own

2    defined contours.  So I'm not sure how qualified

3    immunity applies or doesn't apply to the soccer

4    official.  I'm inclined to think it probably does

5    apply.  Do we need to get into any of that?  I mean,

6    the police officer -- qualified immunity definitely

7    applies to the police officer; we have to litigate

8    that.

9              MR. KOLDE:  Eventually, we would have to get

10    into qualified immunity, Your Honor.  I mean, our

11    concern is --

12              THE COURT:  It definitely applies to the

13    Board.

14              MR. KOLDE:  We would argue that there's --

15              THE COURT:  No, I mean, you're talking about

16    $17.

17              MR. KOLDE:  17.95.

18              THE COURT:  Yeah, it doesn't affect the

19    injunctive relief; it just affects the $17.60 or

20    whatever.

21              MR. KOLDE:  That's right.

22              THE COURT:  Yeah.  Keep that in mind.  Your

23    clients probably -- maybe they don't care about the

24    expense, but you probably don't want to spend that kind

25    of money to litigate that issue.

```
 1              MR. KOLDE:  Well, we do deal with qualified

 2      immunity all the time.  My clients are represented pro

 3      bono; we represent all of our clients pro bono.  So we

 4      are a donor-supported organization.

 5              THE COURT:  Please don't tell me you're

 6      talking about litigating qualified immunity for $17.

 7              MR. KOLDE:  Well, right now, that's our

 8      claim, Your Honor.  But we think that people -- we

 9      think that people ought to know that there is no --

10              THE COURT:  But it doesn't affect the

11      injunctive relief.

12              MR. KOLDE:  It does not affect injunctive

13      relief at all.  Qualified immunity has no effect on

14      injunctive -- declaratory relief.

15              THE COURT:  It's only the $17.

16              MR. KOLDE:  Yeah.  And, look.  If we get --

17      our main focus is on --

18              THE COURT:  How about if I give you the $17?

19              MR. KOLDE:  If they write us a check for

20      $17 --

21              THE COURT:  No, I'll do it.

22              MR. KOLDE:  We don't want it from you, Your

23      Honor.

24              THE COURT:  It's the hearing.

25              MR. KOLDE:  We would like the injunction.
```

1           THE COURT:  Okay.

2           MR. KOLDE:  We would like the injunction.

3      That matters to us the most, we can see about the other

4      claims if we get the injunction.

5           THE COURT:  Thank you, Mr. Kolde.  And if you

6      have rebuttal, I'll allow that.

7           MR. KOLDE:  Thank you, Your Honor.

8           THE COURT:  All right.  Mr. Cullen.

9           MR. CULLEN:  Thank you, Your Honor.  I'm here

10     with Superintendent Marcy Kelley, and my colleague,

11     John Shirley.  And I think you said at the very

12     beginning of this that context matters, and I think

13     context does matter here.

14          THE COURT:  Well, let's start out, if you

15     don't mind, both of you rely heavily in your briefing

16     in *Tinker*.  I don't think it's a *Tinker* analysis, is

17     it?  It's a limited public forum analysis.

18          MR. CULLEN:  I think the way you explained it

19     is the right steps -- that you look first at limited

20     public forum, and then you look to *Tinker* to see, and

21     most importantly now the *L.M. vs. Middleborough* case to

22     determine within that limited forum step what the

23     school can do and can't do.  So I think you're right in

24     that it informs the Court as to the propriety of what

25     they were doing, and that's where the context here

1     really does matter.

2          Here, the context is, you know, noticeably absent

3     protest the plaintiff's papers -- and, incidentally, I

4     was kind of looking over --

5               THE COURT:  Sorry.  I apologize.  It's my

6     habit to interrupt --

7               MR. CULLEN:  It's your court.

8               THE COURT:  -- and I apologize.

9          All right.  So we're in agreement, both parties

10    are in agreement, that it's not a *Tinker* analysis; it's

11    a limited public forum analysis.  Right?

12              MR. CULLEN:  Yes, I believe that's true.

13              THE COURT:  Okay.  Let's go.

14              MR. CULLEN:  Here, I think still the facts

15    matter.  And a little aside, I noted that it sounded

16    like Plaintiff, it sounded like he was reading from my

17    client's declaration, but he was not.  I don't know

18    where all that stuff came in that Marcy Kelley

19    admitting that she's out to get kids and -- you know, I

20    don't know where -- I trust that the Court understood

21    that that was sort of a riff, and not actually text.

22              THE COURT:  I took it as argument.

23              MR. CULLEN:  Yeah.  So -- but going back to

24    the context, as this Court is aware the *Tirrell*

25    decision came out on the preliminary injunction on the

1      10th.  On the 11th, Mr. Desilets specifically has

2      attested that he heard that there was talk at the last

3      game that there was going to be a protest that could

4      even involve, you know, potentially heckling and other

5      things.  And so for them to say this has nothing to do

6      with the trans athlete; this has everything to do -- is

7      farcical.  But even on the morning of -- and this is

8      Desilets' Exhibit A, which is Document 22-2, Your

9      Honor.  Anthony Foote, the plaintiff, writes -- and

10     this is in the second paragraph, "This isn't just

11     another game, not by a long shot.  None of you had a

12     single conversation with our team.  None.  You ignored

13     us, and now you expect us to go along with this."  That

14     was noticeably absent from the plaintiff's discussion

15     of the events where he tried to suggest to you that

16     this was nothing -- this wasn't just another game --

17     that this was just another game; this was just

18     something they just wanted to come out and protest.  So

19     I think it's important that that is the context.  This

20     is at 7:28 a.m. that morning, and that is in the shadow

21     of the prior information that they had about the

22     possibility of the protest.

23         So I think when it comes down to the actual

24     actions on the 17th, what the school did was

25     entirely -- was entirely appropriate and even compelled

1    in order to protect a trans student; in this case, a

2    player on the other side.

3            THE COURT:  Protect them from what?

4            MR. CULLEN:  Well, protect them from

5    harassment and disruption of their -- of their

6    educational development.

7            THE COURT:  And how is wearing a pink tennis

8    wristband with two Xs on it harassing?

9            MR. CULLEN:  So there's two aspects to this,

10   first of all, Your Honor, for me to answer that.  First

11   of all, let's just take a look at these wristbands if

12   we can because they're not just pink XX wristbands;

13   they're wristbands with the word "NAD" written on them.

14   It's interesting that they constantly refer to these as

15   just pink wristbands, but they're not.  These are

16   clearly anti-trans messages.

