UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kyle Fellers, Anthony Foote, Nicole Foote, and Eldon Rash,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District, Philip Lamy & Steve Rossetti,<br><br>　　　　　Defendants. | Case No.  1:24-cv-311-SM-AJ |

**DEFENDANT BOW SCHOOL DISTRICT'S OBJECTION TO PLAINTIFFS' REQUEST FOR PRELIMINARY INJUNCTION**

NOW COMES Defendant Bow School District ("District"), through its attorneys Cullen Collimore Shirley PLLC, and objects to the preliminary injunction demanded in Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction. [Doc. 14].  Although, as set forth below, Defendant does not believe further briefing is required at this time, at Plaintiffs' insistence Defendant submits this brief memorandum in support of its objection.

**PROCEDURAL HISTORY**

Plaintiffs filed the underlying Complaint on September 30, 2024, asserting that Defendants violated their First Amendment rights on the sidelines of a high school girls soccer game on September 17, 2024, and continuing thereafter due to the issuance of "No Trespass" orders. [Doc. 1].  In their request for relief, Plaintiffs sought an order "preliminarily and permanently" enjoining Defendants from enforcing policies to prevent them from "**protesting against allowing biological boys playing in girls' and women's sports**, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot."  [Doc. 1 at 25 (emphasis added).]

1

Four days later – on the afternoon of Friday October 4, 2024 – Plaintiffs filed a single Motion for Temporary Restraining Order and Preliminary Injunction. [Doc. No. 14]. Therein, they sought a restraining order to allow Plaintiffs to attend a game scheduled for Tuesday, October 8, while wearing wristbands <u>and</u> to display signs in the parking lot of the school, among other things. *Id.*[1]

In response to this late Friday filing, the District filed on Monday October 7, 2024, an objection to the motion supported by affidavits and exhibits. [Doc. No. 22]. The objection specifically noted that it was to the entire Motion for Temporary Restraining Order and Preliminary Injunction, but in light of the tactical timing of the Motion asked that "it be permitted to respond more fully to the request for a preliminary injunction in accordance with L.R. 7.1(b) (providing 14 days to respond to motions)."

From the District's perspective, its request was rendered moot when the Court concluded that Plaintiffs had not demonstrated a likelihood of success on the merits for a TRO and ordered the scheduling of an evidentiary hearing where it would combine Plaintiffs' request for a preliminary injunction with its request for a permanent injunction. Despite the facts that Defendant responded to the solitary motion submitted by Plaintiffs and that the parties will be submitting briefings before and after the evidentiary hearing, Plaintiffs assert that the District is not only permitted <u>but required</u> to file a further objection to their request for preliminary injunctive relief

---

[1]  Plaintiffs attached to their Motion a proposed Temporary Restraining Order. [Doc. No. 14-1]. The relief sought included restraining Defendants from enforcing District policies to prevent attendees from "non-disruptively expressing disfavored viewpoints on political or social issues, including **protesting against allowing biological boys playing in girls' and women's sports**, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot." *Id.* at pp. 2, 3 (emphasis added).

2

contained in their October 4 Motion. *See* Plaintiff's Expedited Motion re Hearing-Related Deadlines [Doc. No. 26] at p.2.

The District suspects other considerations, such as a desperate desire to file an otherwise untimely reply brief, are motivating Plaintiffs' position. In any event, rather than impose on the Court by litigating this disagreement, the District hereby submits this objection on the issue of the preliminary injunction demanded by Plaintiffs. Defendant expects to supplement the arguments presented herein before and after the upcoming evidentiary hearing, as contemplated by Plaintiffs in their Expedited Motion re Hearing-Related Deadlines. [Doc. No. 26].

## STATEMENT OF FACTS

The District incorporates herein by reference and respectfully refers to the statement of facts and supporting affidavits and exhibits in its objection to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction filed on October 7, 2024. [Doc. 22.] To the extent additional facts are established at the upcoming evidentiary hearing, the District reserves the right to use those facts in any further briefing on the question of Plaintiffs' demand for injunctive relief.

## ARGUMENT

**I. PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

The Court stated during the TRO hearing that Plaintiffs' free speech claims should be analyzed under the analytical framework applicable to limited public forums. While this may be correct, the District still believes it is important to take account of *Tinker* and the compelling interests schools have in the education and protection of students. What follows, therefore, is a discussion of *Tinker* and cases that have grappled with the impact of speech on students or a student body, public schools as public forums, and an explanation for why the District's policies governing

3

conduct on the sidelines of school-sponsored athletic events do not unreasonably impair Plaintiffs' First Amendment rights.

