# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>    Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT;<br><br>    Defendants. | Case No. 1:24-cv-311-SM-AJ |

**PLAINTIFFS' REPLY TO DEFENDANTS'<br>OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## REPLY ARGUMENT

I.  BOW SCHOOL DISTRICT ATHLETIC EVENTS ARE LIMITED PUBLIC FORA

This Court already held that limited public forum analysis applies to Plaintiffs' claims. Hrg. Tr., Dkt. 24, at 13:22-24, 62:17-24. One of Defendants' own cases, see Dkt. 28 at 5-6, confirms that sporting events on school property "to which the public is invited" constitute limited public fora, so "the school may regulate access . . . only if its restrictions are reasonable and viewpoint-neutral." *Foote v. Bd. of Educ. of Whitehall Cent. Sch. Dist.*, No. 1:22-CV-0815 (GTS/CFH), 2024 U.S. Dist. LEXIS 121617, at *44 (N.D.N.Y. July 11, 2024); *see also Frierson v. Troy City Sch. Dist.,* Nos. 21-2555-cv, 21-2715-cv, 2023 U.S. App. LEXIS 17437, at *4 (2d Cir. July 11, 2023) ("This Court has recognized that school property becomes a limited public forum during school-sponsored athletic events[.]"); *Worthley v. Sch. Comm. of Gloucester,* 652 F. Supp. 3d 204, 212 (D. Mass. 2023) (events at high school "when it is otherwise open to the public" are limited fora).

Rather than address the issue identified by the Court, Defendants cite an unreported, out-of-circuit decision that never discusses forum analysis. *See* Dkt. 28 at 8-9 (citing *Blasi v. Pen Argyl Area School Dist.*, 512 F. App'x 173 (3d. Cir. Jan. 30, 2013)). The pro se plaintiff in *Blasi* sent seventeen racially charged "scathing and threatening emails" containing "deplorable comments about 7th and 8th grade players" to his son's middle-school basketball coaches. *Blasi*, 512 F. App'x at 174. As a result, the school punished him for violating a pre-existing rule, which the

1

unrepresented plaintiff conceded was a reasonable time, place, and manner regulation, by barring him from a single home game. *Id.* at 174, 176. The events in *Blasi* were nothing like the facts of this case, and its narrow, unpublished holding should not alter this court's conclusion that the September 17 soccer game was a limited public forum. *See McElhaney v. Williams*, 81 F.4th 550, 559 (6th Cir. 2023) (distinguishing *Blasi* as "the First Amendment would not protect the parent's speech [in *Blasi*] because 'true threats' are not protected speech").

II. ADULTS HAVE GREATER FIRST AMENDMENT RIGHTS THAN STUDENTS

Adults have "more extensive" free speech rights than students. *See* Hrg. Tr., Dkt. 24, at 52:13-17, 69:13-14. "Children, whose minds and values are still developing, have traditionally been afforded less First Amendment protection, particularly within the context of public high schools." *Mainstream Loudoun v. Bd. of Trs. of the Loudoun Cnty. Library*, 2 F. Supp. 2d 783, 795 (E.D. Va. 1998) (citing *Tinker v. Des Moines Sch. Dist.*, 393 U.S. 503, 506 (1969)). "In contrast, adults are deemed to have acquired the maturity needed to participate fully in a democratic society, and their right to speak and receive speech is entitled to full First Amendment protection." *Id.* Defendants' "suggestion . . . that courts must give *greater* protection to the free speech rights of students is diametrically opposed to precedent and therefore must be rejected." *Stepien v. Murphy*, 574 F. Supp. 3d 229, 243 (D.N.J. 2021), *aff'd* 2023 U.S. App. LEXIS 8197 (3d Cir. N.J., Apr. 6, 2023); *contra* Dkt. 28 at 7, 10.

