**Exhibit B**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KYLE FELLERS, ANTHONY FOOTE, NICOLE FOOTE, and ELDON RASH,<br><br>Plaintiffs,<br><br>v.<br><br>MARCY KELLEY, Superintendent of Schools, State Administrative Unit 67, in her official and individual capacities; MICHAEL DESILETS, Athletic Director, Bow High School, in his official and individual capacities; MATT FISK, Principal, Bow High School, in his official and individual capacities; STEVE ROSSETTI, soccer referee, New Hampshire Interscholastic Athletic Association, in his individual capacity; and BOW SCHOOL DISTRICT;<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

## ~~SECOND~~FIRST AMENDED COMPLAINT
## FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

### INTRODUCTION

Public schools are charged with educating children about America's basic civic values, its Constitution, and the fundamental rights it guarantees. But when an opportunity arose to teach students about how important the First Amendment is to American liberty, Bow School District officials did the opposite—acting as though the First Amendment does not apply in public school buildings, on school grounds, at playing fields, or even during off-campus extracurricular activities. According to these officials, Bow School District property is a First Amendment free zone, from

which they can banish parents who speak in ways the government dislikes. And
that's exactly what they did.

When several parents and a grandfather decided to wear pink wristbands at
their children's soccer game in support of protecting women's sports for biologically
female athletes, school officials threatened to have them arrested for trespass and
nearly forced their children to forfeit the game. They conspired with a soccer referee
to intimidate parents, enforce the school's unconstitutional rules, and prevent
anyone from exercising their rights to speech, petition, and assembly. Following
that game, the school banned those who dared to take a stand from not just future
games, but from all other school property as well.

But public-school facilities are not private property. As the Supreme Court held
over fifty years ago, the Constitution protects the rights of all "persons"—parents
and students alike—to express their opinions, even on controversial subjects "in
school as well as out of school," "in the cafeteria, or on the playing field, or on the
campus." *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 511, 512-13
(1969). And Bow School District's ban on demonstrations criticizing the decision to
allow biological boys to play girls' soccer—cloaked in the language of "disruption"
and "harassment"—is unconstitutional viewpoint discrimination.

The First Amendment does not allow state-operated schools to become "enclaves
of totalitarianism." *Tinker*, 393 U.S. at 511. Plaintiffs are entitled to relief securing
their fundamental rights to free expression, petition, and assembly.

THE PARTIES

1.    Plaintiff Kyle Fellers is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint.

2.    Plaintiff Anthony "Andy" Foote is a natural person and a citizen of New Hampshire and the United States. He resides in Bow and has resided in Bow during all times relevant to his past actions mentioned in this complaint.

3.    Plaintiff Nicole Foote is a natural person and a citizen of New Hampshire and the United States. She resides in Bow and has resided in Bow during all times relevant to her past actions mentioned in this complaint.

4.    Plaintiff Eldon Rash is a natural person and a citizen of New Hampshire and the United States. He resides in Bedford and has resided in Bedford during all times relevant to his past actions mentioned in this complaint.

5.    Defendant Marcy Kelley is the Superintendent of Schools of State Administrative Unit 67, which is made up of the Bow and Dunbarton School Districts, and has held that position during all times relevant to the events in this complaint. She is sued in her official and individual capacities.

6.    Defendant Michael Desilets is the Athletic Director of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

7.     Defendant Matt Fisk is the principal of Bow High School and has held that position during all times relevant to the events in this complaint. He is sued in his official and individual capacities.

8.     Defendant Steve Rossetti is a soccer referee with the New Hampshire Interscholastic Athletic Association (NHIAA) and has held that position during all times relevant to the events in this complaint. He is sued in his individual capacity.

9.     Defendant Bow School District is a New Hampshire school district and part of School Administrative Unit 67 (Bow & Dunbarton School Districts).

JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because this action presents questions of federal law and challenges Defendants' violation of Plaintiffs' civil rights pursuant to 42 U.S.C. § 1983.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims occurred and are occurring in this judicial district and because Defendants all reside in this district.

STATEMENT OF FACTS

*Bow School District Policies on Speech at Extracurricular Events*

12.     Bow School District, the public school district in the town of Bow, New Hampshire, has a school board policy (Policy KFA) on "Public Conduct at School Property." This policy regulates the behavior of "all individuals on school property

4

or at a school event" in "any buildings, vehicles, property, land, or facilities used for school purposes or school-sponsored events, whether public or private."

13.    Exhibit A is a true and correct copy of Policy KFA. The policy is also available on Bow School Board's website at https://sites.google.com/a/bownet.org/bow-school-board/policies_1.

14.    Although entitled a policy on "conduct," Policy KFA regulates speech as well as conduct. Policy KFA states that "[t]he School District expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." The policy mandates, among other things, that no person shall "1. Injure, threaten, harass, or intimidate . . . any other person" or "7. Impede, delay, disrupt, or otherwise interfere with any school activity or function (including using cellular phones in a disruptive manner)."

15.    Bow School District enforces Policy KFA by ordering alleged violators to leave school grounds, by contacting law enforcement, and by issuing "No Trespass" letters.

16.    Bow High School's Athletics Handbook also regulates the speech and conduct of spectators at Bow High School games. The Handbook states that "[p]oor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands." It also tells spectators to avoid certain kinds of speech such as "cheering *against* the team," "us[ing] the names or numbers of opposing teams," or "trying to directly communicate" with players.

17.    As a member of the NHIAA, Bow High School annually commits itself to follow all guidelines and policies set forth by the NHIAA. Failure to comply with NHIAA guidelines can, among other things, cause Bow High School to forfeit games or become ineligible to compete in post-season tournaments.

