# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARCEY KELLEY, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

## PLAINTIFFS' PRE-HEARING BRIEF

## INTRODUCTION

Public schools have a duty to protect unpopular expression and teach students about the central role that freedom of speech, assembly, and petition play in our democracy. *Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 190 (2021). But on September 17, 2024, Bow School District officials abandoned their educational mission and instead censored spectators at a soccer game open to the public who silently protested in support of women's sports and against the inclusion of biological males in women's sports. Indeed, Bow officials assert that suppressing viewpoints they disfavor is part of their educational duties—contrary to the Supreme Court's holding.

Bow School District policies, as applied by Defendants, prohibit parents otherwise lawfully on school property from protesting in support of women's sports at school extracurriculars, including at events other than girls' varsity soccer games, such as swim meets or music concerts. Defendants have enforced these policies in the past and have repeatedly stated in their policies and in documents filed with this Court that they will continue to enforce these policies in the future. Far from mooting this case, Defendants' actions since the filing of this lawsuit have only compounded Plaintiffs' irreparable injury and ensured that Plaintiffs must permanently self-censor at Bow School District extracurricular events, unless this Court grants relief. Plaintiffs, and the public at large, are entitled to injunctive relief securing their fundamental First Amendment rights to silent protest, both

1

inside and outside Bow's designated protest area, at all school extracurricular events open to the public in the future.

At the TRO hearing, the Court indicated that it wanted further factual development about what happened on September 17, before deciding injunctive relief. Since then, in accordance with Court's order, Defendants produced Lt. Lamy's bodycam video. That video supports Plaintiffs' claims that (i) their protest was silent and non-disruptive until officials intervened and directed Plaintiffs to remove the wristbands; (ii) that Kyle Fellers criticized them for intervening, drawing specific parallels to the behavior of officials during the National Socialist regime in Germany; (iii) that other parents were allowed to express support for removing the wristbands without being sent off; (iv) that the game did not resume until a school official observed that Eldon Rash took off the last wristband and radioed to Mike Desilets that "he took it off"; (v) that Fellers was sent off by Desilets for calling school officials "cowards" for failing to support women's sports; and (vi) that he left the sidelines immediately after Lt. Lamy told him to leave the game (not the premises). In short, this evidence will show both that Plaintiffs' protest was silent and non-disruptive and that the officials' behavior was at least partly motivated by the Plaintiffs' resisting their censorship demands.

While this Court did allow Fellers to return to the sidelines for the remainder of the soccer season, the Court directed him not to protest and not to interact with the coaching staff. Moreover, Plaintiffs have expressed an intent to silently protest in

favor of women's sports (and against the inclusion of biological men in girls' sports) at other Bow S.D. sporting events, not limited to girls' soccer, without the threat of exclusion or other sanction. Their speech has been censored since September 17 and that harm is ongoing today.

### STATEMENT OF FACTS

Bow School District enforces multiple policies that restrict the speech and behavior of spectators at sporting events and other extracurricular activities. *See, e.g.*, Dkt. 22-4, ¶¶ 3-5; Dkt 22-1, ¶¶ 5-6. Policy KFA requires "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event" and forbids people from "injur[ing], threaten[ing], harass[ing], or intimidat[ing] . . . any other person" or "imped[ing], delay[ing], disrupt[ing], or otherwise interfer[ing] with any school activity or function." Dkt. 14-7. Similarly, the Bow High School Athletics Handbook states that "[p]oor sportsmanship in any form will not be tolerated on the field of play, on the sidelines, or in the stands." Dkt. 14-9. As Bow High School's Athletic Director Mike Desilets told parents in an email sent September 16, 2024, school officials understand these policies to prohibit "any inappropriate signs, references, language or anything else" at school sporting events, although "some differing opinions . . . is perfectly fine." Dkt. 14-8; *see also* Dkt 22-1, ¶¶ 5-6.

