**<u>NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-3-2025</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


```
* * * * * * * * * * * * * * * * * *
                                  *
KYLE FELLERS, et al               *
                                  *   24-cv-311-SM-AJ
           v.                     *   November 21, 2024
                                  *   1:22 p.m.
MARCY KELLEY, ET AL               *
                                  *
* * * * * * * * * * * * * * * * * *
```

<u>TRANSCRIPT OF EVIDENTIARY HEARING</u>
<u>DAY ONE - AFTERNOON SESSION</u>
<u>BEFORE THE HONORABLE STEVEN J. MCAULIFFE</u>


<u>APPEARANCES</u>:

<u>For the Plaintiffs</u>:          Endel Kolde, Esq.
                             Nathan John Ristuccia, Esq.
                             Brett Robert Nolan, Esq.
                             Institute for Free Speech

                             Richard J. Lehmann, Esq.
                             Lehmann Major List, PLLC


<u>For the Defendants</u>:

(SAU 67,                     Brian J.S. Cullen, Esq.
Superintendent, et al)       Jonathan M. Shirley, Esq.
                             Cullen, Collimore, Shirley, PLLC

(Steve Rossetti)             Dennis T. Ducharme, Esq.
                             Ducharme Resolutions, PLLC



<u>Court Reporter</u>:             Susan M. Bateman, RPR, CRR
                             Official Court Reporter
                             United States District Court
                             55 Pleasant Street
                             Concord, NH 03301
                             (603) 225-1453

I N D E X

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| KYLE FELLERS: | | | | |
| By Mr. Kolde | 3 | | 44, 133 | |
| By Mr. Cullen | | 8 | | |
| By Mr. Ducharme | | 36 | | |
| ANTHONY FOOTE: | | | | |
| By Mr. Kolde | 45 | | 120 | |
| By Mr. Cullen | | 80 | | |
| By Mr. Ducharme | | 112 | | |

```
 1                    P R O C E E D I N G S
 2              MR. KOLDE:  Your Honor, I did talk with opposing
 3    counsel over the lunch hour.  I realized there was a couple
 4    more issues, very brief, that I wanted to talk to Mr. Fellers
 5    about.
 6              THE COURT:  Of course.  Of course.
 7              MR. KOLDE:  We're going to move through it rather
 8    quickly before cross, if that's all right with the Court.
 9              THE COURT:  Of course.
10              MR. KOLDE:  May I proceed, your Honor?
11              THE COURT:  You may.
12            CONTINUED DIRECT EXAMINATION OF KYLE FELLERS
13    BY MR. KOLDE:
14        Q.   Mr. Fellers, after the game did you receive any
15    documents from the school district as a result of what
16    happened at the September 17th game?
17        A.   Yes.  I received a no trespassing order on I
18    believe Friday.
19        Q.   Was that a day or two after the game?
20        A.   A few days.  I think the game was Tuesday.
21        Q.   And how did you receive that no trespass order?
22        A.   I had a message on my voicemail.  I wasn't in town
23    at the time.  When I got into town, I went to the police
24    station and was served.
25        Q.   So the police served you with a no trespass order?
```

1          A.    That's correct.

2          Q.    And which police station did that occur at?

3          A.    The Bow Police Department.

4          Q.    Okay.  And I'm going to show you -- we won't go

5     through it line by line, but I'll show you what's been

6     admitted as Plaintiffs' Exhibit No. 8.

7               MR. KOLDE:  If we could minimize it a little bit so

8     we could see more of the document.

9          Q.    Are you able to read that or is that too

10    fine-grained for you?

11         A.    Yeah, I can read it.

12         Q.    All right.  Is that the no trespass order that you

13    received on September 19th at the Bow PD?

14         A.    That is correct.

15         Q.    All right.  And you don't have to go through it

16    line by line or give a legalistic answer, but give the gist of

17    what this no trespass order was ordering you not to do.

18               Do you need to take a moment to read it?

19         A.    I mean, as far as my interpretation or

20    understanding, I was not allowed to come on any of the Bow

21    district schools grounds, preventing me from dropping off my

22    children, picking them up, which I do regularly, picking them

23    up from practice, attending games.  Essentially to stay away

24    from the school district and any away games.  Stuff like that.

25         Q.    Okay.  And in the second paragraph it states, "The

1    protest was designed to and had the effect of intimidating,

2    threatening, harassing, and discouraging that student as well

3    as other students from playing."

4            Did you see that in the no trespass order when you

5    received it from the Bow PD?

6        A.    Yes.

7        Q.    Did you agree or disagree with that statement?

8        A.    Well, I wholeheartedly disagreed that I was

9    threatening, harassing, bullying, intimidating, discouraging

10   anybody.

11       Q.    And, again, just to keep things moving, can you

12   summarize for the Court how this no trespass order impacted

13   your life with regard to supporting your kids and your

14   daughter specifically?

15       A.    Uh-huh.  Well, I mean, I have custody half the time

16   with my kids, and I'm pretty active with them.

17            So I'm pretty flexible as far as my work.  I

18   usually drop them off in the morning at the middle school as

19   well as the high school, and then I usually pick up -- I can

20   pick them up if my son doesn't take the school bus, and I

21   usually have to pick up my daughter after soccer practice

22   which usually ends around 5:30.

23            My son also ran cross-country.  He was --

24       Q.    Kyle, too much information.

25            How did this impact you?

1          A.    I mean, it just threw a wrench in the gears as far

2    as the ability to get the kids to school and get them home.

3          Q.    So you couldn't pick up your daughter from soccer

4    practice, yes?

5          A.    That's correct.

6          Q.    You couldn't go to watch the games, correct?

7          A.    That's correct.

8          Q.    And at least initially you couldn't even pick up

9    your son from school?

10         A.    That's correct.

11         Q.    All right.  And, again, without going into details,

12   did Marcy Kelley -- prior to the court hearing that we had on

13   October 8th, did Marcy Kelley issue some addenda that changed

14   some of the conditions of the no trespass order?

15         A.    Yeah.  I e-mailed her to explain that I was going

16   to have that --

17         Q.    Just answer the question.

18               Did she change it with addenda?

19         A.    Yes.

20         Q.    Don't answer the next question, please.

21         A.    Okay.

22         Q.    Listen to the question and answer the question.

23               Did she change it with addenda?

24         A.    She did.

25         Q.    All right.  And did that allow you to at least pick

1    up your son?

2         A.    It did.

3         Q.    Okay.  But you still could not pick up your

4    daughter from soccer practice?

5         A.    I still could not.

6         Q.    And until the Court's order on October 8th, you

7    still could not go to the soccer games, correct?

8         A.    That's correct.

9         Q.    And those are both activities that you had wanted

10   to engage in, correct?

11        A.    That I --

12        Q.    You had wanted to do both of those things?

13        A.    Yes.  Absolutely.

14        Q.    All right.  I think this is close to the last

15   question, if not the last question.

16             Are you worried that if you engage in the same kind

17   of silent, nondisruptive protest by wearing the pink wristband

18   to one of the upcoming Bow athletic events in December or

19   January, that you are at risk for receiving a similar no

20   trespass order from the Bow School District?

21        A.    Absolutely, yes.

22        Q.    All right.  And is that threat keeping you from

23   wearing the pink wristband to those events unless and until

24   the Court gives you legal protection to do so?

25        A.    Yes.

 1          MR. KOLDE:  No further questions at this time, your

 2   Honor.

 3          THE COURT:  All right.  Thank you, Mr. Kolde.

 4          Mr. Cullen.

 5          MR. CULLEN:  Thank you, your Honor.

 6                    CROSS-EXAMINATION

 7   BY MR. CULLEN:

 8     Q.    Good afternoon, Mr. Fellers.

 9          I'll be considerably shorter, I hope, than your

10   counsel.

11          So you got a no trespass order and you went to

12   Superintendent Kelley on two different occasions asking her to

13   modify that order, correct?

14     A.    Yeah.  Maybe -- yeah, two times sounds about right.

15     Q.    And she in fact modified it both times, right?

16     A.    Yes.

17     Q.    Okay.  Now, you were aware back in the spring of

18   this year, of 2024, that the U.S. Department of Education had

19   issued updates on Title IX, correct?

20          MR. KOLDE:  Objection to the extent it calls for a

21   legal conclusion.

22          MR. CULLEN:  Well, I don't think I'm asking for

23   conclusions.

24          THE COURT:  Sustained.  He's a fact witness.  He's

25   not a legal witness.

1          MR. CULLEN:  I'm not asking -- I'm just asking if

2    he's aware that there was a modification issued.  I'm not

3    asking him to interpret what it was, your Honor.

4          MR. KOLDE:  I don't think he even knows what it is,

5    but he can answer if he does.

6          THE COURT:  All right.  Overruled.

7          Go ahead.

8     Q.    Do you know if there were modifications proposed to

9    Title IX by the Department of Education?

10    A.    I might have heard something on the news about it.

11   I'm not sure exactly what those modifications are.

12    Q.    Sure.  I tell you what, why don't we pull up

13   Exhibit E, please.

14          Do you recognize this document, sir?

15    A.    Yes.

16    Q.    And it's an e-mail from you, isn't it?

17    A.    Yes, it is.

18    Q.    It's an e-mail dated August 1, 2024, right?

19    A.    That is correct.

20    Q.    The very day that the Department of Education's

21   modifications to Title IX were going to come into place,

22   right?

23    A.    I'm not aware if that was the date or not.

24    Q.    And you wrote -- well, look at the end of the --

25   we'll go through it, but the end of the second paragraph, does

1    that not say, "This happened on the same day the Biden-Harris

2    Administration rewrites Title IX to appease a mentally ill

3    cult."

4              MR. CULLEN:  Would you highlight that for him,

5    please?

6         A.    So your question was the date of my e-mail, I

7    believe?

8         Q.    I asked you -- yeah, I asked you if the date of

9    your e-mail was the same date that the Title IX was changed.

10   I think you were suggesting that you didn't realize that the

11   Title IX had changed at all, if I'm not wrong.

12             Did I misinterpret that?

13        A.    I guess -- did this happen on the day of the boxing

14   event or did this happen on the day of my e-mail?

15        Q.    I guess I was under the impression you were trying

16   to suggest to the Court that you were unaware of any changes

17   to Title IX.  Is that not -- did I misinterpret that?

18             MR. KOLDE:  Objection.  Misstates prior testimony.

19             THE COURT:  Overruled.

20        Q.    You can answer.

21        A.    I guess -- can you ask the question again?

22        Q.    Yeah.  I was under the impression that you were

23   suggesting to this Court that you were unaware that Title IX

24   had been updated or modified by the Department of Education.

25             THE COURT:  I think he said he was unsure if it was

1    on that date, but whatever.

2            MR. CULLEN:  Okay.

3        A.    I guess I meant to say I'm not aware of the exact

4    changes of what happened on Title IX.

5        Q.    Okay.  But it was your opinion that it had been

6    changed and rewritten by the Biden Administration, right?

7        A.    Yes.

8        Q.    Okay.  And that was done to "appease," your words,

9    "a mentally ill cult," right?

10       A.    That is correct.  Those are my words.

11       Q.    And that's not consistent with your earlier

12   testimony in this court that you have no concerns about gender

13   issues at all outside of the playing field, right?

14           MR. KOLDE:  Objection.  Misstates prior testimony.

15           THE COURT:  Overruled.  There's no jury.  It's me.

16       Q.    So you can answer the question.

17           MR. KOLDE:  You may answer.

18           THE COURT:  I don't know what's wrong with my

19   screen.

20       A.    What's the question again?

21           THE COURT:  There's no question pending.

22           MR. CULLEN:  Well, there was a question.  There was

23   an objection, and it was overruled.  So the question --

24           MR. KOLDE:  I think the Judge is trying to see the

25   exhibit.

```
 1                MR. CULLEN:  I apologize.
 2                MR. KOLDE:  Give him a second.
 3                MR. CULLEN:  Oh, no, no.  I thought you were
 4   looking for the transcript of this.
 5                THE COURT:  I was.  I don't know what's going on
 6   with this monitor.
 7                All right.  Go ahead.
 8                MR. CULLEN:  I can give you a copy of it.
 9                Oh, it looks like it's back up.
10                THE COURT:  Yeah, it is for now.
11                Do you have a copy?
12                MR. CULLEN:  Yeah.
13                THE COURT:  Thanks.
14                Thank you.  I appreciate it.
15        Q.    So I think the question was, to the extent that
16   you -- you had testified earlier in this matter, didn't you,
17   that outside of this women's sports arena you didn't have any
18   concerns about transgender people, right?
19        A.    I do not have any concerns about transgender
20   people.
21        Q.    And yet on August 1st you referred to the changes
22   as being made to appease a mentally ill cult?
23        A.    Yes.
24        Q.    Who's that?
25        A.    A cult in my mind is a group of individuals who
```

1    squash any type of dissent on their beliefs.  And whether --

2    if someone agrees that they're transgender, I have the right

3    to believe that they're still the biological sex they were

4    born with.

5          Q.    So can I take that to mean that when you referred

6    to a mentally ill cult, you were talking about people who

7    promoted views on transgender on which you disagreed?

8          A.    I would be more apt to say it's more of the folks

9    who try to squash other people's opinion or speech regarding

10   their belief system.

11         Q.    Okay.  That's what you meant when you wrote it in

12   this e-mail?

13         A.    Yeah.

14         Q.    And at the beginning of the e-mail you write, "For

15   those who are still living under a rock or in denial about the

16   ramification of biological boys playing girls sports, here is

17   Exhibit A on your delusional fantasies," right?

18         A.    That is correct.

19         Q.    And, by the way, you mentioned, I think, that you

20   didn't receive any response to this, correct?

21         A.    I'm pretty sure I didn't get a response.

22         Q.    You didn't get sanctioned for it in any way?

23         A.    No.  I just didn't get a response.

24         Q.    Didn't get a no trespass order?

25         A.    No.

1      Q.    Didn't get a rebuke of any sort, did you?

2      A.    No.

3      Q.    It sounds like you try to get to most of these

4   girls' soccer games because your daughter plays for the team?

5      A.    I'm sorry?

6      Q.    It sounds as though you go to most of the girls'

7   varsity soccer games?

8      A.    I try to go to as many as I can, yeah.

9      Q.    Did you go to the away game in Laconia that Bow

10  played in?

11     A.    I did not go to that game.

12           MR. CULLEN:  Stacy, could you pull up Exhibit F,

13  please, Defendants' Exhibit F?  And if you could just blow it

14  up a little bit for all of us.  Especially me.  Just scan down

15  a little just so the witness can see the top of it, if you

16  would.

17     Q.    The e-mail here, which has been admitted as a full

18  exhibit, indicates a message sent by a parent to Mike

19  Desilets.  It says:  Subject matter, concerned parent-

20  Plymouth game (girls' soccer).

21           And in the third paragraph it mentions a few things

22  that this woman reports:  "Several Bow parents discuss wearing

23  dresses to the game, buying anti-trans warm-up shirts for the

24  Bow players, making signs in protest of trans athletes, and

25  generally planning on how they can heckle and intimidate this

1    player."  Do you see that?

2        A.    I see the paragraph you're referring to, yes.

3            MR. CULLEN:  Can you just highlight that also for

4    us?

5        Q.    Now, you weren't at this Laconia game, but did you

6    hear any comments like this in the buildup to the Plymouth

7    game yourself?

8        A.    I wasn't at the game, and I did not hear any of

9    this type of discussion on the lead-up to the Plymouth game.

10       Q.    Are there any of the items mentioned by this parent

11   that you would agree would be inappropriate on the sidelines

12   of a girls' varsity soccer game?

13           MR. KOLDE:  Your Honor, I just object insofar as it

14   calls for a legal conclusion.  If it's just asking for him to

15   speak as a lay person, we don't have any objection.

16           THE COURT:  All right.

17       Q.    Just as a lay person in your opinion.

18       A.    You're asking me if any of these are appropriate?

19       Q.    Are any of these inappropriate to take place at the

20   sideline?

21           Let me start with Bow parents, presumably males,

22   wearing dresses to the game.  Would that be in your view

23   something that would be okay?

24       A.    No.  I never did that.  So I wouldn't recommend

25   someone else doing it.

1          Q.    Right.  And I'm not suggesting that you did, sir.

2                How about buying anti-trans warm-up shirts for the

3     Bow players?

4          A.    What exactly is an anti-trans warm-up shirt?

5          Q.    How about making signs to protest trans athletes?

6          A.    Is that what's mentioned in this letter?

7          Q.    I believe that's on the bottom of that paragraph,

8     "making signs in protest of trans athletes."  It's in front of

9     you right there.

10         A.    I guess if the signs are -- well, I don't know.  I

11    guess I don't have a problem with making signs as long as it's

12    in good taste.

13         Q.    And how about planning to heckle and intimidate the

14    player, would you agree that that wouldn't be appropriate?

15         A.    Absolutely not.

16         Q.    And you would agree I hope -- but I'll ask, I

17    guess.  You would agree, wouldn't you, that if there was a

18    concern that adults were going to come to the game and

19    potentially heckle and intimidate the player, calling the

20    police to come to the game would be a good idea, right?

21         A.    I don't know if I agree with that.

22         Q.    You go to football games, right?  American

23    football?

24         A.    I haven't been to a Bow football game.

25         Q.    Okay.  There's a lot of police presence in

1    Foxborough, though, right?

2        A.    I've never been to a Foxborough football game, I

3    assume there is, but I've never seen a police officer at a

4    girls' soccer game.

5        Q.    So you don't necessarily have an opinion as to

6    whether or not it would be appropriate to call the police to

7    come to a game in which there is a suggestion that parents

8    might show up and heckle and intimidate a transgender player

9    for the other side?

10            MR. KOLDE:    Objection.    Misstates prior testimony.

11            THE COURT:    Overruled.    You don't contest the fact

12    that it's inappropriate under the First Amendment to heckle or

13    target a child engaged in extracurricular activities, right?

14            MR. KOLDE:    No.    I just don't like opposing counsel

15    putting words in my client's mouth.

16            THE COURT:    Well, that's cross-examination.    If

17    they don't fit, you just spit them out.

18        A.    I don't believe anybody should intimidate anybody.

19    I am a free speech absolutist, but I still think that you

20    should be respectful to anybody.

21        Q.    Okay.    And with respect to the September 17th game,

22    you knew then that Parker Tirrell was going to be potentially

23    playing for the other side, correct?

24        A.    Yes.

25        Q.    Okay.    And you went to the game, and for the first

1    half at least you were on the sidelines?

2        A.    Yes.

3        Q.    Seven to eight feet off the field from your

4    testimony I think, right?

