**NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 3-3-2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                          \*
KYLE FELLERS, ET AL                       \*
                                          \*   24-cv-311-SM-AJ
             v.                           \*   November 22, 2024
                                          \*   9:38 a.m.
MARCY KELLEY, ET AL                       \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF EVIDENTIARY HEARING
DAY TWO - MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

APPEARANCES:

For the Plaintiffs:        Endel Kolde, Esq.
                           Nathan John Ristuccia, Esq.
                           Brett Robert Nolan, Esq.
                           Institute for Free Speech

                           Richard J. Lehmann, Esq.
                           Lehmann, Major, List, PLLC


For the Defendants:

(SAU 67,                   Brian J.S. Cullen, Esq.
Superintendent, et al)     Jonathan M. Shirley, Esq.
                           Cullen, Collimore, Shirley, PLLC

(Steve Rossetti)           Dennis T. Ducharme, Esq.
                           Ducharme Resolutions, PLLC



Court Reporter:            Susan M. Bateman, RPR, CRR
                           Official Court Reporter
                           United States District Court
                           55 Pleasant Street
                           Concord, NH 03301
                           (603) 225-1453

```
                        I N D E X


WITNESSES:              Direct    Cross    Redirect         Recross


ELDON RASH:


By Mr. Ristuccia          7

By Mr. Cullen                      17

By Mr. Ducharme                    20



MARCY KELLEY:


By Mr. Kolde             24                    79

By Mr. Cullen                      69                        82



MIKE DESILETS:


By Mr. Kolde             83                   108

By Mr. Shirley                     94

By Mr. Ducharme                   107


EXHIBITS:                                    FOR ID        IN EVD

Defendants' Exhibit K.                                        3
Plaintiffs' Exhibit No. 15.                                   5
Plaintiffs' Exhibit No. 31.                                   6
Plaintiffs' Exhibit No. 35.                                  51
```

1                    P R O C E E D I N G S

2            THE CLERK:  The Court is in session and has for

3    consideration an evidentiary hearing, day two, in the matter

4    of Kyle Fellers et al. versus SAU 67, Superintendent, et al.,

5    civil case number 24-cv-311-SM.

6            THE COURT:  All right.  Good morning.

7            Mr. Kolde, you may call your next witness.

8            MR. KOLDE:  Thank you, your Honor.

9            We do have a quick preliminary matter to address

10   that Mr. Cullen has asked for, and I'll chime in after that as

11   well.

12           MR. CULLEN:  Just a couple of exhibit issues, your

13   Honor.

14           We had asked, and plaintiffs' counsel agreed, that

15   we could submit the e-mail that we presented to Mr. Foote at

16   the beginning of his testimony yesterday as Exhibit K for the

17   defense, and it's not objected to.

18           THE COURT:  All right.  It's marked K?

19           MR. CULLEN:  It's marked K.

20           THE COURT:  All right.  The ID may be stricken on

21   K.  Anything else?

22           (Defendants' Exhibit K Admitted)

23           MR. KOLDE:  Your Honor, there was some discussion

24   about -- may I approach the exhibits over there, your Honor?

25           THE COURT:  Of course.  My practice is counsel are

1   free to move anywhere at any time is fine.

2              MR. KOLDE:  Thank you, your Honor.

3              So, your Honor -- I'll wait till I get to the

4   microphone.  One of the plaintiffs' premarked exhibits for ID

5   only was Exhibit 15.  That's a call record, actually two call

6   records we received from the Bow police in response to RTK.

7   Actually, my clients' had sent that prior to the filing of the

8   litigation, and there's agreement that the first call record

9   is relevant and admissible.

10             We don't know much about the second call record.

11  So the parties have agreed to just withdraw the second page of

12  the call record.  It's somebody --

13             THE COURT:  What's it being offered for?  Do you

14  know?

15             MR. KOLDE:  Just for a record of what happened and

16  what --

17             THE COURT:  It's not in dispute, right?

18             MR. KOLDE:  Yes.  The first record is not.  The

19  second one --

20             THE COURT:  No, I mean the facts are not in

21  dispute?

22             MR. CULLEN:  They're not in dispute, but we don't

23  have an objection to 15 at this point.

24             THE COURT:  ID is stricken on 15.

25             MR. CULLEN:  I was objecting to the second page

1    because it --

2              THE COURT:  What's the objection?

3              MR. CULLEN:  Well, the objection to page 2 is it's

4    a -- it's not related to this at all.  We don't know who the

5    caller is.  I shouldn't say it's not related to this.

6              If your Honor were to see it, you would see that

7    it's a call that came in handled by a Harry Handy who's a

8    sergeant at the Bow Police Department.  It has to do with a

9    call that came into dispatch.  It never got to any of the

10   parties here.  I don't see it as having any relevance.

11             THE COURT:  Me either.  So what's the problem?

12             ID may be stricken on 15.

13             MR. CULLEN:  You're going to just let both pieces

14   in?  Okay.

15             THE COURT:  It's not going to tip the scales one

16   way or another.

17             MR. CULLEN:  That's fine.  If it's easier for you,

18   your Honor, it's fine.

19             THE COURT:  If we spend two, three minutes on every

20   irrelevant issue, we'll be here for weeks, and that's a

21   problem.

22             (Plaintiffs' Exhibit No. 15 Admitted)

23             MR. KOLDE:  Your Honor, Plaintiffs' 31 is the

24   Senate Education Committee report about the testimony

25   regarding the bill, and I forget the bill number, but it

1   was -- 1205, the bill that was enjoined about trans players

2   playing in --

3                THE COURT:  31 is marked for ID?

4                MR. KOLDE:  It's marked for ID, correct, your

5   Honor.

6                THE COURT:  Do you want to offer it as a full

7   exhibit?

8                MR. KOLDE:  We do want to offer it as a full

9   exhibit not for the truth of the matter asserted but just

10  for --

11               THE COURT:  Is there any objection?

12               MR. CULLEN:  There was.  That's why it's for ID,

13  your Honor.  We object to just 31 pages of hearsay testimony

14  from different people for and against the bill.

15               THE COURT:  Objection overruled.  ID may be

16  stricken on 31.  I'll take it for what it's worth.

17               (Plaintiffs' Exhibit No. 31 Admitted)

18               MR. KOLDE:  All right.  Thank you, your Honor.

19               And at this point Nathan Ristuccia is going to take

20  over the next witness, your Honor, and we call Eldon Rash.

21               THE COURT:  All right.

22               Mr. Ristuccia, whenever you're ready.

23                              ELDON RASH

24           having been duly sworn, testified as follows:

25               THE CLERK:  Please state your full name for the

1    record.

2                    THE WITNESS:  Eldon Rash.

3                    THE COURT:  Whenever you're ready.

4                            DIRECT EXAMINATION

5    BY MR. RISTUCCIA:

6        Q.    Mr. Rash, where do you live?

7        A.    In Bedford, New Hampshire.

8        Q.    Do any of your family members attend Bow School

9    District schools?

10       A.    Yes.  My granddaughter in high school and my

11   grandson in middle school.

12       Q.    And these two grandchildren, are they related to

13   another plaintiff?

14       A.    Yes.  Kyle Fellers is our son-in-law -- or former

15   son-in-law, if you will.

16       Q.    Do your grandchildren play any sports on Bow School

17   District teams?

18       A.    Yes.  Both of them.

19              My granddaughter plays soccer and also swim.

20              My grandson runs cross-country and plays baseball

21   and skiing and stuff.

22       Q.    Are they involved in any other Bow School District

23   extracurricular events?

24       A.    Yeah.  They have been in the music program.  My

25   granddaughter isn't anymore, but my grandson played violin,

1  and we go to the spring concerts and things like that.

2       Q.    Do you attend Bow School District games that your

3  grandchildren are playing in?

4       A.    Yes.  Mostly home games.  Once in a great while

5  away games.  Especially playoff games.

6       Q.    Did you attend the September the 17th game at

7  issue?

8       A.    Yes, I did.

9       Q.    Until this September 17th game, were you aware of

10  the issue around transgender athletes in women's sports?

11       A.    I was aware of the controversy nationwide.  I was

12  not aware of anything going on at that particular game.

13       Q.    Did you know that some parents would be wearing

14  wristbands at that game?

15       A.    Not at all.

16       Q.    Did you know that any parent would be displaying

17  signs at that game?

18       A.    Not at all.

19       Q.    What did you do when you first arrived at the game?

20       A.    My wife and I, as usual, we find a place relatively

21  close to centerline and take our lawn chairs and sit there and

22  watch the game.

23       Q.    When during the game did you become aware of

24  protests occurring?

25       A.    About ten minutes I guess into the second half.

1      Q.    During the first half and in the first ten minutes

2 of the second half, had there been any disruptions?

3      A.    None at all.

4      Q.    Any shouting?

5      A.    None at all.

6      Q.    Anyone holding signs by the sidelines?

7      A.    Certainly not that I saw.

8      Q.    Did you observe Bow School District officials

9 interacting with Kyle Fellers?

10      A.    Yeah.  Mostly from behind me.  I didn't see

11 everything, but I heard a commotion at first.

12      Q.    What happened after you heard the commotion?

13      A.    Well, Kyle had kind of, as he sometimes does, put

14 his hands down on our chair and kind of leans on the back of

15 the chair, and I just kind of turned a bit and my wife also

16 asked, we asked what's going on, and --

17      Q.    And what did Kyle tell you?

18      A.    He said these people didn't want him wearing this

19 wristband, and I asked kind of why, and he said it was a

20 protest of males, biological males in women's sports.

21      Q.    How did you respond to that information?

22      A.    I said -- of course it had the breast cancer

23 ribbon, and being the age I am from the '70s and things like

24 that, it was obvious that it was a breast cancer wristband,

25 and so I said what -- why would they do this, and so then I

1    took it from him and put it on.

2         Q.    At the time you put the wristband on, did you

3    notice two Xs on the wristband?

4         A.    No.

5         Q.    What did you think the message of the wristband

6    was?

7         A.    Well, of course the old-time message was, it was

8    breast cancer, but of course Kyle did say that it was some

9    sort of protest of having biological males on the women's

10   teams.

11        Q.    Why did you put the wristband on?

12        A.    Because it was an innocuous type of a

13   demonstration.  If you want to start protests, it's basically

14   just showing that that's their position, and it was like it

15   was an obvious taking away of any speech rights whatsoever.

16        Q.    What did you wish to express by wearing the

17   wristband?

18        A.    Well, of course I'm not particularly in favor of

19   biological males on women's sports.  And I like to protect

20   women, whether it's my granddaughter or in general, for

21   fairness as well as safety issues, but my main reason was

22   because I thought they were obviously violating their First

23   Amendment rights.

24        Q.    Why was concern about violation of First Amendment

25   rights important to you?

1    A.    I think that should be important to everyone

2  because that's the foundation of our principles as a nation.

3  Plus the fact that's the only way people learn is from hearing

4  these types of things.  People who try to stop that are really

5  trying to stop people from hearing more than they're trying to

6  stop the speech.  That's my position on that.

7    Q.    Did the wristband then have one meaning or multiple

8  meanings to you?

9    A.    It has multiple meanings depending on time.  If it

10  would have been a couple weeks later, that's breast cancer

11  month.  That's why these mixed messages and things, that's why

12  I think there was terrible overreach in this case.

13    Q.    Did you do anything to draw attention to the fact

14  that you were wearing a wristband?

15    A.    Not particularly.  I have a little bit of a neck

16  issue so I do lean on the arm of the chair quite a lot and

17  have it up like this.  I didn't know there was Xs there, but

18  it was I would say somewhat visible, but I don't know that

19  anybody really saw it other than maybe the referee or

20  something or somebody who obviously were watching, in other

21  words, looking for this type of thing.

22    Q.    Did you shout or point to the wristband?

23    A.    Not at all.

24    Q.    Did anyone come up to speak to you about the band?

25    A.    Yes.  Mr. Fisk at first at least came up and said

1    take it off.

2         Q.    Did you know who Mr. Fisk was at the time?

3         A.    No.  I know none of them from Adam.

4         Q.    Did you believe that he was an official or a

5    spectator or something else at the time?

6         A.    I didn't know whether -- what he was for sure.

7    Ordinarily you might assume it could be an official, but from

8    something that was said about that time gave me terrible

9    pause, and that thing that was said kind of behind me was

10   that this is, and to Kyle Fellers, was this is private land,

11   and that's absolutely ridiculous.  I could not imagine any

12   school official even saying anything like that.

13            So I didn't know him.

14        Q.    What did Mr. Fisk say to you?

15        A.    Take it off.

16        Q.    Did he mention any adverse consequences that could

17   happen if you did not take it off?

18        A.    A little bit later on.  Because we went through

19   that many times over almost fifteen minutes.  Later on he

20   basically said that my granddaughter would have adverse things

21   happen to her.  Now, he didn't specify what.

22        Q.    Did you have any sense of what those consequences

23   would be?

24        A.    Well, he did kind of say that they would be

25   forfeiting the game.

1      Q.    What happened to the game itself at the time?

2      A.    Well, it was going on for quite some time there.

3  About halfway through they had a little conference and --

4  well, they shut it down and had a conference.

5      Q.    And then did anyone else speak to you about the

6  band?

7      A.    Well, Mr. Fisk came back up at that time and went

8  through this whole scenario again, take it off, and I said,

9  no, I see no reason to take it off, and a few other comments

10  back and forth.

11          Anyway, at the end they walked off and had another

12  conference midfield, and then I guess it was Mr. Rossetti, I

13  didn't know his name at the time, but he walked over very

14  incensed and he says, take it off or we're going to shut the

15  game down.  And of course shutting down obviously means that

16  it's going to be forfeited, but he also was really berating

17  me.

18      Q.    Did you say anything back to Mr. Rossetti?

19      A.    Only that, no, I wouldn't take it off.  I didn't

20  see reason to take it off.

21      Q.    Did any spectators say anything to you at this

22  time?

23      A.    Not until Mr. Rossetti walked back and they kind of

24  had another conference.

25          But, anyway, then there were some people off to my

1    right, a couple of women, if I remember right, were shouting,

2    just take it off, this is about the girls, write a letter,

3    whatever.

4        Q.    Did you eventually remove the wristband?

5        A.    Yeah.  I could see this final conference and from

6    what they were saying that they were going to shut it down.

7    When they had left the last time, they said you're shutting it

8    down, and both me and my wife yelled back at them as they were

9    leaving that, no, we weren't shutting anything down.  We

10   hadn't done anything.  You are shutting it down.

11       Q.    How long total would you say you wore the

12   wristband?

13       A.    I think we were sitting there close to fifteen

14   minutes.

15       Q.    And you took it off because of what had been said

16   to you by Mr. Fisk?

17       A.    Yeah.  That was the main thing is that I didn't

18   really have an intention of causing my granddaughter an

19   inability to have playoff games and that kind of thing.

20       Q.    Did you take it off in response to what Mr.

21   Rossetti said to you?

22       A.    Not really.  I almost -- because of their attitude,

23   I almost wasn't going to take it off at all, but I thought

24   better of it.