17       The other thing is that -- at least on the 17th --

18           THE COURT:  Are they understood -- again,

19   another factual issue.  Are they understood as

20   anti-trans, whatever that might mean, as opposed to

21   transgender girls should not be playing on girls'

22   sports teams?

23           MR. CULLEN:  As you say, I think that

24   probably needs further development.  I know that the

25   plaintiff was concerned that he only got our papers

1    yesterday afternoon, neglecting to point out that he

2    only filed his TRO Friday afternoon himself.

3            THE COURT:  I mean, I would be curious to

4    know, what's the common understanding and

5    interpretation of that?  We can all put our own on it,

6    but what is the common understanding and interpretation

7    of those symbols?

8            MR. CULLEN:  My understanding is that the

9    "NAD" is that it is short for gonad, and that's not a

10   supportive -- that's not a term that's put out there to

11   support female soccer players.

12       The XX, I think, has been used in the past --

13           THE COURT:  You know, one person's support is

14   another person's challenge.  So that's not helpful.

15       The question is:  What is it that the school

16   district is trying to control here?  What -- what is

17   it?  It's clearly speech, right? Colored speech.  What

18   is the basis for suppressing that speech?

19           MR. CULLEN:  It's the same as the First

20   Circuit outlined in the *L.M.* case; it is the protection

21   of a protected class against the -- and this is where

22   *Tinker* does play, because it talks about, and

23   illustrates for us, that there are limitations that can

24   be there where either there's going to be a disruption

25   or where it's going to collide with the interest of

1    others, and this is where it collides -- it certainly

2    collides with the interest of others.  *L.M.* obviously

3    took the disruption path and said you don't need to

4    have a physical disruption; you don't have to have

5    mayhem on the sidelines.  It disrupts the students'

6    educational progress.  We cited the -- didn't have a

7    lot of time, but we cited one CDC study that talked

8    about how LGBTQ students have higher rates of

9    depression.

10          THE COURT:  Again, I mean no criticism when I

11    suggest these aren't factually or legally developed

12    sufficiently, because these are very nuanced in my view

13    and complicated issues.

14      Surely, it is not harmful to a transgender student

15    playing on a girls' team to know that there are a group

16    of people out there -- they don't hate transgender,

17    they're not bigoted in that sense, but for reasons of

18    sports challenge concepts or whatever, they don't think

19    that a transgender girl should be playing on a girls'

20    team.  That's not an illegitimate point of view.  It's

21    not an inherently bigoted point of view or hateful

22    point of view, is it?  There are a lot of experts that

23    agree with that.

24          MR. CULLEN:  I don't see how it's any

25    significantly -- how it has any difference from the

1          "there are only two genders."  I'm sure the plaintiffs

2          in that case made the exact argument that you're

3          suggesting.  And the First Circuit said, no --

4                    THE COURT:  You don't see a difference there?

5          I see a difference there.

6                    MR. CULLEN:  Well, I think --

7                    THE COURT:  There are only two genders,

8          you're not a real person to the extent that you claim

9          to be this or that, as opposed to biological males

10         shouldn't be playing on girls' teams for reasons of

11         muscle, strengths, speed, whatever, whatever.  I mean,

12         is that -- is that harmful to a student to know that

13         there's a group out there that thinks that?  Is that

14         harassing?  Is that intimidating?  Is that threatening

15         in some way?

16                    MR. CULLEN:  I think it has no place on the

17         sideline of a game --

18                    THE COURT:  That's a different state.  That

19         doesn't count.  You can't suppress free speech based

20         upon the fact that you think it's inappropriate.

21                    MR. CULLEN:  But the location matters as

22         well.

23                    THE COURT:  Well, that's why I asked the

24         question.  What's the extent of the district's power to

25         limit speech?  It has to be legitimately related to

1    some cognizable problem, right?

2             MR. CULLEN:  Right.

3             THE COURT:  What is it?  What's the problem,

4    and what is it that you're limiting it for?

5             MR. CULLEN:  The cognizable problem in this

6    case is exactly what was laid out in the *Middleborough*

7    case.  It's students' ability to develop, students'

8    ability to learn, the difficulty that students face

9    when they suffer harassment.  That's what *Middleborough*

10   said.  I've seen -- that case was further along than

11   this one, and there was a lot more opportunity to

12   develop some of those issues, but that's -- you know,

13   that's the same issue that *Middleborough* the First

14   Circuit said was a legitimate concern for the school,

15   and that they could legitimately want to protect that.

16            THE COURT:  What's the extent -- I'm having a

17   hard time identifying the extent of the limitation put

18   on the speech.  What was the limitation?

19            MR. CULLEN:  The limitation was that they

20   couldn't come out and protest with their -- they

21   couldn't come out and protest on the sidelines of the

22   game.

23            THE COURT:  Where does that come from?  I've

24   looked at Mr. Desilets' e-mail and the attachment and

25   the school's policy, and I don't see anything there

1       that's that specific.

2                MR. CULLEN:  Well, I think when they

3       specifically said -- well, they went up and asked them

4       to stop, so --

5                THE COURT:  No.  No.  But the school district

6       says, You're wearing these bands; you can't wear the

7       bands.  You've been put on -- you've even been put on

8       notice that you can't wear the bands.  So I look at the

9       record and say, Okay, where's that?  So I ask you:

10      Where's that?

11               MR. CULLEN:  I don't think there's anything

12      in the record and I don't think there will be anything

13      in the record that says that the Footes or Mr. Fellers

14      were specifically on notice that they couldn't wear

15      these armbands, but they were --

16               THE COURT:  Okay.  So back up a step of

17      generality.  You can't protest.

18               MR. CULLEN:  Right.

19               THE COURT:  Protest what?  Protest

20      transgender girls playing on girls' teams, because I

21      don't see that?

22               MR. CULLEN:  Yeah.  You can't come to this

23      game and bring your protest to this game.  It doesn't

24      have to be that; it --

25               THE COURT:  Where does it say that?  Where is

1    that noticed?  In other words, point to the authority

2    that you're using to say you can't do that.

3                MR. CULLEN:  If the school had already came

4    up with a policy that night and wrote it, it wouldn't

5    make any difference.  The fact is they said, you can't

6    protest and then they went up and they informed Foote

7    and Fellers, like, look, you gotta take off the bands.

8    That's the notice.  They could have taken off the bands

9    then; they didn't.