### A. *Tinker* and the compelling interests of schools.

Plaintiffs assert that their First Amendment rights have been violated because their conduct on the sidelines of the September 17 soccer game was no different than the black armbands worn by students in *Tinker,* which the Supreme Court held to be protected speech. Doc. 15 at 7. Yet Plaintiffs largely elide the Supreme Court's acknowledgement in *Tinker* that schools have a special interest in regulating student speech that "intrudes upon the work of the schools or the rights of other students." 393 U.S. at 508. Plaintiffs also ignore that a school's regulatory interests remain significant in circumstances "such as serious or severe bullying or harassment targeting particular individuals [or] threats aimed at teachers or other students," even when the circumstances arise off campus. *Mahoney Area School Dist. v. B.L.*, 141 S.Ct. 2038, 2045, 210 L.Ed.2d 403 (2021).

Indeed, under *Tinker*, schools are permitted to restrict student speech in two broad sets of circumstances: if the speech "might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities," or, alternatively, if the speech "collides 'with the rights of other students to be secure and to be let alone.'" *Wynar v. Douglas County School District*, 728 F.3d 1062, 1070 (9th Cir. 2013) (quoting *Tinker*, 393 U.S. at 508). "[C]onduct by [a] student, in class or out of it, which for any reason—whether it stems from time, place, or type of behavior—materially disrupts classwork or involves substantial disorder or invasion of the rights of others is ... not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513.

The special character of the school setting has thus prompted courts to find, for example, that discipline imposed by schools on students for online harassment and intimidation of peers is

4

allowed. *See, e.g., Kutchinski v. Freeland Community School District*, 69 F.4th 350 (6th Cir. 2023) (student social media account impersonating teacher using graphic, harassing and threatening posts); *Kowalski v. Berkeley County Schools*, 652 F.3d 565, 573 (4th Cir. 2011) (student social media account ridiculing fellow student); and *Castro v. Clovis Unified School District*, 604 F. Supp.3d 944, 952 (E.D. Cal. 2022) (student social media account using racial slur against fellow student).

More recently, courts have also sustained school districts that have regulated speech surrounding the issue of gender identity, including speech that is supposedly "silent" and not directed at a particular peer. *See, e.g.*, *L.M. v. Town of Middleborough, Massachusetts*, 103 F.4th 854 (1st Cir. 2024) (sustaining school district decision to bar student from wearing shirt to school with the words "There Are Only Two Genders" even though no peer specially targeted); *Parents Defending Education v. Olentany Local School Dist. Board of Educ.*, 109 F.4th 453 (6th Cir. July 29, 2024) (upholding constitutionality of school district policy that prohibits students from repeatedly and intentionally using non-preferred pronouns to refer to classmates).

Courts have also sustained enforcement of school policies aimed at preventing harassment and intimidation by <u>parent</u> spectators at athletic events. *Blasi v. Pen Argyl Area School Dist.*, 512 F. App'x 173 (3d. Cir. Jan. 30, 2013); *Foote v. Board of Educ. of Whitehall Central School Dist.*, 1:22-CV-0815, 2024 WL 3376651 (N.D.N.Y. July 11, 2024). In *Blasi*, plaintiff, the father of two high school basketball players, sued the school district when he was banned from attending a game after he sent numerous "emails to coaches complaining about their coaching methods, the behavior of his sons' teammates towards them, and alleged favoritism toward white, inferior players." 512 F. App'x at 175. Noting that plaintiff's First Amendment claim was "made in the context of an athletic program in which his sons' participation, and by extension his own, is voluntary," and that

5

"[p]laintiff was aware of and agreed to the standards required of students, and their parents, in order to participate in the School District's basketball program, including restrictions on the manner and tone of speech used with respect to coaches and other players," *id.* at 175, the Third Circuit found dismissal warranted. Among other things, the court noted that "[t]he narrower goals of an athletic team differ from those of academic pursuits and are not always consistent with the freewheeling exchange of views that might be appropriate in a classroom debate," and that "[s]chool officials have a legitimate interest in affording student athletes 'an educational environment conducive to learning team unity and sportsmanship and free from disruptions that could hurt or stray the cohesiveness of the team.'" *Id.* at 175.