Moreover, Plaintiffs expressed themselves in a limited public forum, not in a non-public forum such as a public school during the school day. "[T]he constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986). "The special characteristics of the school environment" limits student speech rights because "schools at times stand *in loco parentis*." *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187, 189 (2021) (cleaned up). But the same is not true for adults, who "have a different relationship to school activities than students do." *McElhaney*, 81 F.4th at 558. "As a result, the 'disruption' standard applicable to student speech has not been applied to run-of-the-mill adult speech targeting school officials." *Id.*

Bow School District does not stand *in loco parentis* over Plaintiffs—adults who are parents themselves—who were not speaking during normal school hours. And so cases about student speech are "a poor guide for cases involving adult speech in the context of student athletics." *Id.*

### III. DEFENDANTS' POLICIES AND PRACTICES DISCRIMINATE ON THE BASIS OF VIEWPOINT BY CERTAIN TARGETING SPEECH

In their declarations, Defendants admit to targeting Plaintiffs' viewpoint when banning them from wearing wristbands. Desilets stated that he heard that parents might be "buying anti-trans gear" and "making signs," which led him to email parents that "inappropriate signs, references, language, or anything else" the issue would not be allowed. Dkt. 22-1 ¶¶ 3, 6. Desilets added that the school's rules

3

require spectators to "maintain positivity." *Id.* ¶ 6. These policies restrict speech based on viewpoint to the extent they bar individuals like Plaintiffs from wearing clothing that silently expresses their view that biological boys should not play girls' sports.

Defendants claim their policy prohibits "all conduct at games that communicates any opinions on the issue." Dkt. 28 at 10. That is false as a matter of fact and impermissible as a matter of law. The only evidence Defendants cite for this claim that they prohibit communication of "any opinion" on the issue is Desilets' email on September 16, 2024. But that email expressly states that only "inappropriate" speech, not all speech, on the issue, is prohibited. Dkt. 14-8. Indeed, Desilets stated that "some differing opinions . . . is perfectly fine," if spectators did not use "inappropriate signs, references, language." *Id.* His email clearly recognizes that some speech on the issue is "appropriate." It cannot be squared with the position Defendants now advance in this Court.

Defendants' claim that the policy may legally bar the expression of any opinion on the issue is also indefensible. Inappropriateness is a viewpoint. *See Iancu v. Brunetti*, 588 U.S. 388, 395-96 (2019) (denying a trademark because it "inappropriately glamoriz[es] drug abuse" or is "offensive to many Americans" is viewpoint discrimination). "Official censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cnty.*, 921 F.3d 440, 447 (5th Cir.

4

2019). The context also shows that "inappropriate" was code for being perceived as anti-trans or not sufficiently trans-affirming.

Defendants also object to Plaintiffs' characterization of their speech as "silent protest," instead arguing that they "reasonably viewed it as harassment and intimidation." Dkt. 28 at 10. But it's not only Plaintiffs that recognize silent protest for what it is—it's the Supreme Court. In *Tinker*, the Supreme Court described wearing armbands as a "silent, passive expression of opinion." 393 U.S. at 508. "It [is] closely akin to 'pure speech' which, [the Supreme Court has] repeatedly held, is entitled to comprehensive protection under the First Amendment." *Id.* at 505-06. The Supreme Court's holding is binding on this issue and not subject to Defendants' historical revisionism.

To avoid the viewpoint issue, Defendants lean on the fact—asserted without evidence—that they were "on alert for Plaintiffs to become actively disruptive during the game, having earlier heard that Plaintiffs were mulling plans to dress in women's clothes, wave signs, and heckle from the sidelines." Dkt. 28 at 10.[1] But that concedes the point: Plaintiffs *didn't* "become actively disruptive." *See also* Dkt. 30, ¶ 37 (admitting this). Yet Defendants still banned them from wearing wristbands because, as Desilets said in his email, "inappropriate" speech is not allowed—that

---

[1] According to Desilet, he had learned via hearsay that "several Bow parents" were discussing such plans. Dkt. 22-1, ¶ 3. This rumor never named any Plaintiff.

is, speech in favor of protecting girls' sports or against the view that biological boys should play girls' sports.