18.    Under the 2024 NHIAA Soccer Policies and Procedures, "[a]ll teams must complete their entire schedule submitted to the NHIAA" and an NHIAA committee determines "if [scheduled] games not played will be considered a forfeit(s) or a no game(s)."

*The September 17 Soccer Game*

19.    On September 10, 2024, this Court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic women's sports teams to biological females. *See Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024).

20.    One of the plaintiffs in *Tirrell v. Edelblut* is a biological male who plays on the Plymouth Regional High School girls' varsity soccer team. Bow High School's soccer team was scheduled to play the Plymouth Regional team on September 17, 2024.

21.    On or about September 13, Nicole Foote, the mother of a player on the Bow High School girls' soccer team, met in person with Bow High School's Athletic Director, Mike Desilets, to complain about the competitive unfairness and injury risk to female athletes inherent in allowing biological males participate in women's

sports. Desilets told Nicole that the court decision prevented the school district from doing anything about the situation.

22.     On September 16, the evening before the game, Desilets emailed soccer families, warning them that "Bow High School's status as a member of the NHIAA" and the school's "Athletics Handbook" impose obligations "regarding sportsmanship and sideline behavior" so that "any inappropriate signs, references, language or anything else present at the [September 17] game will not be tolerated." Desilets also claimed that "some differing opinions regarding tomorrow's game . . . is perfectly fine."

23.     Exhibit B is a true and correct copy of Desilets' email.

24.     Desilets attached to his email a document containing relevant extracts from the Athletics Handbook and the 2024 NHIAA Soccer Policies and Procedures.

25.     Exhibit C is a true and correct copy of this extracts document.

26.     People attending soccer games and other extracurricular activities on Bow School District property regularly wear apparel showing support for political and social causes, such as shirts supporting political candidates, displaying the Pride Flag, or expressing messages about global warming.

27.     Two parents whose daughters play on the girls' soccer team, Kyle Fellers and Anthony "Andy" Foote (Nicole's husband), decided to attend the game and silently express their opinion about the importance of reserving women's sports for biological females. They agreed to wear pink wristbands, purchased off Amazon.

28.     As purchased, these wristbands were the type of pink bands that athletes often wear to raise awareness about breast cancer and had no writing on them. The night before the game, Andy Foote decorated their wristbands with two black Xs, symbolizing the female chromosomes.

29.     Exhibit D is a true and correct photograph of one of these wristbands.

30.     Andy Foote posted on Facebook that night, stating that he would be attending the September 17 game to show solidarity with the girls' team.

31.     Exhibit E is a true and correct photograph of this Facebook post.

32.     Foote's and Fellers' daughters asked if any of their teammates wanted to wear a wristband in support of women's sports. But, since they could not get full support from the team, no one on the team wore wristbands.

*Events at the September 17 Soccer Game*

33.     On September 17, Fellers, Andy Foote, and Nicole Foote attended Bow High School's varsity girls' soccer game, along with other family members. The soccer game occurred at the Bow High School soccer field, which is public property and part of the public high school's campus.

34.     None of these parents wore a wristband during the first half. Andy Foote distributed wristbands to his wife (who did not put it on) and to around half a dozen other spectators who requested one—although Foote told them not to put the bands on until the second half. Fellers and the Footes watched the first half with other parents and cheered for the teams. They did not shout, chant, march, or waive signs about biological males competing in women's sports.

8

35.     At halftime, Andy Foote went to the parking lot and put a sign of Riley Gaines on his Jeep's windshield. Both he and Fellers wore pink wristbands featuring two black Xs at the sidelines at the beginning of the second half.

36.     For the first ten minutes of the second half, the two men continued to watch the game without incident or disruption. They did not shout, chant, march, or waive signs about biological males competing in women's sports. Beyond these wristbands, nothing indicated that any of the parents were protesting.

37.     Approximately ten minutes into the second half, Athletic Director Desilets approached Andy Foote to tell him that he was not allowed to protest at the game and had to take off the wristband. Foote objected, citing the First Amendment. But when Desilets persisted, Foote removed the wristband.

38.     Desilets then told Fellers that he was not allowed to protest at the game and had to take off the wristband. When Fellers refused to obey, Desilets walked a short distance away to speak with Principal Matt Fisk and Bow Police Lieutenant Phil Lamy. Fisk then approached and repeated that Fellers had to remove the wristband or leave the game. After heated words, Fellers again refused.

39.     At the direction of Bow School District officials, Lt. Lamy then told Fellers that he had to either leave the game or remove the wristband. According to Lamy, the First Amendment did not apply as Fellers was on "private property." The interaction between Fellers and the school officials and police officer grew heated. Lamy wore a body camera, which he eventually activated to record some of the interaction.

40.    Fellers finally removed his wristband but continued to hold it in his hand.

41.    Eldon Rash, Feller's former father-in-law (his ex-wife's stepfather) observed some of the commotion caused by officials and asked what was happening. Rash and Fellers did not attend the game together, and Rash was until that point unaware of the wristband demonstration.

42.    After Fellers explained the situation, Rash took the wristband from Fellers' hand and put it around his own wrist. Fisk and Desilets then pressured Rash into leaving the game or taking off the wristband. Andy Foote filmed some of this interaction on his cellphone camera.

43.    Fellers voiced his opposition to Defendants' censorship by accusing them of harassment, invoking the U.S. Constitution, and drawing an analogy to Germany in the 1930's and 1940's. Fellers proceeded to call Desilets a "coward" for not standing up form women's sports, causing Desilets to jerk his thumb at Lamy for Fellers to be sent off, and Lamy immediately follows Desilets's instruction, ordering Fellers to leave the game, while Fisk stood nearby.