On October 1, the day after this lawsuit was filed, Bow School District enacted a new policy governing all future "protests and other free speech exercises" by campus

3

visitors "on any school District properties." Dkt. 14-18; Dkt. 14-17; Dkt. 22-4, ¶ 12. Protests and other free speech exercises at school events must occur in a designated protest area or they "may be deemed as disruptive and result in the game being suspended." Dkt. 14-18. The designated protest area is located in front of the scoreboard at the soccer field—about 50 yards further from the soccer field than where parents normally sit—and is only open "for 30 minutes before and 30 minutes after" soccer games. *Id.*; *see also* Dkt. 14-4, ¶¶ 50-55; Dkt. 14-19. Visitors who wish to protest within the designated area must limit themselves "to protest[ing] the administration—not players" and must still "follow the applicable school policies, including policy KFA." Dkt. 22-4, ¶ 12.

On September 10, 2024, this Court preliminarily enjoined the New Hampshire Department of Education from enforcing a state law that limited participation in interscholastic girls' sports teams to biological females. *See Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 U.S. Dist. LEXIS 162185 (D.N.H. Sept. 10, 2024). On September 17, 2024, Bow High School's girls' varsity soccer team was scheduled to play a home game against the team from the Plymouth Regional High School, which has a biological male as a player. Dkt. 14-4, ¶ 7; Dkt. 14-5, ¶¶ 7-8.

Parents of some Bow players—including Kyle Fellers, Anthony "Andy" Foote, and Nicole Foote—believe that allowing biological males to play girls' and women's sports destroys fair competition, puts female athletes at risk for physical and mental injury, and undermines women's social progress. *See, e.g.*, Dkt. 14-3, ¶¶ 4-6;

4

Dkt. 14-4, ¶¶ 9, 15, 21-22; Dkt. 14-5, ¶¶ 4-5, 8-10. Kyle Fellers and Andy Foote decided to silently express their support for reserving girls' and women's sports to females by attending the September 17 soccer game and wearing pink breast cancer awareness wristbands—with two black Xs, symbolizing the female chromosomes added—in silent protest on the sidelines. *See* Dkt. 14-10; Dkt. 14-3, ¶¶ 10-11; Dkt. 14-4, ¶¶ 16-20.

On September 17, Fellers, Andy Foote, and Nicole Foote attended the varsity girls' soccer game, which occurred on public property at the Bow High School soccer field. Dkt. 14-3, ¶¶ 14-15; Dkt. 14-4, ¶¶ 23-24; Dkt. 14-5, ¶ 13. During the first half, Andy distributed pink wristbands to his wife and to around half a dozen other spectators, telling them to not put the bands on until halftime. Dkt. 14-4, ¶¶ 26-27; Dkt. 14-5, ¶¶ 14-15; Dkt. 22-1, ¶ 10. At halftime, Fellers and Andy Foote put on their XX wristbands and placed a poster of Riley Gaines—an accomplished collegiate athlete who advocates reserving girls' and women's sports to females—on the windshield of Foote's Jeep. Dkt. 14-3, ¶ 17; Dkt. 14-4, ¶ 28; Dkt. 22-1, ¶ 11.

For the first ten minutes of the second half, the two men watched the game from the sidelines, without disruption or commotion. Dkt. 14-3, ¶¶ 16, 18; Dkt. 14-4, ¶¶ 27, 29. If not for the actions of school officials, most spectators or players at the game likely would never have noticed the silent protest because Fellers, Foote, and the other parents did not shout, chant, march, or waive signs on the sidelines. Dkt. 14-3, ¶¶ 16, 18; Dkt. 14-4, ¶¶ 27, 29; Dkt. 14-6, ¶¶ 4, 6; Dkt. 42, ¶ 36. People

5

attending sporting events and other extracurricular activities on Bow School District property regularly wear apparel or display bumper stickers supporting political and social causes, such as the Progress Pride Flag or messages about global warming. *See, e.g.*, Dkt. 42, ¶¶ 26, 52, 60; Dkt. 14-3, ¶ 58; Dkt. 14-5, ¶ 26.