5        A.    Yes.

6        Q.    And during that first half it sounds like you

7    couldn't identify that Parker Tirrell was even on the field?

8        A.    I wasn't looking, no.

9        Q.    You weren't looking?

10        A.    I wasn't looking to try to identify anybody.  I was

11    just there to watch the game.

12        Q.    But certainly Tirrell didn't stand out in any way

13    that caught your attention?

14        A.    Not at all.

15        Q.    Okay.  You mentioned I think that you were the one

16    who purchased the wristbands?

17        A.    I did.

18        Q.    And you purchased them with a -- when you purchased

19    them, did they already have the pink ribbon on one side of

20    them?

21        A.    Yes.

22        Q.    When you wore your wristband at the beginning of

23    the second half of that game, was the pink ribbon the part

24    that you were displaying on your wrist or was it the XX that

25    you were displaying?

1         A.    I can't remember if the Xs were just over that or

2    if it was on the opposite side.  I'm not a hundred percent

3    sure.

4              MR. CULLEN:  Stacy, can you pull up Exhibit 4?

5    Plaintiffs' Exhibit 4.  I'm sorry.

6         Q.    Is this your arm or is this somebody else's?

7         A.    It's not my arm.

8         Q.    Okay.  On this particular band, you can see that

9    the XX is not imprinted over the symbol?

10        A.    That's correct.

11        Q.    Does that refresh your recollection in any way as

12   to where it was on yours?

13        A.    I don't think this was my wristband, no.

14             MR. CULLEN:  Why don't we go to Exhibit 19.  I

15   think that's the pile of wristbands.

16        Q.    At the very top of this pile you can see one

17   wristband bearing the pink ribbon that you mentioned?

18        A.    Yes.

19        Q.    And on every other one all you see is the symbols

20   XX or NAD or the female fertility symbol?

21        A.    Yes.  But the pink ribbon could be on the opposite

22   side.

23        Q.    Oh, I don't disagree.  You said all these bands had

24   a pink ribbon on them?

25        A.    Yes.

1    Q.   You just seemed uncertain as to whether the XX was

2  imprinted over the ribbon or whether they were on opposite

3  sides.

4         Now having looked at this, do you agree with me

5  that they're on the opposite sides?

6    A.   I believe your question was, was the pink ribbon

7  exposed, and I wasn't sure because it could have been on the

8  opposite side of the Xs.

9    Q.   Right.  And to the extent then that I was unclear,

10  you don't disagree that one side of these would have been the

11  XXs or other symbols and the other side would have been the

12  ribbon?

13    A.   That's possible.

14    Q.   Okay.  And you mentioned the Olympics in your

15  e-mail of August 1, 2024, the one you sent to Ms. Kelley and

16  the board?

17    A.   Yes, the Olympics.

18    Q.   Yeah.  The Olympics in Paris, right?

19    A.   Yes.  The women's boxing competition.

20    Q.   In particular?

21    A.   Right.

22    Q.   And in particular you remember at those Olympics,

23  and starting at those Olympics, that several female boxers

24  started using an X symbol during the Olympics, right?

25    A.   I don't recall that.

1      Q.    Do you recall people running through the stadiums

2  with XX flags?

3      A.    I didn't watch the Olympics that closely.

4      Q.    Okay.  And you haven't seen that since then?

5      A.    No.

6            MR. CULLEN:  Stacy, can you go to Plaintiffs'

7  Exhibit 2, please?

8      Q.    I believe you testified that this didn't go

9  directly to you, correct?

10     A.    That is correct.  A bunch of these e-mails do not

11 go to me.

12     Q.    And do you know why that is?

13     A.    I have no idea.  There's e-mails that they sent to

14 us parents about busing transportation, and I don't get them.

15 The mother of my children usually has to forward them to me.

16     Q.    Okay.  But you did see this e-mail when Andy Foote

17 responded to it, right?

18     A.    Yes.  I was cc'd on it, but I didn't look too

19 carefully at it.  It went to my Yahoo e-mail address and I get

20 a ton of spam and junk mail that way, and I don't pay too much

21 attention to my Yahoo address.

22     Q.    And you would agree with me that the e-mail that

23 went out to the families and that was ultimately cc'd to you

24 by Mr. Foote includes the language from Mr. Desilets, "I

25 understand that there's some differing opinions regarding

1    tomorrow's game."

2            Do you see that?

3            MR. CULLEN:  Stacy, do you mind highlighting that

4    in the middle?

5        A.    Yes, I see that.  "That's perfectly fine."

6        Q.    And that's how he concludes, right?  "And that is

7    perfectly fine," correct?

8        A.    Yes.

9        Q.    And he warns that, "Inappropriate signs,

10   references, language, or anything else present at the game

11   will not be tolerated," right?

12       A.    That's the next line, yes.

13       Q.    Now, you didn't know -- at the time you saw this

14   e-mail on the morning of the 17th you didn't even know that

15   the XX wristbands were going to be at the game, right?

16       A.    Can you say that again, please?

17       Q.    Yeah.  Sorry.  I switched my question halfway

18   through.  I apologize.

19            On the morning of the 17th did you know that Andy

20   Foote was going to bring his bag of wristbands to the game?

21       A.    On the 17th?  It's possible.  I don't quite

22   remember.

23       Q.    When did Andy tell you that the captains -- or the

24   kids had decided not to wear the wristbands that he had

25   prepared that you had purchased?

1      A.    I don't think he ever told me.  I think it was my

2  own daughter that told me that the school basically pressured

3  them not to do it.

4      Q.    That's what she told you?

5      A.    I believe that's what she told me, yes.

6      Q.    Okay.  And who did she say said that?

7      A.    I don't recall exactly.  I assume it was just

8  school officials.

9      Q.    And with respect to the conversations you had with

10  Mr. Foote that morning -- after he sent his e-mail, did you

11  have conversations with him?

12      A.    I did not.

13          MR. CULLEN:  Could you bring up Andy's e-mail,

14  Exhibit 18?  And, again, if you could blow that up a little.

15          Perfect.  Thank you.

16      Q.    This is the e-mail you were talking about that you

17  were cc'd on?  I believe you're the second line on the "to"?

18      A.    Yes.  I was cc'd on this, yeah.

19      Q.    You mentioned it went to your Yahoo account, and

20  that's you, kylefellers@yahoo.com?

21      A.    Yeah.

22      Q.    After you got this cc, did you have any

23  conversations with Mr. Foote prior to showing up at the game

24  yourself?

25      A.    See, I don't think I actually saw this e-mail till

1  after the game.

2      Q.    Did you have any conversations on the morning of

3  the 17th with Mr. Foote?

4      A.    I don't believe so.  I don't recall.

5      Q.    And just to be clear, I said morning.  So how about

6  in the afternoon prior to the game, did you have any

7  conversations with him then?

8      A.    Prior to the game?  I don't think so.  I was

9  working that day.  So I came from work.  I picked up my

10  sister.

11      Q.    I'll get to another second question in a second,

12  sir.

13          At the game in the second half you now had your

14  wristband on, correct?

15      A.    At halftime that's when Andy gave me the wristband,

16  yes.

17      Q.    And at this time you walked back to your car to get

18  your phone, correct?

19      A.    Yep.

20      Q.    Checked your e-mails and things then?

21      A.    No, I didn't.  No.  Well, cell phone service at the

22  school isn't very good.  So I just picked up the phone and

23  checked to see if there were any texts, calls, and I don't

24  recall any.

25      Q.    Okay.  When you got back to the game, you've got

1    your short-sleeve shirt on and your wristband?

2          A.    Yes.

3          Q.    In public view.

4                And somebody approached you from behind and told

5    you you couldn't have the wristband, right?

6          A.    Yeah.  He whispered it in my ear.

7          Q.    And when you turned around -- and whispered it to

8    you in sort of an unobtrusive way, right?

9          A.    Yes.

10         Q.    Didn't make a big scene at that point?

11         A.    At that point he didn't make a big scene, no.

12         Q.    And when you turned around -- you didn't know his

13   last name was Desilets, but you recognized that it was Mike?

14         A.    Yes.

15         Q.    And you knew at that time that he was the athletic

16   director?

17         A.    Yes.

18         Q.    And he told you at that time that the wristband

19   violated policy, right?

20         A.    Well, I don't know if those were his words, but he

21   said it was a protest and there were no protests allowed.

22         Q.    Okay.  And at that point at least you understood

23   that the district's position was that this wristband was not

24   going to be permitted at the game, right?

25         A.    At that particular point I thought he was joking

1    around with me, but eventually I came to my conclusion that,

2    yeah, he was actually serious.

3         Q.    How long passed before you came to that conclusion?

4         A.    Probably like 30 seconds or so.

5         Q.    Okay.  So 30 seconds after Mike Desilets tells you

6    that, you know, protests won't be allowed, you come to the

7    conclusion that the intent is you can't wear that wristband?

8              MR. KOLDE:  Objection to just the way that was

9    phrased about whose intent.  I'm just concerned it's a vague

10   question, your Honor.

11        Q.    The district did not want you to be wearing the

12   wristband.  Thirty seconds after Mike talked to you, you came

13   to that conclusion?

14        A.    Yeah, yeah.  It was pretty clear at that point.

15        Q.    And you had an excuse ready, right?

16        A.    I'm sorry?

17        Q.    You had an excuse ready, correct?  You told

18   Lieutenant Lamy that the armband is protesting breast cancer,

19   right?

20        A.    I didn't say that initially, no.

21              At first I was stunned, and then I went to

22   basically saying I'm just following the First Amendment here.

23        Q.    Did you or did you not at some point tell

24   Lieutenant Lamy that the wristband was an armband protesting

25   breast cancer?

1    A.    Yeah.

2    Q.    And that wasn't true, right?

3    A.    Well, when I went to Amazon to buy the wristband,

4    it basically is for breast cancer awareness.

5    Q.    And so is it your position that that was true then,

6    that when you wore the armband you were using it as an

7    intention to, as you said, protest breast cancer?

8    A.    Well, I was wearing it to support women and their

9    causes.  In this case it was preventing biological boys to

10   play girls' sports.

11   Q.    Right.  Which doesn't have anything to do with

12   breast cancer, does it, sir?

13   A.    Well, it's a women's cause.  So, yes, it does.

14   Q.    Well, I mean, you know men can get breast cancer

15   too, right?

16   A.    Yes.

17   Q.    And in any case, you weren't wearing this as part

18   of a breast cancer awareness or breast cancer support

19   wristband that day, right?

20   A.    No.  I was wearing it to support women's causes.

21   Q.    Okay.  And then you added for Lieutenant Lamy that

22   it's a breast cancer pink wristband, right?

23   A.    I'm sorry?

24   Q.    You added for Lieutenant Lamy that it's a breast

25   cancer pink wristband, right?

1      A.    I don't understand the question.  What are you

2  asking?

3      Q.    I'm asking if you told Lieutenant Lamy that it's a

4  breast cancer pink wristband.

5      A.    Yes, I did say that.  Yes.

6      Q.    Okay.  And that was not really true either, right?

7            MR. KOLDE:  Objection.  Asked and answered, your

8  Honor.  We've gone over this.

9            THE COURT:  Overruled.

10     A.    I believe it's true that I was supporting women's

11  causes by wearing a pink wristband, yes.

12     Q.    Well, let's go to the parking lot then.

13           You moved the car so you could see the game, right?

14  And then you didn't hold up the sign during the game, correct?

15     A.    That is correct.

16     Q.    You only pulled out the sign when the game was

17  over, right?

18     A.    That is correct.

19     Q.    And from my recollection of the video, and I'm sure

20  you can correct me if I'm wrong, when Officer Lamy comes up to

21  you, Lieutenant Lamy comes in your direction, you're holding

22  it and looking in his direction at this point, correct?

23     A.    I'm holding it and I'm looking towards him, yes.

24     Q.    And behind him is the visitor's bus, right?

25     A.    I don't know where the bus was.  I didn't see it in

1    the body cam footage.

2         Q.    Okay.  But you were there live, right?  You don't

3    have to just rely on the footage.

4         A.    I didn't know where it was, to be honest with you.

5    It was nowhere near me.

6         Q.    Didn't notice a big, yellow bus parked just --

7         A.    Where was it parked?

8         Q.    You didn't notice a big, yellow bus parked about 50

9    yards to your left?

10        A.    I don't recall.  Where was it?

11        Q.    I'm asking if you recall it or not.

12        A.    I do not recall that, no.

13        Q.    Okay.  The officer told you to leave, right?

14        A.    He --

15        Q.    He told you to leave, right?  That's an easy one.

16        A.    Yes.  That's when he started coming to me and said

17   I had to leave.

18        Q.    And you refused?

19        A.    Yes, I refused.

20        Q.    Multiple times, right?

21        A.    Well, I was asked to leave the game, and I left the

22   game.

23        Q.    Lieutenant Lamy asked you multiple times to leave

24   the parking lot and the grounds?

25        A.    He also said put away your sign or leave.

1          Q.    All right, sir, just --

2                THE COURT:  You really have to answer.  It's not a

3     conversation.  You really have to answer the questions.

4                If your lawyer doesn't like them, he can follow up

5     later.

6                THE WITNESS:  Okay.

7          Q.    Lieutenant Lamy told you multiple times that you

8     were to leave the grounds; isn't that right?

9          A.    Yes.  He told me to put away the sign or leave.

10         Q.    And you did not leave the grounds, correct?

11         A.    I did not.  I did put the sign away, though.

12         Q.    In fact, at one time you told him that he would

13    have to arrest you, right?

14         A.    I'm sorry.  What was that?

15         Q.    At one time you told him he would have to arrest

16    you, correct?

17         A.    Exactly.

18         Q.    You also told him that you were taking the Rashs

19    home.  Do you remember that?

20         A.    Yes.

21         Q.    That wasn't true either, was it?

22         A.    That was a misspeak.

23         Q.    It was a misspeak?  It was a lie, wasn't it?

24         A.    It was not a lie.

25         Q.    It was to try to explain to Lieutenant Lamy for

1    your advantage that you needed to stay because your

2    80-year-old in-laws were present?

3         A.    I believe my exact words were I needed to stay for

4    my children and I needed to care for my in-laws.

5         Q.    No.  You didn't say care for, right?  You said you

6    were going to give them a ride home.  Because he said, oh,

7    you're going to put six people in this car?  And you looked

8    the officer straight in the eye and said, yes, I am, right,

9    and that wasn't true?

10         A.    Yes, I did.  I did say that.  I misspoke in the

11    heat of the moment.

12              Essentially what I do after every soccer game is I

13    help my in-laws carry their chairs to their car.  They suffer

14    from health issues, and I would rather not have them carrying

15    stuff.  So I wanted to be there to help them.

16         Q.    That's not what you told Lieutenant Lamy, right?  I

17    mean, it's nice now, but that's not what you told him, right?

18         A.    In the heat of the moment I didn't say that, no.

19         Q.    No.  What you said was you were giving them a ride

20    home, right?

21         A.    That is correct.

22         Q.    And he challenged that because he knew that wasn't

23    true, right?

24         A.    No, he didn't really challenge that.

25         Q.    He said you're fitting six people into this car?

1      A.    No.  I think he said something about why don't your

2  kids just walk home.

3      Q.    That's one of the things he said, and he also said,

4  you're fitting six people into the car, and you said yep?

5      A.    Yes.

6      Q.    Okay.  And that was not true.  That wasn't a

7  misspeak, right?  That was just not true?

8      A.    That's correct.

9      Q.    Okay.  It's another lie to the police officer?

10      A.    What's that?

11      Q.    That was another lie to the police officer, right?

12      A.    What was the first lie?

13      Q.    The cancer story you tried to tell him, right?

14            Tell me this.  Lieutenant Lamy also said you could

15  protest, if you wanted, out on White Rock Hill Road, correct?

16      A.    I believe so, yeah.

17      Q.    You know that's the road that runs by the school?

18      A.    That's correct.

19      Q.    And you could also of course -- he didn't say this,

20  but you could go to board meetings and protest there if you

21  wanted to, sort of raise your concerns to the board, get on

22  the agenda, all those things?

23      A.    Yeah.  We've done that.

24      Q.    And you could meet with the administrators if you

25  wanted to?

1      A.     Yeah.  We've done that.

2      Q.     Okay.  You could certainly send scathing e-mails

3  like you did on August 1st, right?

4      A.     Sure.

5      Q.     And none of those things are going to get you into

6  any trouble with the board, right?

7      A.     Well, I think we were targeted based on the

8  behavior of the school officials based on these e-mails and

9  concerns that we've raised.

10         MR. CULLEN:  Could you bring up Exhibit J, please,

11  and if you could just expand the text of this?

12         That's perfect.  Thank you.  Thanks, Stacy.

13     Q.     This is an e-mail from you, right, Mr. Fellers?

14     A.     Yes.

15     Q.     Again using your kylefellers@yahoo.com account?

16     A.     That's correct.

17     Q.     And you sent it to Marcy Kelley who you knew to be

18  the superintendent?

19     A.     Yes.

20     Q.     And you complain about one of the officials calling

21  you an F-ing A-hole, correct?

22     A.     That's correct.

23     Q.     And then at the end you write, "Under article

24  f(2)(b) of the NHIAA handbook, this is grounds for suspension

25  if not outright firing."

1      A.    That's correct.

2      Q.    Do you feel that Mr. Rossetti should have been

3  suspended or fired based on the language that he used against

4  you after the game?

5      A.    Against me as well as around other parents and

6  children, yes.  I believe it was very inappropriate.

7      Q.    With respect to upcoming events, what's your --

8  what signs do you intend to bring to the parking lots of say

9  -- you're going to attend a basketball game, correct, in the

10  future?  I think you said you were going to go to the Bishop

11  Brady game that's coming up.

12      A.    I would like to, but I haven't been given that

13  permission.

14      Q.    Okay.  And if you went to that and the Court were

15  to permit you, you're also asking the Court to allow you to

16  have signs in that area, right?

17      A.    No.  I was just looking to wear a pink wristband.

18  I mean, I do reserve the right, if I want, to put a sign in my

19  car.

20      Q.    Okay.  And that sign should just be able to say

21  whatever you want it to say?

22      A.    Well, I would use the same sign that I used in the

23  soccer game, protect women's sports for female athletes.

24      Q.    Just that sign?

25      A.    Yeah.

1        Q.    And what about holding it up outside of the car?

2   Are you looking to be able to walk around with it and march it

3   around?

4        A.    Well, I've never done that in the past.  Why would

5   I do it now?

6        Q.    I don't know, but I'm asking you now on the stand

7   if that's something you're asking to be able to do.

8        A.    I have no intention of doing that.

9        Q.    Do you think that there should be any limit on how

10  many people can walk around the parking lot with signs?