25       Q.    What did you do with the wristband after you

```
 1   removed it?
 2        A.   I placed it on my knee in a very visual place for
 3   anybody to see.
 4        Q.   Was it still visible then?
 5        A.   Yes.
 6        Q.   How long did it remain on your knee?
 7        A.   Until the game was over.  About 20 minutes or so.
 8        Q.   And during that time did anyone tell you to put it
 9   away?
10        A.   No.
11        Q.   Did anyone tell you to make sure it was not
12   visible?
13        A.   No.
14        Q.   So for approximately 20 minutes it was simply
15   visible on your knee?
16        A.   Yes.
17        Q.   What happened after the game?
18        A.   Well, because of all the uproar, we decided we
19   would just sit there for a while and let people leave or at
20   least a fair number of them and until our granddaughter came
21   across afterwards, but there was a couple of people at least
22   that came up and said, they were really rude to you, we
23   support you, that type of thing.  We just thought it would be
24   a good idea to wait, and then we left when my granddaughter
25   came over.
```

1      Q.    Did any Bow School District officials interact with

2    you after the game?

3      A.    No one interacted with me after the game other than

4    those individuals that said that they supported it.

5      Q.    In the days after the game were you contacted in

6    any way by Bow School District officials?

7      A.    No.

8      Q.    Have you attended any Bow events since September

9    the 17th?

10      A.    Yes.  We've attended all of the home games and the

11    playoff games except for the 24th.

12      Q.    Did you protest or wear a wristband to any of those

13    events?

14      A.    No.  I had no intention of having any blowback on

15    Kyle, because he had told me afterwards that he had received

16    the order.

17      Q.    Do you intend to go on attending events in the

18    future?

19      A.    Yes.

20      Q.    Would you like to protest at these future events?

21      A.    Absolutely.

22      Q.    What will you do at these events, if you are

23    allowed, in protest?

24      A.    Just wear the wristband.  I mean, it's a relatively

25    minor thing.  It's only slightly more than I'm a Christian and

1  wear a cross sometimes or whatever, and so it's just stating

2  your position that you're against biological males, and it

3  really was a made-up symbol anyway as far as I can tell

4  because I've never known about that type of a protest before

5  anywhere else.

6       Q.    Why haven't you worn a wristband at any event

7  since?

8       A.    I didn't want to make any trouble or get an order

9  against us to not attend.

10      Q.    Thank you.  That's all for now, Mr. Rash.

11            THE COURT:  Mr. Cullen.

12            MR. CULLEN:  Thank you, your Honor.

13                        CROSS-EXAMINATION

14  BY MR. CULLEN:

15      Q.    Good morning, Mr. Rash.

16            A couple things you mentioned on your direct just

17  now.  You mentioned that somebody had made a comment that this

18  is private land and that's really what caught your attention.

19            Do you recall that?

20      A.    Yes.

21      Q.    Okay.  And having seen the video yesterday and I'm

22  sure during prep and things, you know that that was not by a

23  school official.  That was by Lieutenant Lamy, right?

24      A.    I would assume so.  I don't think there was any

25  direct shot of Mr. Lamy, but voice-wise probably.

1          Q.    You certainly don't have any basis to say that it

2    was specifically made by any Bow School District employee,

3    right?

4          A.    Well, my assumption is that they all are presenting

5    this whole case.  In other words, they're all together.

6    They're the ones that called him, apparently.

7          Q.    I'm sorry, Mr. Rash.  My question was, you don't

8    have any basis to believe that that statement was made by a

9    school district employee.

10         A.    I do not have any direct basis for that, no.

11         Q.    Thank you.

12               You mentioned also that you didn't -- you never saw

13   the XX symbol on the wristband, right?

14         A.    Not at that time, no.

15         Q.    When did you first see the XX symbol?

16         A.    Actually, it's when we got back to the parking lot

17   and Kyle mentioned it, and of course I wasn't necessarily

18   thinking about biological males at the time and it looked like

19   a --

20         Q.    Sir, I'm sorry.  This will go a lot faster if you

21   just answer the question as it is.

22               When the wristband was on your knee then, obviously

23   it was not XX up, right, or you would have noticed that?

24         A.    Right.  It wasn't.

25         Q.    Okay.  And you didn't plan to wear the wristband at

```
 1   events you said, right?
 2        A.   For that event?
 3        Q.   For that day?
 4        A.   No.
 5        Q.   Okay.  You never got a no trespass order?
 6        A.   No.
 7        Q.   You didn't miss any games as a result of any
 8   actions by the school district?
 9        A.   I missed the next game because it was made pretty
10   clear that if Kyle got one and Andy got one, that we could get
11   one at any time.
12        Q.   But you hadn't had one at that time?
13        A.   But, no, we hadn't had one.
14        Q.   And in fact you never got one?
15        A.   No.
16        Q.   And, incidentally, yesterday you heard Mr.
17   Fellers -- on the video you see Mr. Fellers telling the police
18   officer that he's giving you and your wife a ride home.
19             Do you remember that?
20        A.   Yes, I do.
21        Q.   And that wasn't true, right?  You came on your own
22   and you were leaving on your own, right?
23        A.   Well, I understand that in the heat of --
24        Q.   That's not the question, sir.
25        A.   I know, but it was --
```

```
 1        Q.   Was it right or was it not right?

 2        A.   It was not true.

 3        Q.   Thank you.

 4        A.   Because he was --

 5             MR. CULLEN:  I don't have any other questions, your

 6   Honor.

 7             THE COURT:  All right.  Thank you, Mr. Cullen.

 8             Mr. Ducharme.

 9                      CROSS-EXAMINATION

10   BY MR. DUCHARME:

11        Q.   Mr. Rash, it's pretty clear from your testimony

12   that you didn't go to this game planning to be involved in a

13   protest, correct?

14        A.   Right.  I didn't have a plan at the beginning.

15        Q.   And I take both from your testimony today and from

16   the declaration that you signed that was filed in the case in

17   support of the motion for injunction that this in great part

18   was almost a reaction on your part to show in essence

19   solidarity with Mr. Fellers because you didn't like the way he

20   was being treated, correct?

21        A.   Well, it was the fact that he was trying to protest

22   or have his position shown, and I felt it was a violation of

23   his rights, yes.

24        Q.   And it was sort of a response to the situation that

25   you made on the fly, correct?
```

1     A.   Well, pretty much.

2     Q.   Yeah.  No question you heard a commotion behind you

3 that led to eventually you making the decision to put the

4 wristband on once you knew what was going on?

5     A.   Yeah.  That was the start of it.

6     Q.   Yeah.  And there was a commotion?

7     A.   It wasn't a loud commotion because I couldn't hear

8 the words.

9     Q.   Okay.  You don't know Mr. Rossetti from a hole in

10 the wall before that day, correct?

11    A.   I vaguely remember him as a referee on a former

12 game, but as far as a name or anything else, no, I had no

13 idea.

14    Q.   And how many times have you watched that body cam

15 video that shows his interaction with you?

16    A.   Maybe three times.

17    Q.   The words you used today are that Mr. Rossetti was

18 incensed and that he was berating you, correct?

19    A.   Yes.

20    Q.   Those are your subjective interpretations, correct?

21    A.   Yes, but pretty obvious.

22    Q.   To you, correct?

23    A.   It would have been to almost anybody, but yes.

24    Q.   Well, we'll let the Judge decide how he sees it.

25    A.   Yes, let the Judge decide.

1      Q.    And last, you told your counsel that your decision

2  to take the wristband off that day was not really in response

3  to what Mr. Rossetti said to you, correct?

4      A.    Only indirectly in that when he said that the game

5  would be over and Mr. Fisk said they could forfeit the game,

6  those two things together is the reason I took it off.

7      Q.    And the -- you are equating to some extent game

8  over and forfeit, correct?

9      A.    Yeah.  It seemed obvious to me, and that's why I

10  reacted the way I did.

11      Q.    But you don't know by rule if game over with 23

12  minutes left equals forfeit, do you?

13      A.    By rule?

14      Q.    By rule.

15      A.    Probably not.

16      Q.    Okay.  Thank you.

17          THE COURT:  All right.  Any redirect?

18          MR. RISTUCCIA:  No, your Honor.

19          THE COURT:  I have just a few, if you don't mind.

20          I appreciate your testimony, but you said Kyle

21  Fellers said that the pink wristband display or wearing was

22  some sort of protest of having biological males on women's

23  teams.  Is that how you understood the message of the pink

24  wristband?

25          THE WITNESS:  Yes.

1          THE COURT:  All right.  And you also said it was an

2    innocuous type of demonstration.  Did you understand this was

3    some sort of message of an objection to the transgender

4    player?

5          THE WITNESS:  No.

6          THE COURT:  Okay.  What did you understand the

7    message to be?

8          THE WITNESS:  That it was the message of generally

9    that we were against having biological males on women's teams

10   because of safety reasons and the other issues involved with

11   that.

12         THE COURT:  All right.  And were you aware that

13   there was a transgender student playing on the opposing team

14   that day?

15         THE WITNESS:  Not specifically.  However, when he

16   said the message that it had, I was assuming there was a

17   transgender player somewhere.  I had no idea whose team or

18   what.

19         THE COURT:  But on a team as opposed to in the

20   audience?

21         THE WITNESS:  Yeah.  Well, I wasn't even positive

22   if it wasn't somebody on the sidelines.

23         THE COURT:  So when you went to the game, you

24   didn't have any idea at this game there would be a transgender

25   student playing?

```
1                    THE WITNESS:  Right.

2                    THE COURT:  Okay.

3                    Any questions based on mine?

4                    MR. CULLEN:  No, your Honor.

5                    MR. RISTUCCIA:  No, your Honor.

6                    THE COURT:  I apologize.  I keep looking at Mr.

7      Kolde because he's lead counsel.

8                    Thank you, Mr. Rash.  Appreciate it.  You may step

9      down, and you're excused as a witness.

10                   Mr. Kolde, you may call your next witness.

11                   MR. KOLDE:  The plaintiffs call Marcy Kelley.

12                              MARCY KELLEY

13          having been duly sworn, testified as follows:

14                   THE CLERK:  Please state your full name for the

15     record.

16                   THE WITNESS:  Marcy Kelley.

17                           DIRECT EXAMINATION

18     BY MR. KOLDE:

19          Q.   Good morning, Ms. Kelley.

20          A.   Good morning.

21          Q.   Have we met before?

22          A.   I think just here.

23          Q.   Okay.  Just so we understand, you're the

24     superintendent of the Bow public schools?

25          A.   I'm the superintendent of SAU 67, which is Bow and
```

1  Dunbarton School Districts.

2      Q.    And that makes you essentially the CEO of those

3  schools; would that be fair to say?

4      A.    Yes.

5      Q.    And you answer to the school board; is that

6  correct?

7      A.    We have three school boards, yes.

8      Q.    Okay.  And the three school boards are Bow,

9  Dunbarton --

10     A.    And the SAU.

11     Q.    And the SAU.  Okay.

12           And then at Bow High School all the officials

13  essentially have a line of report up to you?

14     A.    I wouldn't say a direct report.  Maybe with the

15  exception of Mr. Fisk.

16     Q.    Okay.  So Mr. Fisk is a direct report, and the

17  other officials report to Mr. Fisk; is that correct?

18     A.    Correct.

19     Q.    All right.  And the only people you report to are

20  the school board; is that correct?

21     A.    Correct.

22     Q.    All right.  And is it true that it's the school

23  board's job to implement policy -- excuse me -- to promulgate

24  policy for the school district, but you, as the

25  superintendent, implement that policy?

1          A.    I uphold our policy, correct.

2          Q.    All right.  Do you have a role in helping to set

3     policy?

4          A.    I have an advisory role.

5          Q.    How did you first learn that there might be some

6     sort of free speech activity at the September 17th girls'

7     varsity soccer game?

8          A.    I first learned of that via Mr. Fisk and Mr.

9     Desilets upon receipt of Shannon Farr's e-mail.

10         Q.    Did they forward the e-mail to you?

11         A.    I'm not sure if they forwarded it to me, but I

12    definitely saw it.

13         Q.    Did you have any other sources of information that

14    there might be free speech activity at the September 17th

15    game?

16         A.    I had information that there may be a protest at

17    those games via, again, that e-mail and social media that was

18    shared with me.

19         Q.    Okay.  And you're using the passive "that was

20    shared with me."  So can -- and I'll just unpack this.

21               What social media are you talking about?

22         A.    Facebook.

23         Q.    Okay.  Was that Andy Foote's Facebook post?

24         A.    I believe so.

25         Q.    Did you go find that yourself or did somebody

1    provide it to you?

2         A.    Once it was shown to me, I was able to find it

3    myself.

4         Q.    Okay.  And who showed it to you?

5         A.    Many people.  Off the top of my head, I know Clem

6    Madden shared it with me.  I know Mike Desilets shared it with

7    me.

8         Q.    All right.  And who's Clem Madden?

9         A.    Clem Madden is a parent and a school board member.

10        Q.    Okay.  And which school board is he a member of?

11        A.    Dunbarton and the SAU.

12        Q.    Is his wife, Clem Madden's wife, Colleen Madden?

13        A.    Yes.

14        Q.    And she's one of the individuals who's heard

15   assertively telling Eldon Rash to take it off at the soccer

16   game; isn't that correct?

17        A.    Yes.

18        Q.    When did Clem Madden first talk to you about the

19   September 17th soccer game?

20        A.    During the September 17th soccer game.

21        Q.    It wasn't before the soccer game?

22        A.    Oh, about the social media post, yes, but I would

23   say days before.

24        Q.    Within a few days of the --

25        A.    Yeah.

1    Q.    And I know you know what I'm saying, but for the

2    court reporter, can you please let me finish before you

3    answer?

4    A.    Sure.

5    Q.    I know you're not trying to be rude, but it makes

6    her job a lot easier.

7    A.    Yeah.

8    Q.    What did you and -- strike that.

9    What did Clem Madden express to you about the

10   September 17th soccer game besides making you aware of the

11   social media post?

12   A.    I think it was out of concern, concern of what may

13   happen, concern for the girls' soccer team, the players.  He

14   has a player on that team.

15   Q.    All right.  Can you explain what the concern was?

16   What was he saying?  Why was he concerned?

17   A.    These aren't his words.  My interpretation of it is

18   that his concern was that things would get out of hand and

19   that it would have a negative impact on the game and on the

20   players.

21   Q.    Okay.  His player is a biological female, right?

22   A.    I believe so, yes.

23   Q.    And she's not trans identifying, is she?

24   A.    I feel a little uncomfortable talking about an

25   underaged person's gender identity.

1      Q.    Okay.  I'll let that answer stand.

2            Can you be more specific about the concerns that

3   Clem Madden, the school board member, had when he came to you

4   other than what you've said here today?

5      A.    I'm not sure how much more I can share other than

6   concern about a protest, about targeting a specific kid on the

7   other team, and what that's doing to the girls' soccer team.

8      Q.    And when you say I'm not sure, are you suggesting

9   that there's some kind of confidentiality between you and Clem

10  Madden?

11     A.    No.

12     Q.    Okay.  So did he tell you what he meant by being

13  concerned that things would get out of hand?

14     A.    No.  I think the difficulty is in the unknown, not

15  knowing what to expect but knowing that something was

16  happening.

17     Q.    Did Clem Madden express to you that he thought

18  there would be targeting of a trans player?