10               THE COURT:  I know.  I guess I'm looking for

11   the -- one of the issues of that, I think the principal

12   issue in this case is, what's the extent of the school

13   district's authority to limit speech at a school soccer

14   game?  What's the extent of it?  And where does it --

15   where are they pointing to say this violates this

16   policy?  It can't just be arbitrary, right?  It can't

17   just be the school board member walking around saying,

18   I don't like that; take it off.  Can't be that.

19               MR. CULLEN:  I think -- it can't be that,

20   but, Your Honor, at the time of the game, if the person

21   comes up and tells you, you gotta remove something,

22   that's not the time to get into an argument on the

23   sideline with the people.  The time to do that is to go

24   back --

25               THE COURT:  That may be.  But that begs the

1    question:  Do you have the right to have that armband

2    on?

3              MR. CULLEN:  I don't think you do have a

4    right to have that armband.

5              THE COURT:  Why?

6              MR. CULLEN:  Because it's clearly out there,

7    and they admit as much in their papers and, in fact,

8    the plaintiffs' counsel admitted as much that this is

9    not just supportive; it's also against trans.  It's a

10   symbol --

11             THE COURT:  Is it okay to be for transgender

12   girls playing on girls' teams?  Is it correct for

13   Mr. Kolde to argue that if it was an LGBTQ-supportive

14   wristband, that would be okay; nobody would have said,

15   "Take it off."

16             MR. CULLEN:  We wouldn't allow to have

17   protests one way or the other on this issue.

18             THE COURT:  Okay.  That's a different

19   argument.  Where do I find that?  Where is it that I

20   can look at your policies and say, This is viewpoint

21   neutral?  This is content -- this is just no

22   demonstrations, no protests?  Where?

23             MR. CULLEN:  This is where Plaintiffs want to

24   sidetrack, and I understand where the Court is going

25   with this.  But you can have bans -- and we regularly

1    do have bans -- on, like, the no-gender shirt, two

2    gender shirts, or things that are against other

3    minorities, like, based on race or religion or other

4    things, and we have those.  And we don't have -- we

5    can't necessarily identify every single thing before it

6    happens.  You have to let the -- you have to let the

7    schools decide, within the context of our school, how

8    does this impact our students?  The school has trans

9    students; it's not just Parker Tirrell here.

10           THE COURT:  In an evidentiary hearing, can

11   you make a proffer as to what the school authorities

12   would testify to with respect to this particular --

13   these particular bans?

14           MR. CULLEN:  I'm not sure what you're asking,

15   Your Honor.

16           THE COURT:  Why does this ban transgress the

17   school policy?  What school policy does it transgress

18   and in what way?

19           MR. CULLEN:  I believe that the school would

20   attest that this violates the school policy against

21   discriminating against students, and that this

22   discriminates against trans students who, we understand

23   by this Court's ruling, to be a protected group.

24           THE COURT:  So it is viewpoint?

25           MR. CULLEN:  I think every case that comes

1    down to protecting a protected class has a viewpoint

2    aspect to it because that's -- those are the people who

3    are being attacked, but we would not let -- we would

4    not let students come to the game and hold up big signs

5    and say, you know, "trans rights are human rights" or

6    things like that.  This is not the forum for that.  It

7    is a limited public forum, and it's open for the

8    purpose of letting invitees come in and watch the game.

9             THE COURT:  That's kind of what I was getting

10    at.  Would the proffer of testimony be that you

11    wouldn't have allowed that either?

12             MR. CULLEN:  Wouldn't have allowed the signs?

13             THE COURT:  Yeah.  Supporting transgender

14    rights --

15             MR. CULLEN:  Yes, Your Honor.  That is it.

16    We would not allow that either.  This is not -- this is

17    not a public forum.

18             THE COURT:  How would you justify that?

19             MR. CULLEN:  For the same reason.

20             THE COURT:  That wouldn't be harassing; that

21    would be something else.

22             MR. CULLEN:  That would be that this public

23    forum was open for one purpose, and that's to come out

24    and watch the game and see your kids play, and that's

25    why people can come to the games and that's what they

1    can do.  This isn't the place to argue about the

2    budget.  This isn't the place to argue about other

3    things.  This is the place that's open for one purpose.

4    And that's what the cases say on limited public forum;

5    that we have to focus on, what is the public forum open

6    for.  If it's a school board meeting, it's open to

7    discuss school issues.  If it's a soccer game, it's not

8    the place to have those.

9            THE COURT:  Okay.  Is -- was that silent

10   protest, if you will, within or without the scope of

11   the activity?

12           MR. CULLEN:  It's without the scope of the

13   activity.

14           THE COURT:  Why is that?

15           MR. CULLEN:  Because the whole purpose was to

16   target this one student and they admit as much.

17           THE COURT:  You agree that's a factual issue

18   as well?

19           MR. CULLEN:  Sure.

20           THE COURT:  They say it wasn't; you say it

21   was.  What's the evidence that it was?

22           MR. CULLEN:  I think the evidence is right

23   here.  This is -- you know, you ignored us; now you

24   expect us to just go along with this.  I'm leader, and

25   a real leader doesn't stand by while players are thrown

1    in harm's way.  Stand up for women, for real women, or

2    get out of the way.  I mean, that's where it comes

3    from.  Plus the Facebook posts that I think are already

4    in the record as well.  I mean, this is --

5            THE COURT:  But isn't that -- isn't that

6    issue-oriented?  I don't see it -- what's the argument

7    that it's targeted to this particular player?  In other

8    words, the school district's position, I assume, is,

9    Look, we have a duty to protect this player, and this

10   was an assault on this player; this was some sort of

11   intimidation or harassment of that player.

12           MR. CULLEN:  I guess I would ask if the

13   words, "This isn't just another game," don't have

14   anything to do with the fact that Parker Tirrell is

15   playing in that game, what do they mean?

16           THE COURT:  I'm missing the point.

17           MR. CULLEN:  I think it's --

18           THE COURT:  Their position is, we are

19   against, in principle, transgender girls playing on

20   girls' teams.  Your position is, no, you were there to

21   harass and intimidate a particular player and students

22   in general with this sort of anti-transgender

23   identity-challenging protest.

24           MR. CULLEN:  Yeah.  And that's the exact type

25   of thing that the courts regularly let administrators

1     make those determinations.

2              THE COURT:  Well, they do in student

3     contexts, but I haven't found a single case, any case,

4     where an adult invitee to an open, public forum was

5     told that they couldn't express a passive political

6     view.  I haven't found one.