The court in *Foote* reached a similar conclusion on similar facts. Foote, the father of a player on a high school basketball team, was banned by the school district from attending games for the remaining season because Foote had angrily confronted the coach and the coach's son on the gymnasium floor following a loss. *Foote*, 2024 WL 3376651, *3-12. The school district found the father had violated policies of the school and athletic league requiring, among other things, that spectators not engage in uncivil and disrespectful behavior on school property and show cordial courtesy to visiting teams and officials. Id. at *8-9. The court held that the conduct polices were not only reasonable and view point neutral, but that the school district's enforcement of the polices was constitutional. *Id*. at 18-19. "[A] rule is neutral as to viewpoint if it is 'based only upon the manner in which the speakers transmit their messages . . ., and not upon the messages they carry.'" *Id*. at 19. The court found no evidence the father's viewpoint precipitated his expulsion. *Id*. Rather, it was the obstreperous manner by which the father communicated his viewpoint that justified the school district banning him. *Id*.

*L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024) is also particularly instructive. There, the First Circuit upheld a restriction barring a T-shirt bearing the words "There are only two genders." The Court noted that the broad ruling of *Tinker* could be limited where speech would invade the rights of others or would cause a material disruption. 103 F.4th at 866. The Court opted to pursue the material disruption analysis and found that the shirt could properly be barred by the school. The Court concluded:

> The question here is not whether the t-shirts should have been barred. The question is who should decide whether to bar them -- educators or federal judges. Based on *Tinker*, the cases applying it, and the specific record here, we cannot say that in this instance the Constitution assigns the sensitive (and potentially consequential) judgment about what would make "an environment conducive to learning" at NMS to us rather than to the educators closest to the scene.

*Id*. at 886. This Court reached a similar conclusion about the discretion courts should grant the judgment of educators in *Governor Wentworth Sch. Dist. v. Hendrickson*, 421 F.Supp.2d 401, 425 (USDC- NH 2006) ("School authorities are generally in a far better position to understand their students and the students' likely response to various modes of intervention. They are entitled to a healthy measure of deference when exercising judgment, drawing inferences, and reaching conclusions about what is actually going on in their schools and classrooms.").

Thus, while it is true that many of the cases discussed above involve issues of student speech, they nevertheless illustrate the compelling interest public schools have in protecting students in the education setting, and the authority schools have to implement reasonable restrictions on speech to protect those interests. Furthermore, it would be illogical to allow a public school to prohibit a student from wearing an anti-transgender t-shirt, but not have the authority to bar a parent from entering school grounds with the same t-shirt. The person wearing the shirt – student versus parent – should not dictate the school's authority to ban it on school grounds.

7

Hence, although *Tinker* was a student speech case, the legal reasoning behind it is equally applicable to parents on school grounds.

### B. Public schools as forums for public expression.

"The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988). "Hence, school facilities may be deemed to be public forums only if school authorities have 'by policy or practice' opened those facilities 'for indiscriminate use by the general public' or by some segment of the public, such as student organizations." *Id*. (internal quotations and citations omitted). "If the facilities have instead reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id*. "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id*.

Moreover, "[i]n the context of the special characteristics of the school environment, …the government [has the power] to prohibit … actions which materially and substantially disrupt the work and discipline of the school." *Healy v. James*, 408 U.S. 169, 189 (1972). "Associational activities need not be tolerated where they infringe upon reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Id*.

With respect to school-sponsored athletic events, some courts have deemed them to be limited public forums while others have not. *Compare Johnson v. Perry*, 859 F.3d 156 (2nd Cir. 2017) (holding basketball gym to be a limited public forum) with *Blasi v. Pen Argyl Area School*

*Dist.*, 512 F. App'x 173 (3d. Cir. Jan. 30, 2013) (in context of parent's speech claim, observing that school officials may condition participation in athletic programs with a greater limitation on constitutional rights than might be otherwise permissible).[2]

In limited public forums, the state may restrict expression so long as the restriction (a) does not discriminate against speech on the basis of viewpoint" and (b) is "reasonable in light of the purpose served by the forum." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001).

### C. The District's policies governing school-sponsored athletic events do not unreasonably impair Plaintiffs' First Amendment Rights.

The District has adopted policies that govern conduct at school-sponsored athletic events. Policy KFA, for example, prohibits (among other conduct) anyone on school grounds from threatening, harassing, or intimidating other persons. [Doc. 1-1.] The Athletics Handbook, in turn, requires that every fan "maintain a positive attitude, to treat players, coaches and officials with respect, and to cheer for their teams as opposed to cheering against the other team." [Doc. 1-3.] The Athletics Handbook also prohibits fans from using "the names or numbers of opposing teams or try[ing] to directly communicate or distract other players." [Doc. 1-3.] Finally, with respect to transgender students participating in school athletic events and the "differing opinions" that surround the issue, the District – acting through Mike Desilets, the athletic administrator – has decreed that there shall be no "inappropriate signs, references, language or anything else present" at games. [Doc. 1-2.]