Defendants also argue that there is no viewpoint discrimination here because the "wristbands are no different and send the same message as LM's 'two gender' T-Shirt." Dkt. 28 at 10. But in *L.M.*, the First Circuit declined to reach the viewpoint-discrimination issue after finding it does not apply under *Tinker*. 103 F.4th at 886 n.11. In contrast, the limited public forum analysis applicable to this case expressly bans viewpoint discrimination. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). In any event, Plaintiffs' message that biological boys should not play girls' sports is not the same as a message stating that there are only two genders. Nothing in Plaintiffs' message demeaned unalterable personal characteristics. *Cf. L.M.*, 103 F.4th at 878. Their message is about fair athletic competition and the public policy governing the very soccer game the Plaintiffs were attending, and it says nothing about the "existence" or validity of trans-identifying individuals. *Cf. id.* at 880.

The wristbands can also be reasonably perceived as a positive affirmation of the importance of girls' sports and a celebration of women's sex-based rights. See Dkt. 22-2. The wristbands signify that biological "girls matter" and "protecting girls' sports matters." It is disturbing that in 2024 a pro-female wristband can be characterized by school officials as unprotected speech, that is off-limits at a girls' soccer game taking place at a public high school.

6

One last point: Defendants do not dispute that they allow individuals on school property, including spectators at sporting events, from wearing apparel expressing other viewpoints. *See, e.g.*, Dkt. 30, ¶¶ 27, 47 (admitting that "People attending soccer games and other extracurricular activities on Bow School District property regularly wear apparel showing support for political and social causes"); *cf.* Dkt. 1, ¶¶ 27, 47. Plaintiffs have seen, for example, people wearing Pride Flag shirts or messages in support of LGBTQ rights while on Bow school property. *See, e.g.*, Dkt. 14-5, ¶ 26; Dkt. 14-4, ¶ 58.

Yet Defendants insist their supposed "no communicating any opinion" rule long predates the September 17 game. Defendant Desilets claimed the Bow Athletic Handbook and the NHIAA's Policies and Procedures required this rule. See Dkt. 14-8; Dkt. 14-9; Dkt. 21-1, ¶¶5-6 (highlighting language from the Handbook about "not mak[ing] it about anything or anyone else"). And after the game, Defendant Kelley confirmed her belief that wearing the wristbands violated the already-existing school policy. Dkt. 14-12. But if Defendants banned *any* communication about this or other sociopolitical issues, then school officials would be at every extracurricular event making sure no one is speaking about LGBTQ issues or anything else. Even Defendants concede they do not do that. *See* Dkt. 30, ¶¶ 27, 47. The only people banned from expressing their view on this issue have been Plaintiffs.[2]

---

[2] After the filing of this lawsuit, Plaintiffs obtained additional evidence of viewpoint

7

IV. **DEFENDANTS' POLICIES AND PRACTICES UNREASONABLY PREVENT SPORTS SPECTATORS FROM COMMENTING ON THE FAIRNESS OF THE GAME**

Even if Defendants did prohibit all communications at extracurricular events on the issue of transgender athletes, as they assert, see Dkt. 28 at 10-11, that ban would be unreasonable given the purpose of the limited public forum. *See People for the Ethical Treatment of Animals v. Tabak,* 109 F.4th 627, 636-38 (D.C. Cir. 2024) (NIH's policy for moderating social-media comments was unreasonable, inflexible, and skewed toward excluding critics of animal testing). As Bow High School's Athletic Handbook recognizes, spectators come to watch amateur sporting events—among other reasons—to "cheer *for* their team," to encourage "good play from everyone," and to uphold the "good sportsmanship, positive ethics, and integrity" that amateur athletics represents. Dkt. 14-9. Unfair advantages, such as performance enhancing drugs, and overly physical tactics that risk injuring other players undercut good play, ethics, integrity, and sportsmanship.

Plaintiffs believe that allowing biological males to play women's sports undermines fair competition and puts biologically female athletes at risk for physical and mental injury. *See, e.g.,* Dkt. 14-4, ¶¶ 4, 9, 17; Dkt. 14-5, ¶¶ 4, 9. Before the game, for instance, Andy Foote emailed school officials to criticize them

---

discrimination, referenced in Plaintiffs' First Amended Complaint: (1) other people were allowed to vocalize opposition to the wristbands without consequences (Dkt. 35 at 12-15); (2) other passive sociopolitical commentary is tolerated on school grounds (*id.*); and (3) officials responded negatively to criticism, including being called cowards for failing to support women's sports (Dkt. 35 at 10, 18-19).