44.    After Lamy told Fellers to leave the game, Fellers immediately left to go to his car. Other than moving his car to obtain a better view of the game from the parking lot, he remained by his car for the rest of the game. As he was leaving the sidelines, Fellers expressed his opinion that the officials present were "a bunch of Nazis." Fisk, Desilets, and Lamy were within earshot.

45.    After Lamy told Fellers to leave the game, he asked Fisk whether Fisk wants Eldon Rash "gone too?" Fisk responded affirmatively, if Rash "doesn't take it off," referring to the pink wristband marked with XX.

46.    During this time, Fisk also repeatedly stood next to a seated Rash, instructing Rash to remove the wristband and at least once threatening that "if this game doesn't continue it's going to have an adverse impact on your granddaughter."

47.    Steve Rossetti, the head referee, stopped play and told both teams to return to their benches. According to Rossetti, he stopped the game because the soccer players could overhear "you guys arguing" about "the First Amendment thing." The game did not restart for about 15 minutes. Speaking to the spectators on the sidelines, Rossetti stated that Bow High School would forfeit the game (and thus be ineligible for the playoffs) if the wristbands were not all removed. Rossetti said that Rash had "no right to embarrass the kids" and that if he did not take the wristband off "the game is over." Speaking directly to Rash, Rosetti repeatedly said "just take it off."

48.    Rash eventually did take off the wristband and put it on his lap. Shortly thereafter, Ben Forbes, another school official, walked past the parents' sideline, turned and directly observed Rash, who was sitting, facing the soccer pitch. As Forbes walked back toward the sidelines, he used a hand-held radio to inform "Mike" (Desilets) that "he took it off."

49.    During this time that Forbes was surveilling Rash and his removal of the wristband, Rossetti, Desilets, Fisk, and at least one other person, had an on-field

11

meeting. They did not allow the game to resume play until after Forbes radioed Desilets that Rash had taken off the wristband.

50.    The game eventually concluded without further incident.

51.    During the stoppage of play other parents on the sidelines vocally expressed opposition to Plaintiffs passively wearing wristbands, advocating that Plaintiffs remove the wristbands, "write a letter to someone," "take it off," and "stop hurting the girls" while Fisk and Desilets were within earshot. None of the parents expressing opposition to Plaintiffs' speech were asked to stop speaking, threatened with removal from the game, threatened with arrest, or trespassed from future games or school property.

52.    The Bow School District has also allowed pro-trans and pro-LGBTQ+ viewpoints to be promoted on school property in other ways. For example, at least as recently as June 2024, a large Progress Pride flag was displayed prominently in the music room at Bow High School, where it was visible to students, staff, and visitors.

53.    The following image is a fair and accurate illustration of the Progress Pride flag displayed in the music room, bearing the same colors and design:



54.    The Progress Pride flag was designed to be more inclusive than the legacy Rainbow flag by adding black, brown, and white stripes to represent communities of color, transgender individuals, and those living with HIV/AIDS. The original Pride flag, also known as the Rainbow flag, does not explicitly represent these communities.

55.    The Progress Pride flag features a chevron shape along the hoist (left side or top) with the added stripes, whereas the traditional Pride flag has a horizontal stripe design. The chevron shape is meant to symbolize forward movement and progress, while also acknowledging that there is still work to be done.

56.    The Progress Pride flag's design and colors are intended to bring attention to the struggles and contributions of marginalized communities within the LGBTQ+

movement, whereas the traditional Pride flag is often seen as a symbol of unity and celebration for the entire LGBTQ+ community.

57.     The Progress Pride flag was developed in 2018 by non-binary American artist and designer Daniel Quasar (who uses xe/xyr pronouns). Based on the iconic rainbow flag from 1978, the redesign celebrates the diversity of the LGBTQ+ community and calls for a more inclusive society.

58.     Displaying the Progress Pride flag amounts to passive sociopolitical commentary on the issue of transgender inclusion and women's sex-based rights, similar to wearing a pink wristband with the letters XX, although from a different viewpoint. In addition to representing a different viewpoint, the Progress Pride flag displayed in the Bow High School music room also was much larger, more prominent, and more visible than Plaintiffs' wristbands. No one was trespassed, disciplined, or excluded from Bow High School for displaying the Progress Pride flag on school property, including in the music room.

*Events in the Parking Lot after the Game*

59.     Fellers watched the rest of the game from his car, in the parking lot next to the soccer field, although he moved parking spots to get a better view. Once the game ended, Fellers stood by his car, holding a hand-written poster reading "Protect Women's Sports for Female Athletes" over his head. The same poster had been displayed on his parked car during the game.

60.     Fellers has observed other vehicles parked at Bow School facilities bearing bumpers stickers and political and social messages, including expressing support for

14

political candidates, displaying a rainbow flag in the shape of New Hampshire, and the pro-liberty motto "Live Free or Die."

61.    As the spectators and teams left to go to their vehicles, some expressed support for Fellers' message while others criticized him. Rossetti, the referee who had threatened to cancel the game and make Bow forfeit, expressed his own opinion that "this is not the time or place" for Fellers's expression of opinion, called Fellers a "f***ing a**hole" and told him that his daughter would hate him. No one prevented Rossetti from engaging in sociopolitical commentary on school property, or from expressing his disagreement with Fellers's views.

62.    After being instructed to do so by Desilets, Lamy approached Fellers and demanded to know why he had not already left the grounds. Fellers replied that he had only been told to leave the soccer game—not the parking lot, a fact later confirmed by the bodycam video. Nonetheless, Lamy insisted that Fellers immediately leave all school property.