Approximately ten minutes into the second half, school officials, including Desilets and Bow High School Principal Matt Fisk, approached first Foote and then Fellers to tell them that they could not protest and had to either remove the wristband or leave the game. *See, e.g.*, Dkt. 22-1, ¶¶ 12-13; Dkt. 22-6, ¶¶ 7-8. Both men initially refused to remove their wristband but eventually gave in and removed their bands. Dkt. 14-3, ¶¶ 20-23; Dkt, 14-4, ¶¶ 30-34.

After Eldon Rash—Feller's former father-in-law—learned about the reason for the commotion, he placed Fellers' wristband around his own wrist, to demonstrate his support both for women's sports and for the freedom to express one's beliefs without harassment. Dkt. 14-3, ¶¶ 23-24; Dkt. 14-6, ¶¶ 4-9. Desilets, Fisk, and Steve Rossetti (a game referee) all pressured Rash to remove the wristband, suspending the game and threatening to cancel it if he did not comply. *See, e.g.*, Dkt. 22-1, ¶¶ 14-15, 17; Dkt. 40, ¶ 47; Dkt. 14-4, ¶¶ 35-36; Dkt. 14-6, ¶¶ 10-12. Parents on the sidelines also vocally disapproved of the wristband protest, telling Plaintiffs to "write a letter to someone," "take it off," and stop "hurting the girls." Dkt. 42, ¶ 51. Much of the interaction between Rash, Fellers, Rossetti, and the

6

school officials was recorded by Andy Foote on a cell phone and by Lt. Lamy on his body camera. Dkt. 14-4, ¶ 34; Dkt. 22-7, ¶ 9.

Fellers criticized the school officials' treatment of Rash, calling Desilets "a coward" without "a backbone" and comparing the officials to "a bunch of Nazis," as the body camera video will show (2:40-55, 4:06-17, 4:24-28). *See* Dkt. 42, ¶¶ 43-44; Dkt. 22-1, ¶ 16; Dkt. 22-7, ¶ 5. The video will show that Desilets then gestured to Bow Police Lieutenant Phil Lamy to "launch" Fellers (4:15-18). Lt. Lamy to told Fellers "you're removed from the game" (4:18-24)—an order that Fellers obeyed by leaving the field immediately and going to his car. Dkt. 42, ¶ 43; Dkt. 22-1, ¶¶ 16, 18; Dkt. 22-7, ¶ 5; Dkt. 14-3, ¶ 28. Rash eventually took the wristband off. Dkt. 42, ¶ 46; Dkt. 14-6, ¶ 13. After Rossetti, Desilets, and Fisk—who were meeting on the field at the time—learned this from another school official via walkie-talkie, the game was allowed to resume. Dkt. 42, ¶¶ 48-49; Dkt. 40, ¶¶ 49-50; Dkt. 14-4, ¶¶ 36-37; Dkt. 14-6, ¶¶ 13-14.

After the game, Fellers stood beside his car in the parking lot and held a poster reading "Protect Women's Sports for Female Athletes." Dkt. 14-3, ¶¶ 14, 29-30. As he departed the game, Rossetti called Fellers a "f***ing a**hole" and stated that "[i]n 20 years your kids are going to hate you," and that "[t]his is not the time or place" for the protest. Dkt. 40, ¶ 61.

Following Defendant Desilets' instruction, Lt. Lamy approached Fellers and told him to leave school grounds immediately, without waiting to pick up his family,

7

because "You were kicked out of the game. Off the property." Dkt. 22-7, ¶¶ 6-7; Dkt. 22-1, ¶ 18; Dkt. 14-3, ¶¶ 31-33. Lt. Lamy's body camera recorded this interaction. Dkt. 22-7, ¶ 9. Fellers reminded Lamy that Fellers had been told to leave "the game"—not the parking lot. Dkt. 14-3, ¶¶ 31-33; *cf.* Dkt. 22-1, ¶ 16; Dkt. 22-4, ¶¶ 7-8; Dkt. 22-7, ¶ 5. As the body camera video will show, Fellers and Lamy then disagreed about whether an order to leave "the game" meant off the property or just off the field (2:38-49). A second Bow police officer (Sergeant Robert Welch) offered to go back to Desilets for clarification (5:03-28). Eventually, Lamy allowed Fellers to stay once he put the Protest Women's Sports sign away, telling Fellers that "he can get his kids and his in-laws, and they can go" (8:11-17). Dkt. 22-7, ¶ 8; Dkt. 14-3, ¶¶ 3; Dkt. 14-4, ¶ 38.