11       A.    If they're not bothering anybody.  I mean, walking

12  around -- you're trying to infer that I walked around with

13  signs.  I did not do that.

14       Q.    I understand.  I'm just trying to understand the

15  scope of what you're asking this Court to allow you to do in

16  the future.

17       A.    I've said it.  I would like to walk around with a

18  pink wristband with two Xs on it.

19            MR. CULLEN:  If I could have a moment, your Honor?

20            THE COURT:  Of course.

21            (Pause)

22            MR. CULLEN:  Thanks, your Honor.  I don't have

23  anything else for Mr. Fellers right now.

24            THE COURT:  All right.  Any redirect?

25            I'm sorry.

 1          MR. DUCHARME:  I have some questions, your Honor.

 2  I don't know if you want Mr. Kolde to go and then have me go

 3  last or have me jump in now.

 4          THE COURT:  You know, why don't we go by aligned

 5  parties here.

 6          MR. DUCHARME:  Thank you.

 7          THE COURT:  So why don't you go, Mr. Ducharme.

 8  Appreciate it.

 9                    CROSS-EXAMINATION

10  BY MR. DUCHARME:

11      Q.   Mr. Fellers, my name is Dennis Ducharme.  I

12  represent Mr. Rossetti.

13          This exhibit that is up, you said --

14          THE COURT:  I should probably -- I don't know.  I

15  don't think this is momentous, but I should mention, I think,

16  Mr. Ducharme and I belong to the same golf club, Concord

17  Country Club, and occasionally we do play against each other

18  in matches.

19          MR. KOLDE:  Do you let him win?

20          THE COURT:  He's not that good.

21          MR. DUCHARME:  I never let him win for much money.

22          MR. KOLDE:  That's fine, your Honor.

23      Q.   Mr. Fellers, you were clearly upset with the

24  exchange with Mr. Rossetti in the parking lot, correct?

25      A.   Yeah.  I mean, I was verbally assaulted.

1      Q.    Any different from you calling people Nazis on the

2  sideline?  Pretty equal?

3      A.    No.  Not even in the ballpark.

4      Q.    No?  Okay.  So you draw a different line?

5      A.    I totally draw a different line.  Especially when

6  you're in front of other children screaming you're a fucking

7  asshole.

8      Q.    Now, you're not suggesting that Mr. Rossetti

9  approached you out of the blue in the parking lot, right?

10  There was an exchange before those words came out, wasn't

11  there?

12      A.    No.  I was holding up my sign quietly.

13      Q.    Okay.  Now, you wrote an e-mail to the

14  superintendent of schools referring to Mr. Rossetti as one of

15  her officials, right?

16      A.    Well, first I sent an e-mail to NHIAA with the

17  complaint.

18      Q.    Okay.

19      A.    They responded and said this needs to go to the Bow

20  administration.  So I just copied and pasted what I sent to

21  NHIAA and sent it to Marcy, here's my e-mail.

22      Q.    You don't really understand the interplay between

23  the NHIAA and its officials and the school districts, do you?

24      A.    I do not.

25      Q.    You don't know who pays who?

1    A.    No.

2    Q.    You don't know who charges who what, correct?

3    A.    I have no idea.

4    Q.    You do know that Mr. Rossetti is not an employee of

5  the Bow School District?

6    A.    I figure he's like a contractor.

7    Q.    And you know he's not a member of the Bow school

8  board, correct?

9    A.    Yes.

10    Q.    You know he doesn't make policy for the Bow School

11  District, correct?

12    A.    Yes.

13    Q.    And as far as what happened that day, if I

14  understand correctly, you and Mr. Foote were both wearing the

15  wristbands at one point in time?

16    A.    At one point, yeah.

17    Q.    Mr. Foote had actually taken his off before the

18  time that the body cam video we saw picks up, right?

19    A.    I wasn't aware of it at the time.

20    Q.    You know that now, though?

21    A.    I know it now.

22    Q.    Okay.  And have you heard some heated words between

23  Mr. Foote and school officials?

24    A.    Remembering it, it was to the left of me, and I saw

25  Mike come from that side and go behind me.  There was

1    something going on, but I didn't -- I was too far away to know

2    if it was heated or not.

3        Q.    You were aware of some sort of commotion before he

4    got to you?

5        A.    It wasn't loud enough for me to think it was a

6    commotion.  It could have been -- in my mind it could have

7    been just a discussion or a conversation.

8        Q.    There definitely was a commotion between you and

9    Mr. Desilets and Officer Lamy though?

10       A.    There was a pretty -- yeah, a discussion.

11       Q.    Heated words?  I think you --

12       A.    Eventually, yeah.

13       Q.    Okay.  I think you used those words in the

14   declaration you filed in support of the injunction.  That

15   things were heated and there was a commotion.

16       A.    Yeah.  I guess that's accurate.

17       Q.    Okay.  And all of that happened before Mr. Rossetti

18   stopped the game, correct?

19       A.    Yeah.  I would say so.

20       Q.    Do you know anything about how referees are trained

21   to deal with sideline commotions or disturbances?

22       A.    I am not familiar with how sideline commotions are

23   handled by referees.

24       Q.    What they're supposed to do or not do?

25       A.    No.  I have no understanding.

1        Q.    Now, in this particular case, and we saw the video

2   this morning, it is Mr. Rossetti who stopped the game,

3   correct?

4        A.    Yes.  He stopped the game, and I think he stated

5   that there was a First Amendment discussion that caused him to

6   stop the game.

7        Q.    And he said that fairly deep into the video after a

8   couple of conversations with folks from the school, correct?

9   The Judge has seen it, Mr. Fellers, so if you don't remember

10  it that way, that's fine.

11       A.    Yeah.  I clearly remember it wasn't about a pink

12  wristband.  It was a First Amendment discussion.

13       Q.    Yeah.  And you don't know what he had been told in

14  those conversations out on the field?

15       A.    That's correct.

16       Q.    Okay.  The initial complaint in this case was filed

17  before you had seen the body cam video, right?

18       A.    You mean this complaint?

19       Q.    The complaint to bring the lawsuit, filed before

20  you saw the body cam video?

21       A.    I believe so.  I'm not a hundred percent.

22       Q.    I think the Judge can take notice of that.

23             THE COURT:  It was.

24       A.    It was.  Okay.

25       Q.    You then saw the body cam video?

1          A.   Yes.

2          Q.   Your lawyers filed a substantially longer amended

3     complaint, didn't they?

4          A.   Well, I also saw a Trace video as well.  I don't

5     know if you're familiar with that, but Trace is a --

6               MR. KOLDE:  Kyle, answer the question.

7               THE COURT:  Thank you.

8          A.   Can you repeat the question for me?

9          Q.   Sure.  After seeing the body cam video --

10         A.   Yes.

11         Q.   -- your lawyers on your behalf filed an amended

12    complaint, correct?

13         A.   Yes.

14         Q.   Both the original complaint and the amended

15    complaint say that Steve Rossetti threatened to forfeit, don't

16    they?

17         A.   I believe so, yes.

18         Q.   You've seen the body cam video, you've seen it

19    today?

20         A.   Yes.

21         Q.   Can you pull it up -- have your lawyers pull it up

22    and show me the place where Steve Rossetti uses the word

23    forfeit?

24              MR. KOLDE:  Your Honor, does the Court want us to

25    show Steve Rossetti's --

1             THE COURT:  It's a personal knowledge question.  He

2   either knows or doesn't know.

3             MR. KOLDE:  It sounds like he was asking me to run

4   the video.  We're happy to do it.

5             MR. DUCHARME:  That's all right.  I'm sorry.  It

6   was a little hyperbolic.

7        Q.   He never uses the word forfeit, does he?

8        A.   I was in the parking lot at that point.  So the

9   only knowledge I know is what I see in the body cam footage.

10       Q.   Okay.  To your memory, does he ever use the word

11   forfeit in the body cam video?

12       A.   I don't recall.

13       Q.   Does that mean he didn't or you don't recall one

14   way or the other?

15       A.   I don't recall.  I don't recall.

16       Q.   One way or the other?

17       A.   What's that?

18       Q.   I don't recall is a funny figure of speech.  It can

19   mean I don't think it happened or I don't know one way or the

20   other.  Which is it you're saying?

21       A.   I guess I don't recall.  I don't know what more to

22   say.  I don't recall.  Let's watch the video footage again, I

23   guess, because that's what you're asking me, right, what was

24   on the video footage?

25       Q.   And if you don't remember that --

1          A.    I don't remember.

2          Q.    Okay.  Do you remember in the video somebody saying

3    to Mr. Rash, if you take the wristband off, we can play 23

4    more minutes of soccer?

5          A.    I do remember that from the video.

6          Q.    And in the video, sometime in that time frame, Mr.

7    Rossetti says, look, take it off, be a nice guy, game's over

8    if you don't, something to that effect?  Do you remember that

9    from this morning?

10         A.    Yeah.  I mean, I guess so then, yes, he's saying

11   game over, meaning forfeit the game, but --

12         Q.    Well, you don't know that, do you?

13         A.    Well, you just said it's game over.  So I guess

14   that means forfeit the game.

15         Q.    That's what you guess, correct?

16         A.    Yes.

17         Q.    Do you know by rule what happens if a game is

18   called with 23 minutes left in the second half and the home

19   team is up?  Do you know who wins the game?

20         A.    Well, again, if I think back on the body cam

21   footage, I believe someone -- some individual said that the

22   girls would forfeit their playoff spot.

23         Q.    And that individual was not Steve Rossetti, was it?

24         A.    I don't think it was, no.

25         Q.    Okay.  Thank you.

  1             MR. DUCHARME:  Those are all my questions, your

  2    Honor.

  3             THE WITNESS:  Thank you.

  4             THE COURT:  Thank you, Mr. Ducharme.

  5             Any redirect, Mr. Kolde?

  6             MR. KOLDE:  Just a couple of very brief questions,

  7    and I think we can move on to the next witness.

  8                      REDIRECT EXAMINATION

  9    BY MR. KOLDE:

 10        Q.   During the examination by Mr. --

 11             No, it wasn't actually you.  It was Mr. Cullen.  I

 12    was going to call you the wrong name.

 13             You gave an answer which I think was a double

 14    negative.  Mr. Cullen had asked you, Mr. Fellers, whether you

 15    thought it was appropriate -- whether it was appropriate to --

 16    it was not appropriate to heckle a player on the field, and

 17    you said absolutely not, and I just want to make clear that --

 18    is your answer that it is not appropriate to heckle a player

 19    on the field?

 20        A.   That is correct.  It's not.

 21        Q.   Okay.  All right.

 22             MR. KOLDE:  That's all I have for this witness,

 23    your Honor.

 24             THE COURT:  All right.

 25             Thank you, Mr. Fellers.  You may step down.  You're

 1   excused as a witness.

 2           And you may call your next witness.

 3           MR. KOLDE:  Plaintiffs call Andy Foote.

 4                    ANTHONY FOOTE

 5       having been duly sworn, testified as follows:

 6           THE CLERK:  Please state your full name for the

 7   record.

 8           THE WITNESS:  Anthony C. Foote.

 9           This is a different perspective.

10           THE COURT:  It is.

11                 DIRECT EXAMINATION

12   BY MR. KOLDE:

13       Q.   Mr. Foote, you live in Bow, New Hampshire?

14       A.   Yes, sir, I do.

15       Q.   All right.  And do you have kids?

16       A.   I do.  Two.

17       Q.   All right.  And do they go to the Bow public

18   schools?

19       A.   Yes, they do.

20       Q.   And what are their ages?

21       A.   12 and 17.

22       Q.   Okay.  And do they participate in any sports or

23   other extracurricular activities?

24       A.   Three seasons, yes.

25       Q.   Kind of give us an overview of what sports or

```
1    activities that your kids participate in if they are part of
2    the Bow public schools.
3         A.   Yes.  Abby has played -- she's currently playing
4    soccer, skiing this season, and lacrosse in the spring.  She
5    did previously play basketball but changed sports.
6              And Molly is doing the same sports right now at the
7    middle school.  Except for the skiing.  Sorry.  Molly is doing
8    soccer, basketball, and lacrosse still.
9         Q.   Do you still go to some basketball games even
10   though your daughter is no longer playing on the Bow varsity
11   girls' basketball team?
12        A.   Yes.  The girls -- Abby plays with the seniors that
13   are on the team.  We go to support the team and watch the home
14   games.
15        Q.   Did you watch some games last season?
16        A.   Yes, we did.
17        Q.   And is it your intent to watch some home games at
18   Bow this season?
19        A.   It is.
20        Q.   All right.  You heard Kyle Fellers testify earlier
21   about some of the home games coming up in December, the
22   December 13th home game against Bishop Brady and the December
23   17th home game against Souhegan.  Are those among the games
24   that you have plans to go to?
25        A.   They are.
```

1      Q.    And if you were allowed to by the Court, would you

2  want to wear the pink XX wristband that has been at issue in

3  this case to that game to silently protest on the sidelines?

4      A.    I would.

5      Q.    Okay.  And if you have an opportunity -- if you had

6  the opportunity to, through protection from the Court, would

7  you want to be able to display the Riley Gaines protect

8  women's sports poster that you had on your car at the

9  September 17th soccer game in the parking lot?

10     A.    I would like to still have that freedom, yes.

11     Q.    Okay.  And currently, given what's happened in this

12 case and the no trespass order that we already kind of know

13 about and we've heard a little bit more about it today, are

14 you refraining from doing either of those things, wearing the

15 pink XX wristband silently on the sidelines of a future event

16 or displaying the Riley Gaines poster on your car in the

17 parking lot, because you're afraid you might get sanctioned or

18 have another no trespass order issued by the Bow School

19 District?

20     A.    Yes.  I have refrained from those activities.

21     Q.    Okay.  And I don't want to necessarily go through,

22 like, every single event that's coming up, but with the ski

23 team -- Bow doesn't have its own ski slope, right?

24     A.    Correct.

25     Q.    But it shares facilities with other schools?

1      A.    (Nods affirmatively).

2      Q.    Is that a yes?  You have to answer audibly.

3      A.    I don't know if they share it with schools, but

4  they share ski areas with schools, so yes.

5      Q.    And there are ski meets, essentially competitions?

6      A.    Right.

7      Q.    And my understanding is there is one on -- I can't

8  tell actually by your handwriting whether it's December 19th

9  or December 11th at Bretton Woods?

10     A.    Yes.  There's one coming up over the Christmas

11  break I think.  Abby mentioned it last night.

12     Q.    All right.  And there are a couple of events in

13  early January at Crotched Mountain?

14     A.    Correct.

15     Q.    And it would be your intent to go to those events?

16     A.    Absolutely.

17     Q.    And to wear the pink wristband if you were able to?

18     A.    Yes.

19     Q.    Okay.  There's going to be a little bit of overlap

20  in your testimony, but for the most part we're going to cover

21  stuff that maybe Kyle Fellers wasn't able to see as much as

22  you were able to.

23          It's true that Kyle is the one who bought the

24  wristbands that are at the center of this case; isn't that

25  correct, Mr. Foote?

```
 1        A.    That is correct.

 2        Q.    All right.  At some point he gave them to you; is

 3   that correct?

 4        A.    That is correct.

 5        Q.    And who made the decision to put the XX on these

 6   wristbands?

 7        A.    I decorated the wristbands.

 8        Q.    Okay.  When you say decorated, you don't have to go

 9   into a ton of detail, but what did you do to decorate them?

10        A.    There's history in my family with breast cancer, so

11   I felt it was appropriate to make this a women's sports issue

12   and focus on women.  So I decorated it with XX for the female

13   chromosome, the Greek symbol for female, and a friend from a

14   club team had suggested another, the NAD, for not a dude.

15        Q.    Not a dude is what NAD stands for?

16        A.    Correct.

17        Q.    Okay.  It was not a reference to gonad or anything

18   like that?

19        A.    No.

20        Q.    Okay.  And just to be clear on the record, at the

21   September 17th game that we've been talking about did you end

22   up wearing an NAD wristband?

23        A.    No, I did not.

24        Q.    Did anyone else, to your knowledge, end up wearing

25   or displaying an NAD wristband during the game?
```

1    A.    I do not know of anybody displaying one.

2    Q.    Okay.  And what about the Greek symbol for female,

3    the kind of mirror image, did you wear that wristband?

4    A.    No, I did not.

5    Q.    And do you know of anybody else at the game wearing

6    that wristband?

7    A.    I did not see one.

8    Q.    Okay.  So you wore an XX wristband?

9    A.    I did.

10    Q.    And that's the same wristband that you gave to Kyle

11    Fellers; is that correct?

12    A.    It is, correct.

13    Q.    Okay.  And when you decorated the wristbands, what

14    did you use, electrical tape, something else?  How did you

15    decorate them?

16    A.    A fat Sharpie marker.

17    Q.    Okay.  And we heard some questioning by Mr. Cullen

18    about, like, the original embroidered breast cancer awareness

19    ribbon.  What about all of that -- let's get that out of the

20    way so we don't have to spend a lot of time talking about it.

21    Did you cover them up?  Were they still visible on the

22    wristbands?

23    A.    One side had the breast cancer awareness ribbon and

24    the other side had the XX on them.

25    Q.    Okay.  So they weren't turned inside out, correct?

1        A.    No.

2        Q.    So if somebody was wearing one of the XX

3   wristbands, part of that wristband would show XX and the other

4   side of the wristband that would be visible either inside or

5   outside of the wrist, depending on how you're wearing it,

6   would show the breast cancer awareness ribbon; is that

7   correct?

8        A.    Yes.  Absolutely.  I support both of those causes.

9        Q.    And in fact the wristbands displayed a breast

10  cancer awareness ribbon and XX, correct?

11       A.    Correct.

12       Q.    All right.  So Mr. Fellers was being accurate when

13  he was saying it was a breast cancer awareness ribbon in part?

14       A.    In part, yes.

15       Q.    Who's Shannon Farr married to?

16       A.    David Farr.

17       Q.    All right.  And we don't need to hear a lot about

18  David Farr, but do you disagree with David Farr about politics

19  sometimes?

20       A.    We are on different sides of the table, yes.

21       Q.    Okay.  How do you know -- again, without going into

22  a lot of detail, how do you know that you disagree with David

23  Farr about politics?

24       A.    We've interacted on social media and events.  He's

25  been around town.  His daughter plays on the team with us, and

1    we've interacted over other town issues.  Let's just say we

2    got to know each other, and we both are different in our

3    opinions.

4        Q.    Okay.  And when you say social media, do you mean

5    Facebook?

6        A.    Yes.

7        Q.    All right.  Is it fair to say that David Farr is a

8    progressive?