19     A.    I believe that Clem knew that it was about

20  targeting a trans player.

21     Q.    Did the Facebook post use the word target?

22     A.    No.

23     Q.    Would you agree that that's Clem's interpretation

24  of the Facebook post?

25     A.    Yes.

1        Q.    Was that also your interpretation of the Facebook

2    post?

3        A.    Yes.

4        Q.    Did you reach that interpretation separately from

5    Clem, the board member, coming to you with his concerns or was

6    it planted there by Clem Madden?

7        A.    No.  That was my concern.  It was our collective

8    concern administratively.

9        Q.    Okay.  When you say our collective concern

10   administratively, who are you talking about?

11       A.    Myself, Mr. Fisk, and Mr. Desilets.

12       Q.    And Clem Madden?

13       A.    No.

14       Q.    Okay.  And why do you say no?

15       A.    Because he's not an administrator.  He's not part

16   of our administrative team.

17       Q.    He's a board member for a different school system,

18   although it's part of SAU 67; is that right?

19       A.    Correct.

20       Q.    Okay.  Do you attend to his input more than other

21   parents because he's a board member?

22       A.    No.

23       Q.    How is it that he got an opportunity to express his

24   views about what would be happening at the soccer game but

25   Andy Foote didn't?

```
1              MR. CULLEN:  Objection.  I think it's been
2    established.
3              THE COURT:  Yeah.  There's no jury here, it's me,
4    right?
5              MR. KOLDE:  Right, and I'm not suggesting.
6              THE COURT:  Yeah.  Sustained.  Move on.
7              MR. KOLDE:  Okay.
8         Q.   Was it an in-person conversation?
9         A.   No.
10        Q.   Okay.  What was it about Andy Foote's Facebook post
11   that bothered you?
12        A.   The pink armband with XX on it is one thing.  I
13   don't think at that time I was aware of signs.
14        Q.   Okay.  So you saw a Facebook post with a pink
15   armband with XX on it?
16        A.   Yes.
17        Q.   Okay.  And what was it that bothered you about
18   that?
19        A.   XX is a pretty well-known anti-trans symbol.
20        Q.   When you say well-known, what is your source of
21   information for that?
22        A.   A couple.  So Riley Gaines actively uses XX in her
23   messaging, in her talks that she does across the country.  XX
24   equals real women.  I view that as exclusionary.
25        Q.   I couldn't hear what you said because there was a
```

1    cough.  You view it as exclusionary?

2        A.   Yes.

3        Q.   Okay.  And perhaps you could scoot up, if you can,

4    to be a little closer to the microphone.  Thank you.

5        A.   Okay.

6        Q.   I didn't mean to interrupt you.

7        A.   Sure.  I think many people saw during the Olympics

8    this past summer that XX was used during boxing matches.  I

9    believe it was a group called Sex Matters.

10            And then we often now see female athletes use the

11   XX symbol, something like this, when being photographed or

12   during or after their matches.

13       Q.   When you use language like we, I'm going to ask you

14   to explain who we is.

15            So perhaps, you know, you might use I, but you

16   testify the way you want.

17       A.   I should have said I.

18       Q.   Okay.  Do you have any understanding that XX means

19   the female chromosomes?

20       A.   Yes.

21       Q.   Okay.  And you believe that that is

22   trans-exclusionary?

23       A.   In this instance, yes.

24       Q.   And that is why?

25       A.   Because of what I just said.  I think we're seeing

1   now in media, social media especially, and through people who

2   are outwardly anti-trans use that as a symbol for their cause.

3        Q.   So you see the XX as an anti-trans symbol?

4        A.   I do.

5        Q.   Do you disagree with the XX symbol?

6        A.   Used in this capacity, yes.

7        Q.   Okay.  Why?

8        A.   Because I believe it's anti-trans.

9        Q.   And can you explain to me a little more why you

10  believe it is anti-trans?

11       A.   Sure.  Because we've seen it.  When I say we, the

12  conversations that I've had with Mr. Fisk and Mr. Desilets

13  around viewing this as anti-trans is that it is seen in other

14  places.  I used the example of the Olympics.  I used Riley

15  Gaines who also sells XX merchandise.  There's an XX Does Not

16  Equal XY clothing line that is anti-trans.

17       Q.   Has anyone told you that the XX symbol is

18  anti-trans?

19       A.   No.

20       Q.   Have you been to any diversity, equity and

21  inclusion trainings where you've been told that XX is

22  anti-trans?

23       A.   I've been to those sorts of trainings, but we have

24  not talked specifically about XX.

25       Q.   Okay.  And what is the basis of your knowledge

1    about Riley Gaines and her advocacy?

2         A.    I'm not sure I understand your question.

3         Q.    Well, you made some statements about Riley Gaines

4    using XX, and so I'm trying to understand what is your basis

5    for your knowledge about Riley Gaines?

6         A.    She's been very outspoken mostly in regards to

7    swimming and having to -- she opposed a trans female athlete

8    and has been vocal about her distaste for that.

9         Q.    So what I'm trying to understand is do you -- what

10   is your source of information about Riley Gaines's views?

11   Have you gone and looked at her X feed, have you gone and read

12   some material she posted, or something else?

13        A.    Sure.  I've seen her advertisements for her

14   speaking engagements.  I've seen her X posts.  I've been to

15   her website.

16        Q.    Do you disagree with Riley Gaines?

17        A.    I think it's nuanced.

18        Q.    Okay.  Explain what you mean by that.

19        A.    What I mean by that is I think that there are many

20   things to consider when it comes to transgender participation

21   in athletics.

22        Q.    So let me ask the question again.  I'll ask it a

23   slightly different way.

24             Do you disagree with some of Riley Gaines's

25   advocacy?

1        A.    Yes.

2        Q.    Could you summarize for us what parts of her

3    advocacy you disagree with?

4        A.    I believe Riley Gaines's advocacy stands for a

5    blanket statement that there should be no trans female

6    participation in female sports.

7        Q.    And you disagree with that viewpoint?

8        A.    I disagree with that viewpoint across the board,

9    yes.

10        Q.    As you're sitting here today, is there any other

11    advocacy point of Riley Gaines's that you disagree with?

12        A.    Not that I'm aware of.

13        Q.    Do you consider yourself a trans ally?

14        A.    Yes.

15        Q.    Do you support gender-affirming care?

16             MR. CULLEN:  Objection, your Honor.

17             THE COURT:  I think he's getting at viewpoint

18    discrimination at some point down the line.  So I'll allow it.

19        A.    I'm not sure, Mr. Kolde.  That's not something I've

20    considered.

21        Q.    Do you believe it's important to use students'

22    preferred pronouns?

23        A.    I do.

24        Q.    What is deadnaming?

25        A.    I'm sorry?

1    Q.    What is deadnaming?

2    A.    I'm not sure.

3    Q.    Okay.  What is misgendering?

4    A.    Misgendering is also a widely known anti-trans

5  term, and I -- yes.

6    Q.    When you say anti-trans term, it's used by the

7  trans community to describe something that other people do

8  that they don't like; is that correct?

9    A.    I'm not sure.  I just know --

10    Q.    Go ahead.  You just have heard the term?

11    A.    I've heard the term.

12    Q.    Do you yourself have an understanding of what is

13  included under the term misgendering as used by the trans

14  community?

15    A.    I could not share that with you today, no.

16    Q.    Do you think that citizens should be used -- should

17  be forced to use people's preferred pronouns?

18    A.    My role is a superintendent, and at schools I do

19  believe we need to use students' pronouns.  Outside of the

20  schools I don't have an opinion.

21    Q.    Okay.  So on school grounds you would say, yes,

22  citizens need to use a student's preferred pronouns; is that

23  correct?

24    A.    Yes.

25    Q.    Can you understand why some people don't want

1    government officials telling them what pronouns to use when

2    they speak?

3        A.    Yes.

4        Q.    Can you understand why some citizens don't want to

5    engage in what they believe is lying about biological sex by

6    calling somebody a woman that they don't personally believe is

7    a woman?  Can you understand that?

8            MR. CULLEN:  Objection, your Honor.

9            THE COURT:  Overruled.

10       A.    Can you repeat the question?

11       Q.    Can you understand why some citizens don't want to

12   do what they consider to be lying about biological sex by

13   calling somebody a woman who they personally don't believe is

14   a woman?

15       A.    I understand that there are people who hold that

16   viewpoint.

17       Q.    You disagree with those people?

18       A.    Yes.

19       Q.    Can you understand why my clients are concerned

20   about biological males playing in girls' sports?

21       A.    I understand their concerns.

22       Q.    You understand that there's a concern about safety,

23   yes?

24       A.    They've shared that, yes.

25       Q.    And you understand that there's a concern about

1    fairness?

2        A.    They've also shared that.

3        Q.    But you disagree with my clients about this issue,

4    correct?

5        A.    I disagree in making a blanket statement that all

6    trans female athletes are dangerous and that all transgender

7    athletes result in a lack of fairness.

8        Q.    Okay.  So help me understand that.  Is it your view

9    that some athletes, transgender athletes can compete fairly

10   and safely but others can't or something different?  And I

11   don't want to misunderstand or misstate your position.  I'm

12   just trying to understand what the position is.

13       A.    I think that's pretty close.  I guess my -- what I

14   am trying to say is that it is for me -- my personal opinion,

15   not my opinion as superintendent of schools, is that it is

16   nuanced and that there are many factors to consider.

17       Q.    I would like to have you look at Exhibit F, the

18   Shannon Farr e-mail, for a moment.

19            And you've seen this e-mail before.  That was your

20   testimony earlier, correct?

21       A.    Yes.

22       Q.    Did you know Shannon Farr prior to receiving this

23   e-mail?

24       A.    No.

25       Q.    What did you think about the contents of this

1   e-mail?

2        A.   I was concerned.

3        Q.   And you don't need to read it word for word to us

4   here today, but can you highlight for us what the most

5   concerning aspects were?

6        A.   She begins by saying she overheard parents making

7   statements about the trans female player from Plymouth

8   which --

9        Q.   Can you slow down just a little bit for the court

10  reporter?

11       A.   Sure.  Sorry.

12       Q.   Go ahead.

13       A.   About the trans female player from Plymouth and

14  their potential plans, and she went on to say Bow parents

15  discussed wearing dresses to the game, buying anti-trans

16  warm-up shirts, and making signs in protest of trans athletes,

17  and generally trying to heckle the player.

18       Q.   Was there anything specifically in the portion that

19  you read that stood out to you as particularly problematic or

20  was it sort of the whole thing?

21       A.   It's the whole thing.  I think the problematic

22  piece is that it's directed at a particular student.

23       Q.   What did you do to investigate the accuracy of the

24  e-mail that Shannon Farr sent you -- or not sent to you, but

25  that she sent to one of your employees who shared it with you,

1   and that has been marked as Defendants' Exhibit F in this

2   case?

3       A.   I had conversations with Mr. Desilets and with Mr.

4   Fisk, but I myself did not do an investigation.

5       Q.   Did either of those two individuals vouch for the

6   accuracy of Ms. Farr's e-mail or anything like that?

7       A.   I'm not sure we had that conversation.

8       Q.   Did you take -- is it fair to say that neither you

9   nor any of the officials that you mentioned contacted Ms. Farr

10  to find out if her information was accurate?

11      A.   I did not contact Ms. Farr.  I'm not sure if Mr.

12  Fisk or Mr. Desilets did.

13      Q.   Let's take a look at that Facebook post that you

14  testified about a moment ago.

15           MR. KOLDE:  Is that your exhibit?

16           MR. CULLEN:  I'm not sure which one you're talking

17  about.

18           MR. KOLDE:  The Facebook post.

19      Q.   Showing you Plaintiffs' Exhibit 5, did you see this

20  particular post before the game?

21      A.   Yes.

22      Q.   Okay.  And what is it about this post that

23  concerned you?

24      A.   I think when you pair this post with the XX

25  armbands, it's pretty clear that what they're -- what they

1    seem to be planning.  You can see Riley Gaines is in that

2    photo.

3        Q.    And seeing Riley Gaines concerned you; is that

4    correct?

5        A.    When combined with the XX bands, yes.

6        Q.    Okay.  Was there anything in particular about what

7    Mr. Foote posted in the text of this Facebook post that

8    concerned you other than the image of Riley Gaines and the

9    reference to XX?

10        A.    Would you mind scrolling down a little bit in this?

11            I would say that I had some concern about a call to

12    come out and support the game and obviously highlighting the

13    fact that females -- only biological females should

14    participate.

15            MR. KOLDE:  Can we zero in on the text, please?

16        Q.    Where is that language that you're talking about?

17        A.    He doesn't say that.  I believe it's represented by

18    the pictures.

19        Q.    I see.  Okay.  I'm ready to move on from this

20    exhibit, but I just want to understand.

21            Was there anything else other than what you've

22    testified about so far -- anything in the text portion up

23    above that bothered you other than what you've said so far?

24        A.    I mean, it's saying that school board, school

25    administration is setting a dangerous precedent.  I believe I

1    take offense to that.  Well, offense is a strong word.

2         Q.    It's your word.  I believe you.

3         A.    It seems untrue to me.

4              THE COURT:  It doesn't matter what you believe.

5         Q.    You take issue with that?

6         A.    I wouldn't say issue, but it made me wonder because

7    I do feel like it's a little perhaps misinformed.

8              THE COURT:  Is there a dispute about the messaging,

9    is that what you're doing now, or the other thing with

10   viewpoint in the future?

11             MR. KOLDE:  Both, your Honor.

12             THE COURT:  All right.  Well, you can move on from

13   the messaging probably.

14             MR. KOLDE:  Got it.  Okay.

15             THE COURT:  I don't understand your clients to be

16   disputing that those wristbands with a XX was a message and

17   the message was opposition to transgender students playing on

18   a girls' team.  Is there some dispute about that?

19             MR. KOLDE:  No.  I'm trying to understand how they

20   understood it, your Honor.

21             THE COURT:  Yeah.  Well, I'm interested, too.  Not

22   the message.  I'm interested in understanding why the

23   restriction and what the restriction was.

24             MR. KOLDE:  Yes, and we're going to --

25             THE COURT:  That's the crux of the case.  We should

1    get to that at some point.  It's a day and a half now.

2              MR. KOLDE:  Soon, your Honor.  Soon.  We're close.

3         Q.   So let's move on from Exhibit 5.

4              There was a picture -- you mentioned something

5    about an image of a wristband, and I'm going to show you

6    what's been marked as Plaintiffs' 4.

7              Is this the wristband you're talking about?

8         A.   Yes.

9         Q.   Okay.  Did you see that image before the September

10   17th game?

11        A.   Yes.

12        Q.   Okay.  And that image bothered you?

13        A.   Yes.

14        Q.   Because of the XX?

15        A.   Because of the XX and because of the e-mail that we

16   received from Shannon Farr and because of the prior Facebook

17   post that you showed me, we use all of these things in

18   considering how we need to respond, if we do.

19             MR. KOLDE:  If we could look at Plaintiffs' 19,

20   please.

21        Q.   I'm just showing you briefly Exhibit 19.  That's an

22   image of a pile of pink wristbands with various messages on

23   them.

24             You've seen that before in court here, correct?

25        A.   Correct.

1          Q.    What I want to understand is had you actually seen

2     this particular post before the game on September 17th?