7              MR. CULLEN:  Right.  Well, I would suggest,

8     Your Honor, that students -- you had mentioned the

9     rights are different.  I would say that students

10    arguably would have more rights because they're

11    compelled to be in school from 8 a.m. to 3 p.m.; the

12    parents don't have to be there.

13             THE COURT:  Their rights to free speech are

14    more limited, not less limited.

15             MR. CULLEN:  Sorry?

16             THE COURT:  Their rights to free speech,

17    students, are more limited.

18             MR. CULLEN:  Within the school building.  But

19    here, the parents are people who have been invited in;

20    they're invitees for a limit purpose, and they're

21    invitees to a limited purpose forum.  They can speak

22    all they want.  They can go across the street.  They

23    can go -- Nicole Foote came in and met with Mike

24    Desilets before the game.  They have lots of

25    opportunities to express their opinion.  This forum was

1      not opened for them to express anti-trans or anti-Black

2      or pro-trans.  It's just not open for those purposes.

3              THE COURT:  I haven't seen that in the

4      policies that I've seen or the athletic manual, the

5      excerpts that I've seen, or in the affidavits that I've

6      seen.

7              MR. CULLEN:  Right.

8              THE COURT:  I've seen -- I've seen

9      restrictions based upon harassment, intimidation,

10     threats, even bad sportsmanship, I guess, but I haven't

11     seen that.  Where would that -- I know what you're

12     saying is it's just inherently everyone understands it.

13             MR. CULLEN:  No.  Your Honor, I don't think

14     you're asking them to go back and think to the

15     beginning of school, What are the possible things that

16     can come up this year?

17             THE COURT:  No.  I'm asking, if you made an

18     evidentiary proffer, I'm asking what the evidence would

19     be and who determined that wearing pink -- these pink

20     wristbands represented speech that was outside the

21     scope of the activity, the purpose for which the forum

22     was being used?  Who decided that, and why would they

23     decide that?  How did they decide that?  It's viewpoint

24     neutral.  It's gotta be viewpoint neutral.

25             MR. CULLEN:  I'm not 100 percent sure that's

1    accurate, Your Honor, because there's lots of things

2    that we limit people from doing because it's hate

3    speech.  You can -- that's just -- you know, we limit

4    hate speech.

5            THE COURT:  Well, I thought we covered that

6    already.  I do not think, as a matter of social-legal

7    policy, that transgender girls should participate on

8    girls' high school sports teams.  That's not hate

9    speech.

10           MR. CULLEN:  I'm not suggesting it is.  What

11   I'm suggesting to you, Your Honor, is there are certain

12   types of speech that you could always argue is really

13   just a viewpoint, but we still don't allow it.  We

14   don't allow people to yell at the referees about, you

15   know, their calls.  We don't allow them to call the

16   referees names.  We don't -- that's -- we just don't

17   allow that sort of conduct.  We don't allow conduct

18   that's targeted at individuals, whether we think of

19   this as harassment, which I think it is.  And also keep

20   in mind, of course, that on that day in particular, the

21   school doesn't have to wait to see whether the other

22   things that have been predicted are going to come to

23   pass, and then the damage is done.  They see this

24   happening -- but going back to your question:  When was

25   the policy made?  The school isn't going to be able to

1    predict what the next thing to happen is.  Each year

2    something new comes up -- but, but, but -- sorry.  I

3    apologize.

4            THE COURT:  Yeah.  But legally your answer

5    has to be something like, we have the authority to

6    limit speech in this limited public forum on grounds

7    that... has to be that.  And, by the way, it's

8    viewpoint neutral.

9            MR. CULLEN:  Right.  I think it's the night

10    before or a couple days before, I think maybe the 13th,

11    when Mr. Foote posts his picture of the variety of

12    wristbands.  And, you know, in the context of hearing

13    that there's going to be some sort of protest that

14    could include heckling, yeah, they come to an agreement

15    that, We're not going to allow this.  And then they go

16    to the game and they wait, and when they see the

17    wristbands they're like, Okay.  Second half apparently

18    that's when the protest is going to be, and they

19    correctly shut it down, again, because this is not the

20    forum for that.  They had other forums.  They used

21    other forums to convey their messages.  This is just

22    not the forum.

23            THE COURT:  Do you contend it was disruptive?

24            MR. CULLEN:  I would say that under *L.M.*,

25    it -- no.  The silent was not disruptive as to

1    disrupting the game.  It wasn't physically disruptive.

2    But under the *L.M.-Middleborough* case, this type of

3    message is disruptive to a student's development, and

4    the First Circuit said that is a category of disruption

5    that the Court should be considering.  We don't have to

6    have a melee on the sideline to characterize something

7    as disruptive, according to the First Circuit.  I

8    didn't make it up.

9         THE COURT:  Okay.  Once again, I think -- I

10    mean, Mr. Kolde agrees, I think, that if this protest

11    was aimed at that student, or trans students in

12    general, that would be a problem, but it wasn't.

13         You say context says it was.  We're not here.  We

14    have bare evidentiary proffers.  Doesn't that require a

15    factual, complete developed record?  Isn't that the

16    turning point pretty much?

17         MR. CULLEN:  Yeah.  If we need to have that,

18    then we should schedule something, ideally, not this

19    week since I just canceled my flight to Ireland last

20    night so I could be here today, but maybe early next

21    week.

22         THE COURT:  I was going to let you decide

23    between counsel when it's convenient for you.  But

24    that's what's troubling me.  I don't think you can make

25    these decisions without a factually developed record.

1            MR. CULLEN:  There's certainly -- there's no

2       reason that this had to be teed up on a Friday

3       afternoon for a Tuesday afternoon hearing.  There was

4       time.  In the plaintiffs' case in *Tirrell*, they filed a

5       motion, and they filed a TRO, and they filed it all

6       together.  As the plaintiffs say, there have been, you

7       know, nearly a half a dozen games since these -- since

8       the trespass orders went into effect.  So I agree with

9       you.  We may need a further hearing.

10           THE COURT:  I'm taking a wild guess, but you

11      would oppose -- you would oppose a limited TRO allowing

12      the plaintiffs to attend games wearing the pink

13      wristbands?

14           MR. CULLEN:  I would, Your Honor, but I want

15      to also carve out --

16           THE COURT:  Just I'm --

17           MR. CULLEN:  I apologize.

18           THE COURT:  Mr. Kolde, your position is

19      pretty hard:  They're not going to go to the games

20      without the wristbands?