Even assuming the District's athletic fields and parking lots are limited public forums during athletic events, the governing policies the District has adopted are reasonable in light of the purpose of the games and viewpoint neutral. The policies are reasonable given the compelling

---

[2] Notably, the *Blais* court follows the analysis articulated in *Lowery v. Euverard*, 497 F.3d 584 (6th Cir. 2007). The District reserves the right in future briefing to address the holding in *Lowery* and its potential applicability to this action.

9

interest public schools have in protecting students and the educational setting. This interest is not merely to prevent distractions or incivility during games, such as by fans targeting opposing team players. Rather, it extends to protecting the rights of students to be left alone and not subjected to intimidation or humiliation on the basis of their sex or gender identity.

The policies are viewpoint neutral because they restrict all conduct on school grounds to the extent it is aimed at intimidating or harassing others or is intended to distract opposing team players. With respect to transgender student athletes, moreover, the District's policy – as articulated by Mike Desiltes – bars *all* conduct at games that communicates *any* opinions on the issue. [Doc. 1-2.]

Thus, the District's actions at the September 17 soccer game and subsequent no trespass orders to Foote and Fellers were justified and constitutionally permissible. The "XX" wristbands are no different and send the same message as LM's "two gender" T-shirt. If the T-shirt can be banned from the school grounds, certainly the XX wristbands (and "NAD" wristbands) can be. The fact that it is parents – invitees to the property, not students compelled to be in school – who are being regulated only gives more weight to the District's actions.

Moreover, although Plaintiffs cast their conduct at the September 17 game as "silent protest," the District reasonably viewed it as harassment and intimidation aimed at 15 year old Parker Tirrell. The District was on alert for Plaintiffs to become actively disruptive during the game, having earlier heard that Plaintiffs were mulling plans to dress in women's clothes, wave signs, and heckle from the sidelines. Indeed, on the morning of the September 17 game, Foote stressed to Mike Desiltes that "[t]his isn't just another game – not by a long shot." [Doc. 22-2.] With this Court declaring only days earlier that Parker Tirrell was entitled as a matter of constitutional right to play on the Plymouth girls varsity soccer team, the District interceded with

Plaintiffs at the September 17 game before their conduct grew more threatening or the circumstances devolved into disorder.

Plaintiffs have no First Amendment claim arising from the events of the September 17 game because the District properly exercised its to protect Paker Tirrell from intimidation and harassment during the game, and it issued reasonable sanctions against Foote and Fellers – in the form of No Trespass Orders – for conduct they knew violated the school's policies governing athletic events.

As for upcoming soccer games, there, too, Plaintiffs lack a concrete risk of a First Amendment violation. Again, the District's policy barring communications at games on the issue of transgender student athletes is a reasonable, viewpoint neutral restriction. It does not permit *any* viewpoint to be expressed on the issue, and it serves the reasonable purpose of limiting distraction to teams and players engaged in school-sponsored athletic competition.

Accordingly, Plaintiffs have no constitutional right to stand on the sidelines of school-sponsored athletic events wearing "XX" wristbands or engaging in any other conduct that may reasonably be interpreted as expressing an opinion on transgender students participating in school-sponsored athletic competitions.

## II. PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM.

With respect to the issue of the likelihood of Plaintiffs suffering irreparable harm, the District incorporates herein by reference and respectfully refers to its objection to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction filed on October 7, 2024. [Doc. 22.] To the extent additional facts are established at the upcoming evidentiary hearing, the District reserves the right to use those facts in any further briefing on the question of Plaintiffs' likelihood of irreparable harm.

III. **PUBLIC INTEREST DOES NOT FAVOR A PRELIMINARY INJUNCTION, SO THE BALANCE OF EQUITIES DO NOT FAVOR PLAINTIFF**.

As for the questions of public interest and balance of equities, the District again incorporates herein by reference and respectfully refers to its objection to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction filed on October 7, 2024. [Doc. 22.] To the extent additional facts are established at the upcoming evidentiary hearing, the District reserves the right to use those facts in any further briefing on the question of public interest or the balance of the equities.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

BOW SCHOOL DISTRICT

By its attorneys,

CULLEN COLLIMORE SHIRLEY PLLC

Dated: October 18, 2024            /s/ Brian J.S. Cullen
                                   Brian J.S. Cullen, NH Bar 11265
                                   Jonathan M. Shirley, NH Bar 16494
                                   37 Technology Way, Suite 3W2
                                   Nashua, NH 03060
                                   (603) 881-5500
                                   bcullen@cullencollimore.com
                                   jshirley@cullencollimore.com

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: October 18, 2024            /s/ Brian J.S. Cullen
                                   Brian J.S. Cullen