8

for lacking the "courage" and "integrity" to "[s]tand up for women" and "[p]rotect our daughters before someone else gets hurt." Dkt. 22-2. And Foote posted online encouraging people to "show your solidarity with our girls' team as they face this challenge" and "protect the integrity and safety of female athletics." Dkt. 14-11.

Plaintiffs wore wristbands in support of the biological females on the Bow High School team, to "Protect Women's Sports for Female Athletes," as Fellers' sign read. Dkt. 14-3, ¶¶ 4, 13-14, 59. They came to the game to cheer for their girls' team, *see* Dkt. 14-4, ¶¶ 26, 29, and to speak on behalf of the values of sportsmanship, good play, ethics, and integrity, which is the purpose for which the forum was opened.

A policy that prohibits spectators from speaking about the fairness and competitive rules that govern the very game they are watching is unreasonable. It prevents, for instance, spectators from objecting when a team openly cheats, pays student athletes under the table, breaks sportsmanship norms, or seeks to deliberately injure opposing players. Such a rule extends far beyond stopping intimidation or humiliation on the basis of sex or gender identity. *Contra* Dkt. 28 at 10. This rule would destroy—not advance—the values that are the purpose of amateur-high-school athletics as a forum.

Defendants' Designated Protest Area policy is even more unreasonable and overbroad, because it empowers school officials to restrict all non-disruptive "protests and other free speech exercises" to a small zone, unreasonably restricted in time and space. Dkt. 14-18. Under this policy, all free speech exercises outside

9

this marked-off area "may be deemed as disruptive" by definition. Dkt. 14-17. Defendants can retaliate against citizens exercising their First Amendment rights anywhere else on campus by suspending school events and removing people from school property. Dkt. 14-18. This "sweeping ban" could never actually be enforced and "cannot be justified even if [Bow sporting events] were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech." *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 574-755 (1987) (invalidating a resolution that preventing anyone from "engag[ing] in First Amendment activities with the Central Terminal Area" of an airport).

V. IT IS IN THE PUBLIC INTEREST TO ENJOIN THE IRREPARABLE DAMAGE THAT PLAINTIFFS ARE SUFFERING

The "suppression of free speech rights is irreparable harm." Hrg. Tr., Dkt. 24, at 62:8-9. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Each day that Plaintiffs cannot silently but visibly express their opinions about women's sports on the sidelines at sporting events or other extracurricular activities is itself irreparable. Moreover, "protecting rights to free speech is ipso facto in the interest of the general public." *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 98 (D. Me. 2022).

## CONCLUSION

This Court should grant Plaintiffs' motion for a preliminary injunction.

| | |
|---|---|
| Dated: October 25, 2024 | Respectfully submitted, |
| */s/ Richard J. Lehmann* <br> Richard J. Lehmann <br> New Hampshire Bar No. 9339 <br> LEHMANN MAJOR LIST PLLC <br> 6 Garvins Falls Road <br> Concord, New Hampshire 03301 <br> Tel: (603) 731-5435 <br> Fax: (720) 995-9156 <br> rick@nhlawyer.com | /s/ *Endel Kolde* <br> Endel Kolde* <br> DC Bar No. 1782129 <br> Brett Nolan* <br> DC Bar No. 90014964 <br> Nathan J. Ristuccia*§ <br> Virginia Bar No. 98372 <br> INSTITUTE FOR FREE SPEECH <br> 1150 Connecticut Ave., NW <br> Suite 801 <br> Washington, D.C. 20036 <br> Tel: (202) 301-3300 <br> Fax: (202) 301-3399 <br> dkolde@ifs.org <br> bnolan@ifs.org <br> nristuccia@ifs.org <br><br> **Pro hac vice* <br><br> *Counsel for Plaintiff* |

---

§ Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

11