63.    Fellers informed Lamy that he still had to pick up his children and sister. Lamy said that the children and sister could walk. A second Bow police officer, Sergeant Robert Welch, and Andy Foote both then arrived and de-escalated the situation. Lamy did not arrest Fellers and ultimately allowed Fellers to collect his family members before leaving the school property.

*The No Trespass Orders*

64.    On September 18, Superintendent of Schools Marcy Kelley released a statement about the events of the previous night. According to Kelley, "late in the

15

game, play had to be stopped on the field for 10-15 minutes because of a form of protest taking place" which supposedly "did not abide by our public conduct on school property policy." Kelley claimed that the school had "reminded all soccer families of these expectations, by email, in advance of Tuesday's game"— presumably referring to Desilets' email.

65.     Exhibit F is a true and correct copy of Kelley's statement.

66.     Kelley attached to her statement Policy KFA and the same document of extracts from NHIAA's Soccer Policies and from the Bow High School Athletics Handbook that Desilets had sent two days before. *See* Exs. A and C.

67.     On September 19, Andy Foote received a "No Trespass Order" in the mail from Superintendent Kelley. This Order stated that Foote was "prohibited from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds" until further notice.

68.     According to the Order, the reason for Foote's ban is that "prior to and during the soccer game" he "brought and distributed pink armbands to parents and other attendees to protest" and "participated and led the protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

69.     The Order stated that Foote's behavior violated Policy KFA's requirement "that attendees at sporting events and extracurricular activities demonstrate mutual respect, civility, and orderly conduct," as well as Policy KFA's prohibition of

16

"threatening, harassing, or intimidating . . . any other person" and of conduct that shall "impede, delay, disrupt, or otherwise interfere with any school activity."

70.    Although the Order was originally only in effect "through September 23, 2024," Kelley noted that the Order "will be extended for the duration of the fall sports seasons" if Foote did anything to violate it and that it "may potentially be extended until the end of the season" even if Foote obeyed.

71.    Exhibit G is a true and correct copy of the document the No Trespass Order that Foote received.

72.    On September 20, Kyle Fellers received a "No Trespass Order" in the mail from Superintendent Kelley. This order is essentially identical to Foote's order, with two main differences.

73.    First, the Order gives a different reason for Fellers' ban: that Fellers had "led a protest . . . [which] was designed to and had the effect of intimidating, threatening, harassing, and discouraging" a student on the other team from playing.

74.    Second, Fellers' order is in effect "for the remainder of the fall sports season" and "may also be extended until the end of the school year" if violated.

75.    Exhibit H is a true and correct copy of the No Trespass Order that Fellers received.

76.    On September 25, Fellers received an "Addendum" to the No Trespass Order in the mail from Superintendent Kelley. The Addendum clarified that the original Order did not prevent Fellers entering school grounds "for the limited

17

purpose of participating in middle school parent pick-up" as well as for various administrative purposes such as voting or school board meetings. Notably absent from the list of permitted purposes, however, were games, sports practices, extracurricular activities, drop-off, and high school pick-up.

77.    Exhibit I is a true and correct copy of the Addendum.

78.    After Fellers emailed Kelley about the difficulties that the trespass order caused him in transporting his kids to and from school, Kelley sent him a second Addendum on September 26. The Second Addendum added pick-up and drop-off from both the middle school and high school to the list of permitted reasons to enter school grounds. However, the Second Addendum expressly stated that Fellers remains prohibited from picking up and dropping off his child for high school soccer events. And, implicitly, Fellers remains prohibited from entering school grounds for cross county drop-off or pick-up, and for any other games, sports practices, and extracurricular activities.

79.    Exhibit J is a true and correct copy of the Second Addendum.

80.    After the filing of this lawsuit, Defendants Kelley, Desilets, and Fisk all submitted declarations detailing that Plaintiffs, and especially Kyle Fellers, were subjected to adverse actions by officials because of their speech, including Fellers's criticism of school officials.

81.    Marcy Kelly declared, under penalty of perjury, that Fellers received a longer no-trespass order in part because of "abuse of school administrators" and his "prolonged refusal to remove his wristband." Dkt. 22-4 at 3.

82.    Michael Desilets declared, under penalty of perjury, that he asked Lamy to remove Fellers from the game after Fellers "told Fisk and/or me that he should be supporting women and called them cowards." Dkt. 22-1 at 4. Shortly thereafter, Desilets saw Fellers holding a sign in the parking lot and asked Lamy to instruct Fellers to leave the premises. *Id.*

83.    Matthew Fisk similarly declared, under penalty of perjury, that after "Fellers again called one or both of us cowards, Desilets asked Lt. Lamy to remove Fellers from the area." Dkt. 22-6 at 3.

*The Designated Protest Area*

84.    On October 1, the day after this lawsuit was filed, Superintendent Kelley sent an email informing parents that future protests at school events must occur in a designated protest area or they "may be deemed as disruptive and result in the game being suspended." Kelley stated that Bow School District "want[s] to be able to continue to have spectators at our games for the rest of the season," suggesting that all spectators may be banned if people disobey this new regulation concerning the designated protest area. Kelley attached a Notice of a Designated Protest Area.

85.    Ex. K is a true and correct copy of Kelley's email on the protest area.

86.    According to the Notice, the Designated Protest Area is the sole location "on any school District properties" where "campus visitors" may engage in "protests and other free speech exercises." This Designated Protest Area is marked off and located in front of the soccer scoreboard—located beside the parking lot, about 50 yards further from the soccer field than where parents normally sit—and is only

19

open "for 30 minutes before and 30 minutes after" girls' soccer games. There is "no designated area for protest outside of this timeframe" and "[t]his is the only designated area for any visitors to engage in protests on any school District properties." No more than 50 people may gather in the designated area. Violating the new regulation regarding the Designated Protest Area "will result in removal from District property."