A couple of days after the game, Fellers and Andy Foote both received "No Trespass Orders" prohibiting them for a time "from entering the buildings, grounds, and property of the Bow School District" including "parking lots, and athletic fields" and "from attending any Bow School District athletic or extra-curricular event, on or off school grounds." Dkt. 14-14; Dkt. 14-13. In the orders and in a public statement released September 18, Defendant Kelley stated that Fellers' and Foote's silent protest violated Policy KFA and the Bow High School Athletics Handbook. Dkt. 14-12; Dkt. 14-14; Dkt. 14-13. Kelley later changed aspects of Fellers' No Trespass Order (which extended for the entire fall sports season) but did not alter

Fellers's ban from attending sporting events or other extracurricular events. *See* Dkt. 14-16; Dkt. 14-15.

On September 30, 2024, Plaintiffs filed this lawsuit in defense of their First Amendment rights. Dkt. 1. At a hearing on October 8, this Court denied Plaintiffs' motion for a temporary restraining order against Defendants' policies restricting protests on school grounds but ordered Defendants to allow Fellers to attend soccer games if he did not protest at games, advocate his position at games, interact with coaches, or violate school rules or sportsmanship expectations. Hrg. Tr., Dkt. 24, at 78:2-79:5.

Plaintiffs intend to and would silently protest outside the designated protest area at a variety of Bow School District sporting events and extracurriculars, by wearing wristbands, distributing wristbands, or holding signs. Dkt. 14-3, ¶¶ 53-57, 59; Dkt. 14-4, ¶¶ 54-58; Dkt. 14-5, ¶¶ 23-25; Dkt. 14-6, ¶ 16. Although the fall sports season has now ended, Fellers and Rash, for instance, have both stated that they intend to silently protest in defense of girls' and women's sports at Bow High School swim meets, if Defendants would permit it. Dkt. 14-3, ¶¶ 2, 52, 55-56; Dkt. 14-6, ¶ 1, 16. Plaintiffs find it frustrating and degrading that Defendants prohibit them from expressing their viewpoint about girls' and women's sports at Bow School District events, while other residents are allowed to promote their viewpoints and opinions on school property. Dkt. 14-3, ¶ 58; Dkt. 14-4, ¶¶ 59-60; Dkt. 14-5, ¶ 26. Plaintiffs reasonably expect, however, that without judicial relief, any future public

protests outside the designated protest area at Bow School District events will violate Defendants' policies and put Plaintiffs in danger of arrest, game suspension, game cancellation, or renewed No Trespass orders. Dkt. 14-3, ¶ 57; Dkt. 14-4, ¶¶ 52, 57-58; Dkt. 14-5, ¶¶ 22, 25; Dkt. 14-6, ¶¶ 16.

## ARGUMENT

When assessing a motion for preliminary injunction, a court must consider: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm; (3) whether the balance of equities favors the injunction; and (4) whether the injunction is in the public interest. *Norris v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020). "In the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012). Once Plaintiffs "show that the state law infringes on their First Amendment rights," the burden shifts to the government to "justify its restriction on speech under the appropriate constitutional standard." *Comcast of Me./New Hampshire, Inc. v. Mills*, 435 F. Supp. 3d 228, 233 (D. Me. 2019) (citations and internal quotation marks omitted).

I.    PLAINTIFFS WILL SUCCEED ON THE MERITS

   A. Defendants' policies and practices discriminate against silent protestors on the basis of viewpoint

Plaintiffs silently protested, and intend to silently protest again in the future, in limited public fora: public school sporting events and extracurriculars open to the public. *See, e.g.*, Hrg. Tr., Dkt. 24, at 13:22-24, 62:17-24; *Frierson v. Reinisch*, 806 F.