9        A.    Absolutely.

10       Q.    All right.  And would it be fair to say that you

11   consider yourself more a right of center conservative

12   politically?

13       A.    Conservative, traditional values, yes.

14       Q.    Okay.  Who's Shannon Farr?

15       A.    His wife.

16       Q.    Do you have any reason to believe that she's

17   politically aligned with him or not?

18       A.    From her e-mail, I would say yes.

19       Q.    Okay.  When you're referring to the e-mail, you're

20   referring to Plaintiffs' Exhibit F?

21       A.    Correct.

22       Q.    It's the e-mail we got as part of this lawsuit?

23       A.    Correct.

24       Q.    I'm sorry.  Defendants' Exhibit F.

25            MR. KOLDE:  Why don't we go ahead and call that up,

1     and go to the third paragraph.

2          Q.    This e-mail is dated September 11th; is that

3     correct, Mr. Foote?

4          A.    That is correct.

5          Q.    So it's about six days before the fateful Plymouth

6     game; is that right?

7          A.    Six days before the 17th game?

8          Q.    Yes.

9          A.    Yes.   Correct.

10         Q.    And you can see Ms. Farr discussing an alleged

11    conversation that she overheard at the Laconia game; is that

12    correct?

13         A.    That is correct.

14         Q.    All right.   And were you at that Laconia game?

15         A.    I was.

16         Q.    All right.   Did you discuss with any of the parents

17    wearing a dress to the upcoming Plymouth game?

18         A.    I did not discuss wearing a dress.

19         Q.    Did you discuss with any of the parents buying

20    so-called anti-trans warm-up shirts, if you know what that

21    means?

22         A.    I did not discuss bringing anti-trans warm-up

23    shirts.

24         Q.    It is true that the Bow girls' varsity soccer team

25    has hot pink warm-up shirts, correct?

1        A.    That's true.

2        Q.    And how long have they had the hot pink warm-up

3    shirts to the best of your knowledge?

4        A.    I'm assuming this season.  I don't know exactly,

5    but I'm assuming for this season.

6        Q.    Okay.  So that predates the September 17th Plymouth

7    game?

8        A.    Oh, yes.

9        Q.    Okay.  And have you seen the girls wear the hot

10   pink warm-up shirts before some of the soccer games in this

11   most recent season?

12       A.    I have.

13       Q.    And you saw them wear them before the September

14   17th game with Plymouth?

15       A.    I don't know if I remember seeing them before, I

16   don't think I focused on it then, but I do remember seeing it

17   after the game.  They had them on.

18       Q.    Okay.  So you know for sure you saw them after the

19   game; is that correct?

20       A.    Yes.  Correct.

21       Q.    And at the first game after the 17th did all the

22   girls wear them before the game as far as you could tell?

23       A.    As far as I could tell, it was the majority of the

24   shirts.  I think that -- depending on -- they looked more pink

25   than they did blue or anything else.

1      Q.    Okay.  And that was the first game you were allowed

2  to go to after the order expired?

3      A.    Correct.

4      Q.    To your knowledge, after the September 17th game

5  did some of the girls on the soccer team eventually stop

6  wearing the pink warm-up shirts?

7      A.    Yes.

8      Q.    Okay.  And what is your understanding of why that

9  occurred?

10            MR. CULLEN:  Objection, your Honor.

11            THE COURT:  Overruled.

12            If you know.

13      A.    My understanding was some thought it was

14  inappropriate given the Parker Tirrell situation.  There was a

15  division that way.

16      Q.    Okay.  So from what you were able to observe from

17  the sidelines, since September 17th have some of the girls on

18  the Bow soccer team continued to wear the hot pink warm-up

19  shirts and some have not worn them?

20      A.    Yeah.  For example, my daughter wore them

21  because --

22      Q.    Just answer the question.  Listen to the question

23  and answer the question.

24            I asked you do some wear them and some not wear

25  them?

1      A.    Yes.   Some did and some didn't.

2      Q.    Okay.   To your knowledge, has the school district

3  done anything to prevent any of the students on the Bow soccer

4  team from expressing their sociopolitical beliefs by either

5  wearing or not wearing the hot pink warm-up shirts after the

6  September 17th game?

7            MR. CULLEN:   Objection, your Honor.

8            THE COURT:   Right.   I think you need to lay a

9  better foundation than that.

10           What suggests that their wearing a warm-up shirt

11  was a sociopolitical issue for girls on the soccer team?

12     Q.    How do you know that some of the girls thought it

13  was a political statement to wear the hot pink warm-up shirts?

14           MR. CULLEN:   Again, objection, your Honor.   It's

15  going to be hearsay for sure.

16     A.    Well, I know that some of the families who --

17           MR. KOLDE:   Wait.   Just wait.

18           THE COURT:   True, true.

19           Sustained.

20     Q.    Do you believe that the hot pink shirts are

21  anti-trans warm-up shirts?

22     A.    No.

23     Q.    And why do you say that?

24     A.    My belief, pink is the color associated with

25  females, and it's a pink shirt that they wear for warm-up.

1      Q.    What's a pink out?

2      A.    They do those either at championship games or

3 during the month of October for breast cancer support.

4      Q.    And when you say they, who's the they that you're

5 talking about?

6      A.    Well, I think most teams.  I know that the girls

7 did it, but I think the football team also does a pink out, if

8 I'm correct.  They all wear pink, and they have parents and

9 fans all wear pink either in support of breast cancer or if

10 it's big games, in the playoffs.

11     Q.    Have you ever seen a pink out happen at any Bow

12 School District facilities?

13     A.    Yes.  At the football games.

14     Q.    Have you ever seen Bow Falcon cheerleaders wear

15 pink tops?

16     A.    I have.

17     Q.    Okay.  Do you have any idea what Shannon Farr is

18 talking about here about anti-trans warm-up shirts?

19     A.    I don't know what an anti-trans warm-up shirt is.

20     Q.    Okay.  You did make a sign to express your support

21 for reserving women's sports for biological women for use on

22 your car in the parking lot at the September 17th game; is

23 that correct?

24     A.    That's correct.

25     Q.    All right.  And I don't think we actually have a

1    copy of it in the record.  We didn't have a very good picture

2    of it.  So can you tell the Court what was on the sign?

3         A.    It was Riley Gaines.  It was a picture of Riley

4    Gaines, and it says save women's sports, and it was an event

5    she was hosting for women's sports.  I made a sign out of

6    that.  I found it on the web.

7         Q.    Cut and pasted it and blew it up into a sign?

8         A.    Yes.

9         Q.    Who is Riley Gaines in case people here don't know?

10        A.    She's an NCAA swimmer that was competing against a

11   biological male and lost -- or tied, I think, in her

12   championship, and they gave the title to the male over her.

13        Q.    Was that the Leah Thomas controversy?

14        A.    Leah Thomas, yeah.  Correct.  Sorry.

15        Q.    Leah Thomas is the biological male that won?

16        A.    Correct.  Well --

17        Q.    And has Riley Gaines been somebody who's been

18   talking about the issue of biological males competing in

19   women's sports?

20        A.    She's an advocate, yes.

21        Q.    Okay.  Did your poster say anything negative about

22   trans players?

23        A.    None of my posters said anything negative about

24   trans players.

25        Q.    All right.  Did the poster that you displayed say

1    anything about any player on any particular girls' soccer team

2    at all?

3        A.    No.  None of my posters were referencing soccer,

4    actually.

5        Q.    Did it reference Parker Tirrell?

6        A.    No.

7        Q.    Okay.  In this e-mail from Shannon Farr to Mike

8    Desilets she makes a statement, "Generally planning on how

9    they can heckle and intimidate this player."

10            Did you talk to anyone at the Laconia game about

11    planning to heckle and intimidate Parker Tirrell or any other

12    player at the September 17th game?

13        A.    Absolutely not.

14        Q.    Did you -- after the Laconia game did you form a

15    plan with anyone to attempt to heckle or intimidate Parker

16    Tirrell or any other player on the field at the September 17th

17    game?

18        A.    No.

19        Q.    Were you aware that Shannon Farr had denounced some

20    parents to Mike Desilets with the school district prior to the

21    September 17th game?

22        A.    Reference in the e-mail?

23        Q.    Yes.

24        A.    I had no idea, no.

25        Q.    Okay.  When was the first time that you learned

1    about Shannon Farr's e-mail reporting other parents to the

2    school district?

3         A.    Disclosure I think is what it's called.

4         Q.    Part of this lawsuit?

5         A.    Yes.  Disclosure in this lawsuit.

6         Q.    When we got a copy from the other side?

7         A.    Yes.

8         Q.    Okay.  All right.  Let's fast forward to September

9    17th.

10              What was your plan, Andy Foote's plan, on September

11   17th when you showed up for that game?

12        A.    The day of the game, get there early.  Get a good

13   seat on the sideline.

14        Q.    Slow down for our court reporter.

15        A.    I had gotten the armbands from Kyle the night

16   before.  I had decorated them, it was either the night before

17   or the morning of, and I was going to bring the armbands and

18   my -- I had some posters of issues with women's sports where

19   women had been hurt by biological boys on the team.

20              My plan was to sit on the sidelines silently

21   wearing the pink wristband, just as we did, and to possibly

22   display the signs, but I realized at that point I didn't have

23   a way to put them up so I decided to put it in the window of

24   my Jeep, and that was it.  Silently on the sidelines.  Not to

25   bring anybody out.  Not to heckle anyone.  Not to harass

1    anyone.  I never did harass anyone.  I was there to support

2    Abby, my daughter, a female on a female sports field, a

3    hundred percent.

4         Q.   Did you get Mike Desilets's e-mail that came out on

5    September 16th?

6         A.   I did.

7         Q.   Did you think that you were violating his e-mail by

8    wearing the pink wristband on the sidelines?

9         A.   I didn't consider it a protest.  So, no.  I admit

10   that until we had discussions I had always considered it

11   support for women and women's sports.

12        Q.   Okay.  Were you expecting to be banned?

13        A.   No.

14        Q.   Okay.  When you first arrived for the game on

15   September 17th, did you notice anything unusual about the

16   amount of people on the sidelines other than parents?

17        A.   I did.

18        Q.   Describe that for us, please.

19        A.   I've been to four years -- or thirteen years of

20   soccer and four years in -- well, eight years of Bow soccer.

21   And, generally speaking, if I show up 45 minutes early, it's

22   the coach and the team warming up on the field, maybe Mike

23   Desilets on the field setting up, but just a small handful of

24   people there.

25             This time I noticed Chris from the lacrosse team

1    was there.  Ben Forbes from the baseball team was there.

2    There was Marcy Kelley, Matt Fisk, and Mike obviously, all

3    there on the field together talking at the golf cart.

4              And also behind that was I noticed a Bow police

5    cruiser which in my time not at a soccer game.  I can't even

6    remember if we had one at the championship game this year.

7    I've never seen police force on a soccer field ever.  So that

8    was unusual to me.

9         Q.   So police presence was unusual.

10             Number of school officials was unusual?

11        A.   Absolutely.

12        Q.   Did the school officials have any method of

13   communicating?

14        A.   Oh, yes.  They all seemed to have two-way radio

15   communications.

16        Q.   What regular people would call walkie-talkies?

17        A.   Yeah, walkie-talkies.  Icoms I guess we used in the

18   military.  Yes, they had a radio.

19        Q.   Okay.  And did they actually use them?

20        A.   They did.

21        Q.   Okay.  Was that unusual?

22        A.   It's a first.  I have never seen that at a soccer

23   game in my career at Bow.

24        Q.   You say you saw Marcy Kelley at the sidelines?

25        A.   Initially, yes.

```
 1          Q.    So she was there at the beginning and then not?

 2          A.    Apparently.  By the time the game had started,

 3   there were a lot more people, and I didn't see her.  She

 4   wasn't part of the folks wandering the sideline during the

 5   second half.  I don't know where she went, but she was there

 6   initially at the golf cart with Mike and the crew, and then --

 7   I don't know if she was doing field hockey at that time, but I

 8   think she was the assistant coach so she might have had to

 9   have left for that.

10          Q.    Okay.  Did she have a walkie-talkie?

11          A.    I don't remember that.

12          Q.    Okay.  Did Mike Desilets have one?

13          A.    I believe he must have.  I think Mr. Forbes called

14   him on the radio.

15          Q.    During the first half did you notice Parker Tirrell

16   on the field?

17          A.    I did only because my daughter was defending him.

18          Q.    Okay.  And did he play?

19          A.    He did.

20          Q.    Did you say anything to Parker?

21          A.    No.

22          Q.    Did you hear any of the other parents say anything

23   to Parker specifically?

24          A.    Nothing other than discussing is that Parker.  I

25   mean, there was some discussion who was this boy, transgender
```

1    female, who was playing on the team.

2        Q.    All right.  Well, I want you to listen carefully to

3    my question because my question was whether they said

4    something to the player, not amongst themselves.

5        A.    Oh, no.  Sorry.

6        Q.    So listen carefully to the question.

7              Did they say anything to the player?

8        A.    Nobody said anything to Parker.

9        Q.    It sounds like you did say there was some

10   discussion amongst the parents on the sideline, is that

11   Parker, something to that effect?

12       A.    Correct.

13       Q.    Okay.  But nothing that was heckling?

14       A.    No.

15       Q.    Nothing that was singling Parker out for playing on

16   the field or anything like that?

17       A.    No, no.

18       Q.    Okay.  And during the first half you weren't

19   wearing the pink wristband; is that correct?

20       A.    That's correct.

21       Q.    All right.  Tell us what happened at halftime.

22       A.    So after the first half we had the break, I got up

23   to walk back to the Jeep to put the Riley Gaines poster in it,

24   and on the way out I saw Kyle walking towards his car, which

25   apparently he was going to get his cell phone.  So I gave him

1    a pink wristband on the way out.

2         And when we got back after the half was over, I sat

3    down in my chair and had my pink wristband on.

4         Q.   Okay.  This is the pink wristband with XX on it?

5         A.   Correct.

6         Q.   All right.  And Kyle had one also?

7         A.   Correct.

8         Q.   Had you distributed any of the pink wristbands to

9    any of the other adults present there that day?

10        A.   There was a handful of folks that grabbed a

11   wristband, yes.

12        Q.   And Eldon is a special case, we'll get to Eldon

13   later, but other than you, Kyle, and Eldon, do you know if

14   anyone else was wearing the pink wristband that day?

15        A.   I don't have personal knowledge, no.

16        Q.   Okay.  So the first ten minutes of the second half

17   you're watching the game wearing your pink wristband?

18        A.   Uh-huh.

19        Q.   Are you seated or standing?

20        A.   I'm seated.

21        Q.   In a camp chair?

22        A.   Yeah, in a camp chair.

23        Q.   On the parent sideline that we saw before?

24        A.   At the 50-yard line.  Actually, at the 50 yard

25   line.  I was right next to it on the sideline.

1      Q.    Okay.  Who's with you?

2      A.    Steve Gallier was on my right.  My father-in-law,

3  my wife, my mother-in-law, my wife's aunts.

4      Q.    All right.  Did you say anything to anyone on the

5  field about your wristband?

6      A.    No.

7      Q.    Did you --

8      A.    On the field of play or on the field?

9      Q.    On the field of play.

10     A.    No.  Definitely not, no.  I mean, actually I didn't

11  say anything to anybody about the wristband.

12     Q.    Okay.  You're just quietly wearing your wristband?

13     A.    Absolutely.  Yes.

14     Q.    All right.  Were you ever approached by a school

15  official during the second half about your wristband?

16     A.    Yes.

17     Q.    Approximately when did that happen?

18     A.    I know Kyle had said ten minutes.  It was somewhere

19  around that time frame.  It wasn't far into the beginning of

20  the second half when Mike Desilets came up and said you're

21  going to have to remove the wristband.

22     Q.    Did he face you?  Did he come up behind you?  How

23  did that happen?

24     A.    He came up on my left quietly and said something,

25  you need to remove the wristband.

1     Q.    What did you say to him?

2     A.    I think my first word was really, and he said -- I

3  think his response was, yes, you need to remove it.  I go, a

4  pink wristband, Mike?  He says, yes, I know what you're doing.

5  It's a pink wristband.  He says, you're going to have to take

6  it off or you have to leave the game.

7     Q.    What were you doing?

8     A.    Sitting in my chair watching the game.

9     Q.    Were you surprised?

10    A.    Yes, in a way, but no.  I mean, I guess no.

11    Q.    Did you express some frustration to Mike Desilets?

12    A.    In a sense of, yes, I was being quiet and peaceful

13  on the sidelines and not making any scene and basically nobody

14  knew what we were doing, I was surprised, and I did express

15  some concern to Mike Desilets about it.

16    Q.    Did you end up removing the wristband?

17    A.    I did.

18    Q.    Okay.  What did you do with it?

19    A.    I threw it on the ground in front of him.

20    Q.    Did Mike Desilets do anything to remove the

21  dangerous, harassing, pink wristband from the ground when you

22  threw it on the ground?

23    A.    No.  He left it there and walked away.

24    Q.    Was it still visible?

25    A.    Oh, yes.  Right in front of me.

1      Q.    What did you do with the wristband?

2      A.    I picked it up and put it on my vuvuzela.

3      Q.    All right.  For people who don't know soccer lore,

4   a vuvuzela is a trumpet-like instrument that is from South

5   Africa that is used at soccer matches to celebrate one or the

6   other side; is that correct?

7      A.    Right.

8      Q.    Some people think they're actually kind of

9   obnoxious, right?

10      A.    Yes.  Very.

11      Q.    But for you that's a good thing, right?

12      A.    For me personally.  I love it.

13      Q.    So it's kind of like a trumpet or a bugle?

14      A.    It's a small horn device that makes a lot of noise.

15      Q.    You bring your vuvuzela to Bow High School girls'

16   games, right?

17      A.    Every soccer game.

18      Q.    You've done it before?

19      A.    For years.

20      Q.    And now that you're allowed back or were allowed

21   back for the rest of the season, you brought your vuvuzela

22   also?