3          A.    I believe I have, yeah.  Yes.

4          Q.    Okay.  Your primary concern was with the XX; is

5     that correct?

6          A.    And the NAD.

7          Q.    Did you know what NAD meant?

8          A.    We -- I interpreted that as short for gonad, but

9     since then you've shared that it's not a dude.  Either of

10    which I have a problem with.

11         Q.    Do you have a problem with the female symbol that's

12    been around for hundreds of years that some of these

13    wristbands had?

14         A.    In the way that it's being used, yes.  It's being

15    paired with XX and NAD.

16         Q.    But what if it was just worn by somebody without

17    one of the other wristbands?

18              THE COURT:  Well, once again, maybe it will help,

19    but there's no jury.  It's the judge that's going to decide

20    this.  So questions that seem to imply a symbol taken out of

21    context -- XX in a biology textbook means one thing.  We're

22    not talking about XX in a biology textbook.  We're talking

23    about it in the context of this dispute, right?

24              So we're wasting a lot of time suggesting that it

25    might mean something mysteriously innocent.  It's either

1    related to this message, and the message is either

2    restrictable or it's not, right, but you seem to be suggesting

3    that, well, in isolation it doesn't mean anything.  So,

4    therefore, it doesn't mean anything.

5             We're in the context of this dispute.

6             MR. KOLDE:  I'm sorry if I gave you that

7    impression, your Honor.  That's not what I'm suggesting.

8             I am trying to understand what Ms. Kelley, who is a

9    decisionmaker in this case and a defendant, thinks was

10   offensive or problematic.

11            THE COURT:  She's said it about three different

12   ways now.  She says the XX in the context that your witnesses

13   said they meant it.

14            MR. KOLDE:  Okay.  I got the XX, and I got the NAD.

15            THE COURT:  That's what she's saying.

16            MR. KOLDE:  Well, yeah, but I'm not asking her

17   about that.

18            THE COURT:  Is that what you think?

19            THE WITNESS:  Yes.

20            THE COURT:  Yes.  Thank you.

21            MR. KOLDE:  But that's not what I'm asking about.

22            THE COURT:  No, and I'm the decisionmaker and I'm

23   confused what you're asking about, and it sounds like you're

24   asking about, well, XX in a biology text is a pretty innocent

25   and straightforward scientific statement.  Why would you be

1   troubled about that?  We're wasting time doing that.  That's

2   not why we're here, okay?  So stick to the context.

3           She told you why she was upset with it.  Now, did

4   you restrict speech with respect to this?  Why did you do it?

5   What were you thinking?  What was going on?  Who's your

6   audience?  You know, the relevant questions under L.M., the

7   relevant questions under Tinker, that's what we need to do.

8   Otherwise, we'll be here till next Thursday.

9           MR. KOLDE:  I thought this wasn't a Tinker case,

10  but --

11          THE COURT:  I know you think that.  I think it is.

12  It is.  Tinker instructs on the principles.  It's not a

13  student and it's not in a school building, but Tinker is

14  relevant, as is L.M.

15          MR. KOLDE:  That's not what you said on October

16  8th, your Honor.

17          THE COURT:  No, it is relevant.  It instructs

18  usefully on the principles to be applied.

19          MR. KOLDE:  I'll leave --

20          THE COURT:  So the better evidence that responds to

21  those nuanced issues.

22      Q.    Let's take a look at Exhibit K that was just

23  admitted into evidence.

24          MR. KOLDE:  I think I'm going to have to use the

25  ELMO for this one, your Honor.

1          MR. CULLEN:  We have a couple hard copies, if you

2    would like.

3          MR. KOLDE:  I have one, but thank you.

4      Q.   This was that e-mail that your counsel introduced

5    from Anthony Foote that was sent around August 23, 2024.  I'll

6    just -- not reading it all, you're familiar with this e-mail;

7    is that correct?

8      A.   Correct.

9      Q.   This is Anthony Foote expressing his views about

10   biological males participating in female sports, correct?

11     A.   Correct.

12     Q.   And he's expressing support for Riley Gaines; is

13   that correct?

14     A.   Yes.

15     Q.   All right.  And how is it that this -- this e-mail

16   wasn't originally addressed to you, correct?

17     A.   Correct.

18     Q.   How is it it came to you?

19     A.   It was shared with me.

20     Q.   By?

21     A.   I believe it was by Mr. Desilets.

22     Q.   All right.  And who's Karen Vogt who's forwarding

23   it?

24     A.   I don't know.  If I had to assume, that would be

25   coach Vogt's wife.

 1          Q.    I see.  And were you concerned about the opinions

 2     that my client, Anthony Foote, was expressing in this e-mail

 3     from August 23rd?

 4          A.    Can you scroll down, please?

 5                Is there a page 2?

 6          Q.    There is.  Do you want me to go to that?

 7          A.    Please.

 8          Q.    Okay.

 9          A.    I'm not concerned about his opinions.  If there was

10     some concern, it would be around the idea of forfeiting games.

11          Q.    Explain what you meant by that.

12          A.    NHIAA requires that we complete all of the games on

13     our schedule, right?  So I know that we had a pretty talented

14     group of soccer players and would be worried if we didn't

15     complete our schedule.

16          Q.    Showing you what's been marked -- premarked as

17     Exhibit E, if I could have my colleague pull that up, please.

18                This is the August e-mail that Kyle Fellers sent to

19     you and several other Bow individuals about the Olympic boxing

20     incident.  Do you recall that e-mail?

21          A.    Yes.

22          Q.    You never responded to this e-mail; is that

23     correct?

24          A.    No.

25          Q.    And in this e-mail he refers to the Biden-Harris

1   Administration's rewrites of Title IX to appease a mentally

2   ill cult; is that correct?

3        A.   Correct.

4        Q.   Did that concern you at all?

5        A.   I think it's a little concerning.

6        Q.   Explain what you mean by that.

7        A.   Mr. Fellers -- this is how he has historically

8   communicated with us.  So I think his language in there is

9   concerning.

10       Q.   And what is it that's concerning?  The tone?

11       A.   Yes.

12       Q.   Did you take offense at the tone that he took with

13  you?

14       A.   No.

15       Q.   Well, then what are you concerned about?

16       A.   I just think that it is an e-mail -- you ask if I

17  respond to it.  I'm not sure what there is to respond to here

18  because it feels like it's sort of a stream of consciousness

19  of his beliefs.

20       Q.   As the superintendent of the Bow schools, do you

21  have a role in implementing -- let me rephrase that -- in

22  being aware of Department of Education guidance?

23       A.   Yes.

24       Q.   And did you have some awareness in your role as a

25  superintendent of the Biden-Harris Administration's rewrite of

1   the Title IX regulations earlier this year to include gender

2   identity as a protected category?

3       A.   Yes.

4       Q.   All right.  And do you have some awareness of Moms

5   for Liberty having a lawsuit in Kansas that enjoined the

6   implementation of those regulations?

7       A.   Yes.

8       MR. KOLDE:  Your Honor -- well, I'll get to this in

9   a moment.

10       Q.   Do you have awareness that my client, Nicole Foote,

11   has joined Moms for Liberty?

12       A.   Yes.  I received that e-mail.

13       Q.   And she sent you and several board members an

14   e-mail on November 3, 2024, titled Title IX changes and the

15   lawsuit, a concerned member of Moms for Liberty?

16       A.   Yes.

17       Q.   And I'll show you what's been marked as Exhibit 35.

18       Actually, I'll switch over to the document camera

19   here.

20       Is that the top half of that e-mail?

21       A.   Yes.

22       Q.   All right.  And we'll just look at it real quick to

23   show that I'm not trying to sneak anything in here.

24       That's the complete e-mail, right?

25       A.   Yes.

1           MR. KOLDE:  Your Honor, we are offering Plaintiffs'

2    Exhibit 35.  I spoke to Mr. Cullen in advance, and they have

3    no objection.

4           THE COURT:  ID may be stricken on 35.

5           (Plaintiffs' Exhibit No. 35 Admitted)

6           MR. KOLDE:  I'm just going to place it up there,

7    your Honor, so I don't hang onto it.

8           THE COURT:  Sure.

9           MR. KOLDE:  Okay.

10      Q.   I'm going to move on from this topic, but I just

11   want to wrap up with one or two quick questions.

12           And this question is not in your role -- I'm not

13   asking you for a legal opinion, but in your role as

14   superintendent, do you understand that this prevents the

15   Department of Education from implementing any of the Title IX

16   regs regarding gender identity in the Bow School District

17   while that injunction is in place?

18      A.   Bow schools are not named in that injunction.

19      Q.   So you do not view Bow schools as being bound by

20   that injunction?

21      A.   Not currently.  Last I checked there's not a Bow

22   school.  There are two schools, two public K-12 schools in New

23   Hampshire, and Bow is not one of them.

24      Q.   So do you feel that there's any effect of the

25   injunction -- in your role as superintendent, do you feel

1    there's any effect of the injunction on Bow schools?

2        A.    Not currently.

3        Q.    What plan, if any, did you form as a result of the

4    information that you received about the September 17th game

5    that we've been talking about here today?

6        A.    Mr. Desilets, Mr. Fisk, and I met to talk about,

7    one, if we felt like something may happen, and if we did, what

8    steps -- we discussed different ideas around how to handle

9    this.

10       Q.    You don't have to go word for word, but what did

11   you talk about?

12       A.    One of the first things I know I considered is do

13   we shut this off for the public, do we not have people come

14   out of concern that a student was going to be targeted, but we

15   didn't want to do that.  We wanted parents to be able to see

16   their children play.

17              We considered having -- which is ultimately what we

18   did, is meeting with our local law enforcement to seek their

19   support not knowing what we would expect on that day.

20       Q.    Did you determine who you thought would be the

21   source of the protests that you were concerned about?

22       A.    Yes.

23       Q.    And who was that?

24       A.    Mr. Foote.

25       Q.    Did you think that Mr. Fellers might be a problem

1    also?

2        A.    Based on his e-mail exchange with us.

3        Q.    So is it fair to say that the e-mails that they had

4    sent you before caused you to believe that they might be the

5    source of the protest on September 17th?

6        A.    Yes.  And I believe we were correct.

7        Q.    Did you have an opinion at that time prior to the

8    game about any other particular person other than Mr. Foote or

9    Mr. Fellers being the source of the possible protest at the

10   September 17th game?

11       A.    I think one of my other concerns is who else would

12   show up at the game other than our -- the typical parents who

13   show up.

14       Q.    Would it be fair to say that you wanted to keep an

15   eye on Mr. Fellers and Mr. Foote at the game because you

16   believed that they might be the source of problems at that

17   game?

18       A.    I believe we kept an extra eye on the activity of

19   the game happening on the sidelines, yes.

20       Q.    I don't know that you answered my question

21   directly, and I want to make sure that we're communicating

22   clearly.

23           Did you -- you have testified that you believed

24   Kyle Fellers and Anthony Foote would be a source of problems

25   at the game.  So as a result, did you keep an eye on them?

```
 1        A.    They were two of the people we kept an eye on, yes.

 2        Q.    But your testimony is you kept an eye on everybody?

 3        A.    Yes.  I believe we did.

 4              There was sort of this call to action that happened

 5   via social media and it was picked up by other known folks,

 6   and so I was concerned that we also may have people there who

 7   we don't know who are not parents and what that might lead to.

 8        Q.    Can you be specific about call to action for the

 9   September 17th game?  What are you talking about besides the

10   evidence that we've looked at here today?

11        A.    It was picked up by a lot of people and people who

12   are anti-trans, they are admittedly that, to come to this game

13   to support the Bow soccer team.

14        Q.    Can you name any specific names?

15        A.    Ann Marie Banfield.

16        Q.    Okay.  And who is she?

17        A.    She's I believe a Bedford resident who is vocal in

18   this area and has been vocal with us.

19        Q.    Do you know what she looks like?

20        A.    I do.

21        Q.    Okay.  Did she show up?

22        A.    Not at that game.

23        Q.    Anyone else?

24        A.    There were people there who I was not familiar

25   with, but I may not be familiar with everyone on the team.
```

1      Q.    Anybody else specific that you haven't named or

2  that you recall?

3      A.    I don't understand your question.

4      Q.    You made a reference to social media activity and

5  people talking on social media.  We have certain exhibits in

6  this case, so I'm trying to understand who you're talking

7  about.

8      A.    I believe there was a candidate for office, and I

9  am not going to remember her name.  Lily, I'm not sure, but

10 also picked up the XX, the photo of XX.

11           And so, again, our concerns as a school district is

12 this is generating a lot of talk and the concern would be who

13 was going to show up at this game, and we needed to be

14 prepared for that.

15     Q.    Lily Tang was a congressional candidate who ran

16 against Maggie Goodlander here in New Hampshire; is that

17 correct?

18     A.    Thank you.

19     Q.    You would agree that -- well, I'll state this

20 slightly differently.  Is it a problem in your view that a

21 congressional candidate would publicize the symbol XX as part

22 of her campaign?

23     A.    No, that wasn't the concern.  The concern was how

24 many people.  Asking for people to come to our game, are we

25 going to be able to handle that as a school.

1    Q.    And did that happen prior to the September 17th

2  game or are you conflating that with events post September

3  17th?

4    A.    I'm not sure.

5    Q.    Okay.  You would agree it's possible this might

6  have happened in the wake of the September 17th game; is that

7  right?

8    A.    It could be.

9    Q.    Okay.  You rejected the possibility of closing the

10  game to all spectators prior to the September 17th game

11  obviously, right?

12    A.    Yes.

13    Q.    What other plans did you discuss with the group

14  that you mentioned earlier?

15    A.    I mentioned that we reached out to local law

16  enforcement.

17    Q.    Is that the plan that you decided to implement in

18  fact?

19    A.    That was part of the plan.  I can't speak to what

20  Mr. Fisk and Mr. Desilets did in addition to that because,

21  again, we each have our roles, but that was part of my plan.

22        MR. KOLDE:  If we could take a look at Plaintiffs'

23  Exhibit 14, please, and if you could scroll down?

24    Q.    You're familiar with this e-mail?

25    A.    Can you make it a little bigger?  Thank you.

1                MR. KOLDE:  If we could go to the beginning, which

2       is the last page, actually.  All right.  The way e-mail

3       threading works, you know, the first e-mail is on the last

4       page.

5            Q.   Do you recall sending that e-mail to Phil Lamy on

6       September 12th?

7            A.   Yes.

8            Q.   In the last sentence you state, "Our opponent has

9       an openly trans female player, and we caught wind that our

10      families are going to protest in some way."

11           A.   Correct.

12           Q.   And it's fair to say that the reason you contacted

13      Lieutenant Lamy is because you were concerned that a protest

14      might take place?

15           A.   I was concerned, duly concerned about a protest,

16      along with a number of people.

17           Q.   I'm asking you about yourself.

18                And, in particular, you were concerned that

19      somebody might display the pink wristband with the XX symbol

20      on it at the game; is that correct?

21           A.   That was one of my concerns.

22           Q.   Because you view that symbol as trans-exclusionary;

23      is that correct?

24           A.   Correct.

25           Q.   What was the purpose of having a police presence at

1  that game?

2      A.   The purpose of having police presence at that game

3  was to help us create -- make sure that there was order in the

4  event that it got out of hand.