21           MR. KOLDE:  Well, Mr. Foote and Mrs. Foote

22      have been going to the games but not wearing the

23      wristbands because they don't want to have another no

24      trespass.

25           THE COURT:  Well, they're expired, right?

1          MR. KOLDE:  Yes.  But they're not wearing

2     them out in the open; they're wearing them under

3     clothing.

4          THE COURT:  So they have a choice.  But

5     Mr. Fellers does not have a choice.

6          MR. KOLDE:  He does not have a choice.  He

7     wants to both go, and he also wants to express his

8     right quietly.

9          THE COURT:  Okay.  But I guess they're not

10     going to agree they can go wearing the wristband.

11          MR. CULLEN:  Absolutely not, and that's

12     because of his conduct after this.  If he just complied

13     and put his thing away, or if he had just protested in

14     the way that Mr. Foote did, but he left the game.  He

15     went out, he held up a sign.  He says he could see the

16     game from where he was watching it, so he said, I went

17     back and I moved my car to a position where I could

18     watch the game, so the people in the game could see him

19     out there holding up his sign as well, presumably.  And

20     on top of it, the police officers went -- and this is

21     in the record.  The police officer went and asked him

22     to leave, and he didn't.

23          So I think Mr. Fellers, you know, has made his own

24     bed here.  He could have complied with all of the

25     things, and then he would be going to the games with

```
 1        Mr. Foote, but he didn't.  And, again, this is where, I

 2        think in Hendrickson, this Court -- in fact, I believe

 3        it was you, Your Honor -- specifically recognized that,

 4        you know, Courts have to be -- have to give some

 5        deference to the administrators on how they're going to

 6        sanction people; otherwise, you're more than welcome to

 7        come to the game tonight and make these decisions

 8        yourself, Your Honor.

 9                THE COURT:  That was something else I wanted

10        to -- as I read the record, there's no dispute the

11        trespass order to Mr. Fellers is based upon more than

12        wearing the wristband and refusing to take it off; it's

13        the subsequent conduct, right?

14                MR. CULLEN:  Yes.

15                THE COURT:  In evidence is going to be that

16        the body cam footage from the officers?

17                MR. CULLEN:  Yes, Your Honor.  Now, if the

18        Court permits us to use the body cam, and I would love

19        to, I just -- there's a statute that restricts our

20        ability that's not subject to 91(a).  We can't just

21        willy-nilly turn it over, but with a court order, we

22        can certainly produce it to the Court and to counsel.

23                THE COURT:  I don't know if the issue is

24        contested.  Is it contested that the trespass order is

25        not just a function of the speech; it's a function of
```

```
 1        the conduct after the speech?

 2               MR. KOLDE:  We would say it's all about the

 3        speech, Your Honor.  They're calling it conduct, but

 4        they didn't like the speech.  Everything he did was

 5        speech.

 6               THE COURT:  That may be true, but you still

 7        can't refuse the lawful directive of a police officer

 8        to leave, and you can't be disorderly and all that, in

 9        an enhanced --

10               MR. KOLDE:  Holding up a sign quietly is --

11               THE COURT:  No.  No.  Refusing to leave,

12        creating a commotion, being disorderly, disrupting the

13        game.

14               MR. KOLDE:  It's absurd.

15               THE COURT:  That you have a First Amendment

16        right to wear a wristband is not a license to misbehave

17        thereafter because somebody wrongfully tells you to

18        take it off.  You still can't misbehave.

19               MR. KOLDE:  Misbehave by what; by staying

20        there?

21               THE COURT:  Disorderly conduct, refusing the

22        order of a police officer.

23               MR. KOLDE:  He called the school officials

24        Nazis and said his First Amendment rights were being

25        violated.
```

```
 1                    THE COURT:  I don't think that's a problem.

 2                    MR. KOLDE:  What's wrong with that?

 3                    THE COURT:  I don't think that's a problem,

 4     but I think it might be a problem if you behave in a

 5     loud, boisterous, disruptive way that disrupts the

 6     activity for which the property is being used, and

 7     refusing -- if the police officer told him to leave the

 8     property, it's a problem if he didn't leave.

 9                    MR. KOLDE:  He did leave.  He did leave.

10                    THE COURT:  I don't know.  I'm just here

11     reading your papers, which I find kind of insufficient.

12                    MR. KOLDE:  He loudly said, "You're violating

13     my First Amendment rights."

14                    THE COURT:  No.  No.  No.  You're saying he

15     didn't leave; they say he did leave.  I don't know

16     whether he left or not.  That's an evidentiary matter

17     that's going to have to be developed.  Right?  But if,

18     in fact, he disobeyed the order of a police officer to

19     leave, that they wrongfully told him to remove the

20     wristband doesn't excuse that subsequent conduct,

21     right?  And, therefore, that subsequent conduct, it's

22     not excused, would justify a longer no trespass order,

23     right?

24                    MR. KOLDE:  I'm not sure about that, Your

25     Honor.
```

1          THE COURT:  Well, I'm sure about that.  I

2     just don't know what the facts are.

3          MR. KOLDE:  So -- yeah, I mean -- I have some

4     things to say when he's done, but he has the floor,

5     I'll sit down.

6          MR. CULLEN:  I'm happy to give up the desk.

7     On the irreparable harm, I noted that the plaintiffs --

8          THE COURT:  Well, suppression of free speech

9     rights is irreparable harm, so no issue there.  It's --

10    the question is, likelihood of success on the merits,

11    it seems to me.

12         And, you know, this is no criticism -- seriously,

13    it's no criticism because this is all an accelerated

14    process, but the briefs simply don't address the proper

15    legal standard to be applied here.  I think we agreed

16    between the parties here that it's not *Tinker*.  You can

17    waste a lot of time on *Tinker*.  It's limited public

18    forum analysis.  There's a Sixth Circuit case by the

19    way, if you care, on it that lays it out pretty well, I

20    think.  It hasn't been widely adopted, but it's pretty

21    persuasive.

22         That then turns to, Well, are you likely to

23    succeed on the merits?  I don't know, because it is a

24    limited public forum as you agree, Mr. Kolde, and that

25    means they can limit the speech to the activity

1    involved that isn't viewpoint discriminatory.

2        You say it's viewpoint discriminatory; they say

3    it's not; it's student protected.  Not many people

4    discuss the *L.M.* case in too much detail, but *L.M.* does

5    suggest that protecting the personal identity of

6    students who are vulnerable, particularly students, is

7    a legitimate obligation of the school district.  Title

8    9 suggests that the school district is obligated to

9    prevent harassment of students particularly engaged in

10   student activity.