87.    Ex. L is a true and correct copy of the Notice of a Designated Protest Area.

*The Immediate Impact of Defendants' Actions on Plaintiffs*

88.    Andy Foote obeyed the No Trespass Order through its expiration on September 23, 2024. As a result, he could not attend Bow High School's homecoming game on September 20, in which his daughter played, the football homecoming game, or his youngest daughter's soccer game on September 23.

89.    After the No Trespass Order expired, Andy and Nicole Foote attended the soccer game on September 24. They wore pink wristbands to the game, but because of their long-sleeved shirts, they do not believe these wristbands were visible or easy to see. Many other people, including a large group from the nationally known organization Moms for Liberty, were protesting at the game by wearing pink wristbands. No disruption or incident occurred.

90.    Immediately before the start of the September 24 game, the Bow High School varsity girls' squad wore bright pink warm-up jerseys on the field. The warm-up jerseys were similar in color to the Plaintiffs' pink wristbands. No

disruption occurred, although at later games some of the players opted not to wear the pink warm-up jerseys, while others did.

91.    Fellers also obeyed the No Trespass Order after receiving it, through this Court's partial grant of a temporary restraining order on October 8, 2024, allowing Fellers to return to soccer games and pick up his daughter from practice, although not yet protest. This was difficult and inconvenient, as Fellers has two children in Bow School District schools. He was forced to arrange for other people to shuttle his children to and from school and their extracurricular activities.

92.    On September 25, for example, Fellers could not attend his son's cross country meet and had to arrange for family members to pick his son up at school and drive him two towns away to attend the away meet.

93.    Likewise, Fellers could not attend Bow High School's homecoming game on September 20, in which his daughter played.

94.    Fellers' children also both have late afternoon sports practices. As a result, they must be picked up when the school buses are not operating. Fellers has been forced to let his daughter drive his car.

*The Continuing Impact of Defendants' Actions on Plaintiffs*

95.    If Bow School District permitted them to do so, Plaintiffs would continue attending sporting events and other extracurricular events, on and off school grounds, throughout not only the fall sports season but throughout the current school year and the years to come. If permitted, Plaintiffs would silently protest on

the sidelines near the field of play in support of women's sports at some of these events, including by wearing pink wristbands of the sort that Defendants forbid.

96.     If permitted, Fellers would come onto school property to drop off or pick up his children from practices, games, concerts, and other events. He believes, however, that such action would lead to his arrest and prosecution for criminal trespass. He also fears such action would also cause Defendants to extend the No Trespass Order until the end of the school year. *See* Exhibit H. Until this Court's order on October 8, 2024, Fellers was unable to enter school property for soccer-related reasons, even if he did not protest in any way.

97.     If permitted, Fellers would attend each of the remaining soccer games on the schedule through October 25 and any playoff games, as well as swim meets, cross country meets, and other sporting events or extracurricular activities, this year and in future years. He would also silently protest at each of the remaining soccer games, as well as other events, in defense of women's sports, by wearing a pink wristband, by distributing wristbands, or by holding signs in the parking lot. He would protest near the field of play, rather than in the Designated Protest Area. He believes, however, that these actions would all violate the No Trespass Order, lead to his arrest or imposition of a new or extended order, and potentially cause Bow High School sports teams to forfeit games or impair their chances of making the playoffs.

98.     If permitted, Fellers would also silently protest at each of these soccer games, as well as swim meets, cross country meets, and other sporting events or

extracurriculars against Bow School District's violation of the First Amendment. He believes, however, that this would violate the No Trespass Order and the school's policy against protesting in defense of women's sports, lead to his arrest or imposition of a new or extended order, and potentially cause Bow School District sports teams to forfeit games or impair their chances of making the playoffs.

99.    Once his current No Trespass Order expires, Fellers wishes to begin visibly but silently protesting at sporting events or other extracurricular activities. He would protest near the field of play, rather than in the Designated Protest Area. He reasonably believes, however, that such action will cause Bow School District to take out another No Trespass Order because it violates Bow School District's policy against protesting in defense of women's sports. As a result, even when the present Order expires, Fellers intends to avoid silently protesting so long as Bow School District enforces its policy against protesting in defense of women's sports.

100.    Andy Foote intends to attend sporting events and other extracurricular events, on and off school grounds, throughout the fall sports season and the school year, including each of the remaining soccer games on the schedule through October 25 and any playoff games, as well as sporting events and other extracurricular events in future years.

101.    If permitted, Andy Foote would visibly but silently protest at some of these events, including each of the remaining soccer games on the schedule through October 25 and any playoff games, in defense of women's sports, by wearing a wristband on the sidelines, by distributing wristbands, or by holding signs in the

parking lot. He believes, however, that protesting in a silent but visible way during this and future school years could potentially cause Bow School District to take out a new No Trespass Order against him, perhaps lasting through the end of the season as the original No Trespass Order threatened. As a result, he is only willing to show his support for girls' and women's sports in more subtle ways or in circumstances where he is not likely to be singled out, as he did at the September 24 game.

102.    Andy Foote also worries that protesting in a silent but visible way during this and future school years could potentially cause Bow School District sports teams to forfeit games and be ineligible for the playoffs, as the referee stated.

103.    Andy Foote feels that forcing him to express my viewpoint and opinions from a designated protest area relegates him and people who agree with him to second class status and is designed to make it sounds like their views are too dangerous to be seen or heard by other parents or high school students. Indeed, the designated protest area does not afford Foote an ample alternative means of communicating his message. If permitted, he would protest at the sidelines, not from the designated protest area.