10

App'x 54, 58 (2d Cir. 2020). Speech restrictions in a limited public forum must be "reasonable in light of the purpose served by the forum and [] viewpoint neutral." *McBreairty v. Sch. Bd. of RSU22*, 616 F. Supp. 3d 79, 93 (D. Me. 2022) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). Bow School District's policies and practices, however, ban viewpoints that school officials consider "inappropriate," Dkt. 14-8, "[p]oor sportsmanship," Dkt. 14-9, or "demean[ing]" to transgender and gender non-conforming students, Dkt. 39 at 1.

Bow conceded that there are "certain types of speech that you could always argue is really just a viewpoint, but [Defendants] still don't allow it" such as "hate speech," "call[ing] the referees names," and speech that "discriminates against . . . a protected group." Hrg. Tr., Dkt. 24, at 48:25-49:3, 53:10-54:19. In truth, Plaintiffs' message defending fair and safe competition by limiting girls' and women's sports to biological females did not demean or hate anyone. *See, e.g.*, Dkt. 14-4, ¶¶ 4, 9, 17; Dkt. 14-5, ¶¶ 4, 9; Dkt. 14-11.

But even if Plaintiffs had expressed viewpoints that were "inappropriate" or "demean[ing]," government officials cannot prohibit such viewpoints in a limited public forum. A policy that "disfavor[s] ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (internal quotation marks omitted). Courts regularly invalidate such policies. *See, e.g., Moms for Liberty v. Brevard Pub. Sch.*, 118 F.4th 1324, 2024 U.S. LEXIS 25394, at *16 (11th Cir. 2024) (holding ban on "abusive" speech at a school

11

board meeting discriminates based on viewpoint because it bars "unacceptable" language); *Ison v. Madison Local Sch. Dist. Bd. of Educ.*, 3 F.4th 887, 893, 895 (6th Cir. 2021) (striking down ban on "abusive" or "antagonistic" speech at a school board meeting); *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 500-01 (6th Cir. 2020) (striking down ban on speech that subjects a group of people to "scorn or ridicule" in nonpublic forum); *Am. Freedom Def. Initiative v. King Cnty.*, 904 F.3d 1126, 1131-33 (9th Cir. 2018) (striking down ban on "disparagement" in nonpublic forum).

Bow School District's polices are viewpoint based—not content based. The District admits that it allows people at sporting events, at other extracurricular activities, and even during school itself to wear clothing or display flags, bumper stickers, and other signs supporting a wide array of political and social causes, including messages about political candidates, transgenderism, LBGTQ+ issues, and environmentalism. Dkt. 42, ¶¶ 26, 52, 60; Dkt. 35, ¶¶ 26, 52, 60; *see also* Dkt. 14-3, ¶ 58; Dkt. 14-5, ¶ 26. At the September 17 soccer game, Bow School District permitted parents to express viewpoints *opposing* Plaintiffs' silent protest. *See* Dkt. 42, ¶ 51; Dkt. 35, ¶ 51. Indeed, Defendant Rossetti himself was allowed to express his support for transgender athletic participation. *See* Dkt. 40, ¶ 61; Dkt. 35, ¶ 61.

Bow School District, however, claims these messages are acceptable at extracurricular events—but Plaintiffs' messages are not—because those other messages are not "discriminating or hateful speech," Dkt. 42, ¶ 60, and "we limit

12

hate speech," Hrg. Tr., Dkt. 24, at 54:3-4. Pink wristbands with XXs on them,

however, are not "hate speech," whatever may be the meaning of that term.[1] And

even if they were, singling out hate speech for prohibition is impermissible

viewpoint discrimination. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 391-92 (1992).

   B. Bow School District's designated protest area policy is an unreasonable
      and overbroad restriction on First Amendment activities at school
      extracurricular activities

Even if Defendants' policies were content neutral (they are not), these polices are

overbroad and unreasonable in light of the purpose of the forum: school

extracurriculars open to the public.