23      A.    Yes.

24      Q.    How often do you trumpet or play your vuvuzela?

25      A.    Sometimes not as often as I like, but every time

1    the girls score I will use it.  I don't blow it just all the
2    time.  Only when they score a goal.
3        Q.    All right.  Have you ever been stopped by school
4    officials from blowing the vuvuzela to celebrate a Bow goal?
5        A.    Actually, yes.
6        Q.    Oh, my goodness.
7        A.    Yes.
8        Q.    That's another lawsuit.  No.
9        A.    There was a game -- the game we played against
10   Weare this year, it was part of the initial starting up
11   announcement.
12       Q.    For the most part, are you able to play it?
13       A.    I have been, yeah.  It has never been an issue.
14       Q.    And the referees don't have an issue with it?
15       A.    Not at the high school.  No, they haven't.
16       Q.    All right.  So this supposedly trans-exclusionary,
17   harassing wristband that was pink with the XX, you did what
18   with it?  After you were forced to remove it and picked it off
19   the ground, what did you do with it?
20       A.    So a vuvuzela is just a long, skinny horn, and you
21   could slide it easily over the mouthpiece end.  I slid it over
22   down towards the larger bell and left it on the vuvuzela.
23       Q.    All right.  For the remainder of the second half
24   was the supposedly harassing, trans-exclusionary pink XX
25   wristband visible on your vuvuzela on the sidelines?

1    A.    Yes.

2    Q.    Do you recall whether you played your vuvuzela at

3  all?

4    A.    I think they scored a couple goals in the half,

5  second half, so yes.

6    Q.    Okay.  And did any official ask you to remove the

7  wristbands?

8    A.    No.

9    Q.    Would you have preferred to have worn the wristband

10 on your wrists?

11   A.    Yes.

12   Q.    Was that your intention?

13   A.    My intention was to wear it on my wrist, yes.

14   Q.    Okay.  To your recollection did the trans

15 identifying player for Plymouth, Parker, did he play in the

16 second half?

17   A.    As far as I remember, Parker played most of the

18 game.

19   Q.    Okay.  Do you have any recollection that Parker

20 left the game or left the game early or didn't play or

21 anything like that?

22   A.    Not that I could tell.

23   Q.    All right.  Did you use the vuvuzela with the

24 wristband in any way to try to gesture at Parker or

25 communicate with Parker during the second half?

1          A.    No.  Not at all.

2          Q.    Did Steve Rossetti walk over to you and ask you to

3    remove the wristband from the vuvuzela?

4          A.    No.

5          Q.    Okay.  Did you see some of the interaction between

6    the school officials and Kyle Fellers that resulted in Kyle

7    being sent off by Desilets and Lamy?

8          A.    Yes, I did.  I saw it.  I think it was about the

9    time Kyle said something about the First Amendment.  I

10   overheard that off to my right.

11         Q.    Okay.  At that time were you aware that Kyle had

12   removed the wristband and that Eldon Rash had taken the

13   wristband and put it on?

14         A.    When I initially saw it, I thought Kyle still had

15   the wristband on.  I didn't know anything had happened.  I

16   didn't realize until seeing the body cam footage that there

17   was much more that I had missed, actually.

18         Q.    Okay.  Give us a best estimate for how far you were

19   away from where the interactions were happening between the

20   school officials and Kyle when, you know, when this was going

21   on.

22         A.    25 or 30 feet, I guess.

23         Q.    On the body cam footage in the background do you

24   hear somebody saying it's supporting women's sports?  Do you

25   know who was saying that?

1      A.    Well, I said it once.

2      Q.    Okay.

3      A.    It's just a pink wristband.  And I think my

4  father-in-law said something else, too, but there was a few

5  people talking.

6      Q.    Okay.  Why were you saying that?

7      A.    Because it was a pink wristband supporting women's

8  sports.

9      Q.    Okay.  Were you able to overhear Steve Rossetti

10 when he came to the sidelines -- stopped the game and game to

11 the sidelines?

12     A.    I was.  I was filming it.

13     Q.    Okay.  You have your own homemade video, and that's

14 in evidence; is that correct?

15     A.    It is.

16     Q.    All right.  It shows the events from your

17 perspective 30 feet away, correct?

18     A.    Correct.

19     Q.    All right.  So it captures some of the detail but

20 not as close-up as the body cam footage; is that correct?

21     A.    Correct.

22     Q.    All right.  And we're not going to watch it here

23 today unless Mr. Cullen wants to run it.  In the interests of

24 time, it's in the record, you know, I don't think we need to

25 go through all the details of it, but at the end of that

1    video, your own video, you kind of said, oh, Eldon didn't take

2    it off, at least somebody has got balls around here, or

3    something like that; is that right?

4        A.    That's correct.

5        Q.    Okay.  Later did you find out that you were wrong

6    about that?

7        A.    I did.

8        Q.    Okay.  And that Eldon had taken it off?

9        A.    Yes.  Correct.

10        Q.    All right.  We'll leave that for testimony from

11    Eldon later on.

12            Do you recall that when Rossetti -- well, when the

13    game was stopped and Eldon was seated wearing the wristband, a

14    bunch of other parents started yelling, take it off, you're

15    hurting the girls, write a letter to somebody, things like

16    that?

17        A.    Yes.  I remember two people specifically.

18        Q.    Okay.  Who were the two people specifically that

19    you remember from your own memory?

20        A.    So the lady on the left is Clem Madden's wife,

21    Colleen Madden.

22        Q.    Slow down.

23            Colleen Madden?

24        A.    Colleen Madden.  She was the one closest to the

25    field.  I think she is that one that said write a letter.  She

1  is the one that said write a letter.  I know she is.

2      Q.    Was she the one that said take it off and sort of

3  ordering people around?

4      A.    The loud, very heated, yes.  That was Colleen on

5  the left.

6            And to the right was David Farr, Shannon's husband,

7  who said you're only hurting the girls.

8      Q.    So David Farr is the progressive person that you

9  know from the Bow community?

10     A.    Correct.

11     Q.    And it's his wife that sent the e-mail reporting

12 the other Bow parents to the Bow School District; is that

13 correct?

14     A.    That's correct.

15     Q.    All right.  And he was allowed to say that Eldon

16 should take the wristband off, correct?

17     A.    Correct.

18     Q.    And did you hear those same voices on the videotape

19 when we were listening to it earlier?

20     A.    You can see Colleen on the tape actually, and on my

21 video you can see Dave Farr.

22     Q.    Okay.  But specifically, you know, there are times

23 when we hear audio in there, Kyle wasn't exactly sure who was

24 who.  Did you recognize the voices yourself?

25     A.    I did.

1          MR. KOLDE:  All right.

2          Your Honor, does the Court want us to go through

3     that and identify specific voices?

4          THE COURT:  No.

5          MR. KOLDE:  Okay.  I'll take my cue from the Court.

6     Q.    After Eldon -- you later learned Eldon took off the

7     wristband.  Was the game allowed to resume?

8     A.    It was.  Apparently that was the call from Ben

9     Forbes.  He said "it's off" to Mike, and that's when the

10    game -- you could see in the video when the girls started

11    going back on the field.

12    Q.    All right.  It looks like there were two different

13    conferences between Rossetti and the school officials on the

14    field; is that correct?

15    A.    I believe there was two times they went and talked,

16    yes.

17    Q.    All right.  The first time Desilets goes out to

18    talk to Rossetti; is that right?

19    A.    Correct.

20    Q.    Does Fisk go out?  Do you remember?

21    A.    No, I think it was just Mike alone on the first

22    one, and then the second one I remember -- it's in the video,

23    yeah, and you saw it.

24    Q.    And then Rossetti comes out and says the wristband

25    is coming off or the game is over?

1      A.    Yes.  There was a discussion from Mr. Rossetti.

2      Q.    Okay.  And then Rossetti says, take it off, just

3  take it off, and then he ends up walking off again?

4      A.    His assistant coach escorted him away, yes.

5      Q.    All right.  Assistant referee?

6      A.    Referee.  I'm sorry.  Correct.  Sorry.

7      Q.    All right.  And Eldon is still resisting taking off

8  the wristband, and then the officials go back out on the

9  field, school officials and Rossetti, and I guess one of the

10 assistant referees; is that correct?

11     A.    Right.

12     Q.    And at that point the game is still suspended.

13 Rossetti is out on the field, Fisk is out on the field, Mike

14 Desilets is out on the field, correct?

15     A.    Correct.

16     Q.    Do you know what they're talking about?

17     A.    I do not.

18     Q.    All right.  And at that point in the video we see

19 Ben Forbes go over, look at Eldon, and radio to Mike "he took

20 it off."  Is that correct?

21     A.    That is correct.

22     Q.    And does that comport with what you were able to

23 observe albeit from 30 feet away?

24     A.    Yes.  And it's on my video.

25     Q.    All right.  After that point was there any

 1    disruption in the game?

 2         A.    After the call from Ben Forbes?

 3         Q.    Yeah.  After Rossetti ended the suspension of the

 4    game and allowed the game to proceed with the agreement of the

 5    school officials, did --

 6              MR. CULLEN:  Objection, your Honor.

 7              Adding in "with the agreement of the school

 8    officials."  There's been no testimony about it.  I've tried

 9    to be pretty liberal with letting the --

10              THE COURT:  Sustained.  It's not relevant.

11         Q.    After the game was allowed to resume, Mr. Foote,

12    did anything else happen that was unusual?

13         A.    No.  The game played out without interruption.  I

14    mean, a standard soccer game with standard soccer issues.

15         Q.    All right.  Rossetti didn't stop the game for any

16    other reason --

17         A.    No.

18         Q.    -- having to do with your speech?

19         A.    No.

20         Q.    And no school official approached you after that

21    about removing the wristband from your vuvuzela?

22         A.    No.

23         Q.    Okay.  What did you observe after the game in the

24    parking lot?

25         A.    In the parking lot only, I walked up -- there's a

1    little bit of history because Kyle's daughter came up and

2    broke down what was going on, and I walked up to the parking

3    lot going -- I've known Lieutenant Lamy for a few years for

4    other situations in town, and I went up to say to those guys

5    if there's nothing going on, basically, can you please just

6    let this go for now, as we've seen in the video, just to

7    defuse it.  If Kyle wasn't getting arrested or if the game was

8    over, could we stop because it was affecting his family.

9        Q.    Did that seem to help?

10       A.    Phil seemed to -- yeah, at that point I don't know

11   if he was ready to --

12       Q.    Don't speculate.  Just talk about what you

13   observed.

14       A.    Yeah, when I saw it -- I mean, it seemed like Phil

15   was ready to say, all right, I've got it, we're good, the

16   game's over, I'll go home.

17             Yes, it seemed to help.

18       Q.    Okay.  You shook his hand at the beginning.  Why

19   did you shake his hand?

20       A.    Because I know Phil.  I've known him for four

21   years.

22       Q.    Okay.  After the game was over, did you receive any

23   documentation from the Bow School District?

24       A.    I did.

25       Q.    About when did that happen relative to the game?

 1          A.    I believe it was Thursday after the game.  Thursday
 2   evening.
 3          Q.    What happened?
 4          A.    The Bow Police Department showed up at my front
 5   door.
 6          Q.    And what did they do?
 7          A.    They gave me a no trespass order.
 8          Q.    All right.  And we're not going to go through it
 9   line by line, but if we could just briefly have you identify
10   the order that's already in evidence, and it is the
11   Plaintiffs' Exhibit No. 7.
12                THE COURT:  If you do it briefly.  I'm familiar
13   with it.
14          Q.    Is this the no trespass order that you got?
15          A.    That is.
16          Q.    All right.  And it kept you from attending some of
17   the soccer games for the upcoming not quite week?
18          A.    Correct.
19          Q.    How many games did you miss as a result?
20          A.    One varsity game, one middle school game, and I
21   wasn't able to go to the homecoming football game.
22          Q.    All right.  And you would have gone if you had had
23   the opportunity, correct?
24          A.    I would have.
25          Q.    And would you have worn the pink wristband if you

 1  had had the opportunity to?

 2      A.    If I could have.

 3      Q.    Yes.  And the same thing with regard to the other

 4  soccer games in the season that you weren't able to wear the

 5  pink wristband, correct?

 6      A.    Right.

 7      Q.    You would have if you could have?

 8      A.    Correct.

 9      Q.    And you would like to wear the same pink wristband

10  in the upcoming games, Bow basketball, ski team; is that

11  correct?

12      A.    Absolutely.

13          MR. KOLDE:  Okay.  Let me just check to see if I

14  left anything out.  I think we're good.

15          (Pause)

16          Nothing further at this time, your Honor.

17          THE COURT:  All right.  Why don't we take our mid

18  afternoon break now.  Ten or fifteen minutes.

19          (RECESS)

20          THE COURT:  All right.  Mr. Cullen.

21          MR. CULLEN:  Thank you, your Honor.

22                      CROSS-EXAMINATION

23  BY MR. CULLEN:

24      Q.    Mr. Foote, you had indicated I think on your direct

25  that you were not -- it's probably better to ask you the

1    questions that are for you than for your wife.

2         A.    Probably.

3         Q.    You had indicated that your intent at this game was

4    not to target Parker Tirrell, correct?

5         A.    Correct.

6         Q.    And that your only purpose in going to this game

7    was to express your support for female athletes, right?

8         A.    For my daughter.  Female athletes, yes.

9         Q.    Your daughter and the rest of the Bow team?

10         A.    What's that?

11         Q.    Your daughter and the rest of the Bow team?

12         A.    Yes.

13         Q.    Now, you -- is it fair to say that you supported

14    the passage of HB 1205, the bill that would have restricted

15    Parker and others from playing on girls' teams?

16         A.    The one that Governor Sununu passed?

17         Q.    Correct.

18               THE COURT:  The legislature passed.

19               THE WITNESS:  The legislation.

20               THE COURT:  He signed it.

21               THE WITNESS:  Correct.  Sorry.

22         Q.    And you knew this summer that it was being

23    challenged by Parker Tirrell and another student, right, that

24    HB --

25         A.    Summer of -- sorry.

1          Q.    I'm sorry.  You knew in the summer of 2024, this

2     past summer, that HB 1205 was being challenged by two students

3     in this very court?

4          A.    I think I knew about the two instances.  My wife

5     attended the court whenever the court hearings were.  I think

6     September 11th was one, and there was one prior to that.

7          Q.    There was one in August, right?

8          A.    I don't know the date, but they were the two --

9     last two hearings, yes, that's when I became aware of it.

10         Q.    And after that occurred you sent a note to the

11    girls' varsity soccer coach, correct?

12         A.    I did send an e-mail to -- sorry.  I don't know if

13    that was in reference to the house bill, I don't think.

14         Q.    But just in the summer, August 23rd, in particular,

15    you sent an e-mail to the soccer coach, correct?

16         A.    I did.

17         Q.    And that was a Mr. Vogt?

18         A.    Jay.  Head coach.

19         Q.    Jay Vogt, head coach.

20               And in that e-mail you went through all the other

21    countries and their positions -- not all the other countries,

22    but a number of other countries and their positions on when

23    male-born athletes could play in women's sports, right?  Do

24    you remember that?

25         A.    I referenced other countries, how they were dealing

1    with it, yes.

2         Q.    And you told Mr. Vogt, "No one other than the

3    United States transgender mob supports boys playing on girls'

4    sports teams," right?

5         A.    Is that what the e-mail says?

6         Q.    If you don't remember, we can --

7               MR. CULLEN:  Can you bring up that e-mail?

8         Q.    Just to refresh your recollection, if you turn over

9    to -- first of all, you can look at this for yourself.  It's

10   not marked as an exhibit.

11              MR. CULLEN:  If you can turn to the second page

12   just so that Mr. Foote can see.

13        Q.    After the big, long paragraph, "No one other than

14   the United States transgender mob supports boys playing on

15   girls' sports teams," that's something you said to Mr. Vogt?

16        A.    That's in my e-mail, yes.

17        Q.    And you told Vogt, though, that this was not a game

18   that we have to deal with tomorrow, correct?

19        A.    That was -- I think the -- what's the first part of

20   the e-mail say?

21        Q.    Yeah, why don't we go back to the first.  Sorry.

22              Okay.  So what you wrote to Mr. Vogt was,

23   "Apparently there was a discussion at BWW's tonight that

24   Pinkerton might have a boy on the team."

25              BWW is Buffalo Wild Wings?

```
 1          A.    Buffalo Wild Wings, yes.

 2                So the girls were at Buffalo Wild Wings, and

 3    Abby came home and said that somebody had brought up --

 4          Q.    Hold on.  I don't want to hear the hearsay part of

 5    it.  I just want to ask the questions.

 6          A.    Oh.  So --

 7                THE COURT:  Just answer the question.

 8          A.    Yeah.  Sorry.  Go ahead.  I apologize.

 9          Q.    I will do my best to actually get the question out.

10    I apologize.

11          A.    Yes, sir.

12          Q.    You write in the second paragraph to Mr. Vogt,

13    "Apparently the boy was the one from Plymouth, so that's not a

14    game we need to deal with tomorrow."

15          A.    Address.  Yes.

16          Q.    Okay.  And you knew already that Plymouth was on

17    the schedule?

18          A.    I did.

19          Q.    And you knew that it wasn't coming up until

20    sometime in September?

21          A.    Correct.

22          Q.    Okay.  And after you sent this e-mail on the 23rd,

23    the regular season began, right?

24          A.    Yes.

25          Q.    And the girls' varsity team for Bow played a bunch
```

1    of games in August and September before the Plymouth game,

2    right?

3        A.    They did play some games, yes.

4        Q.    Well, they played -- you go to most of the games it

5    sounds like.

6        A.    I try to go to all of them.

7        Q.    So did you go to the game against Kingswood?

8        A.    I think that's the one I missed.

9              Did I go to Kingswood?

10       Q.    How about Lebanon?

11             We don't get a lifeline.  You can't ask your wife.

12       A.    No.  I'm thinking.  It's not a lifeline.  I'm

13   trying to think.

14       Q.    Okay.

15       A.    I couldn't tell you off the top of my head.  I know

16   Keene, Coe-Brown.  There were two games.  There were some

17   games I had to work that I think conflicted.  I couldn't make

18   it.

19       Q.    Looking at this schedule, it looks as though you

20   had regular scheduled games against Kingswood, Lebanon, and

21   Keene all prior to the Plymouth game.

22             Did you go to any of those?

23       A.    I don't recall.  Yeah.  Sorry.  I can't tell you

24   off the top of my head.

25       Q.    The Laconia game wasn't the first game you went to

1    all season, right?

2        A.    I think we played Keene -- who did we play before

3    -- does anybody have the schedule?

4            THE COURT:  It doesn't matter.

5            THE WITNESS:  Okay.

6        Q.    You went to at least some other games before

7    Plymouth and Laconia, right?

8        A.    Yes.

9        Q.    Okay.  I mean, your daughter was the captain of the

10   team, right?

11       A.    Yes.

12       Q.    And you try to go to all the games?

13       A.    To the best of my ability, yes.

14       Q.    So the odds of you having missed the first three

15   games of the season seems pretty low, right?

16       A.    It does.

17       Q.    Okay.  And you didn't bring any XX wristbands to

18   any of those games, right?