5      Q.   Was one police officer sufficient for that?

6      A.   At that game, yes, but I didn't know that ahead of

7  time.

8      Q.   Did you share your concerns with Lieutenant Lamy?

9      A.   Yes.

10      Q.   What did you tell him?

11      A.   I shared with him the information that we had.

12      Q.   Did he -- to your knowledge did he do anything to

13  investigate the accuracy of that information?

14      A.   I'm not sure.

15      Q.   What did you ask Matt Fisk or Mike Desilets to do

16  relative to the September 17th game?

17      A.   I didn't ask anything specific.  It was I was

18  taking care of this piece, and I know Mr. Fisk and Mr.

19  Desilets had additional plans.

20      Q.   Well, what did you know about that?

21      A.   We were going to have additional presence at the

22  game.

23      Q.   When you say we are going to have additional

24  presence, you mean there's going to be additional school

25  officials at the game?

1       A.    Not necessarily school officials, though there

2   were, but sometimes we have additional teachers who will come

3   and help support games.  At football games.  At basketball

4   games.

5       Q.    Was that something you asked them to do or was that

6   something they decided?

7       A.    No.

8       Q.    Please let me finish.

9       A.    Sorry.

10      Q.    How many -- I mean, who all was asked to come to

11  the game, or is that a Matt Fisk and Mike Desilets question?

12      A.    I think it's probably better served for them to

13  answer.  I know who I saw.

14      Q.    Tell us who you saw.

15      A.    I saw our three what we call BEST teachers, which

16  are physical education teachers.

17      Q.    Okay.  And in terms of officials or coaches, who

18  all was at the game?

19      A.    Of course the coaches were.  I was there for the

20  first half, Mr. Fisk was there, and Mr. Desilets was there.

21      Q.    Okay.  And when you say the coaches, are you

22  talking just about the soccer coaches or somebody else?

23      A.    The coaches of Bow and Plymouth on the other side.

24      Q.    But Ben Forbes was there also?

25      A.    He's one of the physical education teachers I just

1    spoke about.

2         Q.   I see.  Whose idea was it to have walkie-talkies?

3         A.   I can't answer that.

4         Q.   Okay.  That wasn't your idea?

5         A.   No.

6         Q.   Did you have a walkie-talkie?

7         A.   I'm not allowed.

8         Q.   Were you there for the second half?

9         A.   I was not on the field for the second half, but I

10   was in a place where I was watching.

11        Q.   I see.  And did you have binoculars or some kind

12   of an implement to watch?

13        A.   No.

14             THE COURT:  Is this relevant really?

15             MR. KOLDE:  Well, I want to know what she was able

16   to see on the field.

17             THE COURT:  I'm sure you do, but I don't.  I want

18   to know what the evidence is relevant to the legal issues that

19   I'm required to resolve, and where she was and whether she had

20   binoculars is not a tipping point.

21             It's time for a break.  We'll take our midmorning

22   break.

23             Were you part of this Kansas City v. U.S.

24   Department of Education case you referred to, the injunction?

25             MR. KOLDE:  No, we just --

1          THE COURT:  Do you know if there's been a -- you

2    know that the order says there has to be a notice filed in the

3    record identifying the schools which the members of the

4    plaintiff groups or their members' children attend, suggesting

5    it only relates to those schools.

6          You mentioned that one of your clients joined Moms

7    for Liberty?

8          MR. KOLDE:  Yes.

9          THE COURT:  Is the point that she joined Moms for

10   Liberty, therefore, her child goes to a school now?

11         MR. KOLDE:  No.

12         THE COURT:  But has a notice been registered with

13   the the kind of --

14         MR. KOLDE:  We'll find out.

15         THE COURT:  Well, it doesn't matter.  It's after

16   the fact anyway, right?

17         MR. KOLDE:  After the fact looking backwards, but

18   not going forward, your Honor.

19         THE COURT:  Well, sure, but this is just an

20   injunction against the federal government and law enforcement

21   from enforcing the regulation, and nobody is trying to enforce

22   the regulation, right?  Why are we even talking about it?

23         MR. KOLDE:  Because they've marked for ID only

24   several -- a summary and a press release regarding the Title

25   IX regulations and --

1          THE COURT:  We agree Title IX does not trump the

2  First Amendment, right?

3          MR. CULLEN:  Correct.

4          THE COURT:  All right.

5          Do you agree that's not an issue?

6          MR. KOLDE:  Oh, yeah.  I'm just responding to what

7  they're doing.

8          THE COURT:  All right.  It's not an issue so let's

9  not spend any more time on that.

10          The First Amendment controls over Title IX.

11          MR. KOLDE:  Very good, your Honor.

12          THE COURT:  All right.  Let's take a midmorning

13  break.

14          (RECESS)

15          THE COURT:  We have to switch out court reporters

16  at 12:30.  So we'll take lunch at 12:30.

17          It's past midmorning and you're not done with your

18  case.  I'm going to start helping you.  I know you don't want

19  any help, but I'm going to help you.

20          We've got to move along.  I need evidence on why

21  the restriction on speech was imposed, what the motivating

22  factors were, what the considerations were, what the effects

23  were.

24          MR. KOLDE:  Okay.

25          THE COURT:  I don't need to know about how many

1    police officers you wanted or needed or could have had.  It's

2    got nothing to do with the issues here.

3         Q.    What was the speech restriction that you imposed on

4    the September 17th game?

5         A.    We didn't impose one.  Maybe I'm not understanding

6    your question.  The September 17th game where they wore the

7    armbands?

8         Q.    Well, the wristbands, but yes.

9         A.    Okay.  We asked them to remove them because we

10   believe that those are anti-trans symbols and they were

11   targeting a player on the other team.

12        Q.    And you interpreted those symbols as expressing an

13   anti-trans message; is that fair to say?

14        A.    Yes.

15        Q.    You understood that my clients were expressing

16   themselves by wearing the pink armbands with the XX symbol on

17   them, correct?

18        A.    No.  I believe they were targeting a student on the

19   other team.

20        Q.    What makes you say that they were targeting a

21   student on the other team?

22        A.    Because they decided -- they planned and decided to

23   do this on the one time that we were playing the team that had

24   a trans student on it.

25        Q.    So it was the timing?

1       A.    I think the timing is telling.

2       Q.    Do we agree that my clients did nothing on the

3  sidelines that day other than wear the wristbands?

4       A.    No.

5       Q.    Explain what you mean by that.

6       A.    Mr. Foote had a sign on his Jeep.  Mr. Fellers held

7  a sign in the direction of the opposing team's bus that would

8  ultimately pass him as they exited.

9       Q.    Did it pass him while they exited?

10      A.    I don't know.  That's the route that away teams

11 take to leave our property.

12      Q.    Right.  Let's set aside the parking lot for a

13 second, and we'll come back to it.  We'll just talk about the

14 sideline behavior.

15            Do we agree that the concerning First Amendment

16 activity that you're concerned about was my clients, Foote and

17 Fellers, wearing the pink wristband with the XX on it on the

18 sideline?

19      A.    That was part of the concerning behavior, yes.

20      Q.    Okay.  When you say part of, what is the other

21 concerning behavior just on the sidelines?

22      A.    The response to being asked to remove them.

23      Q.    And just summarize for us what it was about the

24 response to being asked to remove the pink wristbands that

25 concerned you.

1     A.    That Mr. Fellers -- it took him an extended period

2   of time to comply.  That he required police intervention

3   twice.

4     Q.    So it was the time and the fact that Lieutenant

5   Lamy was there?

6     A.    It was the fact that Lieutenant Lamy was not just

7   there but he had to intervene.  It is also the way that Mr.

8   Fellers treats our administrators, our school officials, at

9   those games.

10     Q.    Were you -- I don't understand what you mean by

11   treats.  Were you concerned about the fact that he compared

12   them to Nazi German officials from the 1930s and '40s?

13     A.    Yes.

14     Q.    You believed it was inappropriate for him to

15   express that opinion?

16     A.    I believe that it causes a disruption in our school

17   environment when folks see our administrators being talked to

18   that way, yes.

19     Q.    Okay.  And I don't need to go into detail on this,

20   but is your understanding based on what you observed that day,

21   what people told you after the fact, or the videotape, or all

22   three?

23     A.    I don't -- what is the question?

24     Q.    How do you know what happened on the sidelines?

25     A.    I was there.

1          THE COURT:  Well, I don't know why it's relevant.
2   Why are we talking about this?
3          MR. KOLDE:  Okay.  I'll move on.
4          THE COURT:  Mr. Fellers's statements are not part
5   of the case, right?
6          MR. KOLDE:  Well, I think they're part of the case,
7   your Honor.
8          THE COURT:  All right.  They're not.
9          MR. KOLDE:  Okay.
10         THE COURT:  Okay.  So move on.
11         MR. KOLDE:  All right.
12     Q.    Do you agree that my clients didn't gesture at
13  Parker or any of the other players with the armbands?
14     A.    I'm not aware that they did, no.
15     Q.    So we agree that they did not; is that correct?
16           We've got some double negatives.
17     A.    I was only there for the first half.
18     Q.    And you would agree -- you don't have any reason to
19  disagree with the testimony that my clients never said
20  anything to Parker, correct?
21     A.    I did not observe and have not been told that they
22  said anything to Parker.
23     Q.    Right.  And Parker played the whole game or most of
24  the game?
25     A.    I don't know.

```
 1        Q.    You're not aware that Parker left the game early or

 2   anything like that?

 3        A.    I'm not aware.

 4        Q.    Okay.  And just so we're clear, the issue is the

 5   wristbands with XX on them and then the comments that my

 6   client made to your officials.  Other than that, you have no

 7   concerns about my clients' activities on the sidelines on

 8   September 17th; is that correct?

 9        A.    No.  I have concerns that they were displaying an

10   anti-trans message on the one day.  It's not supporting

11   women's sports.  It's targeted at that one day and that one

12   student.

13        Q.    Okay.  But it's also fair to say that you consider

14   the pink wristband with XX on it to be an anti-trans message

15   generally, correct?

16        A.    Yes.

17        Q.    All right.  And it is true that going forward if my

18   clients showed up to a Bow High School sporting event wearing

19   the pink wristband with XX on it, it would also be considered

20   an anti-trans message, correct?

21        A.    Correct.

22        Q.    And regardless of whether Parker Tirrell or any

23   other trans-identifying player was present to compete or in

24   the audience, my clients would be asked to remove the

25   wristband or leave the location; is that correct?
```

1      A.    Correct.

2      Q.    And that is the policy of the Bow School District;

3  is that correct?

4      A.    It's not a policy.  It would be our practice

5  knowing what that symbol means and knowing that we have trans

6  students and staff within our buildings.

7      Q.    But I want to be clear that -- and I think this was

8  part of the answer.  I just want to be clear on it.

9            At any specific future sporting event it wouldn't

10 matter whether a trans student was actually there.  You would

11 still enforce the practice of not allowing the pink wristband

12 with XX on it; is that correct?

13     A.    Correct.

14     Q.    Would it be fair to say if somebody wore a T-shirt,

15 a pink T-shirt with XX on it, that would be treated the same

16 way?

17     A.    Probably.

18     Q.    Okay.  And if somebody wore a T-shirt with a Pride

19 flag on it, they would be allowed to attend the event,

20 correct?

21     A.    Probably, because it's inclusionary.  It's not

22 harassing.  It's not directed at anybody or targeting someone.

23            MR. KOLDE:  Thank you.  Nothing further.

24            THE COURT:  Thank you.

25            Mr. Cullen.

1          MR. CULLEN:  Thank you, your Honor.

2                    CROSS-EXAMINATION

3     BY MR. CULLEN:

4          Q.   Good morning, superintendent.

5          A.   Good morning.

6          Q.   I just want to clarify a couple questions.

7               With respect to the XX symbol, your efforts to stop

8     that are strictly specific to the school itself and the fields

9     and the property, right?

10         A.   Correct.

11         Q.   You don't take any actions against parents who use

12    that in e-mails?

13         A.   No.

14         Q.   Okay.  And in this case you received e-mails from

15    Mr. Fellers and Mr. Foote in -- or you saw them in August, and

16    we've been over them.  You never took any action against them

17    based on those e-mails?

18         A.   No.

19         Q.   And you didn't remove the -- you didn't remove

20    these or ask for these -- sorry.  Let me strike that and start

21    over.

22              You didn't come to the conclusion that the XX

23    wristbands were not appropriate for this game based on your

24    personal views on transgender issues?

25         A.   No.

1    Q.    Okay.  And on any given game do you know for a fact

2    whether or not there's a trans-identifying student on your

3    team or the other team?

4    A.    No.

5    MR. CULLEN:  Backing up just a little, your Honor.

6    MR. KOLDE:  Your Honor, I am a little concerned

7    that counsel is leading his own witness.  I understand we're

8    trying to move things along, but I --

9    THE COURT:  It's cross-examination.  There's no

10   jury.  It's me.  I'll allow it in the interest of time because

11   now we are way behind what was projected.

12   MR. KOLDE:  I understand.

13   MR. CULLEN:  Thank you, your Honor.

14   Q.    Just briefly, I know you're superintendent now.

15   Could you just let the Court know what's your educational

16   background?

17   A.    In terms of where I went and --

18   Q.    Yeah.

19   A.    So I have a Bachelor's Degree from the University

20   of Rhode Island, my Master's in Education, and my

21   certificate -- I'm sorry.  My Master's in Special Education, a

22   Certificate of Advanced Graduate Studies in Educational

23   Leadership.

24   Q.    And where did you get the master's?

25   A.    Plymouth.

1          Q.     And the certificate?

2          A.     Southern New Hampshire University.

3          Q.     Okay.  And after college till today, again briefly

4    though, what was your career?  What did you do?

5          A.     Primarily my career in education has been in the

6    area of student services.

7          Q.     And when you first joined the SAU, you were

8    director of student services?

9          A.     Correct.

10         Q.     And again, briefly, what does that entail?

11         A.     Special education, 504, McKinney-Vento, English as

12    a Second Language, and Title IX.

13         Q.     I think we're both feeling a little pressure to

14    speak too quickly for the steno.

15         A.     Sorry.

16                THE COURT:  No.  Just limit it to relevant -- this

17    is a preliminary injunction hearing.  It's not the trial on

18    the merits.

19                MR. CULLEN:  I agree.  I think her background is

20    important for you to understand where she's coming from for

21    her decisions.  I'll move along, though.

22         Q.     You receive regular training on Title IX?

23         A.     Yes.

24         Q.     And you're familiar also with the state's

25    antidiscrimination statute, 354-A?

1        A.    Yes.

2        Q.    Okay.  You understood, of course, at this game on

3   the 17th that Parker Tirrell was going to play?

4        A.    Yes.

5        Q.    And that she identified as a female?

6        A.    Yes.

7        Q.    And we've already been over this, but you've

8   received correspondence from -- or you saw correspondence from

9   Ms. Farr?

10       A.    Yes.

11       Q.    And you've reviewed Facebook posts that included

12   the XX symbol?

13       A.    Yes.

14       Q.    Okay.  So what was it about the XX symbol that made

15   you conclude that it was something that should be restricted?