11       Was this wearing of the band a protest within the

12   context with a lot of extra meaning?  Don't know.  Was

13   the ability of the school district sufficient to

14   require removal of it?  Don't know.  Requires a factual

15   determination based on evidence.  These proffers,

16   insufficient; factual development, insufficient; legal

17   development, insufficient.  Again, not a criticism.

18       So I'm not prepared -- I can't -- at best, I would

19   say it's a push.  Is your case illegitimate?  Of course

20   not.  Do you have merit?  I think you do.  Does the

21   school district have merit?  I think they do.  It's

22   going to depend on the evidence, I think, and it's

23   going to depend on the factual findings.

24       So I think I'm going to deny the TRO for that

25   reason, failure to establish likelihood of success on

1    the merits for all the reasons I've just articulated.

2    So I think we need to schedule a preliminary injunction

3    hearing, an evidentiary hearing.  I'm going to combine

4    the permanent injunction hearing with the preliminary

5    injunction hearing.  Whatever is convenient for you.

6    You might talk, by the way.  Counsel, you might talk.

7    Maybe Mr. Fellers would like to go see his daughter

8    play at soccer without wearing the wristband.

9             MR. KOLDE:  Your Honor, I did actually have a

10    few things I had wanted to say in response, but the

11    Court's ruled.

12             THE COURT:  I'm sorry.  You did.  You did.

13             MR. KOLDE:  Can I just make my record on

14    these things?

15             THE COURT:  Oh, sure, of course.  I'm sorry.

16             MR. KOLDE:  Look, Your Honor --

17             THE COURT:  But, you know, it might help if

18    you just address the points that I'm concerned about,

19    the lack of factual development and legal development.

20             MR. KOLDE:  Okay.  Well, Your Honor, I would

21    say on the key facts, the parties actually agree on a

22    lot of the key facts.

23             THE COURT:  They do.

24             MR. KOLDE:  You know, they changed the

25    subject, which is what good defense attorneys do.  I

1    used to be a defense attorney myself defending the

2    Government.  And we cited the correct standard, which

3    is it's a limited public forum.  Okay?  They have

4    doubled down on viewpoint discrimination.  They have

5    said it's specifically the viewpoint that's being

6    represented.  There's per se illegal.  There's no

7    factual development that needs to be made on that.

8    They have admitted to engaging in viewpoint

9    discrimination.  They haven't really responded to that,

10   Your Honor.

11            THE COURT:  Well, their argument is that

12   under *L.M.* case, it's a legitimate -- and maybe the

13   duty of the school district to protect vulnerable

14   students from harassment, intimidation in the nature of

15   challenging the characteristics that are associated

16   with their personal identity; that that creates a lot

17   of harm.  Read the *L.M.* trial.

18            MR. KOLDE:  I've read the *L.M.* case.

19            THE COURT:  Yeah.  That's their theory --

20   it's student protection.

21            MR. KOLDE:  That's a *Tinker*-based case

22   analysis.  *L.M.* is a *Tinker* care.  100 percent, it's a

23   *Tinker* case.

24            THE COURT:  It is a *Tinker* case, but *Tinker*

25   does seem to establish the nature of the school-student

1    relationship that requires the school board's action to

2    protect.

3              MR. KOLDE:  Yeah, but my clients are not

4    students, Your Honor, and that's the whole point of our

5    argument, and the Court understands that.  Your Honor

6    came out at the beginning and said, I don't think

7    *Tinker* applies.  If *Tinker* doesn't apply --

8              THE COURT:  Analysis.  The *Tinker* analysis

9    does not apply.

10             MR. KOLDE:  -- then *L.M.* doesn't apply

11   either.  *L.M.* is a *Tinker* analysis.  It's all over that

12   opinion.  They clearly follow *Tinker* in that case.  I

13   happen to disagree with the result there.  I hope

14   SCOTUS flips it.  We'll see.  Ser --

15             THE COURT:  I'm relying on it more.  Their

16   defense is, We have -- we have the ability and right to

17   limit a public forum discussion to germane topics, and

18   this is not a germane topic.  And not only is it not a

19   germane topic, it's a topic that can likely inflict

20   harm on vulnerable students, therefore, we exercise our

21   right in our forum to prohibit it.  That's what they're

22   saying.

23        The legal analysis of that claim:  Insufficiently

24   litigated, insufficiently briefed, so you need to brief

25   it.  Factual development, I don't know if that was

1    their reason.  I don't know if this was -- posed a risk

2    of that.  You argue that, you know, it didn't pose any

3    risk of such a thing.  I don't know.  We'll have to

4    have an evidentiary hearing, and those issues will have

5    to be resolved.

6         MR. KOLDE:  Okay, Your Honor.  I mean, I

7    guess I had some other things to say, but I kind of

8    feel like the writing is on the wall.  Do you want to

9    hear from me on those things?

10        THE COURT:  Sure.  No, I would.  It's

11   helpful.

12        MR. KOLDE:  So I think on Foote -- actually,

13   let me change the feed here.  All right.

14    So I think addressing the Court's question about,

15   you know, who was this directed at.  My client, about

16   four days before the September 17th game, did have a

17   Facebook post.  And he explains his view -- and this is

18   just speaking for him, not necessarily the other

19   plaintiffs, that, you know, despite Governor Sununu's

20   stance on protecting female athletes, the Federal Court

21   has failed to enforce this decision leaving our girls

22   vulnerable.  While it's not the athletes' fault --

23   skipping ahead -- the failure to uphold the governor's

24   decision by the legal system, the school board and

25   school administration is setting a dangerous precedent

1      for women's sports.

2          They're allowed to express that opinion.  It's

3      directed at all of those public bodies which they're

4      allowed to direct their speech at.  There's clearly

5      nothing directed here specifically at Parker Tirrell or

6      any other trans student.

7          These armbands -- and this is somewhat a

8      scurrilous tactic by the defendants to put up these

9      armbands.  The evidence, and the parties agree on this,

10     is that pink armbands -- wristbands, rather, with XX

11     were worn.  The "NAD" comment, that, by the way, means

12     "Not a Dude."  I would argue there's nothing offensive

13     about it, but nobody wore a "NAD" wristband.  Okay?