104.    Nicole Foote intends to attend sporting events and other extracurricular events, on and off school grounds, not only throughout the fall sports season but throughout the school year and future school years, including each of the remaining soccer games on the schedule through October 25 and any playoff games.

105.    If permitted, Nicole Foote would visibly but silently protest at some of these events, including each of the remaining soccer games on the schedule through October 25 and any playoff games, in defense of women's sports, by openly wearing a pink wristband with the letters XX visible on it in black ink. Nicole Foote believes, however, that for the foreseeable future during this and future school years, protesting in a silent but visible way would cause Defendants to take out a No Trespass Order against her, as they did with her husband. As a result, Nicole Foote is only willing to show her support for girls' and women's sports in more subtle ways, as she did at the games on September 20, September 23, and September 24.

106.    Rash intends to attend several of the remaining soccer games on the schedule, as well as swim meets, cross country meets, and other events that his grandchildren are competing in. If permitted, he would silently protest the government's decision to allow biological boys and men to play girls' and women's sports and to prohibit parents and others from non-disruptively demonstrating about this issue on school property by wearing a pink wristband at future extracurricular events. He believes, however, that doing so would violate Bow School District policy and that Bow School District would take out a No Trespass Order against him as well.

107.    Plaintiffs find it frustrating and degrading to have their viewpoints, and even presence, prohibited by Bow School District, especially when they see other spectators being allowed to promote their viewpoints and opinions at school events, even at sporting events on the sidelines, near the field of play.

108.    Unless this Court grants relief, Plaintiffs expect to be unable to express their views on women's sports on Bow School District property or at any Bow School District sports or extracurricular events, whether home or away.

COUNT ONE
VIEWPOINT DISCRIMINATION
AS-APPLIED CHALLENGE TO SCHOOL POLICIES
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

109.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

110.    Plaintiffs have a First Amendment right to access public school sporting events and other extracurricular activities, which are open to the public, including Bow High School soccer games. Plaintiffs also have a First Amendment right to speak in both a limited public forum and a nonpublic forum, free from viewpoint discrimination.

111.    During school hours, a public school is typically a nonpublic forum, but it becomes a public forum if opened to the public by policy or practice. *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023) (citing *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988); *see also Pitta v. Medeiros*, No. 22-11641-FDS, 2023 U.S. Dist. LEXIS 87864, at *16 (D. Mass. May 19, 2023); *Frierson v. Reinisch*, 806 F. App'x 54, 58 (2d Cir. 2020). When a school holds an event that is otherwise open to public, it is "at least a limited public forum." *Worthley*, 652 F. Supp. 3d at 212. Bow High School has a policy and practice of allowing parents and other spectators to watch sporting events and other extracurriculars.

112.    Under the First Amendment, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to

express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). "[I]n a limited public forum, government '[c]ontrol over access to [the] forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Likewise, access to a nonpublic forum can only be restricted "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view." *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 97 (1st Cir. 2004) (cleaned up).

113.    Defendants have relied on four policies to prevent Plaintiffs from expressing their views on school property:

> (1) the KFA policy requiring "mutual respect, civility, and orderly conduct" on school property;
>
> (2) the KFA policy prohibiting people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing]" any person on school property;
>
> (3) the KFA policy prohibiting people from "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function"; and
>
> (4) the Bow High School Athletics Handbook policy governing "sportsmanship and sideline behavior."

114.    These four policies, both together and separately, unconstitutionally discriminate based on viewpoint when applied to prohibit attendees at an extracurricular event from expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys or men playing in girls' and women's sports or in favor of women's sports, by silently wearing a wristband or displaying a sign in the parking lot.

115.    Defendants also unlawfully apply their policies to prevent Plaintiffs and other spectators from voicing opposition to censorship or criticizing school officials using sharp or provocative language, including mentioning the Constitution or First Amendment, accusing the officials of harassment, comparing the school officials to Nazi officials who censored speech in the 1930s and 1940s, or calling officials "cowards" for failing to support girls' sports.

116.    The right to criticize government officials is safely within the "protected speech zone" and off-limits to government regulation. *McElhaney v. Williams,* 81 F.4th 550, 557 (6th Cir. 2023). Terming speech "harassing" because it criticizes school officials is viewpoint discrimination. *Ison v. Madison Local Sch. Dist. Bd. of Educ.,* 3 F.4th 887, 895 (6th Cir. 2021). "Restrictions that bar offensive or otherwise unwelcome speech are impermissible, regardless of the forum in which the government seeks to impose them." *Moms for Liberty v. Brevard Pub. Sch.*, No. 23-10656, 2024 U.S. App. LEXIS 25394, at *17-18 (11th Cir. Oct. 8, 2024); *see also Mama Bears of Forsyth Cnty. v. McCall,* 642 F. Supp. 3d 1338, 1350 (N.D. Ga. 2022) (respectfulness requirement impermissibly targets speech that is critical of school

board); *Marshall v. Amuso,* 571 F. Supp. 3d 412, 422 (E.D. Pa. 2021) (allowing speakers to praise but not criticize a school board member is viewpoint discrimination).

117.    Defendants do not prohibit attendees at extracurricular events from expressing all viewpoints on political or social issues, by, for example, allowing individuals to wear apparel showing support for politicians and other causes. Parents who opposed Plaintiffs' views, and agreed with the schools officials that Plaintiffs should remove the pink wristbands, were allowed to express their opinions on the sidelines and shout their opinions at Plaintiffs, without any adverse consequences. By singling out those opposed to biological boys playing in girls' and women's sports, advocated in favor of women's sex-based rights, and criticized school officials, Defendants have applied their policies in a way that discriminates based on viewpoint in violation of the First Amendment.