Defendants claim that they prohibit all communications at extracurricular

events on the issue of transgender athletes—for or against. Dkt. 28 at 10-11.

Evidence demonstrates that, in truth, they allow speech in favor of transgender

participation in girls' and women's sports formerly reserved for biological females.

*See, e.g.*, Dkt. 42, ¶¶ 26, 51-52, 60; Dkt. 14-3, ¶ 58; Dkt. 14-5, ¶ 26. But, regardless,

a policy that prohibits spectators from speaking about the fairness and competitive

rules that govern the very game they are watching is unreasonable.

Plaintiffs believe that allowing biological males to play girls' and women's sports

undermines fair competition and puts biologically female athletes as risk for

physical and mental injury. *See, e.g.*, Dkt. 14-4, ¶¶ 4, 9, 17; Dkt. 14-5, ¶¶ 4, 9; Dkt.

---

[1] The term "hate speech" has no widely accepted definition in the United States and
is usually a proxy for speech that is hated by the censor.

14-11. As a result, Plaintiffs wore wristbands in support of the biological females on the Bow High School team, with the goal of "Protect[ing] Women's Sports for Female Athletes," as Fellers' sign read. *See* Dkt. 14-3, ¶¶ 4, 13-14, 59; Dkt. 14-4, ¶¶ 26, 29. Defendants' policy unreasonably prevents spectators from speaking on behalf of the values of sportsmanship, good play, ethics, and integrity, which is the purpose for which the forum was opened, see Dkt. 14-9.

Defendants' designated protest area policy is even more unreasonable and overbroad. Speech restrictions may not "sweep unnecessarily broadly and thereby invade the area of protected freedoms." *NAACP v. Alabama*, 377 U.S. 288, 307 (1964). If a policy "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," that overbreadth "suffices to invalidate all enforcement of that law." *Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003) (cleaned up). This rule applies "even" in "a nonpublic forum." *Bd. of Airport Comm'rs v. Jews for Jesus*, 482 U.S. 569, 575 (1987).

The protest area policy empowers Bow school officials to restrict all non-disruptive "protests and other free speech exercises" to a small zone, restricted in time and space. Dkt. 14-18. This policy applies to every protest on schoolgrounds, even ones unrelated to girls' soccer occurring at, for instance, a cross country meet or a swim meet. *See id*. Anyone wanting to engage in "free speech exercises" at a swim meet must travel to the soccer field before or after a soccer game. During the

winter swim season, that would mean the protestor would have to wait for months—as soccer is not a winter sport.

Under this policy, all free speech exercises outside this marked-off area "may be deemed as disruptive" by definition. Dkt. 14-17. Defendants can prohibit "even talking and reading, or the wearing of campaign buttons or symbolic clothing," *Jews for Jesus*, 482 U.S. at 575, anywhere else on school property. Dkt. 14-18. This "sweeping ban" could never actually be enforced and "cannot be justified even if [Bow sporting events] were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech." *Id.*

C.  Plaintiffs have a right to criticize government officials, without suffering retaliation for their speech

The right to make "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" is central to this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Thus, "the right to criticize public officials is protected by the First Amendment." *Bourne v. Arruda*, No. 10-cv-393-LM, 2011 U.S. Dist. LEXIS 62332, at *40 (D.N.H. June 10, 2011) (citation and internal quotation marks omitted).