19       A.    No.

20       Q.    You didn't take any effort to display your support

21   for women's sports at any of those games, right?

22       A.    No.

23       Q.    And you didn't bring any signs to put on your car

24   at any of those games, correct?

25       A.    No.

1          Q.    And that's true of the Laconia game, too, right?

2    You didn't bring any wristbands to the Laconia game, right?

3          A.    No.

4          Q.    You didn't bring any positive pro-women sports

5    messages to the Laconia game, correct?

6          A.    Correct.

7          Q.    You didn't bring your Riley Gaines poster to the

8    Laconia game?

9          A.    Correct.

10         Q.    The Plymouth game was the first one where you

11   decide to bring your poster and your wristband to, correct?

12         A.    Correct.

13         Q.    Okay.  Now, on September 10th -- are you aware that

14   that's the date that the Court confirmed its ruling, its prior

15   ruling that Parker Tirrell could play for Plymouth for the

16   duration of the season?

17         A.    Yes.

18         Q.    Okay.  And I think you mentioned in fact that your

19   wife had attended that hearing herself?

20         A.    Correct.

21         Q.    And you went to the Laconia game.  I think you told

22   your attorney that you were not -- you didn't make any of

23   these comments that were mentioned in the Farr e-mail,

24   correct?

25         A.    Not the specific comments in that e-mail, no.

1          Q.    Okay.  What comments did you make?

2          A.    I talked about the hearing.  We were waiting to let

3    the system work the process.

4          Q.    And at that stage the system had worked the

5    process, right?

6          A.    Well, we were hoping that the judge's ruling would

7    go in favor of House Bill 1205, but it didn't.

8          Q.    All right.  And you knew that -- at the time of the

9    Laconia game you already knew that that's the way it had gone,

10   right?

11         A.    I think it came -- did it come out that day?  I

12   think I found out on the 11th.

13         Q.    And with respect to the things that were reported

14   by Ms. Farr, just cutting to the chase, you would agree I

15   think that heckling or intimidating the player from the other

16   side would not be something that would be appropriate.

17         A.    Absolutely not.

18         Q.    You posted on Facebook on September 13th --

19               MR. CULLEN:  Can we bring this up, Stacy,

20   Plaintiffs' Exhibit 5?

21         Q.    You posted on September 13th, if I'm reading it

22   correctly at the top, it's a little faint, about the upcoming

23   game, correct?

24         A.    Correct.

25         Q.    Okay.  And one of the things that you wrote was,

1    "Despite Governor Chris Sununu's stance on protecting female
2    athletes, the federal court has failed to enforce this
3    decision, leaving our girls vulnerable," correct?
4         A.    That's correct.
5         Q.    And you go on to say that it's not the athlete's
6    fault, right?
7         A.    Correct.
8         Q.    And that you believe the athlete is a victim of
9    child abuse, correct?
10        A.    Correct.  That's what it says.
11        Q.    And then you went on to say, "The failure to uphold
12   the governor's decision by the legal system, the school board
13   and the school administration is setting a dangerous precedent
14   for women's sports," correct?
15        A.    Correct.
16        Q.    Was it your position at that time that the school
17   board and the school administration should not have followed
18   this court's order and allowed Parker Tirrell to play?
19        A.    My consideration on this is that the leadership
20   failed, and that is part of the leadership.  From the
21   governor's office to the coach on the field.
22        Q.    But was it your position that the school board and
23   the school administration should not have followed this court
24   order and should not have allowed Parker Tirrell to play?
25        A.    I honestly didn't consider it at that time.

1    Q.   Okay.  You got Mike Desilets's e-mail the night

2  before the game, right?

3    A.   I did.

4    Q.   Okay.  At this time had you already made up your

5  armbands?

6    A.   I had the armbands, but I hadn't done anything to

7  them.

8    Q.   And then -- so after you got this note --

9    MR. CULLEN:  And if we could just pull up Exhibit

10  2, please, Plaintiffs' Exhibit 2.

11    Q.   Now, you were on the distribution list for this?

12    A.   Correct.

13    Q.   And you saw Mike writing that he understood there

14  were differing opinions and that that was fine?

15    A.   Correct.  Yes.

16    Q.   Okay.  And you also got the message -- you also

17  read the part that said, "Please understand that any

18  inappropriate signs, references, language, or anything else

19  present at the game would not be tolerated," correct?

20    A.   I didn't really catch the anything else present,

21  that didn't sink in as part of it, but I did see inappropriate

22  signs and references and language.  I did see that.

23    Q.   Well, you wrote a fairly lengthy response to this

24  e-mail, didn't you?

25    A.   I did.

1      Q.   Okay.  Are you saying now, though, that you didn't

2  read the e-mail in full?

3      A.   I didn't catch the anything else present.  It

4  didn't sink in.  The more I read that, I can see more maybe,

5  but it's an e-mail.  It takes time to digest and interpret it.

6  At that point I didn't even think of anything.

7      Q.   Well, you digested and interpreted it by the next

8  morning, right?

9      A.   Say that again.

10      Q.   You digested it and interpreted it by the next

11  morning, didn't you?

12      A.   As in the e-mail that was sent?

13      Q.   Yeah.  You interpreted and digested this e-mail

14  from Mr. Desilets sent to you -- received by you September

15  16th?  By the next morning, the morning of the 17th, you had

16  digested this?

17      A.   I don't think these two were -- it was a separate

18  e-mail.  I wasn't referencing this alone.

19      Q.   Didn't you respond specifically to this e-mail and

20  attach it?

21      A.   I may have replied to that e-mail, but it wasn't in

22  response to that e-mail.

23      Q.   Okay.  Well, you replied to this e-mail because --

24  you already heard Mr. Fellers say that's the only reason he

25  knew about this e-mail, right, because it was attached to

```
 1   yours?
 2        A.    I cc'd Kyle on it.  That doesn't mean I was writing
 3   responding to his e-mail.  I was writing an e-mail back about
 4   the issue I have with the whole situation, not just Mike's
 5   e-mail about the game.
 6             If you read my e-mail, it doesn't even -- I don't
 7   think I reference it.
 8             MR. CULLEN:  Well, why don't we bring that e-mail
 9   up then, Stacy, if you would.
10             If you could just drop it down a little bit so we
11   can see who it goes to at least at the beginning?  Thank you.
12        Q.    So this is an e-mail from you to Mr. Desilets?
13        A.    Correct.
14        Q.    Copied to your wife and to Kyle Fellers, among
15   others?
16        A.    Yes.
17        Q.    The others are other people on the -- other parents
18   on the team, right?
19        A.    I assume so, yeah.  I don't know exactly.
20        Q.    I mean, this is your e-mail?
21        A.    It is my e-mail.  I just -- I don't remember
22   exactly who it went to.  It's probably other parents that
23   share like views.
24        Q.    And you understood -- you heard Mr. Fellers testify
25   that this was attached to your -- that Mr. Desilets's e-mail
```

1    of September 16th was attached to your e-mail, right?  That's

2    how he learned about it?

3         A.    Right.

4         Q.    You do not have any reason to dispute that, right?

5         A.    No.

6         Q.    And what you say in here is, "Is this all you have

7    to say about this game?"  That's your very first line, right?

8         A.    Yeah.  Correct.

9         Q.    Does that help refresh your recollection as to

10   whether you're responding to Mike's e-mail?

11              MR. CULLEN:  Can you highlight that, please?

12        A.    So, yeah, it's there.  I understand it.  I saw

13   that.  That doesn't mean that I'm just responding to the

14   single e-mail.  My wife had two conversations with him.  We've

15   had -- I e-mailed Jay Vogt.  That was a question.  We've

16   talked about this.  I've talked to my daughter about it.

17   There's been multiple discussions.  This just happens to be

18   the last one that comes out.

19        Q.    I just want to make sure I'm clear, because I

20   thought you were saying earlier that you didn't really digest

21   Mike's e-mail and you never even really realized that it said

22   other types of inappropriate behavior would not be allowed.

23        A.    It's in there.  I see it.

24        Q.    Okay.  And then you continue, "You've proven

25   yourselves weak, ineffective, and completely out of touch with

```
 1   real leadership," right?
 2         A.   Correct.
 3         Q.   Okay.  And then you say:  This isn't "just another
 4   game."  Not by a long shot.
 5         A.   Absolutely.
 6         Q.   And that's how you felt about the Plymouth game,
 7   right?
 8         A.   Do you understand the context of that?
 9         Q.   I'm asking -- that's how you felt about the game,
10   didn't you?
11         A.   I felt that it was more than just another game,
12   yes.
13         Q.   So when you said earlier that your protest wasn't
14   anything to do with protesting transgenders or anything like
15   that, this was the first time that you actually decided you
16   were going to go to a game and bring something, some material
17   to the game, a sign and the wristbands?
18         A.   No.  That's not what that means.
19         Q.   But that's what it says, right, is that:  This
20   isn't just another game.  Not by a long shot.
21         A.   That doesn't have anything to do with wearing
22   wristbands.
23         Q.   Okay.  And after you -- at this stage you had
24   already prepared the wristbands, right?
25         A.   This was sent the morning of -- it was right around
```

1    the same time.  Actually, you know what, I think I wrote this

2    and then did the wristbands, to be honest.  I know that the --

3    I know my disposition.  I mentioned it.  I think the timing

4    was off.  I think I did the wristbands after this e-mail,

5    actually.

6            Q.    Okay.

7            A.    To clarify the record.

8            Q.    So after this e-mail and after receiving the

9    message from Mike Desilets, that's when you decided to mark up

10   the bag of wristbands that you had received from Mr. Fellers?

11           A.    So in the timeline of events, I wrote the e-mail,

12   Kyle dropped off the wristbands, I think I read his e-mail, I

13   responded to the e-mail, and then I put the Xs on the pink

14   wristbands.  Yes, that's the correct order of events.

15           Q.    And you continue in the e-mail, "You ignored us,

16   and now you expect us to just go along with this," don't you?

17           A.    Does is it say that?  I think it does.  Where are

18   you referencing?

19           Q.    The same paragraph.

20           A.    Oh.  It does say that, yes.

21           Q.    And you continue, "I'm a leader, and a real leader

22   doesn't stand by while their players are thrown into harm's

23   way.  You don't let biological males who are stronger, faster,

24   and more physically dominant compete against women, and you

25   don't sit around waiting for someone to get hurt before you

 1   take action."

 2        A.   Yes.

 3        Q.   You can certainly understand how someone receiving

 4   this e-mail would consider that you were not going to stand

 5   around at the game, correct?

 6             MR. KOLDE:  Objection.  Calls for speculation.

 7             THE COURT:  Overruled.  It's what he sees.

 8        A.   Ask the question again, please.

 9        Q.   You can understand how somebody reading this e-mail

10   would get the impression that you were not going to just sit

11   around waiting for somebody to get hurt at the following game,

12   you were going to do something, right?

13        A.   I would have thought he would call me and ask

14   what's going on.

15        Q.   That wasn't my question.

16        A.   Oh.  Well, that's what I was -- you asked what I

17   thought.

18        Q.   I said you would understand how somebody reading

19   this e-mail could get the impression that you planned to do

20   something at the game.

21        A.   I suppose.

22        Q.   Just suppose?

23        A.   If I was the leader, I would actually seek out more

24   clarification, but I don't know.

25        Q.   No.  If you were a leader, you wouldn't stand by

1    while their players were thrown into harm's way.  That's what

2    you told them.

3        A.    I would try to address it with the people that are

4    in charge.

5        Q.    And you reference Riley Gaines here, right, in the

6    very next sentence?

7        A.    "Look at Riley Gaines," yes.

8        Q.    And you knew of Riley Gaines here.  You had already

9    posted about her on your Facebook page, right, or on a

10   Facebook page?

11       A.    Uh-huh.

12       Q.    Was that a Facebook page or was it -- was it yours

13   or was it the Bow Common Sense page?

14       A.    I don't know.  Can you pull it up again?

15       Q.    Sure.

16            MR. CULLEN:  Stacy, can you just switch over real

17   quickly to Plaintiffs' 5?

18       Q.    Are you able to tell from this if this is posted on

19   your Facebook page or if this is on the Common Sense page?

20       A.    It looks like my page, but I don't know.  Usually

21   it says on it.  So I couldn't tell you.

22            MR. CULLEN:  Stacy, if we can go back to Exhibit 2,

23   please?  I'm sorry.  You were right.  Exhibit 18.  Thank you.

24       Q.    And Riley Gaines, among other things, has been

25   using this XX symbol herself to promote the idea that only

1  biologically females belong in women's sports, right?

2      A.   I don't know.

3      Q.   You don't know that?

4      A.   I didn't know she had XXs, no.

5      Q.   You continue on in the second to the last

6  paragraph, "I'm sick of your cowardice and your pandering.

7  You would rather be woke than do what's right.  Where's your

8  courage?  Where's your integrity.  Stand up for women, for

9  real women, or get out of the way."

10          Do you see that?

11     A.   A hundred percent.

12     Q.   And that's what you sent on the morning of the

13  game?

14     A.   September 17th at 7:28, yes.

15     Q.   And this is the day that you decide you're going to

16  go and bring the wristbands for the first time to the game?

17     A.   This is not the first time we talked about

18  wristbands, no.

19     Q.   Okay.  When else did you talk about wristbands?

20     A.   When Kyle bought them.  When he delivered them.

21  When I asked Abby to see if the team would wear them.

22     Q.   But during this week, the week of the game, right?

23     A.   Well, this all happened within the week of the

24  game.

25     Q.   Because you were responding to this Court's

1  decision that had confirmed that Parker was going to play in

2  that game, right?

3      A.   No.  I was responding because of the last court

4  decision that they were going to allow Parker to play, yes.

5      Q.   And up until that time you hadn't done anything to

6  support women's sports visually at any game?

7      A.   I never had a reason to.

8      Q.   Right.  Because the only reason you had this day

9  was because you knew Parker Tirrell was going to be on the

10  playing field?

11     A.   I knew that my daughter could be potentially hurt

12  someday.  My younger daughter could potentially be hurt at

13  some point.

14     Q.   But you didn't expect her to be physically hurt in

15  this game, right?

16     A.   I don't know.

17     Q.   I mean, your wife had attended the hearings.

18     A.   I don't know.  That's speculation.  I couldn't tell

19  you.  We had a slide tackle happen, and a girl went out for

20  the rest of the season.

21     Q.   That can happen even when you're just playing

22  against another female-born female athlete?

23     A.   Oh, yeah.  Absolutely.

24     Q.   But beyond that, you didn't have any particular

25  reason to be concerned about Parker Tirrell, right?

1      A.    In what context?

2      Q.    In the context of this game.  You already --

3            THE COURT:  You knew she was small.

4            MR. CULLEN:  Thank you.

5      A.    Oh, I don't know.  I didn't even -- I really

6  honestly didn't know what size she was.  I didn't know what

7  size Parker was.

8      Q.    But your wife had gone to the hearing so she knew,

9  right?

10     A.    I don't know if my wife saw Parker, what size

11 Parker is.

12     Q.    So you go to this game on this particular day and

13 you bring these wristbands with you, correct?

14     A.    Correct.

15     Q.    You originally asked the players to wear them -- or

16 asked your daughter to ask the players to wear them?

17     A.    I asked her to see if the team would wear them,

18 yes.

19     Q.    Okay.  And then you brought them and you brought

20 them in like a shopping bag or a Market Basket bag or

21 something?

22     A.    Yep.  Exactly.

23     Q.    Okay.  And you -- actually, you came to the game at

24 2:30 that day, didn't you?

25     A.    It was 45 minutes before it started I think is what

1    I said.

2        Q.    It was an hour and a half, though, wasn't it?  You

3    were one of the first people at the game?

4        A.    I was there early, yes.

5        Q.    And you got a prime parking space over on the far

6    right side of the field?

7        A.    I was one of the only people there.  I think Clem

8    Madden was another one that was there at the same time-ish.

9        Q.    And you set up your chairs, right, at the center of

10   the field?  Hey, first come, first served.  You might as well

11   get the best spot.

12       A.    It's the best seat in the house.  You might as well

13   get it.

14       Q.    I'm not faulting you for that.

15             And you brought your -- you didn't put your Riley

16   Gaines sign on at that time, did you?

17       A.    No.

18       Q.    You didn't put that on till halftime, right?

19       A.    Correct.

20       Q.    And you didn't -- you handed out the wristbands to

21   whoever wanted to take them at the beginning of the game,

22   right?

23       A.    I handed out a couple, I don't know, six or so.  I

24   don't know the exact number.

25       Q.    And basically you just kind of showed them the bag

1   and said they could reach in and grab one?

2       A.   No. I didn't really have the bag open.  It was just

3   sitting next to me.  And people came by and if they wanted

4   one, I would give them one.  I think the only one I really

5   gave one to was my father-in-law and Kyle.

6       Q.   Okay.  So you had the bag open and people could

7   just come up.  So they knew you had the wristbands then?

8       A.   Some people did, yes.

9       Q.   Because you had communicated to them at some point

10   that, hey, I'm going to have these wristbands at the game.  If

11   you want one, grab one.

12       A.   I don't think I ever said that.  I think I said --

13   I don't think I ever said I'm going to have wristbands, to

14   pass them out.  Maybe I did.  If it's in a Facebook post, I

15   guess, but I don't remember saying that.

16       Q.   And you didn't put your wristband on at the

17   beginning of the game, right?

18       A.   I did not.

19       Q.   And that's because you knew that it was going to

20   contravene policy KFA, right?

21       A.   I don't know about that.  I just didn't want to

22   miss the first half of the game.

23       Q.   You didn't want to miss it because you knew that

24   you could miss the game if you wore the wristband, right?

25       A.   I had suspected that something would happen, yes.

1    Q.    Yeah, you knew this -- in fact, your wife didn't

2    even wear one of the wristbands at the game, right?

3    A.    No.  She had one, but she didn't wear it.

4    Q.    Okay.  And you didn't put yours on until halftime

5    because you knew that there could be an issue with you wearing

6    this?

7    A.    I suppose you could look at it that way.

8    Q.    And that's the same reason why you didn't put the

9    Riley Gaines poster on your Jeep until halftime, right?

10   A.    That's because -- yes, that's what I thought would

11   work.

12   Q.    Yeah.  You were concerned that if you put it on too

13   early, Mr. Desilets or someone else would come and tell you

14   that you can't do that, right?

15   A.    Yes.

16   Q.    It was not really a big surprise to you when Mr.

17   Desilets came over and said, hey, Andy, you can't wear that,

18   right?

19   A.    I wouldn't say it wasn't a surprise, but I didn't

20   know who was going to come over.  I mean, we had the

21   superintendent at the field.  We had the principal at the

22   field.  We had Desilets at the field.  We had Bow PD.