16       A.    Again, I believe that it's an anti-trans symbol

17   that we are seeing in many, many places now.

18             So I talked about Riley Gaines and how she actively

19   uses XX as an anti-trans message, along with what we saw

20   during the Olympics, and things coming out in terms of, like,

21   clothing being anti-trans.

22       Q.    Okay.  And sort of the growth of this anti-trans

23   movement in your experience as a school administrator, when

24   has that really occurred?

25       A.    It hasn't.  I mean, in terms of this XX?

1      Q.    No.  Just in general.  Like six years ago, seven

2  years ago when you started at Bow, was there an anti-trans

3  movement that you were aware of?

4      A.    I mean, in terms -- we had some anti-LBGTQ book

5  challenges.

6      Q.    Okay.  But just in general -- I guess what I'm

7  getting to is this is a fairly recent and developing

8  phenomena, correct?

9      A.    Yes.

10     Q.    And as a school administrator, do you try to keep

11 up with what's going on?

12     A.    Yes.

13     Q.    Okay.  And do perception of different symbols

14 change over time?

15     A.    Yes.

16     Q.    And as a school administrator, is that something

17 that you follow as part of your job?

18     A.    Yes.

19           MR. KOLDE:  Your Honor, it's Mr. Fellers (sic)

20 testifying at this point, not Ms. Kelley.

21           I'm concerned about --

22           THE COURT:  I'll allow it.

23           When you say anti-trans, what exactly do you mean?

24 Do you mean opposition to players classified at birth as males

25 participating on girls' team or do you mean something broader

1    than that?

2            THE WITNESS:  I mean that.

3            THE COURT:  You mean that.  Okay.

4        Q.   So you're really talking about it being a symbol of

5    nonparticipation, an exclusion of assigned male at birth

6    persons from playing in girls' sports?

7        A.   Yes.

8        Q.   There is a policy, KFA, and we've seen that I think

9    already, but maybe we can just bring it up very quickly.  It's

10    Plaintiffs' A -- I mean, Plaintiffs' Exhibit 1.

11            While Stacey is getting that up for us, you're

12    familiar with KFA?

13        A.   Yes.

14        Q.   And do you view that as the terms under which the

15    public is invited to the school to attend events?

16        A.   Yes.  These are expectations.

17        Q.   Okay.  And is it your view that the public's

18    attendance at events is conditioned on their compliance with

19    this policy?

20        A.   At events and within our building, meetings, et

21    cetera.

22        Q.   And are there parts of this policy that would apply

23    to a protest on school grounds at a sporting event?

24        A.   In my mind one is applicable to it in terms of

25    attempting to harass or intimidate -- it says staff member,

1    school board member, sports official, coach, or any other

2    person.

3         Q.    And how about number 4?

4         A.    A violation of federal or New Hampshire law.  In

5    this case it would be HB 354-A and Title IX.

6               And then 10, of course, which allows these

7    violations to result in a no trespass order.

8         Q.    Mr. Foote said yesterday in his testimony that

9    after he sent the e-mail on September 17th that included

10   language like weak, ineffective, and out of touch, cowardice

11   and pandering, that nobody reached out to him to ask him to

12   have a meeting; is that fair?

13        A.    Yes.

14        Q.    If he had asked you for a meeting, would you have

15   given him one?

16        A.    Yes.

17        Q.    Are you familiar with Nicole Foote?

18        A.    Yes.

19        Q.    Did she have a meeting with Mike Desilets?

20        A.    Yes.

21        Q.    Would you have extended that same courtesy to Mr.

22   Foote had he asked for it?

23        A.    Yes.

24        Q.    This didn't come up, but just to clarify.  At some

25   stage you set up a protest zone?

1      A.   Yes.

2      Q.   And why was that?

3      A.   Following the September 17th game, not the

4   homecoming game, but the one on the 24th, a large number of

5   people showed up at the game.  It was at least double, perhaps

6   triple what's normally there.  And we were very concerned

7   about our ability to keep that orderly and not disruptive for

8   our students.

9           And so with -- in consultation with our school

10  council, we set up an area that offered people the ability to

11  do that in that said area but also they could see the game

12  from there.

13     Q.   And there's no protest zone currently?

14     A.   No.

15     Q.   And no plans to have a new protest zone?

16     A.   No.

17          MR. CULLEN:  If I could have a moment, your Honor?

18          THE COURT:  Of course.

19          (Pause)

20     Q.   And again, Ms. Kelley, with respect to making the

21  determination that the XX symbol was exclusionary, you did

22  your own research on that?

23     A.   Yes.

24     Q.   And you spoke with other people?

25     A.   I spoke with high school administration.

1   Q.   Okay.  Thank you very much.

2   A.   Thank you.

3   Q.   There may be more questions.  You can't leave yet.

4        THE COURT:  Mr. Ducharme.

5        MR. DUCHARME:  Nothing, your Honor.

6        THE COURT:  I have a couple.  Just a couple.

7        You seem to agree with Mr. Foote that part of the

8   nuanced aspect of this larger issue is perhaps standards

9   should be developed and rules developed and procedures

10  developed for providing different participation by trans

11  students.

12       THE WITNESS:  I do.  I think that, again, it's

13  nuanced.

14       THE COURT:  All right.  How would the -- how would

15  the protest zone operate to protect a trans child playing on a

16  soccer team?

17       THE WITNESS:  I think it would have been really

18  challenging.

19       THE COURT:  I mean, your goal, I gather, was we

20  think the child was being targeted.  We're going to protect

21  the child from the effects of that targeting.  We're going

22  create a protest zone 50 yards away.

23       How does that protect a child, whereas on the

24  sideline wearing the wristbands doesn't?

25       THE WITNESS:  I think it's further out of view from

1  students.  I think it is, again, less visible.  Perhaps you

2  can hear less.

3           It was our attempt to make the sidelines of our

4  games manageable without having to close down spectators.

5           THE COURT:  Okay.  And what exactly were you

6  protecting Parker Tirrell from?  What risk?  What danger?

7  What injury?

8           THE WITNESS:  An anti-trans message.

9           THE COURT:  Hurt feelings?

10           THE WITNESS:  I guess -- if I may?

11           THE COURT:  Sure.  I need to know.

12           THE WITNESS:  In school districts when we suspect

13  that there's some sort of threat that something might happen,

14  we don't wait for it to happen in order to go into action.

15           If we heard that there were two teams and there was

16  going to be a fight, we don't wait for that to happen to take

17  action, and that's what we did here.

18           THE COURT:  But what is it that you didn't want to

19  wait to have happen, I guess?

20           THE WITNESS:  I didn't want to wait to have her see

21  this and feel like she doesn't belong or that it's wrong her

22  being trans.  That's what I didn't want to have happen.

23           THE COURT:  Okay.

24           Any questions based on mine?

25           Mr. Kolde.

```
 1                MR. KOLDE:  If I may, your Honor.
 2                      REDIRECT EXAMINATION
 3  BY MR. KOLDE:
 4       Q.   The no protest zone that you just testified about,
 5  that was imposed the day after we filed this lawsuit, correct?
 6       A.   I'm not sure.
 7       Q.   And the game that you referred to where some other
 8  people came to express the pink XX message, that was on
 9  September 24th; is that correct?
10       A.   Correct.
11       Q.   And that was a response to what had happened at the
12  September 17th game, correct?
13       A.   We viewed that as a response to the no trespass
14  orders that we gave, and that that was people trying to take
15  action against administration for our decision.
16       Q.   Right.  And some people at that next game also wore
17  the forbidden wristband, pink with the XX message, correct?
18       A.   Not at the next game.  On the 24th.
19       Q.   On the 24th.  I'm sorry.  The 24th game?
20       A.   Yes.
21       Q.   All right.  But that game wasn't stopped, correct?
22       A.   No.  It would have gotten out of hand.
23       Q.   All right.  And no one was trespassed because of
24  that game, correct?
25       A.   No.
```

1          Q.    And there were no incidents at that game, right?

2          A.    Not that I'm aware of.

3          Q.    And it's fair to say your officials didn't

4     intervene at that game like they did on the 17th?

5          A.    Not that I'm aware of.

6          Q.    I'm just about done, but we did set aside the signs

7     in the parking lot, and I just want to understand briefly.

8                We've all heard testimony about what Mr. Fellers's

9     sign said and what Mr. Foote's sign said, and just please tell

10    us, what is your problem with the contents of the sign, both

11    of those signs.  You did say that you found those signs

12    problematic.  Tell us why.

13         A.    We don't allow signs at our events.  That's

14    actually -- I believe it's in our handbook.

15               Unless it is, go, Sally, number whatever, we don't

16    allow message, whether it's political messages, whether it's

17    something that's targeted at another student.  The signs that

18    we allow at events are specific to that event.

19         Q.    Okay.  So no signs at the sidelines, but we agree

20    these were clearly in the parking lot, right?

21         A.    These two signs were in the parking lot.

22         Q.    All right.  And you understand that my clients have

23    only asked to display signs in the parking lot, not at the

24    sidelines.  You understand that, correct?

25         A.    I don't understand that, actually.

1      Q.    Okay.  Would you agree that the school district

2    does allow people in the parking lot at Bow events to express

3    some political messages passively in the form of having a

4    bumper sticker on their car supporting a candidate?

5      A.    Yes.

6      Q.    And there are some vehicles that we've seen that

7    have, like, for example, a Pride Progress flag on it, correct?

8      A.    Yes.

9      Q.    Okay.  So what is it about the signs that my

10    clients displayed that is problematic, but it's okay to have

11    those bumper stickers in the parking lot?  Not on the

12    sidelines but in the parking lot.

13      A.    Because these signs were targeted at a particular

14    student on the other team.  And as far as I know, that student

15    is part of an injunction by this court, and if we were to

16    allow harassment, we are liable.

17      Q.    Okay.  Help us understand.  Help the Court

18    understand.  What was it about my clients' signs that made

19    them harassing or targeting in your opinion?

20      A.    The only time those signs came out was when we

21    played a game against Plymouth which includes the trans

22    player.  At no other game.  No other time.  This was organized

23    and targeted.

24      Q.    So timing is an issue.

25            Is there anything about the message that the signs

1    expressed that you found problematic, not just the timing but

2    the message itself, the contents of the message?

3        A.    I can't separate the two.

4        Q.    Okay.  But the contents of the message displayed at

5    that time was a problem for you?

6        A.    Yes.

7        Q.    Okay.

8              MR. KOLDE:  I think I'm done.

9              THE COURT:  All right.

10             MR. CULLEN:  Just briefly, your Honor, if you would

11   indulge me.

12                        RECROSS-EXAMINATION

13   BY MR. CULLEN:

14       Q.    With respect to the parking lot, Ms. Kelley, do you

15   ever allow people to march around your parking lots holding

16   signs above their heads?

17       A.    No.

18       Q.    Regardless of the content of the sign?

19       A.    Regardless.

20       Q.    This isn't a place where political demonstrations

21   are permitted and staged for any issue?

22       A.    No.

23       Q.    Thank you.

24             THE COURT:  All right.  Thank you, ma'am.  You may

25   step down, and you're excused as a witness.

1          And you may call your next witness.

2          MR. KOLDE:  I call Mike Desilets.

3                    MICHAEL DESILETS

4      having been duly sworn, testified as follows:

5          THE CLERK:  Please state your full name for the

6  record.

7          THE WITNESS:  Michael Desilets.

8                    DIRECT EXAMINATION

9  BY MR. KOLDE:

10     Q.    Mr. Desilets, what do you do for a living?

11     A.    I'm the athletic director of Bow High School.

12     Q.    And you don't have to go into a lot of detail, but

13  what do you do as doing that?

14     A.    Administration of anything athletics and as well as

15  some of the other activities that go on that are considered

16  extracurricular, game management, game planning, scheduling of

17  officials, transportation, compliance, making sure that

18  student athletes are eligible for play, making sure that we

19  stay in line with the NHIAA regulations as a member school.

20     Q.    Who do you report to?

21     A.    Mr. Fisk and Ms. Kelley.

22     Q.    Are you familiar with my clients outside of this

23  lawsuit?

24     A.    Mr. Foote, yes.  Mr. Fellers, not so much.

25          I'm not sure I would have known exactly who he was

1    visibly, but I've had conversations with Mr. Foote, yes.

2         Q.    And what did those conversations center around or

3    did they have various topics?

4         A.    More just cordial, hello, a handshake.  We never

5    really got into much detail on really anything specific.

6         Q.    Did you understand Mr. Foote to be somebody who had

7    strongly held beliefs about women's rights and the issue of

8    biological males playing in women's sports?

9         A.    Certainly through this, but prior to this I

10   certainly know that he had some strong political views.

11        Q.    How did you become aware of that?

12        A.    Just kind of through his actions with things that

13   were going on at school, the signage in his front yard, things

14   like that.

15        Q.    Signage in his front yard, is this the political

16   candidates he supports?

17        A.    Correct.

18        Q.    All right.  A Trump supporter?

19        A.    Yes.

20        Q.    How are you aware of that?  Are you in his

21   neighborhood?

22        A.    I drive by it on a fairly regular basis.  I assumed

23   it was his house.  I saw him there before.  I've never been

24   there, but I've seen him in the yard.

25        Q.    All right.  And he was involved in a book challenge

```
 1   at the Bow school; is that correct?
 2        A.   I believe so, yes.
 3        Q.   And is that what you were talking about when you're
 4   saying you're aware of his political activities relative to
 5   the school?
 6        A.   That was part of it, sure.  Yes.
 7        Q.   And he had sent you an e-mail expressing views
 8   about the upcoming game at Bow on September 17th, correct?
 9        A.   I believe so.
10        Q.   All right.  What did you think about that e-mail?
11        A.   Could you call it up?
12        Q.   Sure.
13             MR. KOLDE:  It is -- it's actually --
14             MR. CULLEN:  I think it's Defendants' 18.  I mean
15   Plaintiffs' 18.  I apologize.
16             MR. KOLDE:  Yeah.
17        A.   Okay.  So what was your question?
18        Q.   What did you think about the opinions he expressed
19   in the e-mail?
20        A.   So this was in response or reply to the e-mail that
21   I had sent to the soccer families, I believe.
22             What do I think about it?  It's fairly strongly
23   worded, insulting I suppose in some ways.
24        Q.   Did you have a problem with the contents of the
25   e-mail?
```

1          A.    I wouldn't call it a problem.  I didn't really, I

2    mean, take it super personally or anything, no.

3          Q.    Did you respond to the e-mail?

4          A.    I did not.

5          Q.    Okay.  Did you yourself have any opinion about the

6    New Hampshire state law that was enjoined in the Parker

7    Tirrell matter?

8          A.    What was the first part?  Did I have what?

9          Q.    Did you yourself have an opinion about the New

10   Hampshire state law about the inclusion -- about not including

11   biological boys in girls' sports in the state of New

12   Hampshire?

13         A.    No.  I wouldn't say I had an opinion about it.  At

14   that point that was kind of the determining piece of my job is

15   to follow what the law is telling us to do.  So at that point

16   I knew that Parker Tirrell, as well as the student from

17   Pembroke, which is not playing in a fall sport, but I knew

18   that Parker Tirrell was intending to play soccer for Plymouth

19   and Plymouth was on our schedule, and we were going to, as far

20   as I was concerned, play that game.