14     There's just no evidence of that in the record.  So

15     they're reaching and grasping here, trying to find some

16     evidence of something that looks iffy or, you know,

17     crass.  How can wearing a pink wristband with the

18     female chromosomes be offensive?

19              THE COURT:  Harmful to students engaged in a

20     student activity.

21              MR. KOLDE:  It's ridiculous.

22              THE COURT:  Transgender -- well *L.M.* -- the

23     Court of Appeals in *L.M.* didn't think it was

24     ridiculous.  They thought it was harmful.  It was a

25     t-shirt.  XX, there's only XX or something?

1          MR. KOLDE:  No.  It said "there's two

2     genders."

3          THE COURT:  "Only two genders," that's right.

4     And then crossed out the only two genders and just put

5     XX and put "censored."  Yeah.  The Court of Appeals

6     said, Yeah, that's bad; the school district gets to

7     regulate that.

8          MR. KOLDE:  In the school context by a school

9     context.

10          THE COURT:  You took the words right out of

11     my mouth.

12          MR. KOLDE:  Correct.

13          THE COURT:  And this is an adult case and the

14     rights are more extensive, but the question is, of

15     course, how more extensive?  How far out does it go?

16     Do we reach a point where, first, you have to decide

17     whether what your clients were wearing falls into the

18     category of the XX t-shirt in *L.M.*, and then you have

19     to decide whether or not that falls short of where an

20     adult's free speech rights begin or whether it eclipses

21     the adult's free speech rights in a limited forum.

22     Right?  These are nuanced questions; these aren't easy

23     questions.

24          MR. KOLDE:  Not when there's viewpoint

25     discrimination, Your Honor.

1              THE COURT:  Well --

2              MR. KOLDE:  They haven't even made a

3     content-based argument.

4              THE COURT:  My viewpoint is Black kids should

5     not play on high school football teams in New

6     Hampshire.  That's my position; that's my viewpoint.

7     You can't prohibit me from attending a high school

8     football game with a sign, holding up, that says Blacks

9     are inferior and shouldn't be playing on high school

10    football teams in New Hampshire.  Yes, they can.  Can't

11    they?

12             MR. KOLDE:  That wasn't this case.

13             THE COURT:  Can the school board not say,

14    Yeah, you don't get to do that at our football games?

15             MR. KOLDE:  That's not our case.

16             THE COURT:  I know.

17             MR. KOLDE:  They might be able to say that.

18             THE COURT:  Of course, it's not your case.

19    You know how we reason; we reason from the ends.

20        Do we agree that's not appropriate, and that can

21    be controlled?

22             MR. KOLDE:  Probably.

23             THE COURT:  I hope we agree that can be

24    controlled.

25             MR. KOLDE:  It would depend on all the facts

1    of the case.

2    THE COURT:  And it's being controlled in the

3    interest of protecting students.

4    MR. KOLDE:  So, Your Honor, I don't want to

5    get into the facts any further at this point.  I see

6    the Court has made up its mind for today, but I think

7    it would be helpful to us to tentatively set the

8    preliminary injunction hearing, and maybe there to be

9    some amongst the parties of what the Court's

10    expectations are for the development of the factual

11    record.  Are you wanting live testimony?

12    THE COURT:  Well, now, you know, I am really

13    hesitant after all these decades to tell counsel how to

14    try their own case because that inevitably falls back

15    on me, He didn't tell me I shoulda whatever.  So I

16    don't do that.

17    We're going to combine the permanent injunction

18    hearing with the preliminary injunction hearing, so it

19    will be a trial on the permanent injunction.

20    MR. KOLDE:  Yeah.

21    THE COURT:  It's your burden, I'm sure you

22    understand, Mr. Cullen, your burden to justify the

23    limitation you placed on the speech.  I expect to hear

24    evidence on context, on intent, on effect, on purpose,

25    on what the limitations were and where they come from

1      and who decided, and whether or not it actually makes

2      sense in the real world.  And I expect thorough legal

3      briefing on this notion of how far does the *Tinker*

4      obligations and duties of protecting students go in

5      terms of the limited public forum where adults are

6      expressing speech.  How far does that go?  How far can

7      you go in keeping adults from saying things that

8      students, say, couldn't say?  How far?  How far does

9      the *L.M.* XX on the t-shirt ruling -- how far does that

10     apply to an adult speaking?

11             MR. KOLDE:  Not at all.

12             THE COURT:  Well, I would like to see

13     something other than your personal opinion.  I would

14     like to see some legal authorities.  I would like to

15     see it thoroughly discussed and briefed.  Any -- you

16     should get together.  I don't think I need you to

17     reproduce all the experts about the harm related to

18     transgender students from "XX only" t-shirts unless you

19     insist, I guess, because the First Circuit has already

20     sort of discussed that and accepted it, I think.  You

21     may want to -- are you going to put them to the proof

22     to show the vulnerability of the kid and what the risks

23     of harm --

24             MR. KOLDE:  For wearing a pink wristband with

25     XX on it?  Yeah.  We don't concede that's harmful in

1    any way.

2              THE COURT:  Again, that's why I don't like to

3    tell you how to try your own case.  If you don't -- I

4    guess, I don't know what you're going to do.  You can

5    present evidence to that effect, I guess.  I think I

6    can take judicial notice of it, I'm not sure, based on

7    the First Circuit's opinion.  Maybe I can.

8              MR. KOLDE:  Your Honor, so there's another

9    issue which counsel alluded to.  We asked for the

10   body-cam video.  It was denied under an RTK exception.

11   But, you know, counsel indicated they would comply with

12   all, you know, discovery orders of the Court.  Clearly,

13   counsel for the defense has seen the body-cam video;

14   it's referred to in the declarations.  We would like

15   it.  We think it's relevant, but without an order from

16   the Court, I don't think they're going to give it to us

17   under their interpretation of state law.  I don't think

18   it's really beneficial to litigate this in state court,

19   and I'm not planning to.  So we would like the Court to

20   direct --

21             THE COURT:  It's plainly relevant.  Don't you

22   think?  It's relevant to you.

23             MR. CULLEN:  Yeah.  I don't have an objection

24   to it.  I just don't want to violate the State statute,

25   so if the Court orders it to be produced as part of

 1          discovery in this case --

 2                  THE COURT:  So ordered.  I think it's

 3          particularly relevant to the length and extent of the

 4          no trespass order.