118.    By enforcing these policies against Plaintiffs to prohibit them from wearing their wristbands or displaying their signs in the parking lot in support of girl's and women's sports, and against the inclusion of biological males in such sports, and preventing Plaintiffs from resisting censorship or criticizing school officials, Defendants under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to ~~compensatory or~~ nominal damages; declaratory and preliminary and permanent

29

injunctive relief against continued enforcement and maintenance of Defendants'
unconstitutional customs, policies, and practices; and attorney fees and expenses
pursuant to 42 U.S.C. § 1988.

COUNT TWO
UNREASONABLE RESTRICTION
AS-APPLIED CHALLENGE TO SCHOOL POLICIES
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

119.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

120.    In addition to being viewpoint discriminatory, Defendants' restrictions on
sociopolitical commentary related to girls sporting events taking place on the
sidelines of girls sporting event is unreasonable, lacks sufficient implementation
guidance, and is not reasonably related the purposes of the limited public forum.

121.    It is unreasonable for Defendants to restrict silent protest in the form of
wearing pink wristbands on the parents' sidelines at a girls' soccer game or at any
other Bow School District sporting event, or to restrict such expressive activity to
the time and place of the Designated Protest Area.

122.    It is also unreasonable for Defendants to prevent parents or visitors from
passively displaying sociopolitical messages related to girls' sports on their
automobiles parked in the parking lot at Bow School district sporting event.

123.    By unreasonably restricting passive sociopolitical commentary about girls'
sports at girls' sporting events, Defendants, under color of law, deprived and
continue to deprive Plaintiffs of the right to free speech, assembly, and petition in
violation of the First and Fourteenth Amendments to the United States
Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and,

30

therefore, are entitled to ~~compensatory or~~ nominal damages; declaratory and

preliminary and permanent injunctive relief against continued enforcement and

maintenance of Defendants' unconstitutional customs, policies, and practices; and

attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
CONSPIRACY TO VIOLATE FIRST AMENDMENT RIGHTS
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

124.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

125.  A civil rights conspiracy is a combination of two or more persons acting in

concert to commit an unlawful act, or to commit a lawful act by unlawful means, the

principal element of which is an agreement between the parties to inflict a wrong

against or injury upon another, and an overt act that results in damages. *Sánchez v.*

*Foley*, 972 F.3d 1, 11 (1st Cir. 2020). Conspiracy is a matter of inference, which can

be shown through direct or circumstantial evidence of an agreement among

Defendants to inflict harm upon Plaintiffs. *See Estate of Bennett v. Wainwright*, 548

F.3d 155, 178 (1st Cir. 2008).

126.  Both before and during Plaintiffs' September 17 silent demonstration,

Defendants consulted with each other and agreed to take overt acts together to

prevent Plaintiffs' demonstration by threatening to direct police to arrest Plaintiffs,

expel them from events open to the public, stop Plaintiffs' children and the other

members of the girls' soccer team from playing, or force the team to forfeit its game.

These threats were both intended to and did have the effect of causing Plaintiffs to

stop demonstrating on the sidelines, thus abridging their federally secured rights.

127.   For example, during the game, Fisk and Desilets told Rossetti that Eldon Rash was refusing to remove his wristband. Defendant Rossetti then used his authority as referee to threaten to abandon the game, which would have caused the Bow team to forfeit their playoff spot, unless Rash removed his wristband.

128.   Rossetti also objected to Plaintiffs talking about the "First Amendment."

129.   Rossetti conferred with Defendants Fisk and Desilets and did not allow the game to resume until after a school employee radioed Desilets that Rash had removed the wristband. This is evidence that Rossetti participated in the agreement to stop Plaintiffs from wearing the pink wristbands as a social and political statement.

130.   Defendants continue to conspire to deprive Plaintiffs of their rights by enforcing No Trespass Orders against them and threatening to extend or renew such Orders if Plaintiffs protest again.

131.   By conspiring to unlawfully prohibit Plaintiffs from silently demonstrating in support of girls' and women's sports, and against the inclusion of biological males in such sports, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to ~~compensatory or~~ nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and

32

maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FOUR
FIRST AMENDMENT RETALIATION
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

132.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

133.    Defendants commit First Amendment retaliation when they act in a way that would deter a reasonably hardy individual from exercising constitutional rights. *Barton v. Clancy,* 632 F.3d 9, 29 (1st Cir. 2011). A plaintiff makes out a prima facia claim for retaliation, if a plaintiff shows that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action. *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). The burden then shifts to the defendants, who are liable unless defendants can prove that they would have reached the same decision even in the absence of the protected conduct. *Id.*

134.    Defendants retaliated against Plaintiffs for pure speech when they prohibited Plaintiffs from silently but visibly protesting at the September 17 soccer game, by threatening to expel them from events open to the public, stop Plaintiffs' children and the other members of the girls' soccer team from playing, or force the team to forfeit its game, if Plaintiffs did not stop speaking.

135.   Eldon Rash was told he needed to remove the wristband or his granddaughter's soccer game would be forfeit, forcing the veteran to choose between his First Amendment rights and love for his family.

136.   Defendants further retaliated against Plaintiffs for speech by threatening to arrest two Plaintiffs for trespassing if they attended soccer games or entering school grounds for specific periods of time, as punishment for Plaintiffs' protest at the September 17 game.

137.   Defendants also retaliated against Plaintiffs Foote and Fellers for verbally resisting the officials' censorship, criticizing school officials for restricting their speech rights, and asserting that school officials were harassing them; and also for invoking the Constitution, comparing the officials to Nazis, and calling them cowards for failing to protect female student-athletes.