Government officials commit First Amendment retaliation when they act in a way that "would deter a reasonably hardy individual from exercising his constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) (internal

15

quotation marks omitted). A plaintiff makes out a prima facia claim for retaliation, if a plaintiff shows that (1) he or she engaged in constitutionally protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) the protected conduct was a substantial or motivating factor in the adverse action. *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). The burden then shifts to the government officials, who are liable unless they can prove that they would have reached the same decision even in the absence of the protected conduct. *Id.*

Here, Defendants banned Fellers and Andy Foote from school grounds because they participated in a protest during the September 17 soccer game. Dkt. 14-14; Dkt. 14-13. And Defendant Kelley banned Fellers from school grounds for over a month longer than she banned Foote "because of [Fellers'] abuse of school administrators." Dkt. 22-4, ¶ 10. The wristband wearing itself cannot account for the differences in punishment. Indeed, Eldon Rash wore a pink wristband at the game, for considerably longer after being told to remove it, than either Fellers or Foote, but Rash never received any No Trespass Order. Indeed, Fellers was ejected from the game, even though he had already removed his wristband, see Dkt. 22-1, ¶¶ 13-14, 16; Dkt. 22-6, ¶¶ 8, 10—again, unlike Foote or Rash. Fellers was not removed for his participation in the wristband protest, but rather because he called Defendants Fisk and Desilets "cowards," see Dkt. 22-1, ¶ 16; Dkt. 22-1, ¶ 10. Fellers' protected speech criticizing school administrators motivated Defendants' retaliation against him.

16

Criticizing government officials who failed to defend women's sports was the point of Plaintiffs' protest. Before the game, Andy Foote emailed school officials to berate them for not exhibiting "real leadership" and called them "weak, ineffective, and completely out of touch" for failing to "[s]tand up for women," and "[p]rotect our daughters before someone else gets hurt." Dkt. 22-2. Foote later emphasized, in a social media post encouraging people to join the protest, that the situation was "not [Parker Tirrell's] fault" but the fault of "the legal system, the school board, and school administration." Dkt. 14-11. Eldon Rash has testified that he wore the wristband partly just "to protest against the people intimidating and harassing others for simply wearing a wristband and expressing their beliefs." Dkt. 14-6, ¶ 8. Defendant Desilets was aware of Foote's prior criticisms of the school administration when he acted against Plaintiffs. Dkt. 22-1, ¶¶ 7-8.

Defendants retaliated against all four Plaintiffs' speech, by prohibiting their protest, by expelling them or threatening to expel them from school events open to the public, by stopping their children from playing soccer, and by threatening to force the team to forfeit if Plaintiffs did not self-censor. *See, e.g.*, Dkt. 22-1, ¶¶ 12-15, 17; Dkt. 22-6, ¶¶ 7-8; Dkt. 14-3, ¶¶ 20-23; Dkt. 14-4, ¶¶ 30-36; Dkt. 14-6, ¶¶ 10-12. Such threats would deter a reasonably hardy individual from continuing to protest—just as they deterred Plaintiffs, who all eventually removed their wristbands, if they ever put one on (see Dkt. 14-5, ¶¶ 15-17, 21-22).

17

II.    THE END OF BOW SCHOOL DISTRICT'S FALL SPORTS SEASON DOES NOT MOOT
       PLAINTIFFS' REQUESTED INJUNCTIVE RELIEF

Plaintiffs' request for an injunction presents a live controversy because

Defendants continue to compel their self-censorship is ongoing and this Court may

grant Plaintiffs meaningful legal relief. "The burden of establishing mootness rests

with the party urging dismissal." *ConnectU LLC v. Zuckerberg*, 522 F.3d 82, 88

(2008). "This burden is a heavy one." *Id.* It requires proving that it is "impossible for

the [court] to provide effective relief." *Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 48 (1st

Cir. 2006). For an injunction, that means asking whether "intervening events have

eliminated any reasonable anticipation that the aggrieved party will, in the future,

be faced with a recurrence of the alleged harm." *Id.* at 49.

Although the fall soccer season has ended, Plaintiffs intend to continue wearing

their wristbands at other school extracurricular events—such as swim meets and

cross country meets—during this school year and in future school years. *See* Dkt.

14-3, ¶¶ 2, 52, 55-57; Dkt. 14-4, ¶¶ 56-57. Dkt. 14-5, ¶¶ 23-24; Dkt. 14-6, ¶¶ 1, 16.