23   Q.    And the school you said never communicated with you

24   after getting this e-mail about what your plan was, right?

25   A.    The school didn't ever communicate on any of my

1    e-mails.

2         Q.    And you certainly didn't tell the school, hey,

3    we're going to wear these wristbands but nothing more, we're

4    just going to silently wear the wristbands, right?

5         A.    I don't think anything in your -- we failed at

6    communicating.  Let's put it that way.

7         Q.    So the question was you never told the school, hey,

8    this is the limit of our protest.  We're going to come out

9    this day, we're going to wear these, but we're not going to

10   chant, we're not going to heckle, we're not going to protest,

11   we're not going to do any of those things, right?

12        A.    Not in that case, no.

13        Q.    Okay.  And they had good reason to be concerned

14   that you in particular might take this a little bit further,

15   right?

16             MR. KOLDE:  Objection.  Calls for speculation.

17        A.    No.

18             THE COURT:  Overruled.

19        A.    No.

20        Q.    Well, for one thing, you had already sent them an

21   e-mail saying that a real leader doesn't stand by, right?

22        A.    Yes.  It's right there.

23        Q.    And for another thing, you had tried to get into a

24   Gay-Straight Alliance meeting the year before, right, a

25   student meeting?

1      A.    Do we want the full context of that?

2      Q.    Is that true?  You tried to get into a Gay-Straight

3    Alliance meeting, right?

4      A.    I did not try to get into a Gay-Straight Alliance.

5    I tried to request what is a Gay-Straight Alliance.  There's a

6    bigger history there.  I don't know how far you want to go.  I

7    was curious --

8      Q.    If your counsel wants to, he can go into that.

9            THE COURT:  You're talking over each other.

10           MR. KOLDE:  Andy, listen to the question and answer

11    the question.  Nothing else.

12           THE COURT:  Mr. Kolde, I'll handle that.  That's my

13    job.  Thanks for the help, though.

14           Go ahead, Mr. Cullen.

15     Q.    You were asking about the Gay-Straight Alliance?

16     A.    Yes.

17     Q.    And at one stage you wanted to get into the meeting

18    and Sergeant Handy had to actually stop you from going into

19    the school to the meeting, right?

20     A.    No.  No, that never happened.

21     Q.    And in fact you posted online the identity of one

22    of the kids in the Gay-Straight Alliance, right?

23     A.    If she spoke at a book review and then she was one

24    of the individuals in the public forum for a school board

25    meeting, I may have mentioned her.  If she was in the club, I

1  don't know.

2      Q.    So, again, the school district had a reason to be

3  concerned that your protest might go beyond simply having

4  wristbands and silently sitting by the game, right?

5      A.    I don't -- no, I disagree.

6      Q.    And you as you said yourself, a real leader doesn't

7  stand around -- sorry -- doesn't stand by while their players

8  are thrown into harm's way, right?

9      A.    I tried from August until September to get someone

10  to have a conversation.

11      Q.    And in fact a real leader makes sure that you

12  protect the students on the field before things get out of

13  hand and that student is heckled or intimidated or otherwise,

14  right?

15      A.    Well, I think as a parent, you defend your daughter

16  and your family and you try to protect them from harm's way.

17  Whether Parker Tirrell was going to be the problem or some

18  other transgender player, the point is there's a precedent

19  set, and we were trying to protect -- I was trying to protect

20  my girls in some way.  Because I have another one five years

21  from now that could be in the same situation, and I don't know

22  what the scenario is going to be.

23      Q.    You were familiar with the XX symbol being used at

24  the Paris Olympics or not?

25      A.    I didn't watch the Olympics after the opening

1  ceremonies.

2       Q.   All right.  And you don't know which other parents

3  may or may not have worn the wristbands?

4       A.   I do not.

5       Q.   And you don't know which wristbands they took

6  because they just reached into the bag and grabbed them,

7  right?

8       A.   It was random.

9       Q.   So it could have been the XX or it could have been

10  the NAD?

11      A.   It could have been any of the three symbols.

12      Q.   Okay.  And when Mr. Desilets did come up and tell

13  you that you needed to take off the wristband, you already

14  understood why because you were at least half expecting this

15  to happen, right?

16      A.   I guess with the information you've seen here,

17  yeah, there was some understanding of something.

18      Q.   And you missed the next game, but you were back for

19  the game on September 24th, right?

20      A.   Was that the Coe-Brown game?

21      Q.   Well, I think of it as the Moms for Liberty game.

22      A.   Oh, I'm sorry, yes.  The Moms for Liberty, yes.

23  Correct.

24      Q.   And a whole bunch of people came to that game,

25  right?

1    A.    Correct.

2    Q.    And they sat right up behind the parents at the

3  game, right, or stood really?

4    A.    They were a few feet behind the line, the parents'

5  line.

6    Q.    35 to 50 people?

7    A.    Approximately.

8    Q.    None of whom had kids in the game?

9    A.    Maybe not in that particular game, no.

10    Q.    Okay.

11    A.    I don't know for all the people who were there.  I

12  don't know if they had a niece or a nephew.  I know my aunts

13  were there with them.

14    Q.    Yeah.  I mean, there were too many people for you

15  to even know who all of them were, right?

16    A.    I wouldn't say that.  There was a significant

17  amount of people, yes.

18    Q.    You posed for some selfies with them?

19    A.    I did take a picture that they requested, yes.  One

20  picture.

21    Q.    Incidentally, you don't have any actual suspicion

22  that if you went to the game wearing just a pink wristband

23  with the breast cancer ribbon on it, that you would be told to

24  take that off, right?

25    A.    I don't know.

1          Q.    And you don't have any real concern that if you

2     wore just a pink jersey or pink socks or dressed head to toe

3     in pink, that somebody from the district would come over and

4     tell you you can't do that, right?

5          A.    I don't know.  If it was another transgender game

6     going on and you wore all pink, I don't know how they would

7     react.

8          Q.    I mean, you understand that the issue here is your

9     XX symbols, not the color?

10         A.    You mean the female -- biological female XX is an

11    issue?

12         Q.    I'm saying you understand that that's the issue the

13    district has, not the color pink?

14         A.    No.  I had no idea.

15         Q.    So this is the first time you're learning that that

16    could be a possibility?

17         A.    This court case has been presenting it, yes.

18         Q.    I mean, because you took pictures of -- or you

19    found pictures of the cheerleaders wearing pink, and you have

20    no reason to think any of them were in trouble for wearing

21    pink, right?

22         A.    I didn't, but I saw the picture.

23         Q.    And similar with the band?

24         A.    There's a picture of the band?

25         Q.    You submitted an exhibit that is a picture of band

 1    people wearing pink I think.

 2          A.    I don't remember that one.

 3          Q.    Your counsel submitted as exhibits in their

 4    exhibits here a series of photographs of cars in the parking

 5    lot.  Did you look at those?

 6          A.    I did.

 7          Q.    One of them has a license plate that says boy girl?

 8          A.    It did.

 9          Q.    That's a relative of yours, right?

10          A.    By marriage.

11          Q.    I couldn't -- I'm not sure if I was able to get Mr.

12    Fellers to answer this or not, but is it your contention

13    that --

14          A.    I say by marriage, but it's a very distant -- I

15    mean, we don't spend Thanksgivings together.

16          Q.    You're staying as far away from this person as

17    possible.  I understood --

18          A.    No.  Just in context, I didn't want you to think

19    that we have Christmas dinners or anything.  We are distant

20    relatives.

21                MR. KOLDE:  Objection.  Nonresponsive.  Move to

22    strike the witness's nonresponsive answer.

23                THE COURT:  Well, granted.  It's totally

24    irrelevant.

25                MR. KOLDE:  Just answer the question.

1            THE WITNESS:  Yes.

2            THE COURT:  Mr. Kolde, I'll handle it.

3            MR. KOLDE:  I understand, your Honor.

4            THE COURT:  No more interruptions, please.

5      Q.    With respect to this question about what it is

6 you're looking to do with respect to signs, is it your hope to

7 get a ruling from this court that you can walk around the

8 parking lots at any time of the day with whatever political

9 message you want to on a sign that you held above your head?

10     A.    I think it's in line with the First Amendment

11 right.  That's what we're fighting for.  I think as long as

12 it's within the realm of our legal system for displaying, then

13 it should be allowed.

14            MR. CULLEN:  If I could just have a moment, your

15 Honor?

16            THE COURT:  Of course.

17            (Pause)

18            MR. CULLEN:  I don't have any other questions.

19            Thank you, your Honor.

20            I think Mr. Ducharme might come next.

21            THE COURT:  Mr. Ducharme.

22            We'll go till 4:30.

23            MR. DUCHARME:  Okay.  I will not take anywhere

24 near.

25            THE COURT:  No, I hope.

```
 1                    MR. CULLEN:  I wasn't that long.

 2                    MR. DUCHARME:  Oh, that wasn't what I mean, Mr.

 3    Cullen.

 4                    THE COURT:  Aren't you done?

 5                    MR. CULLEN:  I am done.

 6                    THE COURT:  Okay.

 7                         CROSS-EXAMINATION

 8    BY MR. DUCHARME:

 9         Q.   Mr. Foote, I would like to pick up right where you

10    left off in answering Mr. Cullen's question about the signs.

11              You're here fighting for your First Amendment

12    rights, correct?

13         A.   What's that?

14         Q.   You are here fighting for your First Amendment

15    rights?

16         A.   Correct.

17         Q.   And you're fighting with the town of Bow about

18    their policies and the way they implement those policies,

19    correct, or the Bow School District I should say?

20         A.   Yes.

21         Q.   And they sent you a no trespass order?

22         A.   Correct.

23         Q.   And they are enforcing the school rules and

24    policies, correct, the policies of the school board and school

25    district?
```

```
 1        A.   Yes.

 2        Q.   And you know that Mr. Rossetti is not an elected,

 3   appointed, or employed official of the Bow School District,

 4   correct?

 5        A.   I don't know the relationship for how they're

 6   employed.

 7        Q.   Okay.  Do you have any basis to say that he is an

 8   employee or an official?

 9        A.   I mean, he's at a lot of the games.

10        Q.   He's a ref?

11        A.   Yes.

12        Q.   You've seen him at games?

13        A.   Yes.

14        Q.   You've seen him at basketball games?

15        A.   Yes, I think.  I don't know.  I've seen him at

16   soccer games.  I know that.

17        Q.   But, again, to cover quickly what I covered with

18   Mr. Fellers, you don't know the interrelationships between

19   referees and the NHIAA and the school districts, correct?

20        A.   I don't know the financial, if that's what you're

21   asking.

22        Q.   And what this case is about mostly is your very

23   important First Amendment rights, correct?

24        A.   That's why we're here, yes.

25        Q.   Your lawyers have dropped your claim for monetary
```

1  damages, correct?  I assume you know that.

2      A.   I know they dropped the value, yes.

3      Q.   Well, you know they've dropped the claim for

4  compensatory damages?

5      A.   I mean, we did talk about that, yes.

6      Q.   Okay.  I don't want to know what you talked about.

7  You know it happened?

8      A.   Yes.

9      Q.   And that what the vast majority of the time and

10  effort going into this case is about is your hope to get

11  injunctive relief, right?

12      A.   Correct.

13      Q.   You weren't really damaged by what happened on

14  September 17th, were you, by Mr. Rossetti?

15          MR. KOLDE:  Objection insofar as it calls for a

16  legal conclusion, and it does sound legal, your Honor.

17          THE COURT:  I understand the issues.  He's damaged

18  if his rights were infringed.

19          MR. KOLDE:  Fair enough.

20      Q.   So you in the complaint have alleged a conspiracy,

21  correct, that includes Mr. Rossetti?

22      A.   In our group, yes.

23      Q.   And you in your declaration filed in support of the

24  request for both a temporary restraining order and this

25  preliminary injunction have said that Mr. Rossetti threatened

1  a forfeit, correct?

2       A.    The specific words, I would have to look at the

3  video.

4       Q.    I'm not talking about the video.  I'm talking about

5  the pleadings filed in this court, including your declaration

6  which is document 14-4 signed under oath.

7       A.    Right.

8       Q.    You recall saying under oath in that declaration,

9  "I declare under penalty of perjury that the foregoing is true

10 and correct," that you heard Steve Rossetti threaten to

11 forfeit the game.  You said that, didn't you?

12      A.    I heard him say that Bow could potentially forfeit

13 the game.

14      Q.    You heard him say that?

15      A.    I believe I did.

16      Q.    Is it on the video?

17      A.    I don't know.

18      Q.    You heard him say it, though?

19      A.    You're going to have to stop and lose the game,

20 yeah.  There was some insinuation.  Whether it was forfeit or

21 -- yeah, that's what I remember.

22      Q.    Did you hear him say the game's over if this

23 disturbance doesn't end?

24      A.    It could have been something like that.

25      Q.    You don't know if game over equals forfeit, do you?

1          A.    We were told up to that point if they didn't play

2     the game, they would forfeit.

3          Q.    By whom?

4          A.    By my daughter.  By the coach I had talked to.  I

5     don't know.  I heard that if they didn't finish the game, they

6     would forfeit it.

7          Q.    I'm sorry.  I didn't see the coach or your daughter

8     come over to the sideline.

9          A.    No.  This was before just discussing on the field.

10          Q.    You're talking about if they just hadn't showed up

11     to play?

12          A.    There was a lot of discussion about these teams and

13     games and what would happen to them.  I don't know the

14     specifics.

15          Q.    Let's focus on the day in question here.

16                You didn't hear Mr. Rossetti threaten to forfeit

17     the game, did you?

18          A.    I would have to go back and view my video.

19          Q.    Okay.  By the time that the body cam video picks

20     up --

21          A.    My video, I'm sorry, not --

22          Q.    Okay.  I'm talking about the body cam video.

23          A.    Okay.

24          Q.    By the time that the body cam video picks up,

25     you've already taken your wristband off?

1        A.    Correct.

2        Q.    And you do agree that the interaction between Mr.

3   Desilets and Mr. Fellers was pretty heated, loud?

4        A.    It was a passionate discussion about a topic, yes.

5        Q.    So if, again, your declaration used words like

6   heated and loud, you wouldn't step back from that now, right?

7        A.    It wasn't louder than Colleen Madden's -- it was

8   quieter than her comments, let's put it that way, or quieter

9   than the cheering on the sidelines during the game.

10        Q.    You don't think it stood out at all?

11        A.    Not compared to my vuvuzela or comments, us yelling

12   for the girls, let's go, Bow, no.

13        Q.    You don't really believe that Steve Rossetti shut

14   this game down to stop your protest, do you?

15        A.    Say that again.

16        Q.    I said you don't believe that Steve Rossetti blew

17   the whistle and stopped this game to stop your protest, do

18   you?

19        A.    I don't know.

20        Q.    You don't know, do you?

21        A.    I don't know the facts behind it, but it seemed

22   suspicious.

23        Q.    Yeah, you've alleged it, but you don't know, do

24   you?

25        A.    It would be speculation.

1     Q.   Yeah, it probably is.

2     A.   I'm not in his head.

3     Q.   If he was a really good co-conspirator, he would

4  have come and pulled the wristband off your vuvuzela, wouldn't

5  he, but he didn't do that?

6     A.   I don't understand the question.

7     Q.   Yeah, I didn't think you would.

8          MR. CULLEN:  Vuvuzela.

9          MR. DUCHARME:  Vuvuzela.  Excuse me.

10    A.   No, no.  I understood that part.

11    Q.   You saw that he reacted to a commotion on the

12  sideline, right?

13    A.   Did he react to the commotion on the sideline

14  before or after that?  Yeah.

15    Q.   Weren't you there?

16    A.   I was there, but I don't know.  Was it enough to

17  see?  I don't know.

18    Q.   Or hear?

19    A.   I mean, if I was watching the game watching for

20  fouls on the field, I don't know if what happened on the

21  sideline was enough to trigger --

22    Q.   Well, to that end, you don't know what referees are

23  trained to do when there is a commotion on the sideline, do

24  you?

25    A.   Well, I'm not a referee, no.

1          Q.    Are you saying to the Court that you think what was

2    going on and shown in the videotape, the body cam tape with

3    Mr. Fellers and Mr. Desilets, was like a nice, friendly, quiet

4    conversation?

5          A.    I think a police officer and four people huddled

6    around one individual would probably indicate something is

7    going on.

8          Q.    A bit of a commotion, right?

9          A.    Well, somebody was creating one, yes.

10         Q.    Yeah.  Well, again, whoever was creating it, Mr.

11   Rossetti didn't blow his whistle and come over until after

12   that commotion, correct?

13         A.    I don't know why he blew his whistle or what caused

14   him to.

15         Q.    I didn't ask you if you know why.  I asked about

16   when.  You were there and you've seen the body cam video.  It

17   happened after the commotion, didn't it?

18         A.    There were people on the sidelines, yes.

19         Q.    Do you not understand my question or would you

20   rather just not answer it?

21         A.    I don't know if the commotion caused him to come

22   over.  I don't know if there was enough --

23         Q.    I'm asking about the sequence of events.

24               Isn't it correct that he blew his whistle and got

25   involved after the commotion?  A simple question.

1        A.    The discussion with Mr. Fellers, yes.

2        Q.    Okay.  From there forward you observed that the

3   officer and Mr. Desilets and Mr. Fisk finished their doings

4   with Mr. Fellers and he left, correct?

5        A.    Kyle was rejected from the game.

6        Q.    But you watched it all happen?

7        A.    We just did, yes.

8        Q.    You watched it that day, too?

9        A.    Yes.

10        Q.    And then the focus became Mr. Rash, correct?

11        A.    Yes.

12        Q.    And then you saw that at the end of that when the

13   large coach whose name I have forgotten -- Mr. Burke, I think.

14        A.    Ben Forbes.

15        Q.    Forbes.  Mr. Forbes radioed Mr. Desilets, and that

16   once Mr. Rash's wristband came off Mr. Desilets said, okay,

17   we're going to play?

18        A.    Yes.  I assume, yes.  He went to Mike and said,

19   Mike, the wristband is off, or something to that effect, yes.

20        Q.    All right.  Thank you.

21              THE COURT:  Any redirect?

22              MR. KOLDE:  Very brief, your Honor.

23                        REDIRECT EXAMINATION

24   BY MR. KOLDE:

25        Q.    Mr. Foote, we met the other day and you saw some

1    photographs of vehicles with political and other bumper

2    stickers that were -- that you had gathered for us; is that

3    correct?