21         Q.    Did you disagree with any of the political opinions

22   that my client was expressing in this e-mail or otherwise

23   about the issue of including trans-identifying players in

24   girls' sports?

25         A.    I don't necessarily agree that they are stronger,

1    faster, more physically dominant.

2         There are certainly instances which, you know, if

3    we look at Riley Gaines, if we look at some of these

4    incidents, sure, but I wouldn't characterize that as every

5    transgender student athlete is physically strong, faster, and

6    more dominant than their opponents.

7         Q.   Is there anything else with regard to the issue of

8    including biological boys in girls' sports that my client

9    expressed that you disagreed with either in this e-mail or in

10   your other interactions with him leading up to this event?

11        A.   No.  He can have his opinion, and that's perfectly

12   fine.

13        Q.   Okay.  You got the e-mail from Shannon Foote also,

14   right?  Not Shannon Foote.

15        A.   Shannon Farr?

16        Q.   Farr, yes.  Sorry.

17             Shannon Farr?

18        A.   Yes.

19        Q.   And you escalated that to Marcy Kelley; is that

20   right?

21        A.   I forwarded it to Marcy Kelley, yes.

22        Q.   All right.  Did you know Shannon Farr before that?

23        A.   No.  I know that she's a parent of a soccer player,

24   a parent of students in our district.  I was more aware of her

25   husband than her.

1          Q.    Okay.  And without going into a lot of detail, how

2     are you aware of her husband?

3          A.    Because he coaches our middle school soccer team.

4          Q.    I see.  All right.  Any other reason to be aware of

5     him other than that?

6          A.    No.

7          Q.    All right.  What did you and -- so we heard

8     testimony earlier about Marcy Kelley's planning regarding

9     preparing for this September 17th game.  There was a piece of

10    this that she said you'll have to ask Mike and Matt Fisk about

11    it.

12              So fill that in for us, that gap.  What did you and

13    Matt Fisk talk about to prepare for this September 17th game

14    based on the information you had in advance of the game?

15         A.    Was that about additional personnel?

16         Q.    I think, and anything else that you guys had

17    decided to prepare for this particular game.

18         A.    So we had met, you know, on multiple occasions on

19    what the planning would be for it based on the information

20    that we were given as Marcy just testified to.

21              So we were going to involve police or at least

22    inquire about what they thought that we should do, if they

23    thought they should be present, if they were able to be

24    present, and then I also -- knowing that myself would be there

25    and Mr. Fisk would be there, the Bow Police Department as

1    well.  So then I also went to Mr. Forbes, Ms. Robb, and Mr.

2    Doherty as our other teachers to kind of provide me with

3    additional eyes and ears around the field.

4         Q.    And what were those additional eyes and ears

5    designed to help you with?

6         A.    Just to see or hear anything that may be kind of

7    brewing, for lack of a better term, but for anything that

8    might be happening in terms of a protest, in terms of

9    harassment or intimidation toward anybody on the field.

10        Q.    Would it be fair to say that you were in part

11   concerned about some of the parents wearing pink wristbands

12   with XX on it?

13        A.    Yes, but at that point we weren't aware if those

14   wristbands were even going to be present.

15        Q.    Had you seen them on social media at that point?

16        A.    Yes.

17        Q.    All right.  So were they part of your concern?

18        A.    Yes.

19        Q.    Okay.  And the XX wristband in particular, did you

20   have a problem with that message?

21             THE COURT:  What message?

22             MR. KOLDE:  The message that is displayed on the

23   wristband.  His understanding of the message.

24             THE COURT:  That's in dispute, I assumed.

25             Are you not disputing this?  If you're not

1    disputing the message, as I think your witness has testified

2    what the message was, why are we talking about this?  We need

3    to move on.  It doesn't matter what preparations they had in

4    anticipation of some demonstration that didn't occur.  We

5    don't need evidence on that.

6            MR. KOLDE:  All right.

7        Q.    Do we agree that nothing happened in the first half

8    of the game -- of the game on September 17th?

9        A.    Yes.

10       Q.    All right.  But something happened in the second

11   half?

12       A.    Correct.

13       Q.    Tell us what it was.

14           THE COURT:  Is this the same ground we're going to

15   plow or do you have something different?  We've already heard

16   what happened.  I don't need six witnesses to tell me what

17   happened unless you've got something new or different.

18           Make a proffer.

19       Q.    When you --

20           THE COURT:  Make a proffer.

21           MR. KOLDE:  I just want to ask him what he -- I'll

22   skip ahead to this.

23           THE COURT:  I know what you want to do.  Make a

24   proffer.

25           MR. KOLDE:  All right.  I would like to ask him

1    what he meant when he said we know what you're doing with the

2    XX.

3                    THE COURT:  Okay.

4         Q.    In the video -- we've all seen the video.  We've

5    heard the testimony, right?

6                    At some point when people are talking to Eldon Rash

7    and Kyle Fellers and trying to get Eldon to take the wristband

8    off, somebody, it sounded like it might be you, said, it's got

9    XX on it.  We know what you're doing.  Take the wristband off.

10   I'm paraphrasing here.  Do you recall that from the video?

11        A.    I recall it from the video.  It was not me that was

12   speaking to Mr. Rash.

13        Q.    All right.  Who was it?

14        A.    I believe it was Mr. Forbes.

15        Q.    Did you agree with what Mr. Forbes said?

16        A.    Yes.

17        Q.    Okay.  What did you understand that message to be?

18        A.    What message?

19        Q.    When you said, we know what you're doing.

20        A.    Meaning we know that you are wearing that wristband

21   because it has an XX on it, that's an anti-trans message, and

22   we know that you're wearing that because Parker Tirrell is

23   playing on the other team.

24        Q.    Did you think that my clients were trying to get

25   Parker to leave?

1    A.   I don't know what your clients were trying to get

2  her to do.

3    Q.   Do you agree with the testimony and the evidence

4  that we've presented so far in this case that on the sidelines

5  other than wearing the pink wristband with the XX on it,

6  that's the extent of what my clients did?

7    A.   On the sideline, correct, until they were asked to

8  remove them, and there was some dissent in those

9  conversations.

10    Q.   All right.  So you have a concern about the dissent

11  that my clients had resisting being told to remove the

12  wristbands; is that correct?

13    A.   Yes.

14    Q.   All right.  And the Court doesn't want to hear a

15  lot about that.  Just give us bullet points.  What is your

16  concern about that?

17    A.   The disrespect in not -- it's not the wordage of

18  the KFA policy, but not respecting what I was asking them to

19  do as a game official.  Mr. Foote said, you know, we didn't

20  talk about our initial reaction -- or my initial conversation

21  with Mr. Foote before any video came on.  I said, Andy, you've

22  got to take the wristband off.  We can't do this today.  And

23  his response was, oh, what, this, and he wiped his forehead,

24  it's just a sweatband.  And then it became, well, it's just

25  for breast cancer, and then it became the XX thing.  So we

1    kind of went through a progression there of he wasn't going to

2    take it off, he wasn't going to take it off.  He did

3    eventually in tossing it on the ground, and then I moved on.

4             And then the dissent from Mr. Fellers I think was

5    pretty evident on the body cam footage as well.

6        Q.    I want to wrap this up in the interest of time, but

7    was there something -- in your view as an official on the

8    scene enforcing this practice, was there something about the

9    pink wristband with XX on it that made it different if it was

10   being worn on the wrist versus it sitting on the ground or in

11   some other location?

12       A.    The wrist was the only spot that I saw it

13   displayed.

14       Q.    Okay.  We agree that my clients didn't talk to

15   Parker, didn't gesture at Parker, or anything like that?

16       A.    I didn't see them do that.

17       Q.    And you did not see anybody wear the NAD wristbands

18   there at the scene; is that correct?

19       A.    Correct.

20       Q.    Did you ask anybody else to remove the wristbands

21   other than my clients in this case?

22       A.    No.  There was a gentleman standing next to Mr.

23   Foote that removed it as soon as I asked Andy to as well.  I

24   don't know who that was, though.

25       Q.    Okay.  In hindsight do you think that maybe this

1    situation could have been handled a little better by you and
2    the other officials?
3        A.    No.
4        Q.    Okay.  Why not just talk to my clients in advance
5    of the game before things became what they did?
6        A.    Well, I did communicate with your clients before
7    the game via e-mail.
8            MR. KOLDE:  Nothing further at this time.
9            THE COURT:  Thank you, Mr. Kolde.
10           Mr. Shirley.
11                        CROSS-EXAMINATION
12   BY MR. SHIRLEY:
13       Q.    Mr. Desilets, what time did you arrive to the field
14   on the day of September 17th?
15       A.    Approximately 2:15.
16       Q.    Why were you there at that hour?
17       A.    To get the field set up prior to the teams and
18   spectators arriving.
19       Q.    And at that moment and time when you arrived to the
20   field that day what did you know about the plans of anybody
21   with regard to protests, armbands, what have you?  What did
22   you know?  What was the plan?
23       A.    I don't know.
24       Q.    You had no idea.  You had received an e-mail from a
25   Ms. Farr, correct, several days earlier?

1      A.   Yes.

2      Q.   And we've seen that document.  I'm not going to

3  pull it up.  I'll just represent to you it describes -- and

4  you read that e-mail at the time you received it, right?

5      A.   Yes.

6      Q.   It talked about several forms of things that were

7  being discussed that she had overheard, right?

8      A.   Right.

9      Q.   And there was the suggestion there was going to be

10 heckling possibly?

11     A.   Yes.

12     Q.   And maybe dressing up as girls?

13     A.   Correct.

14     Q.   Okay.  So on the day that you're at the field you

15 know somebody has heard that that's the possible scope of

16 something that's going to happen, but you don't know for sure?

17     A.   Correct.

18     Q.   Okay.  Did you see Mr. Foote arrive?

19     A.   I did.

20     Q.   Okay.  And he parked where?

21     A.   He parked in kind of a side parking lot behind one

22 of the goals.  I don't know if you want to pull up that map.

23     Q.   I'm going to pull up the field exhibit.  I'll tell

24 you in just a second.  13.

25          On the screen you'll see Plaintiffs' Exhibit 13.  I

1    think actually if you touch, you can maybe even mark the

2    screen, but if you would indicate either behind you or on the

3    screen?  There you go.

4         A.   Somewhere in one of those spots, yes.

5         Q.   Okay.  So that's parking -- where he parked his

6    vehicle?

7         A.   Yes.

8         Q.   And you said at what time was that?

9         A.   I would guess about approximately 2:30.

10        Q.   Okay.  And when was the game planned for?

11        A.   4 o'clock.

12        Q.   So about an hour and a half earlier?

13        A.   Yes.

14        Q.   Okay.  And what did he do then?  Did he get out of

15   his car?

16        A.   He got out of his car, grabbed what I assumed were

17   a couple camp chairs, and walked to the parent sideline.  He

18   typically sits right at the 50-yard line.

19        Q.   Okay.  And what were you doing during this time?

20        A.   We were sitting -- myself, Marcy, and Matt, as well

21   as the additional game help, were seated around -- standing

22   around the golf cart, in that area.

23        Q.   Did he attempt to talk to you?

24        A.   No.

25        Q.   Okay.  Did he have anything else with him in

1    addition to the chairs?

2        A.    He did.  I don't know if he carried it with the

3    chairs or not, but there was an additional bag, like a Shaw's

4    or a Market Basket bag, a plastic grocery bag that we could

5    tell had something pink inside.

6        Q.    Okay.  You had been speaking -- prior to that day

7    you had actually spoken with Mr. Foote's wife; is that right?

8        A.    Correct.

9        Q.    Okay.  You met with her in fact?

10       A.    I did.

11       Q.    Okay.  And roughly when did that happen?

12       A.    I believe that was on Friday -- I think it was

13   Friday the 13th.

14       Q.    Okay.  And what was the purpose of that meeting?

15       A.    She wanted to express her concerns about playing

16   against Plymouth and playing against a transgender soccer

17   player, that should we -- are we considering a forfeit, what

18   are we considering to address this, and things like that.

19       Q.    And what did you say in response?

20       A.    My general response was that if there are girls on

21   our team that don't want to play, they don't have to, they're

22   not going to be forced to, but we are planning to play.  Based

23   on the injunction, based on the law, that we're going to play

24   the schedule that's given to us.  And I'm assuming that

25   Plymouth is sending a roster of athletes that are in

1  compliance legally, and that we were going to play.  That I

2  wasn't really looking at a forfeit as an option.

3      Q.   Okay.  And did she have any response to your

4  response?

5      A.   She disagreed with it.

6      Q.   Okay.  That was a meeting that took place after you

7  had received Ms. Farr's e-mail, right?  Ms. Farr e-mails you

8  on September 11th?

9      A.   Right.

10     Q.   Yes.  And this was the 13th?

11     A.   Yes.

12     Q.   Any discussion by Mrs. Foote about what was being

13  planned the day of the game?

14     A.   No.

15     Q.   Okay.  You became aware -- between that meeting

16  with Ms. Foote and the day of the game you had seen images of

17  wristbands, correct?

18     A.   Yes.

19     Q.   And then you also had Ms. Farr's e-mail describing

20  the possibility of things happening?

21     A.   Yes.

22     Q.   And I want to go back then to the day of the game.

23          When your decision is made that you're going to

24  ask, say, Mr. Foote to remove the wristbands, did you know

25  that that was it, that that's all they wanted to do?

```
 1          A.   No.  I had no idea.
 2          Q.   Okay.  And did you have a concern that if you
 3   didn't do something at that point, more would happen?
 4          A.   Yes.
 5          Q.   Okay.  Thank you.
 6               I want to step back just for a second.
 7               School athletics, does that have any educational
 8   aspect or component to it?
 9          A.   School athletics is a term education-based
10   athletics.  So, yes, there is a carryover from the classroom.
11   An extension of the classroom I think is the common phrase
12   that's used.  So yes.
13          Q.   In terms of participation, is it mandatory?
14          A.   No.
15          Q.   With regard to what you do on a day-to-day basis as
16   athletic director, do you attend games regularly?
17          A.   I do.
18          Q.   Okay.  Do you have occasion to talk to referees?
19          A.   I do.
20          Q.   Do you do it during the game?
21          A.   If needed.  Sometimes at halftime.
22          Q.   Do you do it sometimes before the game?
23          A.   Yes.
24          Q.   Do you do it sometimes days before the game?
25          A.   Yes.
```

1          Q.    What kind of things do you talk to referees about?

2          A.    I mean, it depends on the situation.  If there's

3    any special circumstances within the game, if it's our senior

4    night and we're going to use some time before the game to

5    introduce seniors, if there's any sort of special event going

6    on at halftime, if there's a band playing at halftime, if

7    there's weather concerns coming in, if it's a heated game and

8    we've played this team previously and there's a rivalry.  Just

9    things that would be helpful for a referee to know going into

10   the game.

11         Q.    How about when you're at games?  Do you ever have

12   an occasion to try to patrol the sidelines?

13         A.    Yes.

14         Q.    What kind of things would provoke you to go into

15   the sidelines?

16         A.    Any sort of disruptive behavior, inappropriate

17   language, dissent towards officials or players, things like

18   that.