 5                  MR. KOLDE:  Your Honor, I don't want --

 6          because my clients' rights are continuing to, you know

 7          be impacted here.  We would like to have an early as

 8          possible NPI combined NPI hearing on the merits as we

 9          can.  I understand counsel's schedule.  I also have a

10          lot going on.  The Court, I'm sure has a lot going on.

11                  THE COURT:  No, actually, I'm pretty

12          flexible.  Senior status.

13                  MR. KOLDE:  Can we pick a date and shoot for

14          that?

15                  THE COURT:  Absolutely.

16                  MR. KOLDE:  Can we do that and set that here?

17                  THE COURT:  I expect you're going to need at

18          least a couple days, right?

19                  MR. CULLEN:  A couple days?  I'd think we'd

20          need more than that, Your Honor.  You've listed a

21          fairly intense list of things.

22                  MR. KOLDE:  For the hearing length?

23                  MR. CULLEN:  Oh, I apologize.  I thought you

24          meant a couple days before it's to happen.

25                  THE COURT:  No.  No.  A couple days of

1    hearing time.

2         MR. CULLEN:  I apologize, Your Honor.  Yes, I

3    misunderstood that.  I assume there's four or five

4    witnesses there.  We've got two or three --

5         MR. KOLDE:  All my clients will want to

6    testify.

7         THE COURT:  So, three, four?  Eight, ten

8    total?

9         MR. CULLEN:  Certainly, not more than ten,

10   unless we can reach an agreement on the expert issue, I

11   suppose.

12        THE COURT:  Yeah.  Look into judicial notice

13   of the fact.  I don't know.  The circuit seemed to,

14   yeah.  I'm not sure what they do now, whether they

15   accepted the evidence or whether they just say it was

16   enough to --

17        MR. KOLDE:  If they want to make us a

18   proffer, we'll take it under consideration, Your Honor.

19   It's real hard for me to evaluate on the fly.

20        THE COURT:  Yeah.  It basically is

21   transgender students are particularly vulnerable, and

22   harassment causes particularly serious long-time

23   injury.  That's what it is.

24        MR. KOLDE:  Can we pick a date?

25        MR. CULLEN:  We can certainly try.  Actually,

1    you know, the -- Superintendent Kelley is not allowed

2    to bring her phone in --

3              THE COURT:  I'm sorry.  What?

4              MR. CULLEN:  The superintendent can't bring

5    her phone in, so she doesn't have her calendar.

6              THE COURT:  She can bring her phone in.

7              MR. CULLEN:  She couldn't do it today.  So we

8    can't really necessarily pick an exact date.  Perhaps

9    if the Court gives us a sense of it, we can work it out

10    with the clerk.

11              THE COURT:  I'm flexible.  I'm happy to do it

12    as soon as you can arrange to do it.

13              MR. KOLDE:  Can we do that today?

14              THE COURT:  Sure.

15              MR. CULLEN:  I don't know if we can do it

16    today.  It depends on --

17              THE COURT:  You can do it today.  Get

18    together with the deputy clerk.

19              MR. KOLDE:  November day or are we doing

20    October, later in October?

21              MR. CULLEN:  November day.  Sometime in

22    November.

23              THE COURT:  Fine.

24              MR. CULLEN:  Thank you.

25              MR. KOLDE:  And, Your Honor --

1            THE COURT:  We'll make it work.

2            MR. KOLDE:  Would the Court be willing to

3    just enter a limited order to allow Mr. Fellers to go

4    back to the games, even without wearing a wristband for

5    now, just so he can watch through the end of the

6    season?

7            THE COURT:  If you're asking me for a

8    temporary restraining order with respect to his

9    attending games without protesting on this issue --

10           MR. KOLDE:  Yes.

11           THE COURT:  -- I don't have a problem with

12    that.  Do you have a problem with entering that order?

13           MR. CULLEN:  I do, Your Honor, because --

14           THE COURT:  He's not going to wear a

15    wristband.

16           MR. CULLEN:  I know, but it was his comment

17    after the fact that --

18           THE COURT:  It may turn out to be illegal.

19           MR. CULLEN:  It may.  It may, Your Honor.

20           THE COURT:  Take the win.

21           MR. CULLEN:  How about this, Your Honor:

22    There's a senior game coming up on the 17th, or the

23    18th.  Why don't we allow him to go there without the

24    games (sic) to celebrate his kid?

25           THE COURT:  Listen, tell you what.  I'm not

1    willing -- I think this is a push in terms of the

2    evidence.  The factual development is a push.  Legally,

3    I think it's nuanced, and it's a jump ball.  That's the

4    way I look at it.  So you haven't met your burden in

5    showing likelihood of success on the merits, in my

6    view.  However, he could win, and it could turn out

7    that what you've done in terms of the trespass is not

8    sustainable.  So in an effort to balance the equities

9    somewhat, I will enter a restraining order allowing

10   Mr. Fellers to attend his child's soccer games for the

11   rest of the season.

12          MR. KOLDE:  Can he pick her up from practice

13   too, Your Honor?

14          THE COURT:  Is there a problem with that?

15          MR. CULLEN:  I think it's a matter of not

16   having him have interactions with the coach, Your

17   Honor.

18          THE COURT:  He can pick up his child from

19   soccer practices, no interaction with the coaches, no

20   speaking, proselytizing, advocating, protesting, speech

21   making.  None of that.  And he can attend his

22   daughter's games for the rest of the season.  No

23   protesting, no violation of any of the rules and

24   expectations of good sportsmanship promulgated by the

25   school, and then we'll see on the merits how this works

1          out.  All right?

2                    MR. KOLDE:  Understood.  Will the Court enter

3          an order, or do you need us to submit an order on that?

4                    THE COURT:  Counsel understand my order?

5                    MR. CULLEN:  I understand what you've asked.

6                    THE COURT:  This is New Hampshire.  Thank

7          you.  We're adjourned.  Get together with the deputy

8          clerk and arrange a schedule.

9                    MR. KOLDE:  We'll do it.

10                        (Hearing concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2

3           I, Jan-Marie Glaze, RPR, CRR, Pro-Tem Court

4    Reporter for the United States District Court for the

5    District of New Hampshire, do hereby certify that I was

6    present in court during the foregoing matter and reported

7    said proceedings stenographically.

8

9           I further certify that thereafter, I have caused

10   said stenographic notes to be transcribed under my direction

11   and that the foregoing pages are a true and accurate

12   transcription to the best of my ability.

13

14

15

16   _____
                                JAN-MARIE GLAZE
17                              COURT REPORTER

18

19

20

21

22

23

24

25