138.   Defendant Kelley specifically listed Fellers's exercise of this right to speak critically of school officials as reason for imposing a longer no-trespass order on him.

139.   Defendant Kelley also created a Designated Protest Area, designed to discourage parents from expressing their views on sociopolitical issues related to girls' sports by banishing them to an area located away from the sidelines or primary spectator area of the sporting event.

140.   These threats and punitive measures were both intended to and did have the effect of causing Plaintiffs to stop speaking on the sidelines or criticizing officials, thus abridging their federally secured rights.

34

141.    By unlawfully retaliating Plaintiffs for silently demonstrating in support of girls' and women's sports, and against the inclusion of biological males in such sports, for resisting censorship, and for criticizing school district officials, Defendants, under color of law, deprived and continue to deprive Plaintiffs of the right to free speech, assembly, and petition in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to ~~compensatory or~~ nominal damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT FIVE
OVERBREADTH
U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

142.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 108.

143.    Speech regulations may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (internal quotation marks and citations omitted) (emphasis original).

35

144.    Defendants' Designated Protest Area policy and practices empower school officials to restrict all non-disruptive protests and other free speech exercises to a small zone, unreasonably restricted in time and space. Defendants deem all protests and other free speech exercises outside this designated area to be disruptive by definition and are empowered to suspend school events and remove people exercising their First Amendment freedoms from school property as a result. Defendants' Designated Protest Area policy and practices violate the First Amendment right of free speech on its face because they are substantially overbroad, sweeping in vast amounts of protected non-disruptive political expression and other free speech exercises.

145.    By enforcing the Notice of Designated Protest Area against non-disruptive protests and other free speech exercises, Defendants, under color of law, deprive Plaintiffs of their right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983 and, therefore, are entitled to <u>nominal</u> damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered in their favor and against Defendants as follows:

1. Orders preliminarily and permanently enjoining defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from:

   a. Enforcing those parts of Policy KFA – Public Conduct on School Property that (1) require "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;

   b. Enforcing the Bow High School's Athletics Handbook to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot;

   c. Enforcing either Policy KFA – Public Conduct on School Property or the Bow High School's Athletics Handbook in such a way as suppress

non-disruptive expression of political or social views based on audience
reaction or a heckler's veto.

    d.  Enforcing either Policy KFA – Public Conduct on School Property or
the Bow High School's Athletics Handbook in such a way as to prevent
all sociopolitical commentary related to girls' sports by adults
attending girls' sporting events.

    e.  Enforcing either Policy KFA – Public Conduct on School Property or
the Bow High School's Athletics Handbook in such a way as to prevent
Plaintiffs from criticizing school officials in provocative terms for
censoring Plaintiffs' viewpoints or not supporting women's sports.

    f.  Enforcing the No Trespass Orders issued against Fellers and Foote on
September 19, 2024.

    g.  Enforcing the Notice of Designated Protest Area to prevent attendees
at an extracurricular event from non-disruptively expressing
disfavored viewpoints, or any sociopolitical viewpoints related to girls'
sports, outside of the protest area.

    h.  Otherwise retaliating against Plaintiffs for resisting censorship or
criticizing school officials.

2. Declaratory relief consistent with the injunction, to the effect that:

    a.  Those parts of Policy KFA that (1) require "mutual respect, civility,
and orderly conduct among all individuals on school property or at a
school event," (2) prohibit "injur[ing], threaten[ing], harass[ing], or

intimidat[ing]," and (3) prohibit "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function" violate the First Amendment and Fourteenth Amendment when applied to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot.

b. The Bow High School's Athletics Handbook violates the First Amendment and Fourteenth Amendment when applied to prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting for women's sports or against allowing biological boys playing in girls' and women's sports, by silently wearing a wristband on the sidelines or displaying a sign in the parking lot, or from criticizing school officials for censoring speech or not supporting women's sports.

c. Imposing or extending the no-trespass order against Kyle Feller because he criticized school officials in provocative terms for censoring Plaintiffs' viewpoints, or not supporting women's sports, violates the First Amendment and Fourteenth Amendment.

d. The Notice of Designated Protest Area violates the First Amendment and Fourteenth Amendment when applied to prevent attendees at an

extracurricular event from non-disruptively expressing disfavored

viewpoints related to girls' sports outside the protest area.

3. ~~An award of compensatory damages to each Plaintiff for the extra costs and~~

~~inconvenience that each Plaintiff incurred complying with the No Trespass~~

~~Orders;~~

~~4.~~3.    An award of nominal damages of one dollar total ~~from each Defendant~~

to each Plaintiff, jointly and severally from all individual capacity defendants

and the Bow School District ~~in the amount of $17.91~~;

~~5.~~4.    Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. §

1988; and

~~6.~~5.    Any other relief as the Court deems just and appropriate.

Dated: Nov. 7 ~~October 22~~, 2024          Respectfully submitted,

*/s/ Endel Kolde*                  By:    */s/ Richard J. Lehmann*
Endel Kolde*                              Richard J. Lehmann
DC Bar No. 1782129                        New Hampshire Bar No. 9339
Brett Nolan*                              LEHMANN MAJOR LIST, PLLC
DC Bar No. 90014964                       6 Garvins Falls Rd,
Nathan Ristuccia*[1]                       Concord, NH 03301
Virginia Bar No. 98372                    603.731.5435
INSTITUTE FOR FREE SPEECH                 rick@nhlawyer.com
1150 Connecticut Avenue, N.W.
Suite 801
Washington, DC 20036
202.301.3300
dkolde@ifs.org
bnolan@ifs.org
nristuccia@ifs.org

* Pro hac vice

---

[1] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).