But the District's policy forbids doing so. As Defendant Kelley explained, wearing

pink wristbands to protest biological boys playing girls' sports "violate[s] the

[District's] policy" governing civility on school property, even if that protest occurred

within the designated area. Dkt. 22-4, ¶¶ 4-5, 12. Defendants have not rescinded

their application of these policies, apologized for their behavior, or given legally

binding assurances that they will not re-impose sanctions for silent protests at

18

future events. *See FBI v. Fikre,* 144 S. Ct. 771, 777-79 (2024) (discussing

government manipulation of jurisdiction by temporarily suspending misconduct).[2]

    And the District's newly established "designated protest area" policy restricts *all*

"free speech exercises" for *all* "campus visitors" to a limited location and time

period. Dkt. 14-18. Plaintiffs will thus "be faced with a recurrence of the alleged

harm" if they wear their wristbands to other school activities this year (and in

future years). *Goodwin*, 436 F.3d at 49. They continue to need an injunction to stop

Bow School District from continuing to violate their First Amendment rights.

III.    CENSORSHIP OF SILENT PROTEST AMOUNTS TO IRREPARABLE HARM

    "The loss of First Amendment freedoms, for even minimal periods of time,

unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976). Defendants here continue to enforce policies against Plaintiffs that prevent

them from silently protesting at any Bow School District sporting events and other

extracurricular activities. And Bow's designated protest area policy expressly

regulates all future "free speech exercises" by campus visitors "on any school

District properties"—not just silent protests at soccer games. Dkt. 14-18; Dkt. 14-17.

Unless this Court grants relief, Defendants will continue to prohibit Plaintiffs from

---

[2] Indeed, should Defendants attempt to avoid judicial review of their misconduct by suddenly rescinding policies on the eve of this hearing, that would implicate the voluntary cessation doctrine. *See Fikre,* 144 S. Ct. at 777; *Fields v. Speaker of the Pa. House of Representatives,* 936 F.3d 142, 161-62 (3d Cir. 2019). Any policy that can be so easily rescinded can be just as easily re-imposed later.

any silent protests outside the designated protest area and from protesting in defense of girls' and women's sports even inside the designated area. *See* Dkt. 22-4, ¶¶ 10, 12.

IV.    ENJOINING DEFENDANTS' VIOLATIONS OF THE FIRST AMENDMENT PROMOTES THE PUBLIC INTEREST

"[T]he suppression of political speech harms not only the speaker, but also the public to whom the speech would be directed." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012). Suppression "depriv[es] the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* (cleaned up). "When the Government is the opposing party," courts "merge" "balancing of the equities and analysis of the public interest together." *Doe v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (cleaned up).

Unless this Court grants injunctive relief, Defendants thus will continue to deprive the public of its right to listen and evaluate Plaintiffs' political and social views on fair and safe competition in girls' and women's sports. Defendants have no legitimate government interest in suppressing the public's right to listen, and permitting Plaintiffs' speech will not prevent Bow School District from running schools, hosting extracurricular events, or performing its legitimate function.

CONCLUSION

This Court should grant Plaintiffs' request for injunctive relief.

Dated: November 18, 2024                        Respectfully submitted,

/s/ Richard J. Lehmann                          /s/ Endel Kolde
Richard J. Lehmann                              Endel Kolde*
New Hampshire Bar No. 9339                      DC Bar No. 1782129
LEHMANN MAJOR LIST PLLC                         Brett Nolan*
6 Garvins Falls Road                            DC Bar No. 90014964
Concord, New Hampshire 03301                    Nathan J. Ristuccia*§
Tel: (603) 731-5435                             Virginia Bar No. 98372
Fax: (720) 995-9156                             INSTITUTE FOR FREE SPEECH
rick@nhlawyer.com                               1150 Connecticut Ave., NW
                                                Suite 801
                                                Washington, D.C. 20036
                                                Tel: (202) 301-3300
                                                Fax: (202) 301-3399
                                                dkolde@ifs.org
                                                bnolan@ifs.org
                                                nristuccia@ifs.org

                                                *Pro hac vice

                                                Counsel for Plaintiff

---

§ Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

20