4         A.    Yes.

5         Q.    All right.  And I'll represent to the Court and the

6    parties that we're talking here about the photographs that are

7    agreed admitted Exhibits 27, 28, 29, and 30.  It's a gray car

8    with political bumper stickers, a black car with political

9    bumper stickers, a blue car with political bumper stickers,

10   and a silver car with political bumper stickers.

11             Have you seen those vehicles parked on Bow School

12   District property?

13        A.    I have.

14        Q.    Okay.  I don't want to replow all the ground with

15   the e-mail that you sent to Mike Desilets the morning of the

16   game with Plymouth, that is, the morning of September 17, the

17   morning that you also added XX to the wristbands, but what

18   were you hoping to get from -- it's fair to say that you were

19   concerned about what you called a lack of leadership; is that

20   correct?

21        A.    Correct.

22        Q.    What were you hoping to elicit from Mike Desilets

23   or the other Bow officials that you weren't getting that was

24   contributing to your frustration?

25        A.    Not a single person in the administration ever had

1    any conversation with a parent, with the team, the coaches

2    didn't, nothing had ever happened.  This was just like we're

3    just going to play the game the way it is.  I wanted to have a

4    discussion.

5         Q.    You wanted to have communication?

6         A.    Yes.

7         Q.    And did Mike Desilets try to communicate with you?

8         A.    No.

9         Q.    Marcy Kelley?

10        A.    No.

11        Q.    Mr. Cullen asked you about people coming and

12   grabbing the wristbands out of the bag.

13        A.    Yes.

14        Q.    And, again, I just want the record to be clear.

15   Did you see anyone on the sidelines at that game on September

16   17th, any adult, anyone else, wearing one of the NAD

17   wristbands?

18        A.    I did not.

19        Q.    Okay.  Mr. Cullen asked you about the signs you

20   want to display, okay, and so language is important.

21             Are you wanting to display a sign like the Riley

22   Gaines sign that you had displayed on your car on September

23   17th?

24        A.    Yes.  Similar signs to that and the ones that are

25   in the Facebook post.

1      Q.   All right.  I need you to be very specific, Mr.

2  Foote, because this is very important.

3           What do you mean by that?

4      A.   In respect to the signs, I want to be able to post

5  signs that support protecting women in women's sports.

6      Q.   All right.  So you're not just asking to be able to

7  display random political messages about other topics?

8      A.   No, no.  In this instance, no, not at all.

9      Q.   Okay.  And are you asking to display signs that

10  name trans players?

11      A.   That was not my intent.  You can see from my signs

12  I didn't even try that.  That was not it.

13      Q.   Just answer the question.

14      A.   No.

15      Q.   Okay.  Are you asking to display signs that say

16  harassing things about trans players?

17      A.   No.

18      Q.   Okay.

19           MR. KOLDE:  Nothing further, your Honor.

20           THE COURT:  All right.  I have a few, if you don't

21  mind.

22           I have to decide this, and it's a complicated

23  issue.  It's nuanced.  It's not easy.

24           I think I understand Mr. Feller's position and your

25  position.

1          MR. KOLDE:  Your Honor, I can barely hear you.  I'm

2     sorry, your Honor.

3          THE COURT:  I'm sorry.

4          I think I understand your position and Mr.

5     Fellers's position to be we oppose people classified at birth

6     as males, boys, from participating on female girls' high

7     school sports teams.  That's your view?

8          THE WITNESS:  Yes.  Yes.  Generally speaking, yes.

9          THE COURT:  And a lot of people hold that view.

10    Obviously, the legislature passed a statute to that effect

11    which the governor signed.

12         But I'm curious about you say you were not

13    protesting.  Now, back when I was young people protested the

14    Vietnam War.  If you asked a protester, they might say I'm not

15    protesting the war.  I'm supporting peace.  I don't see a

16    difference there.

17         And you're saying I'm not protesting that a

18    transgender student is playing on a girls' team.  I'm

19    supporting girls' sports.

20         Is there a distinction there that you can draw

21    that's meaningful?  You're against transgender girls playing

22    on girls' sports teams?

23         THE WITNESS:  I'm against women having to compete

24    against biological males.

25         THE COURT:  Same thing, right?  I support women's

1  sports in that I oppose transgender girls playing on girls'

2  sports teams.  Is that fair?

3          You want to say it's got nothing to do with

4  directing harassment or heckling or denigrating trans girls,

5  it's got to do with supporting girls' sports teams that are

6  biological girls, right?

7          THE WITNESS:  Well, there's a lot more to it, your

8  Honor, and I --

9          THE COURT:  Well, tell me about it then.

10          THE WITNESS:  Well, I don't want to get in too

11  deep.

12          THE COURT:  Get as deep as you like.

13          THE WITNESS:  It comes down to the bottom line of

14  the dignity, the safe places, the awards, the varsity teams.

15  It comes down to girls losing what they fought for.  My

16  daughter played for 13 years.

17          THE COURT:  Losing unfairly because of what?

18          THE WITNESS:  Genetically, boys are more stronger,

19  faster, recover faster, and it's just not fair to a girl who's

20  fought her entire life to get to a place of captain on a

21  soccer team to potentially lose that seat because now a boy is

22  on the team who beats them out.

23          THE COURT:  Yeah, so the problem is -- in your

24  position the problem is that transgender girls are on the team

25  or are participating in the sport.

1          THE WITNESS:  Well, there's more to it than that

2    also, sir.

3          THE COURT:  Well, tell me.

4          THE WITNESS:  No one has had a conversation in the

5    entire state of New Hampshire about the issue.

6          In the military you have standards.  You set

7    standards for anything, whether it's passing a PT test,

8    whether it's your height and weight, you have standards on how

9    you would evaluate things.

10          There is not a single standard other than the fact

11    that Parker Tirrell identifies as a female and now he can play

12    on the team, and that's dangerous.  My signs, as you can see,

13    were for protecting women that had been hurt.  These were all

14    examples of either a loss of a title or a loss of physical

15    injury, and the only time anything is done is when that

16    happens.

17          THE COURT:  So do you not agree that wearing the

18    pink wristband with the XX was your way of communicating I

19    oppose the transgender girl playing on this girls' sports

20    team?

21          THE WITNESS:  That's one way of looking at it.

22          THE COURT:  Tell me why that is.  Because that's

23    the normal way to look at it.

24          THE WITNESS:  Well, I looked at it because I have a

25    daughter on the team who's fought for 13 years, and I'm

1    supporting her and her accomplishments.

2              THE COURT:  Yes, but you're supporting her by

3    opposing what you think is getting in the way of her fair

4    competition, right?

5              THE WITNESS:  I suppose that's another way to look

6    at it.

7              THE COURT:  Well, I notice that you -- and here's

8    the problem.  It's the message.  What message is being sent by

9    this protest?  What's the message?  And I know you probably

10   sincerely think I'm not sending a harassing, demeaning,

11   degrading, exclusionary message.  I'm sure you in your mind

12   think I'm just stating my legitimate position on a

13   controversial social political issue, right?

14             THE WITNESS:  Well, I wasn't, like, saying I hate

15   trans.  That's for sure.

16             THE COURT:  That's what I mean.  You don't think

17   that.

18             But here's the thing.  You don't wear those --

19   first of all, you haven't really -- you've done it a little

20   bit.  Mr. Fellers didn't at all.  You refer to Parker Tirrell

21   as he, or you refer to transgender girls playing on these

22   teams as boys.  Like you seem to go out of your way to suggest

23   that there's no such thing as a trans girl or you don't accept

24   it, you don't recognize it.  Is that part of your position?

25             THE WITNESS:  No.  That's just like when you're

1    learning a new language.

2             THE COURT:  Okay.

3             THE WITNESS:  I'm sorry if I --

4             THE COURT:  All right.  So here's the thing.

5    You're wearing this statement of your political issue on this

6    issue just at school activities.  Is there any evidence -- do

7    you wear it to Walmart?  Do you wear it to work?  Do you wear

8    it to church?  Do you wear it anywhere else?

9             THE WITNESS:  The time we're wearing it now is a

10   chance where it actually applies.

11            THE COURT:  But the question is do you wear it

12   anywhere else.

13            THE WITNESS:  I do.  Yeah, I've had it on my Jeep

14   on the dashboard.

15            THE COURT:  Do you wear it anywhere?

16            THE WITNESS:  Oh, do I personally wear it?

17            THE COURT:  Yeah, other than at the school

18   activities.  It seems like it's only school activities.

19            THE WITNESS:  No.  I've had it on around Concord.

20            THE COURT:  You have?

21            THE WITNESS:  I have.

22            THE COURT:  What's the audience that you're trying

23   to reach with your protest?  What's the audience?  Is it the

24   kids playing, is it the teachers and administrators, is it the

25   other parents, or is it the public in general?  What is the

1    audience?

2              THE WITNESS:  Those that support House Bill 1205.

3              THE COURT:  Okay.  So you're going to the school

4    events where these issues arise because there's school

5    athletics, and your audience is people that also might support

6    the bill that you support?

7              THE WITNESS:  If I was wearing it outside of a

8    school activity, it would be the other parents that support

9    the same issue.

10              THE COURT:  Your counsel made a point of asking you

11    about the supposedly harassing, trans-exclusionary pink XX

12    wristband.  Now, supposedly harassing, that's an effect

13    question, is it harassing in effect.  I gather your view is I

14    was certainly not intending to harass a transgender player,

15    right?

16              THE WITNESS:  No.  Not at all.

17              THE COURT:  But trans-exclusionary, that is

18    consistent with your protest.  That's what you want to have

19    happen, right?  You want trans girls not playing on girls'

20    sports.

21              THE WITNESS:  I want an open discussion about how

22    we do it.

23              THE COURT:  So you weren't protesting the fact that

24    trans girls were allowed to play on girls' teams?

25              THE WITNESS:  My honest at the start was a fear

 1  that somebody is going to get hurt.

 2          THE COURT:  No, no, no.  But the cause of -- your

 3  fear of someone getting hurt is because in your view allowing

 4  trans girls to play on girls' teams will result in injury.

 5          THE WITNESS:  My fear is all the things I've spoken

 6  of, yes.  At some point there will be some sort of injury,

 7  whether it's physical, whether it's mental, whether it's

 8  something else.

 9          THE COURT:  Sure.  So the object of your protest

10  was I don't like the fact that a trans girl is playing on a

11  high school girls' team?

12          THE WITNESS:  Well, the bigger one is I didn't like

13  the fact my daughter was forced to play without even being

14  asked.  It was not her choice.

15          THE COURT:  So you weren't protesting the fact that

16  a trans girl was allowed to play on a girls' team?

17          THE WITNESS:  I was supporting my daughter's female

18  sport.  I wasn't -- I know you're saying it's not that way.

19          THE COURT:  Well, we went around that circle, but

20  you're supporting her by saying I support you by taking the

21  public position that trans girls should not be allowed to play

22  against you.  It's all about the trans girls playing on girls'

23  teams, isn't it?

24          THE WITNESS:  You're not going to -- honestly, if

25  there wasn't a trans girl trying to play on a girls' team, it

 1    wouldn't be an issue.  You're right.

 2              THE COURT:  All right.  The answer is right.

 3    That's what you're protesting against.

 4              Okay.  So trans-exclusionary, that's not something

 5    you walk away from.  That's what you want to see and you want

 6    that to happen, trans girls excluded.

 7              Pink associated with female is girls, right?

 8              THE WITNESS:  Yes.

 9              THE COURT:  XX, the female chromosome, right?

10              THE WITNESS:  Yes.

11              THE COURT:  And did it ever occur to you that

12    someone who is trans who's playing on a girls' team might see

13    that XX wristband that's pink under these circumstances as

14    sort of a statement that there are only two genders, boy,

15    girl, you know, female, that there aren't legitimate

16    transgenders, that maybe people who identify as trans are not

17    valid as human beings, you know, that sort of thing?  Did it

18    ever occur to you that somebody might see it that way?

19              THE WITNESS:  Honestly, I thought of it as if he's

20    a trans female, then pink might be a color he likes.  I don't

21    know.  The XX could be taken another way.  I don't know.

22              THE COURT:  So you didn't think that way?

23              THE WITNESS:  I didn't.  I didn't spend that much

24    time thinking about that, no.  That wasn't my concern.

25              THE COURT:  Okay.

1          THE WITNESS:  It was safety.  Really it was safety

2    of female and female sports.  Everything I've ever said is

3    based upon that.

4          THE COURT:  Okay.  And I got the impression --

5    again, you're entitled to your viewpoint, and a lot of people

6    hold it.  Don't take this as criticism.  You're entitled to

7    have that viewpoint.

8          I guess the other -- the last thing I guess I

9    wanted to ask you was from your testimony I got the

10   impression -- I think maybe Mr. Ducharme asked you the

11   questions, or maybe it was Mr. Cullen.

12         When you went to the game that day, you fully

13   understood that when you pulled those armbands out and put it

14   on, there was likely to be a confrontation or a reaction.  I

15   don't mean violent or anything, but you understood the school

16   having issued what it issued, somebody was going to come up

17   and say that's a problem.  That's why you didn't put it on

18   till after the first half.  That's why you --

19         THE WITNESS:  I won't argue that.  I suspected

20   something would happen.

21         THE COURT:  All right.  Again, these are

22   complicated issues and nuanced issues, and sometimes a message

23   is sent that you didn't intend, and sometimes that's the

24   issue, not that you were there to specifically harass a

25   particular student or cause mental anxiety or stress or

1  suffering or anything like that, but sometimes the message you

2  think you're sending might not be the message that's being

3  sent.

4          All right.  Any questions based on mine?

5          MR. KOLDE:  Yes, your Honor.

6                    FURTHER EXAMINATION

7  BY MR. KOLDE:

8      Q.   Mr. Foote, did the armband, excuse me, the

9  wristband to you have more than one meaning or only one

10  meaning?

11     A.   I'm not sure if I understand the question.  One

12  meaning as in I support women's --

13     Q.   You did not intend to harass or intimidate

14  a transgender --

15     A.   Yes, I did not at all.

16     Q.   Listen to my question carefully.  Listen, please.

17          Did the wristband to you that you were wearing --

18     A.   Yes, sir.

19     Q.   -- have only one meaning or did it have more than

20  one meaning?

21     A.   To me it had one meaning.

22     Q.   What was the one meaning?

23     A.   I was supporting women's sports.

24     Q.   Okay.  Do you know what it meant to Kyle Fellers?

25     A.   As far as I know, it was the same.

1          Q.    No.  Do you know what it meant to Kyle Fellers?

2          A.    No.  I don't know exactly what it meant to Kyle

3     Fellers.

4               MR. KOLDE:  All right.  Thank you.  Nothing

5     further.

6               THE COURT:  Thank you.  Any others?

7               MR. CULLEN:  No, your Honor.

8               MR. DUCHARME:  No, your Honor.

9               THE COURT:  All right.  It's 4:20.  Why don't we

10    stop.

11              Any possibility we're going to finish evidence

12    tomorrow?

13              MR. CULLEN:  I would hope we would finish tomorrow.

14              MR. KOLDE:  We have one tomorrow.

15              I mean, we're just doing a PI motion, right, your

16    Honor?  Oh, when we're going to finish evidence?

17              THE COURT:  Yeah.  How many witnesses?

18              I'm sorry.  You can step down if you would like.

19              THE WITNESS:  Thank you, sir.

20              MR. KOLDE:  We're not going to call Ms. Foote

21    unless something comes up that we don't expect.  We're going

22    to call Eldon Rash, and then our direct case will consist of

23    calling Marcy Kelley and Mike Desilets.

24              THE COURT:  Is it Desilets?

25              MR. KOLDE:  Desilets, sorry.

1          And we're not planning on calling Matt Fisk unless

2    something changes.  And we're not entirely sure about

3    Rossetti, but at this point we're still planning on calling

4    him.

5          So I would expect that we would be done in the

6    morning, mid morning sometime.

7          THE COURT:  Oh, mid morning is fine.

8          MR. KOLDE:  Lawyers are notoriously bad

9    about estimating.

10          THE COURT:  Mr. Cullen, how many witnesses do you

11    have?

12          MR. CULLEN:  So mid morning seems a little

13    ambitious, but really other than the witnesses he's named,

14    that's all, except we might call Matt Fisk if he does not.  I

15    don't think -- at this point I don't anticipate anyone else

16    from our list being called.

17          So, in other words, I would cross-examine my own

18    witnesses after they've been directed by --

19          THE COURT:  Good.  And how long do you think?

20    You're saying mid morning is optimistic.

21          MR. CULLEN:  Well, I think I'll be 45 minutes at

22    the most, maybe 45, 35 minutes with Ms. Kelley.  Attorney

23    Shirley is going to handle Mr. Desilets, but I would say

24    that's probably a fair estimate.

25          MR. KOLDE:  Double it.

1          MR. SHIRLEY:  I would say 30 minutes.

2          MR. CULLEN:  Yeah, so we're thinking 30 to 45

3    minutes per witness from our discussion.

4          THE COURT:  Mr. Ducharme?

5          MR. DUCHARME:  Your Honor, there is a tiny chance I

6    would call the head referee, Mr. Murphy, but he would be ten

7    minutes at the most.

8          THE COURT:  Okay.

9          All the damages claims are gone, right?  There's a

10   conspiracy claim.

11         MR. KOLDE:  The nominal damages are still in, your

12   Honor, for past harms.

13         THE COURT:  Conspiracy and retaliation?

14         MR. KOLDE:  Conspiracy and retaliation, and the nub

15   of the case is still viewpoint discrimination.

16         There is an overbreadth claim, your Honor, that I

17   think we can set to one side at the moment.  That is this

18   designated protest area gimmick that they -- in our view a

19   gimmick, they may disagree, that they imposed after we filed

20   the case.  They have told me -- counsel has told me, well,

21   we're getting rid of that.

22         THE COURT:  It's in his brief.

23         MR. KOLDE:  It's in his brief, but that's just a

24   representation.  There's so far no actual evidence.  There's

25   been nothing in writing issued, there's been no e-mail sent

1    out, you know, indicating that.

2         And from our standpoint as far as the lawsuit is

3    concerned, that's not moot because that's voluntary cessation

4    and it's just playing games.

5         But for the preliminary injunction, I think

6    that's -- you know, that's not as important, and we're not

7    planning on focusing on that for the remainder of the hearing.

8         THE COURT:  Okay.  Understood.

9         All right.  I'll see you tomorrow morning at 9:30.

10         (Hearing adjourned at 4:25 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, Susan M. Bateman, do hereby certify that the foregoing transcript is a true and accurate transcription of the within proceedings to the best of my knowledge, skill, ability and belief.


Submitted:  12-2-24     /s/   Susan M. Bateman _____
                        SUSAN M. BATEMAN, RPR, CRR