19         Q.    Okay.  And why would you care?  Why do you care?

20         A.    Because it's part of my job just to control the

21   sideline.  I like to view the game itself.  On the field once

22   the game starts, it's the referee's discretion to control

23   that, but I like to be able to control the outside piece of

24   that.

25         Q.    We were looking earlier at, I'm not sure if it was

1    through you, but through Ms. Kelley, looking at policy KFA.

2    You saw that on the screen just a little earlier this morning,

3    but there's policies as well that govern athletics; is that

4    right?

5         A.    Sure.  Yes.

6         Q.    Okay.  And what is that generally?

7         A.    Well, there's NHIAA policies, which is our member

8    organization.  There's rules within our own athletic handbook.

9         Q.    And what do those rules in the athletic handbook

10   talk to?  What do they speak to?

11        A.    Sportsmanship.  Generally speaking, sportsmanship,

12   sideline behavior.

13             MR. SHIRLEY:  Would you call up Exhibit I, Stacy?

14             And this is Exhibit I.  It's been introduced

15   already.  It's a full exhibit.

16        Q.    Just quickly, this is your e-mail that you sent on

17   September 16th, correct?

18        A.    Yes.

19        Q.    And this was sent to whom?

20        A.    This was sent to the girls' soccer team families.

21        Q.    Okay.  And how does that get decided?  Like, what's

22   that supposed to look like?

23        A.    We have a platform called Final Forms, which is our

24   registration platform.  So parents have to register their

25   student athletes to participate in a sport, and that will

1    populate e-mail lists of parents, families, student athletes

2    only.  There are a number of different filters that I can use,

3    so I chose the parent, e-mail parent feature to that, which is

4    going to send an e-mail to whoever's e-mail address is listed

5    in that registration.

6        Q.    Okay.  I may come back to the contents of this

7    e-mail, but I really want to just turn to the second page, if

8    you would.

9            You're now seeing what was the attachment, correct?

10       A.    Yes.

11       Q.    And what is this document?

12       A.    The top paragraph is essentially information about

13   us being a -- Bow High School being a member school of the

14   NHIAA and that they have a full slate of handbook rules and

15   regulations that we are expected to follow.

16       Q.    And what's the bottom half part of this document?

17       A.    The bottom half is a cut and paste essentially from

18   our BHS Athletics Handbook.

19       Q.    Okay.  And so you made this document.  You kind of

20   took two pieces and photographed them together -- or copied

21   them together?

22       A.    Yes.

23       Q.    And this was attached to that e-mail.  And, again,

24   this business -- what you see from the athletics handbook is a

25   statement about sportsmanship; is that right?

1        A.    Yes.

2        Q.    And when you say that there's policies about how

3    games are played and what's expected of players and fans, it's

4    contained in this statement, right?

5        A.    I believe so.

6        Q.    Okay.  And with regard to the business -- you

7    earlier just described that this handbook -- when parents are

8    enrolling their children into a program such as varsity girls'

9    soccer, is there anything about -- do the students have to

10    acknowledge this handbook in some way?

11        A.    Yes.

12        Q.    Okay.  And how does that happen?

13        A.    It happens through that registration platform Final

14    Forms where they have to agree to a number of different

15    things.  They have to include medical history and things like

16    that.  Part of that is essentially a checkbox that they

17    acknowledge that -- that they're acknowledging the handbook.

18        Q.    That this is one of the policies in participating

19    in this activity, correct?

20        A.    Yes.

21        Q.    And parents have to do the same thing, the parents

22    who enroll their children, correct?

23        A.    Yes.

24        Q.    Okay.  Do we know if any of the plaintiffs in this

25    case did that?

1          A.    Yes.

2          Q.    Did they enroll their kids in the girls' soccer

3     team for this last fall?

4          A.    They did, yes.

5          Q.    By the way, is this policy available online, the

6     handbook?

7          A.    Yes, it is.

8          Q.    It's on the Bow High School website?

9          A.    Yes.

10         Q.    I'm briefly just going to -- you were there.

11               Back to the day of the game.  It's now halftime.

12    You had not seen anything happen up to the point of halftime,

13    correct?

14         A.    Correct.

15         Q.    Okay.  And then the second half begins, and at that

16    point where are you on the field?

17               THE COURT:  Again, I've heard all the evidence.

18               MR. SHIRLEY:  That's fine.

19               THE COURT:  Unless you've got something new or

20    different.

21               MR. SHIRLEY:  There is one more piece, your Honor,

22    a proffer about the very end of the game.  It may be just

23    useful to know.  So I'll jump to that, if I may.

24               THE COURT:  Thank you.

25         Q.    At the end of the game it concludes, and I'll try

1  to do this in a -- with respect to the Bow team -- excuse me.

2  I meant to say with respect to the Plymouth team, the game

3  concludes --

4           MR. SHIRLEY:  Can you actually pull up, if you

5  would -- this may be a better way to do it.  Just pull up

6  Exhibit 13.

7           There you go.  Thank you.

8      Q.   On the screen of course, Mr. Desilets, is an

9  overview of the field.

10          Can you indicate, again with your finger, where was

11  the Plymouth bus?

12     A.   Towards the end of the game I had instructed or

13  requested that the bus driver park his bus -- am I just

14  pointing to it again?

15     Q.   If you would rub your finger on the screen.

16     A.   Sort of in this dirt parking lot.

17     Q.   Okay.  And is that where the bus was when the game

18  concluded?

19     A.   Yes.

20     Q.   Okay.  Did you give any specific direction to the

21  Plymouth team upon exiting what they should do?

22     A.   Once the game ended I went onto the field towards

23  their bench, which was on this far side of the field, and

24  tried to kind of filter or usher them towards their bus.

25  There's a gate in the fence right near where their bus was.

1    So it was kind of a direct line to their bus.

2        Q.    Can you kind of maybe with a dotted line point us

3    to how you were directing them to leave?

4        A.    Yeah.  So if they were gathered on their sideline,

5    they just kind of were going to go this way.

6        Q.    Okay.  And was there a reason that you wanted them

7    to do it that way?

8        A.    I just felt like it was a better option than having

9    them kind of dispersed through the crowd that typically is on

10   the other side, other end of the field.

11       Q.    Okay.  Did you become aware of where Mr. Fellers

12   was at the end of the game?

13       A.    In that process, I suppose, of kind of ushering

14   them.  So when I'm probably in this area here, good game,

15   congratulations, you know, head out this way, good luck the

16   rest of the season, and I got a phone call from Ms. Kelley

17   that said that Mr. Fellers was still at the game or still on

18   the property and he was parked near the road where the bus may

19   travel holding up a sign.

20       Q.    Based on what you now understand, are you able to

21   indicate where you believe Mr. Fellers was?

22       A.    Yes.  In that area.

23       Q.    Okay.  How does the bus leave if it's going to

24   leave at that point?

25       A.    Well, it depends I guess on the bus driver.  I

1    don't know what their intention was.  They had come in along

2    this road.  So oftentimes they will also go out the same way

3    they came in.  So I don't know which direction they were going

4    to head in.  They can certainly go this way as well.

5        Q.    Okay.

6            MR. SHIRLEY:  Thank you, Mr. Desilets.

7            THE COURT:  Thank you, Attorney Shirley.

8            Mr. Ducharme.

9                        CROSS-EXAMINATION

10   BY MR. DUCHARME:

11       Q.    Mr. Desilets, what was the score at the time of the

12   stoppage by Mr. Rossetti?

13       A.    I don't know the exact score.  I know that we were

14   -- that Bow was winning I would say 2-1 or 3-1 at least, yeah.

15       Q.    If Mr. Rossetti had called the game at that point,

16   what's the effect?

17       A.    I believe that the rule in soccer is if a game is

18   suspended, which typically would happen I guess for weather,

19   certainly not in this case, but the rule states that if a game

20   is suspended in the second half, it is considered final.

21       Q.    Sort of like the sixth inning of a baseball game?

22       A.    Right.  Yes.

23            MR. DUCHARME:  Okay.  Thank you.

24            THE COURT:  Redirect based on that?

25            MR. KOLDE:  Yes, although it's really cross, your

1    Honor, but I suppose it's a hostile witness.

2         THE COURT:  No.  It's direct.  You just get some

3    liberty on direct if it's a hostile witness, which you haven't

4    established, by the way, but I'll accept.

5         MR. KOLDE:  Yes.

6                        REDIRECT-EXAMINATION

7    BY MR. KOLDE:

8         Q.    Mr. Desilets, you were asked some questions about

9    the referee and the rules of the game.

10             Did you talk to this referee ahead of the game?

11        A.    Yes.

12        Q.    Okay.  And what did you tell him?

13        A.    I sent an e-mail to Steve Rossetti and Ryan Murphy

14   as the officials to let them know that we had been hearing

15   some things of potential disruptions to the game in the form

16   of a protest.

17        Q.    Did you say anything beyond that in the e-mail?

18        A.    Is that part of the -- do we have that e-mail that

19   I can review or am I just going from my memory?

20        Q.    I don't have the e-mail.

21        A.    No, I don't believe so.

22        Q.    So it's fair to say that you had informed Steve

23   Rossetti ahead of time that there might be some kind of issues

24   with speech activities at the September 17th game, correct?

25        A.    Correct.

1        Q.    Did you do anything else other than e-mail him

2   ahead of time?  Did you have a conversation with him when he

3   arrived?

4        A.    It's pretty standard for me to welcome officials to

5   the games and just have conversations, yes.

6        Q.    Did the issue of your concerns that there might be

7   some kind of expression of opinions at the game come up in

8   your brief meet-and-greet at the beginning?

9        A.    It may have been reminded.  It was nothing extended

10  beyond that initial conversation.

11       Q.    Did Steve Rossetti respond to your e-mail that you

12  had sent before the game?

13       A.    I don't believe so.

14       Q.    Okay.  And we all know about the stoppage, and Mr.

15  Ducharme asked you some questions about the stoppage and what

16  the rule is.

17            We've seen the videotape and some people, and I

18  don't recall if it was you and Mr. Fisk or just Mr. Fisk, were

19  telling Eldon Rash essentially, look, you know, this could end

20  up in a forfeit for your granddaughter, or I believe the exact

21  words were adverse consequences for your granddaughter.

22            Were you there to hear that?

23       A.    I don't believe so.

24       Q.    Okay.  Did you hear anybody, any of the Bow

25  officials talking to Eldon Rash that day telling him

1    essentially you need to take this off or we're going to have a

2    problem here with a forfeit or something like that?

3        A.    Not a forfeit.  I was there when Mr. Fisk initiated

4    the conversation.  When the stoppage happened and I went on

5    the field, I think there was further conversation that I

6    wasn't present for.

7        Q.    Were you present when Steve Rossetti walked up and

8    said, the wristband comes off or this game is over?

9        A.    I believe I was talking to the Plymouth coach at

10   that point.

11       Q.    Okay.  So you weren't there for that part?

12       A.    Correct.

13       Q.    All right.  But you saw it on the video?

14       A.    Yes.

15       Q.    All right.  Did you talk to Steve Rossetti on the

16   field during the stoppage?

17       A.    Yes.

18       Q.    Did you ask him to do anything?

19       A.    No.

20       Q.    What did you tell him?

21       A.    He blew the whistle, which stopped it, and that

22   prompted me to walk onto the field to meet with him because,

23   A, I didn't know why he had stopped it.  I had an idea, but I

24   don't know what he -- so we discussed, you know, that he had

25   heard there was a commotion.  And I said, yeah, I think

1    that -- I don't know that there's a lot of -- a lot left of

2    it.  I said, let's wait a couple minutes to see if we can get

3    this wristband off and resume the game.

4         Q.   Did he follow your direction to wait a few minutes?

5         A.   He did.  I originally thought that maybe we would

6    continue the game then, but at that point the teams had

7    already gone back to the sidelines so it didn't make sense to

8    call them back out.  So essentially it remained stopped at

9    that point.

10        Q.   Did Mr. Rossetti say anything about what he thought

11   about the wristbands being worn by my clients?

12        A.   No.

13        Q.   Did Rossetti ask you to do anything?

14        A.   Other than let him know, no.

15        Q.   Did you and he discuss a possibility of abandoning

16   the game or stopping the game from that point on because of

17   the wristbands?

18        A.   Not at that point.  I think the second conversation

19   that came up.

20        Q.   All right.  So tell me about what was discussed in

21   that second conversation relative to abandoning or stopping

22   the game because my clients were wearing the wristbands -- or

23   at this point it was only Eldon Rash.

24        A.   Yeah.  That was more along the lines of what do you

25   want to do, we've been delayed here for however long it was,

1    ten, fifteen minutes, you know, at this point the game would

2    be considered final.  How long do we wait?  What do you want

3    to do from here?

4        Q.    And what did Rossetti say?

5        A.    That's what Rossetti had said.

6        Q.    Oh.  And what did you say?

7        A.    I just kind of continued, you know, I'm going to

8    talk to the coaches, let's see where we're going and give them

9    some information.

10       Q.    I can barely hear you.

11       A.    Talk to the coaches to give them information

12   because they weren't necessarily in the loop of why the

13   stoppage had happened, trying to explain to them, explain to

14   the Plymouth coach that an option was to --

15       Q.    Right.  I'm only asking you about Rossetti.  So

16   let's focus on Rossetti, all right?

17             So Rossetti offered to call the game; is that

18   correct?

19       A.    It was presented as an option.

20       Q.    Okay.  And he was presenting the option to you; is

21   that correct?

22       A.    Yes.

23       Q.    And what feedback did you give him on that option?

24       A.    Essentially, not yet.

25       Q.    Okay.  Wait and see; is that right?

```
 1        A.    Yes.

 2        Q.    And that's what you did; is that correct?

 3        A.    Yes.

 4        Q.    All right.  And then eventually my client, Eldon

 5   Rash, did take the wristband off and placed it on his knee; is

 6   that correct?

 7        A.    Correct.

 8        Q.    All right.  And you learned that through the radio

 9   call from Ben Forbes, correct?

10        A.    Yes.

11        Q.    All right.  And that was important information to

12   you; is that correct?

13        A.    It was.

14        Q.    And at that point you instructed Steve Rossetti to

15   go ahead and resume the game; is that correct?

16        A.    Yes.

17        Q.    All right.

18             MR. KOLDE:  Nothing further.

19             THE COURT:  Great.  Anything else based on that?

20   No?  Good.

21             All right.  We'll adjourn for lunch now.  Why don't

22   we say 1:15 and try to cut it back just a little bit.

23             We're going to stop at 4:30 today whatever.

24             MR. KOLDE:  Understood.

25             THE COURT:  I can't imagine there's any evidence
```

1    left that we haven't already seen or covered.  But if we

2    arrive at 4:30 and you claim there is such evidence, any of

3    you, we'll reschedule it into the future if necessary, but

4    probably what I'll do is limit you to offers of proof to fill

5    in the record as you think best.

6                Okay.  See you at 1:15.

7                (RECESS)

```
1                    C E R T I F I C A T E

2

3

4          I, Susan M. Bateman, do hereby certify that the

5    foregoing transcript is a true and accurate transcription of

6    the within proceedings to the best of my knowledge, skill,

7    ability and belief.

8

9

10   Submitted:  12-2-24     /s/  Susan M. Bateman _____
                             SUSAN M. BATEMAN, RPR, CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```