*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO MARCH 3, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

```
* * * * * * * * * * * * * * * * * * *
                                    *
KYLE FELLERS, ET AL                 *
                                    *
              Plaintiffs,           *
                                    *   1:24-cv-311-SM-AJ
         v.                         *   November 21, 2024
                                    *   9:42 a.m.
MARCY KELLEY, ET AL                 *
                                    *
              Defendants.           *
                                    *
                                    *
* * * * * * * * * * * * * * * * * * *
```

TRANSCRIPT OF EVIDENTIARY HEARING
MORNING SESSION
BEFORE THE HONORABLE STEVEN J. MCAULIFFE

Appearances:

For the Plaintiffs:          Endel Kolde, Esq.
                             Brett Robert Nolan, Esq.
                             Nathan John Ristuccia, Esq.
                             Institute for Free Speech

                             Richard J. Lehmann, Esq.
                             Lehmann Major List, PLLC


For the Defendant,           Brian J.S. Cullen, Esq.
SAU 67:                      Jonathan M. Shirley, Esq.
                             Cullin Collimore Shirley, PLLC


For the Defendant,           Dennis T. Ducharme, Esq.
Steve Rossetti:              Ducharme Resolutions, PLLC


Court Reporter:              Liza W. Dubois, RMR, CRR
                             Official Court Reporter
                             U.S. District Court
                             55 Pleasant Street
                             Concord, New Hampshire 03301
                             (603) 225-1442

```
1                          I N D E X

2

3

    WITNESS:              Direct   Cross   Redirect   Recross
4

5   Kyle Fellers
      By Mr. Kolde        43
6

7

8   EXHIBITS:                      FOR ID              ADMITTED

9   Plaintiff's Exhibit 13                               59

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The court is in session and has for
 3     consideration an evidentiary hearing in the matter of Kyle
 4     Fellers, et al, vs. SAU 67 Superintendent, et al, civil case
 5     number 24-cv-311-SM.
 6              THE COURT:  Okay.  Good morning, Mr. Kolde.  Good to
 7     see you again.
 8              MR. KOLDE:  Good morning.
 9              THE COURT:  All right.  Let's start.  Why isn't it
10     moot?
11              MR. KOLDE:  Okay.
12              THE COURT:  Not -- not the whole case, obviously,
13     but the motion for -- for preliminary injunction.
14              MR. KOLDE:  Good morning, your Honor.  May it please
15     the Court.
16              The Court has before it a live controversy about
17     preliminary injunctive relief because this case isn't just
18     about wearing wristbands at soccer games or displaying signs in
19     the parking lot at soccer games.  My clients want to silently
20     express their views in support of women's sports at other
21     sporting events and extracurricular events, and they've so
22     stated since the outset of this case.  Their declarations
23     reflect that.
24              I'll give the Court some examples of games that are
25     imminent -- of sporting events that are imminent:  Girls
```

1   varsity basketball games, girls' ski team events, girls' swim

2   team events, boys' hockey events, and at least a middle school

3   band winter concert.  These games will be happening

4   in -- some of them, of these events, will be happening in

5   December, so just a few weeks away, and some in January and

6   beyond.  I can give the Court specific dates if you want.

7             In addition, some of the children of my plaintiffs

8   will likely participate in girls' lacrosse.  That is a spring

9   sport, but that is going to be -- they're going to have tryouts

10  in February with practices starting in March.

11            They've said that they want to wear these wristbands

12  at more than just soccer events in their declarations.  They

13  said also at other sporting events, they gave some specifics in

14  their declarations and at least three of the declarations refer

15  to other extracurricular activities.

16            I think it's important for the Court to also just

17  take note with regard to the mootness issue that policy KFA,

18  which is at the heart of the defendant's censorship regime,

19  applies on or off school property.

20            And if I could just call that up real quick.

21            And this has been marked as Plaintiff's 1, your

22  Honor.  And we don't need to go through the whole policy right

23  now, but right here in the very lead paragraph it says:  For

24  purposes of this policy, school property means any buildings,

25  vehicles, property, land, or facilities used for school

1   purposes or school-sponsored events, whether public or private.

2           So it doesn't even need to take place on Bow School

3   District-owned property.  It could be property that they have

4   rented or leased --

5           THE COURT:  Yeah, implied is that they have

6   possessory use and control over the property for school events.

7   That makes it a limited public forum, doesn't it?

8           MR. KOLDE:  I agree with you.

9           THE COURT:  You know, it occurs to me that -- not to

10  interrupt you, but it's an interruption.

11          It occurs to me that there's not -- I don't --

12  there's not a lot of actual disagreement between the parties

13  here.  But let's explore that.

14          The plaintiffs -- you do not disagree, you agree,

15  that a school district, a school board, does have the authority

16  to limit speech in a limited public forum, a school-controlled

17  limited public forum, for the purpose of protecting children

18  participating in sports from harassment, intimidation,

19  targeting, degrading, dehumanizing speech, right?

20          MR. KOLDE:  To some degree, yes, your Honor.  I

21  think that --

22          THE COURT:  Okay.  All right.  Let's --

23          MR. KOLDE:  -- it depends on the facts.

24          THE COURT:  Let's work in steps.  Yeah, I know.  I

25  know you hate to concede the time of day, but let's work in

1    steps.

2              Okay.  And that's proper.  That's a correct

3    concession.

4              MR. KOLDE:  Qualified concession, your Honor.

5    Depends on the facts.

6              THE COURT:  Correct.  Correct qualified concession.

7              Your position is that's not what happened here.  Our

8    clients were not targeting, intimidating, harassing, whatever;

9    didn't intend to, didn't actually do it, didn't pose a

10   reasonable threat of it.

11             That's your position.  Right?

12             MR. KOLDE:  (Nods head.)

13             THE COURT:  The school board's position is that's

14   what we acted to prevent.  We think you did.  We agree we can't

15   limit free speech broadly -- we can't limit passive,

16   undisturbing, nonthreatening speech -- but we didn't try to.

17             So there's a factual dispute here, right, about what

18   you did and what you -- what your clients did and what they

19   intended to do and there's a flip-side factual dispute of what

20   the school board did or tried to do and why, right?

21             It's not so much a legal disagreement.  It's a

22   factual disagreement.

23             MR. KOLDE:  You know, I respectfully disagree, your

24   Honor.  I don't think --

25             THE COURT:  Okay.  Why?  Tell me why.

1          MR. KOLDE:  The facts aren't even close.  The --

2          THE COURT:  Well, no, don't argue it.  Tell me why

3    it's not a factual dispute and it's just a legal dispute.

4          MR. KOLDE:  Because they don't dispute that all my

5    clients did was wear pink wristbands with XX on them.  Okay?

6    All the other stuff is window dressing and distraction.  That's

7    all my clients did.

8          And if you watch the video, which we're prepared to

9    play, it completely backs up my clients' version of events.  It

10   absolutely shows that nothing was going on until the officials

11   decided to confront my clients.  There was absolutely no

12   behavior or messaging targeted at any of the players on the

13   field.  The players likely didn't even know what was going on.

14         THE COURT:  That's just the long -- that's just a

15   long-winded way of saying we disagree that that was our action,

16   our intent, or the natural risk of our action or intent.

17   That's all you're arguing.

18         MR. KOLDE:  No, we're arguing that there was no

19   harassment.  And I --

20         THE COURT:  Yes, of course.  You're saying as a

21   factual matter, we didn't harass.  Our actions didn't have a

22   tendency to harass, our actions were not in the realm of

23   regulatable conduct because we didn't mean to, we didn't

24   actually, and this doesn't constitute.  That's all you're

25   saying, as a factual matter.

```
 1                    MR. KOLDE:  Well --

 2                    THE COURT:  They're going to get up and say the

 3      absolute opposite:  Given the background, given the emails,

 4      given the social media, given the warning, that's exactly what

 5      you intended to do.

 6                    MR. KOLDE:  May I show the Court one thing from

 7      their -- their --

 8                    THE COURT:  No, I'm not going to resolve that

 9      factual issue right now.  I'm just saying --

10                    MR. KOLDE:  Yeah.

11                    THE COURT:  -- isn't that what we have here, a

12      factual dispute, not a -- a legal dispute?  You agree --

13                    MR. KOLDE:  I disagree that there's actually a

14      factual dispute.  It is a -- it's about -- I think most of the

15      facts are agreed; it's the conclusions to be drawn from the

16      facts.

17                    They call what my clients did -- I don't think

18      there's actually a dispute about what my clients did.  Those

19      are the facts.  They call it harassment.  We don't call it

20      harassment.

21                    THE COURT:  Or they call -- or they don't.  They may

22      not.  They may actually just say, no, it may not have gotten to

23      that level, but we get to regulate speech to -- so it doesn't

24      get to that level.

25                    MR. KOLDE:  That's a legal --
```

1            THE COURT:  We don't have --

2            MR. KOLDE:  That's a legal question, not a factual

3    question, your Honor.  That is not a -- that is not a factual

4    dispute.

5            THE COURT:  But it's not a disagreement about First

6    Amendment law.  It's a --

7            MR. KOLDE:  It absolutely is a disagreement about

8    First Amendment law.

9            Could you please pull up their overreaching and

10   breath-taking statement in their prehearing memo, which is

11   really -- when I read it, my jaw just dropped.

12           This is from page 13 of their prehearing memo just

13   filed a few days ago.  They make this statement, which is an

14   error of law, and truly surprising.

15           Quote:  The district is justified in treating

16   plaintiffs' wristbands and signs at soccer games and the

17   parking lot as targeting the school's transgender and

18   gender-nonconforming student population generally for

19   harassment and intimidation irrespective of whether those

20   students are playing on the field, attending the games as a

21   spectator, or present at the games at all.

22           This is absolutely legal dispute.  And it --

23           THE COURT:  It sounds a lot like what *J.M.* stood

24   for.

25           MR. KOLDE:  *J.M.* is a different case.  It's about

1    regulating student speech --

2                    THE COURT:  I know.

3                    MR. KOLDE:  -- in the classroom.

4                    THE COURT:  But that's the concept in *J.M.*, right?

5    You're saying it doesn't translate to adults, but that's the

6    concept in *J.M.*

7                    MR. KOLDE:  I just think *J.M.* is a different case.

8                    THE COURT:  Where is that, do you know?

9                    MR. KOLDE:  I'm sorry?

10                   THE COURT:  Where does that stand?

11                   MR. KOLDE:  Sur-petition's been filed.  It's a good

12   sur-petition I hope they grant but, you know, the Supreme Court

13   doesn't take enough cases, unfortunately.

14                   THE COURT:  Do you know when it was filed?

15                   MR. KOLDE:  My expert's here.

16                   THE COURT:  I'm not going to hold you to it.  Just

17   roughly.

18                   MR. NOLAN:  The response --

19                   MR. KOLDE:  Go ahead, Brett.  Why don't you --

20                   MR. NOLAN:  The response to the sur-petition has

21   been waived and so it's pending whether the Court will call for

22   a response or not.  The sur-petition was filed, I think, about

23   60 days ago.

24                   THE COURT:  Oh, good.  Okay.  So that's, you know --

25                   MR. KOLDE:  It's in the pipeline, yeah.

1          THE COURT:  Okay.  All right.

2          MR. KOLDE:  So, in any event, I mean, we -- you

3    know, legally -- ultimately, I think this is more a legal

4    dispute than it is a factual dispute and, you know, to -- to

5    summarize, I think, where some of the legal disagreement is in

6    this case, I think the Court and plaintiffs agree that these

7    sporting events are a limited public fora.  The law is clear on

8    that.

9          The defense seems to nod -- have a nod towards,

10   yeah, they might be limited public fora, but then they keep

11   trying to come back and argue, no, they're nonpublic fora.

12   However, nonpublic fora have the same legal test as limited

13   public fora:  Got to be viewpoint-neutral, you've got to have

14   reasonable content-based restrictions, you can't have viewpoint

15   discrimination.

16         And then what they do through the back door, and his

17   is where I think there's some sleight of hand and really

18   inaccurate legal argumentation going on, is that they try to

19   treat my clients like students and bring in *L.M.* through the

20   back door.  They want to do that, and I understand why they

21   would want to do that.

22         But my -- as this Court has recognized and I think

23   you -- you know, the Court understands this, my clients are

24   adults in a limited public forum and this Court has stated

25   previously at the hearing, and this is a correct statement of

1    law and I don't think there's any -- any authority that I know

2    of to the contrary, that adults enjoy more rights than students

3    to speak, including in limited public fora.

4              And so they have taken, actually, the opposite

5    position and they've done it repeatedly, including in their

6    prehearing memo, that they want to say that, no, this is only

7    about the students, these events are about the students, and,

8    actually, my clients have less rights even than students.

9              That's simply not true.  That is a legal dispute.

10   But that -- that explains a lot about why they treated my

11   clients the way they did.  They treated my clients like a

12   student wearing this wristband in the classroom.  And while I

13   personally would defend a student's right to wear this

14   wristband in the classroom, I would agree with the Court that

15   that is a different forum or a different situation and a

16   different legal test and would be analyzed under *Tinker* and in

17   this circuit under *L.M.* as long as *L.M.* remains, you know, good

18   authority.

19             So --

20             THE COURT:  That -- that you can regulate student

21   conduct doesn't follow that you cannot regulate an adult

22   conduct -- adult's conduct.  And sometimes the conduct that you

23   prohibit a student from engaging in in school is also

24   prohibited -- prohibitable by an adult at an extracurricular

25   activity, right?

1          MR. KOLDE:  Perhaps if you're speaking in

2    generalities, your Honor, but this is not conduct.  This is

3    speech.

4          THE COURT:  Because you've already agreed --

5          MR. KOLDE:  Yeah.

6          THE COURT:  -- yes, if my clients had organized,

7    gotten together, shown up at a school extracurricular event and

8    on a limited public forum for the purpose of targeting and

9    harassing a transgender student-athlete while playing, you

10   would agree that speech can be restricted.

11         You've -- I think you've already agreed to that,

12   right?

13         MR. KOLDE:  I -- I think that it --

14         THE COURT:  I'm an adult and I get to target

15   transgender students while engaged in school activities.

16   That's a silly proposition and you don't advance that, right?

17         MR. KOLDE:  I guess I'm not exactly following --

18         THE COURT:  Yes, if your clients had gotten together

19   and if it could be shown that they said, look, we don't want

20   that trans girl playing on a girls' team, competing in high

21   school girls' soccer, and we're going to show up and make her

22   feel uncomfortable and hopefully get her to quit, you would

23   agree that speech, for that purpose, would be subject to

24   legitimate regulation under the First Amendment, right?

25         MR. KOLDE:  If -- if they engaged in --

14

```
 1                THE COURT:  Take --

 2                MR. KOLDE:  -- actual --

 3                THE COURT:  -- take my -- take my -- take my

 4   presentation of assumed facts as correct and don't tell me I --

 5   I want to change the facts and then it isn't.

 6                Take my presentation of facts.  Would you not agree

 7   that speech is regulatable?

 8                MR. KOLDE:  It -- it might be, your Honor.

 9                THE COURT:  Might be?

10                MR. KOLDE:  Yes.  Your Honor --

11                THE COURT:  You think the First Amendment allows

12   adults to show up at school activities and harass a student

13   while playing?

14                MR. KOLDE:  May I argue, your Honor?

15                THE COURT:  No.  Take my facts and admit the

16   obvious --

17                MR. KOLDE:  Yes.

18                THE COURT:  -- yes, the school can regulate such

19   conduct, and we'll back off from there.

20                MR. KOLDE:  If -- if there was actual harassment,

21   yes.

22                THE COURT:  Taking -- take my facts as I give them

23   to you.  You're a lawyer.  You can assume facts for purposes of

24   the argument.

25                MR. KOLDE:  The facts are conclusory legal
```

1    conclusions, so --

2              THE COURT:  Take my facts as correct and answer the

3    question.

4              MR. KOLDE:  By doing what, your Honor?  By doing

5    what, specifically?

6              THE COURT:  By telling me, yes, I agree, that type

7    of speech can be regulated.

8              MR. KOLDE:  What harassment, though?  What is the

9    harassment?  What is --

10             THE COURT:  Targeting a transgender student.

11             MR. KOLDE:  What does that mean?  What does that

12   mean, targeting?

13             THE COURT:  Yelling at her, waving a sign, you don't

14   belong, transgender student.  That stuff.

15             MR. KOLDE:  Naming the student by name?

16             THE COURT:  No.  Transgender students out, that kind

17   of sign.

18             You're telling me that can't be regulated?

19             MR. KOLDE:  On the sidelines?

20             THE COURT:  Yes.  On the grounds, on the -- in the

21   limited forum.

22             MR. KOLDE:  That would be a harder case.  I probably

23   wouldn't take that case.

24             THE COURT:  Well, you know, concession is good for

25   the soul sometimes.

1              MR. KOLDE:  Yeah.

2              THE COURT:  Yeah.

3              MR. KOLDE:  Well, Judge, I want to make clear --

4              THE COURT:  If you won't concede the obvious,

5    then --

6              MR. KOLDE:  Judge --

7              THE COURT:  -- I'm going to find it difficult to

8    follow you in the rest of your --

9              MR. KOLDE:  Well, I understand that the Court is

10   trying to get us to concede certain parts of our case, but --

11             THE COURT:  No, I'm trying to get you to concede the

12   obvious so we can move back from it.

13             MR. KOLDE:  Well, it's less than obvious to me, your

14   Honor, and you'll have to forgive me because the Court is using

15   conclusory terms that the defendants have used without --

16             THE COURT:  No, I'm using facts that establish

17   harassment.  Whatever facts in your mind would establish

18   harassment of a student while engaged in extracurricular

19   activities, do you not concede that kind of behavior can be

20   regulated?

21             MR. KOLDE:  May I --

22             THE COURT:  And the answer is no.

23             Move on to another topic.

24             MR. KOLDE:  Okay.  If I may make the statement then,

25   your Honor, I would say that if -- if one of my clients had

1    stood on the sidelines and said --

2            THE COURT:  No, you're changing the facts.  You're

3    changing --

4            MR. KOLDE:  -- Parker, get out of here, then, yes,

5    that would have been --

6            THE COURT:  Don't change the facts.

7            MR. KOLDE:  Okay.

8            THE COURT:  Do you not concede that the school has

9    the power under the First Amendment to regulate harassing

10   speech aimed at discouraging a transgender student from

11   participating in girls' sports?

12           MR. KOLDE:  Under a limited public forum standard,

13   yes.

14           THE COURT:  Yes, of course.

15           MR. KOLDE:  Yes.

16           THE COURT:  That's the standard that applies.

17           MR. KOLDE:  Sure, if it's -- if we're talking

18   limited public forum, yes, your Honor.

19           THE COURT:  Yes.  Yes.

20           MR. KOLDE:  But I want to emphasize ours is an

21   as-applied challenge, not a facial challenge.

22           THE COURT:  Well --

23           MR. KOLDE:  The facts do matter, and the facts are

24   largely agreed that did not occur in this case.

25           THE COURT:  The facts are probably not largely

```
 1    agreed and the contention is that's exactly what happened.
 2    So --
 3                    MR. KOLDE:  Well, that's how they've characterized
 4    it --
 5                    THE COURT:  Of course.
 6                    MR. KOLDE:  -- but they have not said our clients
 7    did anything other than wearing the wristbands.  If the Court
 8    reads, as we have, the declarations very carefully, they don't
 9    actually allege that my clients at any point yelled at Parker
10    or held up signs on the sidelines that have content like that.
11                    THE COURT:  No, no.
12                    MR. KOLDE:  And the video supports what my clients
13    have been saying.
14                    THE COURT:  The point isn't to conclusorily find
15    what your clients did at this hearing.  The point here, for me
16    anyway, is to try to figure out whether or not what we have
17    here is a factual, not a legal, dispute.
18                    MR. KOLDE:  It's a legal dispute, your Honor.
19                    THE COURT:  Okay.
20                    MR. KOLDE:  There are -- the facts, I think, are
21    largely agreed.  It is -- it is a legal dispute, including what
22    conclusions are to be drawn from the facts.  We call this
23    legal, passive speech.
24                    THE COURT:  Okay.  What's --
25                    MR. KOLDE:  They call it harassment.
```

1           THE COURT:  What's the uncontroverted evidence with

2     respect to the school board's or the school -- I'm not sure, is

3     it the school district or the town, both?

4           MR. CULLEN:  The district, your Honor.

5           THE COURT:  The district.

6           What's the school -- what's the evidence of the

7     school district's intent and purpose?  What's the evidence of

8     the school district's actual directive?  What's the evidence of

9     the school district's -- you have a conspiracy claim, who

10    conspired in what way, saying what, doing what, meaning what?

11    Where is all that?

12          MR. KOLDE:  That's a --

13          THE COURT:  That's uncontroverted.

14          MR. KOLDE:  -- compound question, your Honor.

15          THE COURT:  Where is all that?

16          MR. KOLDE:  Which question would you like me to

17    answer first?

18          THE COURT:  Yeah, where is all that?

19          MR. KOLDE:  Which part?

20          THE COURT:  The uncontroverted evidence that shows

21    all that.  You say it's not controverted.

22          MR. KOLDE:  What they did, which is sensor my

23    client, is uncontroverted.

24          Could I have the notes --

25          THE COURT:  No, no.  I think you might have missed

1    my question again.

2              You allege a conspiracy.

3              MR. KOLDE:  Correct.

4              THE COURT:  Okay.  What's the uncontroverted

5    evidence that you rely upon that establishes that two or more

6    people reached an agreement to achieve an unlawful purpose?

7    When did they do it, what did they say, how did they do it,

8    what was the effect?

9              I think that's controverted.  I think they're

10   saying --

11             MR. KOLDE:  The conspiracy may be, your Honor, but

12   the viewpoint discrimination is not.

13             THE COURT:  Okay.

14             MR. KOLDE:  They claim a right to be able to engage

15   in viewpoint discrimination.  We don't have to prove every

16   claim in our case at an MPI hearing for it to be -- for us to

17   be entitled to relief.

18             THE COURT:  Exactly.

19             MR. KOLDE:  It's viewpoint discrimination.

20             THE COURT:  That's exactly my point.

21             MR. KOLDE:  Yeah.

22             THE COURT:  You don't have to prove it here, nor

23   could you, because it's disputed.

24             MR. KOLDE:  The conspiracy perhaps, but the

25   viewpoint discrimination, I think it's -- they -- I mean, they

1    all but admit it, your Honor.  They don't call it that, but

2    they keep saying --

3            THE COURT:  No, they call it conduct regulation.

4            MR. KOLDE:  Yeah, which is -- that's a -- that's a

5    conclusion of law and it's --

6            THE COURT:  Okay.

7            MR. KOLDE:  -- a clear error of law.

8            THE COURT:  And so tell me again why -- well, tell

9    me again why the motion for preliminary injunction isn't moot.

10           MR. KOLDE:  Because they still want to be able to do

11   it.  If my clients show up to the Bow girls' basketball game

12   wearing this wristband, there's a Bow -- there's a home game

13   against Bishop Brady on December 13th.  There's a home game

14   against Souhegan, if I'm pronouncing that right, on December

15   17th.  There's a boys' swim meet coming up in December,

16   December 6th, December 18th -- a Bow swim, sorry, that's girls'

17   swimming.  If my clients show up wearing this wristband, as

18   they have stated that they want to do, silently, they face

19   potential sanctions.

20           Again I'd point the Court to what they state in

21   their prehearing brief.  There doesn't need to be a trans

22   player on the field or competing in the pool.  There doesn't

23   need to be a trans player in the stands.  They don't even need

24   to be present at all.  They are saying they will enforce their

25   policy, and their policy says it applies wherever there's a

1    school event.  And they've already shown, your Honor, that they

2    will enforce the policy by the way they treated my clients at

3    the soccer game.

4            If I may, your Honor, just remind the Court about

5    the contents of the Fellers' no trespass order.

6            THE COURT:  Which is expired.

7            MR. KOLDE:  Which is expired, but it's evidence of

8    how they've handled this in the past.  And, by the way, they've

9    said they will do it again.  Because look at what they said in

10   their prehearing brief:  We don't even need a trans kid there

11   and we're going to enforce this policy.

12           All right?

13           So if we could just scroll down a little bit, let's

14   see here, maybe the second page.  Yeah, you're right.

15           Specifically:  Prior, during the soccer game, you

16   led a protest regarding the participation of a transgender

17   female student on the team.  The protest was designed to and

18   had the effect of intimidating, threatening, harassing, and

19   discouraging that student as well as any other students from

20   playing.

21           That -- that's what they've shown they're going to

22   consider wearing a pink wristband with XX on it.  My clients

23   obviously face the risk of being hit with no trespass orders

24   like this again if they show up at any of the events that I've

25   just listed for the Court.

1           And I have a longer list.  I don't want to take up

2    the Court's time, but there are many other events that my

3    clients want to go to in the next few months and express

4    themselves passively and quietly by wearing these wristbands.

5    They face sanctions if they do that because, according to the

6    Bow School District, just wearing a pink wristband with XX on

7    it is intimidation, threatening, and harassment, which are

8    essentially legal conclusions, your Honor.  They are drawing

9    conclusions from the undisputed facts.  They have not pointed

10   to any actual evidence that my clients did anything other than

11   wear these pink wristbands.

12          And if the Court would allow us at some point this

13   morning to play the body cam video from the sidelines, that

14   doesn't show everything that happened, but it shows a big chunk

15   of the interactions.  It's very clear that, you know, my

16   clients were engaging in silent speech and what -- the exchange

17   between the school officials and my client Kyle Fellers shows

18   that no one was harassing Parker and no one was harassing any

19   player on the field, and that the disruption was caused --

20   interruption, rather -- of the game was caused by the officials

21   confronting my clients and asking them to remove the

22   wristbands.

23          So that's what was going on.  This is viewpoint

24   discrimination, your Honor.  It's very clear.  They're proud of

25   it.  They think they're right.

1          THE COURT:  It sounds like you're arguing the merits

2    for a permanent injunction request as opposed to telling me why

3    the motion for a preliminary injunction with respect to these

4    games isn't moot.  That's your motion.  Your motion is give me

5    a preliminary injunction relative to these games and that --

6    those --

7          MR. KOLDE:  Our motion said athletic events, your

8    Honor.  It did not say soccer games.  Our motion was towards

9    athletic events.  It's very clear and our clients' declarations

10   very clearly stated they wanted to attend other athletic events

11   and other extracurricular activities, not just soccer events.

12   It is wrong to say that we only asked for it for soccer games.

13   It's simply not true.

14          THE COURT:  All right.

15          MR. KOLDE:  And I can -- do we have the motion?

16          THE COURT:  I have it somewhere here.  I'll find it.

17   Unless you have it --

18          MR. KOLDE:  I think he has it handy if you'd just

19   give us ten seconds.

20          So this is docket 14, you know -- no, this is not --

21   this is the wrong one.

22          THE COURT:  I have it somewhere.

23          MR. KOLDE:  Oh, yeah.  Plaintiffs also request an

24   injunction.

25          Plaintiffs are likely to succeed on their claim that

1    defendant's policy prohibits -- prohibiting spectators at

2    school athletic events from silently expressing views about

3    girls' and women's sports by wearing pink wristbands or

4    displaying signs in the parking lot violates the First

5    Amendment.

6            So this was not limited, our request for relief.

7    This is in our short motion for preliminary injunction, not the

8    memorandum, but the memorandum also makes -- repeatedly makes

9    arguments about the nature of extracurricular events as limited

10   public fora.

11           You know, the defendants have said, oh, well, you

12   need to supply more facts about the nature of those fora.

13           Your Honor, the Court and plaintiffs agree on this

14   issue.  Defendants are the only ones that appear to disagree.

15   Bow athletic events are limited public fora and to state

16   otherwise is an error of law.

17           THE COURT:  I'm looking at document -- docket number

18   14-1 filed October 4th.

19           MR. KOLDE:  Yes.  There is a reference in there to

20   enjoining enforcement of a policy at extracurricular events on

21   page 2, your Honor.

22           If you look at -- if the Court looks at page 2,

23   Subsection C:  We ask the Court to enjoin enforcing those parts

24   of policy KFA -- and I'm skipping ahead from the quote from

25   policy KFA -- from interfering with any school activities or

1  function to prevent attendees at any extracurricular event from

2  nondisruptively expressing disfavored viewpoints on political

3  or social issues, including protesting against allowing

4  biological boys playing in girls' and women's sports by

5  silently wearing a pink wristband on the sidelines or

6  displaying a sign in the parking lot.

7          So this is what we asked for.

8          THE COURT:  That -- doesn't that seem tailored to

9  your specific claim for irreparable injury arising out of the

10 display at this soccer game?

11         MR. KOLDE:  Well, the as-applied relief applies

12 certainly to the wearing of the wristband and -- and the

13 wanting to display signs in the parking lot, but we used

14 extracurricular event for a reason, your Honor, and that's

15 because we didn't want to limit ourselves to the soccer season.

16 Okay?

17         Defendants play games about mootness all the time

18 and run out the clock.

19         THE COURT:  Oh, it's not running out the clock.

20 Your -- if -- it's not running out the clock.

21         MR. KOLDE:  Well --

22         THE COURT:  Your preliminary injunction claim is

23 preserved.  That doesn't go away.

24         MR. KOLDE:  We clearly wanted -- this isn't just

25 about soccer, your Honor, and we clearly --

1          THE COURT:  Well, I agree it may not be, but your

2   request for a preliminary injunction, in my view, related to

3   these events, the actual events, not to some future speculative

4   event in which they may or may not --

5          MR. KOLDE:  That's what a preliminary injunction is

6   for.  It's essentially a preenforcement challenge.

7          THE COURT:  Of course.

8          MR. KOLDE:  They've already enforced it against us

9   and we are worried they're going to enforce again.  And they've

10  said they will enforce it again, your Honor.

11         THE COURT:  I have a vague familiarity with what

12  it's for.

13         MR. KOLDE:  Yeah.

14         THE COURT:  But you've talked -- you targeted these

15  events and these events are over.  And now you have the burden

16  of showing that these events identical or substantially close

17  will arise again in the future.

18         And you're positing -- it seems to me you're

19  speculating.  You're trying to turn this motion into a broad

20  forum future preliminary injunction motion, which I -- I don't

21  think I'm going to allow to you do.

22         But who knows what the future brings.  Who knows how

23  they're going to enforce it, if they're going to enforce it.

24         MR. KOLDE:  Judge, I just couldn't disagree with you

25  more.

```
1                THE COURT:  I understand.

2                MR. KOLDE:  I think as a matter of mootness -- I

3      mean, this case is not moot.

4                THE COURT:  The case is not moot.  That's not --

5                MR. KOLDE:  Neither is the --

6                THE COURT:  -- what we're talking about.  We're

7      talking about your motion for preliminary injunction.

8                MR. KOLDE:  If they had come up here and said, we're

9      not going to enforce the policy, we made a mistake, we

10     overreached, this would be a harder call.  But they have not

11     said that.  They have said, and we've quoted the -- the

12     prehearing memo:  We were right to do what we did, we're going

13     to do it again, even if there's no trans player on the team,

14     even if there's no trans player even at the event.  We have the

15     right to enforce our policy.

16               And the language they've used all throughout is that

17     this -- wearing this wristband is harassment and intimidation.

18     It is not.

19               My clients cannot -- as a practical matter, your

20     Honor, my clients cannot go to any of these events that are

21     happening in a few weeks that they have stated in their

22     original declarations that they filed when we filed our motion

23     for preliminary injunction and TRO, it's in their declarations

24     that they want to wear these wristbands.  They can't do that

25     because they're going to face no trespass orders again or
```

 1    potentially having events forfeited.

 2              So that's the reality.  They're self-censoring, with

 3    good reason, because they've already been censored before and

 4    defendants have said they're going to do it again.  That is why

 5    this is not moot.

 6              THE COURT:  Okay.  Anything else on that subject?

 7              MR. KOLDE:  I think I'll reserve an opportunity for

 8    rebuttal after we hear from the other side, your Honor.

 9              THE COURT:  Of course.

10              All right.  Mr. Cullen.

11              MR. CULLEN:  Thank you, your Honor.

12              Depending on the Court's inclination to ask

13    questions, I'll be a little shorter, I think.

14              We think it's moot because if we look at 14-2,

15    certainly Section A is moot as it talks about attending soccer

16    games, attending the -- enforcing the no trespass order, as you

17    properly say, is -- the trespass orders are no longer in

18    effect.

19              The -- there's no protest zone in effect anymore, so

20    that part of the request for relief is --

21              THE COURT:  But what about Mr. Kolde's argument

22    that, look, the reality here is you're going to -- you're going

23    to enforce the same ban at limited public fora, school

24    extracurricular events in the future, in the immediate future.

25              MR. CULLEN:  I think -- I think that's right.  If

1    Mr. Foote or one of the other plaintiffs shows up at the

2    basketball game wearing the same wristbands in the same manner

3    and they want to protest outside the -- I notice we've heard

4    nothing about signs so far, but if they want to protest outside

5    in the parking lot with signs, yeah, they'll be asked to take

6    off the wristbands.  And then if they don't comply with the

7    orders, you know, they'll be asked to leave.

8              THE COURT:  Okay.  That sounds like it's not moot.

9              MR. CULLEN:  I don't think we need to have a -- a

10   preliminary injunction hearing on this because I think -- I

11   think you have the facts in front of you that you need.  But

12   we're here.  We have our witnesses ready if you think you need

13   to go forward.

14             I don't understand the ever-expanding nature of the

15   relief that they're requesting.  I certainly don't understand

16   why they would want to wear or feel that their right to wear

17   wristbands to --

18             THE COURT:  Because they say it's not targeting, not

19   harassing, not degrading, not demeaning, not threatening

20   students engaged in extracurricular activities.

21             MR. CULLEN:  I apologize.

22             THE COURT:  That's why.

23             MR. CULLEN:  I didn't -- I didn't quite finish.  At

24   the -- I was trying to speak slowly because I have a habit of

25   speaking too quickly sometimes for the reporter.

1            At a -- at the middle school band concert that's

2    coming up, for instance, they seem to be -- this case started,

3    as you rightly point out, about, you know, soccer games.

4            The school doesn't have control over the swim meets.

5    They don't host swim meets.  That's not really on the table.

6            The soccer -- the music, that's just come for the

7    first time in the recent papers.

8            THE COURT:  What I'm understanding you're saying,

9    Mr. Kolde's absolutely right, our policy, such as it is, will

10   be enforced as he described.

11           MR. CULLEN:  Yes.  I mean, that's -- that's the --

12           THE COURT:  So how is it -- why are you arguing that

13   this motion for temporary restraining order -- I mean for

14   preliminary injunction is moot and we should just move on to a

15   trial on the merits of the permanent injunction request?

16           MR. CULLEN:  I just don't think you need an

17   evidentiary hearing to make this decision.  But we're here.

18   We're ready to go, your Honor.

19           THE COURT:  But we do, because you're -- I thought

20   your claim was we -- as I --

21           MR. CULLEN:  As I said --

22           THE COURT:  It's interesting to me that neither side

23   wants to concede the obvious.

24           MR. CULLEN:  Yeah.

25           THE COURT:  You seem to both agree what the law

1    is --

2              MR. CULLEN:  Right.

3              THE COURT:  -- with respect to a limited public

4    forum, but you both take opposite positions on what the facts

5    are.  And you say, we get to regulate this speech --

6              MR. CULLEN:  Correct.

7              THE COURT:  -- because we get to protect children --

8              MR. CULLEN:  Right.

9              THE COURT:  -- engaged in school activities.

10             MR. CULLEN:  Yes.

11             THE COURT:  Right?

12             MR. CULLEN:  Yes.

13             THE COURT:  So it's not a disagreement about what

14   the law -- First Amendment law is.  It's a disagreement about

15   what the facts are when you apply that law.  You say it's

16   simple, it's straightforward, we're protecting a child, we get

17   to do that.  They say it's simple, it's straightforward, we get

18   to passively, in a nonthreatening, intimidating way exercise

19   our First Amendment rights.

20             MR. CULLEN:  Yeah.  Then we should go forward, your

21   Honor.

22             THE COURT:  Okay.  So you agree that this temporary

23   restraining order -- I mean preliminary injunction request is

24   not moot because you intend to apply it in the same way.

25             Why isn't your argument we don't know if the conduct

1    in the future is going to be threatening to a particular

2    student or students in general?

3              MR. CULLEN:  Well, I believe that our view of

4    this -- of policy KFA is that wearing the XX pink wristbands --

5    not just -- not pink wristbands.  They can wear pink wristbands

6    if they want to.  Wearing the XX wristbands, we believe that

7    that violates the policy and doesn't comply with our Title IX

8    obligations.

9              And that's -- that's where the -- you know, that's

10   where the school is.

11             THE COURT:  Without a showing that it's actually

12   detrimental to the psyche or physical well-being of a student?

13             MR. CULLEN:  Well, we think --

14             THE COURT:  Don't you have to show that?

15             MR. CULLEN:  Well, the school -- I mean, I think the

16   school officials are the ones who are there with their students

17   making determinations every day as to sort of what conduct is

18   permissible and how it's going to be --

19             THE COURT:  But it has to be reasonable.  It has to

20   be rooted in reality.  It has to be consistent with the law.

21   It can't just be, you know, I'm the school board chair, what I

22   say goes.  I find that wearing your hair up in a bun is

23   threatening to transgender students.  That's our policy, that's

24   our conclusion, good enough.  No, that's not good enough.

25   That's irrational.

```
 1              MR. CULLEN:  Right.

 2              THE COURT:  You can't be irrational.

 3              MR. CULLEN:  I agree.

 4              THE COURT:  Okay.  So then if that's your policy,

 5   don't you as a factual matter have to justify the

 6   reasonableness of the decision to show, in fact, it has an

 7   intimidating or demeaning or degrading effect and how that

 8   works?  Don't you have to show that?

 9              MR. CULLEN:  Well, we can certainly do that at the

10   permanent injunction hearing and we can do it -- you know, we

11   can introduce facts on that today.

12              I mean, testimony would be that, you know, this XX

13   symbol has -- is rapidly developing into a symbol that's more

14   than just a pro women's sports, but actually an

15   anti-transgender women in sports symbol and that that has been

16   displayed through the Olympics, through -- through the creation

17   of an XX-XY clothing line, that is that this is developing into

18   a symbol of anti-trans participation in women's sports.

19              THE COURT:  But anti-trans participation in women's

20   sports is a legitimate, debatable, sociopolitical, educational

21   issue.

22              MR. CULLEN:  Absolutely, it is.

23              THE COURT:  Right.

24              MR. CULLEN:  And they can and did bring this to the

25   attention of the administration.  You'll hear that Nicole Foote
```

1    met with the AD.  There are a lot of different places that they

2    can have that opinion and they've never been sanctioned for

3    that.  They've expressed that opinion in -- in -- you know, in

4    strongly worded emails, in other forum.  That's never been

5    sanctioned.

6              It's purely a matter of do you get to do this at the

7    sidelines of a game and do you get to -- you know, do we have

8    to turn our parking lots into protest zones where everybody can

9    come in for any reason, you know, not just for this, but for

10   anything, just walking around with signs.

11             THE COURT:  But they can unless there's a legitimate

12   reason to limit the speech in a limited public forum.  That's

13   the law.  They can.

14             MR. CULLEN:  Well, I know -- I think that the -- I

15   think that's -- that's true as far as the sidelines go, but

16   we're saying, obviously, that this speech is not -- is outside

17   of that.  You don't get to do this speech at that event.

18   But -- but the -- let's not lose sight of the --

19             THE COURT:  But the only reason you get to say that

20   is not because of the viewpoint expressed to the position taken

21   on the issue.  You only get to say that if there's some

22   detrimental effect that you can show to students.  The only

23   defense is we're protecting students, right?

24             MR. CULLEN:  Yes, your Honor.

25             THE COURT:  So you can't just say, well, we don't

 1  like that viewpoint, that anti-trans national develop --

 2  international developing trend to recognize it as such.  You

 3  can't say that.  You've got to say and it adversely affects our

 4  students.

 5          MR. CULLEN:  Correct.

 6          THE COURT:  Right.

 7          Okay.  I thought your position was they've --

 8  they've rapidly expanded the scope and reach of the complaint;

 9  they've changed the nature of the dispute; we can't possibly go

10  forward with that on the permanent injunction basis because of

11  this expanded claim situation on the amended complaint;

12  and -- and, by the way, the motion for preliminary injunction

13  relief, that's moot because that's over and done and who knows

14  what's going to happen in the future.

15          But that's not your position, as I'm hearing you

16  this morning.

17          MR. CULLEN:  No.

18          THE COURT:  This morning you're saying, sure, let's

19  go forward on the preliminary injunction.

20          MR. CULLEN:  We can't -- you know, we probably don't

21  have all the facts on, you know, conspiracy to retaliation, the

22  things that you're going to need for the ultimate findings for

23  the trial.

24          But, yeah, look, I -- as I said, the school's

25  position is if they come to the basketball game with the XX

1    wristbands, they'd be asked to take them off.

2            THE COURT:  You would enforce the policy against

3    passively wearing XX wristbands at extracurricular events.

4            MR. CULLEN:  Yes.  It's the school's belief --

5            THE COURT:  Then I don't -- you're not arguing it's

6    moot then.

7            MR. CULLEN:  I --

8            THE COURT:  You're telling me it's not moot.

9            MR. CULLEN:  I'm telling you the truth, which is

10    that's the way the policy's going to be.

11            So, yes, if that makes it not moot, then -- then we

12    go forward.

13            THE COURT:  Okay.  Good enough.  That solves that.

14            MR. KOLDE:  Your Honor, I don't really have anything

15    to say in rebuttal.

16            THE COURT:  No, you're winning now.

17            MR. KOLDE:  Yeah.

18            THE COURT:  You should keep quiet.

19            Okay.  All right then.  We'll go forward on the

20    preliminary injunction, understanding that the defendants have

21    agreed that its -- its actions will be the same at future

22    school events.

23            MR. KOLDE:  I think we do agree on that, your Honor.

24            THE COURT:  All right.

25            MR. KOLDE:  May we go first as plaintiffs?

1            THE COURT:  Yes.  Yeah, I -- yes, I don't have a

2  problem with that.

3            MR. KOLDE:  All right.  Did you want to take a break

4  before we do that?

5            THE COURT:  I do.

6            MR. KOLDE:  And, your Honor, if I could just --

7            THE COURT:  But I think let's try to keep it --

8  let's understand that -- let's try to keep the evidentiary

9  presentations focused and relevant to the preliminary

10  injunction, understanding I don't want to -- we can't try the

11  permanent injunction with respect to all future conspiracies

12  and activities.  You're going to have to have an evidentiary

13  hearing on those issues at some future time.

14            MR. KOLDE:  I understand that, your Honor.

15            THE COURT:  In other words, let's not try the

16  conspiracy and retaliation.  Let's try the preliminary

17  injunction hearing.

18            MR. KOLDE:  I read you, your Honor, and I'll, of

19  course, be open to feedback from the Court as we go along.  I'm

20  ready to do either, but I have heard the Court in terms of the

21  scope of this hearing.

22            THE COURT:  Well, you know --

23            MR. KOLDE:  Yeah.

24            THE COURT:  -- I'm jumping ahead.

25            MR. KOLDE:  Yeah.

 1              THE COURT:  Mr. Cullen's already surprised me once.

 2    Maybe he can surprise me again.

 3              Are you prepared to try the preliminary -- the

 4    permanent injunction case?

 5              MR. CULLEN:  No, your Honor.

 6              THE COURT:  Okay.  And so let's limit it to the

 7    preliminary injunction.

 8              MR. KOLDE:  And then one -- one other just request,

 9    a personal request.

10              One of my clients, Eldon Rash, is older and he takes

11    certain medications and sometimes he needs to go to the

12    restroom.  And so if that's an issue, I would just ask that he

13    be given -- you know, perhaps when his testimony is happening

14    that we just take a short break --

15              THE COURT:  Anytime.

16              MR. KOLDE:  -- so that he can do that.

17              Thank you, your Honor.

18              THE COURT:  Anytime.  Just let me know.

19              All right.  Let's take a short break, get organized,

20    and when we come back, we'll begin with the plaintiff's

21    presentation.

22              MR. KOLDE:  Thank you, your Honor.

23              THE CLERK:  All rise.

24          (Recess taken from 10:23 a.m. until 10:45 a.m.)

25              THE COURT:  All right.  Mr. Kolde, your evidentiary

1    presentation is going to be focused on nondisruptive, passive,

2    silent, right?

3              MR. KOLDE:  Yes, your Honor.

4              THE COURT:  Okay.  And we can anticipate the defense

5    is going to be messaging, what's the message, is it harmful,

6    could it be harmful, right?

7              I'm just telling you that because -- in case you

8    want to save us some time, you could probably --

9              MR. KOLDE:  Yes, expedite things.

10             THE COURT:  If you have rebuttal evidence to that

11   contention, maybe you could put that on, too.

12             MR. KOLDE:  Yes.

13             THE COURT:  Okay.

14             MR. KOLDE:  Our plan, your Honor, and I've told

15   Mr. Cullen similar things, is that we intend to call Kyle

16   Fellers and lay out most of the facts of what happened and the

17   background, introduce the body cam video through him and have

18   him explain who some of the people are that are shown on the

19   video that wouldn't be known necessarily to the Court.

20             So we'll cover a lot of the evidence with him and

21   then there are certain gaps where he has, you know, been

22   excluded from the game because he was sent off that will be

23   covered through the testimony of Andy Foote and then also of

24   Eldon Rash, who was the last person on the sidelines to be

25   wearing a wristband that day.

1           Ms. Foote is present in court, too, and we were

2   prepared to -- to present her.  I think she mostly would

3   corroborate what the others have said and I think in the

4   interest of time and keeping things moving, we're not planning

5   to call her unless something comes up with respect to her that

6   we don't anticipate.

7           THE COURT:  Okay.

8           MR. KOLDE:  We have had an agreement with the other

9   side prior to the hearing between counsel that in the interest

10  of keeping things moving, we would give each other some room on

11  cross-examination if it goes beyond the scope so that we don't

12  have to recall witnesses at different parts of the case and all

13  that.

14          THE COURT:  Great.  Super.  Appreciate it.

15          MR. KOLDE:  I think it's more efficient.  I'm not

16  going to be objecting to things that go beyond the scope and

17  then Mr. Cullen and I talked about, hey, there's some -- to

18  keep things moving, there's some preliminary kind of

19  table-setting foundational stuff with Mr. Fellers, for example.

20  I might lead him a little bit, but when we get to the meat of

21  the case, I'm going to do my best not to lead and he's going to

22  object if I do, and I'll restate my question a different way if

23  that happens.  So --

24          THE COURT:  All right.  I appreciate that.  Let's

25  get to the merits.

1          All right.  Whenever you're ready, you may call your

2    first witness.

3          MR. KOLDE:  And, your Honor, before I call

4    Mr. Fellers, can we officially offer all nondisputed admissible

5    exhibits in this case?

6          THE COURT:  Premarked?  Are they --

7          MR. KOLDE:  They are premarked and they're here.  I

8    can -- I can list them.  There were significant numbers on both

9    our list and their list where --

10          THE COURT:  Yeah.  If you would, just read into the

11    record the -- the identification of the exhibits that are

12    agreed to be fully admitted.

13          MR. KOLDE:  I will do that, your Honor.

14          So agreed on the plaintiff's list are Plaintiff's 1,

15    2, 3, 4, 5, 6, 7, 8, 9, 10, 14, 18, 19, 20, 21, 22, 23, 24, 25,

16    26, 27, 28, 29, 30, 32, 33, and 34.

17          And I do have the defendants' lists here as well.

18          Oh, unfortunately, it doesn't say on my version

19    which ones are agreed, but I'll trust Mr. Cullen to fill in

20    that.

21          THE COURT:  Mr. Cullen.

22          MR. CULLEN:  If we could do that now, your Honor.

23          Agreed numbers are -- or letters are Exhibit C,

24    Exhibit D, Exhibit E, Exhibit F, Exhibit G, Exhibit H, Exhibit

25    I, and Exhibit J.

```
1              THE COURT:  Okay.  Great.  Thank you.

2              MR. KOLDE:  All right.  Plaintiffs call Kyle

3    Fellers.

4              Do you need a refill on your water?

5              THE COURT:  There's water up here, I think.

6              THE CLERK:  Please remain standing and raise your

7    right hand.

8              KYLE FELLERS, having been first duly sworn,

9    testified as follows:

10             THE CLERK:  Thank you.  Please be seated.

11             And please state your full name for the record.

12             THE WITNESS:  It's Kyle Fellers.

13                      DIRECT EXAMINATION

14   BY MR. KOLDE:

15        Q.   Mr. Fellers, you live in Bow, New Hampshire; is that

16   correct?

17        A.   Correct.

18        Q.   And you have two school-aged children that are

19   attending the Bow public schools?

20        A.   Yes.

21        Q.   And what are their ages and sexes?

22        A.   17 and 13, a boy and a girl.

23        Q.   Okay.  And the girl is 17?

24        A.   Yup.

25        Q.   Okay.  And, I'm sorry, your boy is how old again?
```

44

1       A.   He's 13 now.

2       Q.   Okay.  And is he still in middle school?

3       A.   He is.

4       Q.   All right.  And do they participate in

5  extracurricular events through the Bow public schools?

6       A.   Yes, that's correct.

7       Q.   Okay.  And can you kind of break it down for us by

8  boy or girl and --

9       A.   Yup.

10      Q.   -- which events do they participate in?

11      A.   Yeah.  So my daughter participates in the Bow soccer

12  team, she competes with the Bow swim team, and she's on a

13  traveling team as well but outside of Bow's district.

14          And then my son is on the cross-country team, Bow

15  cross-country, which is a fall sport.  He's going to be skiing

16  next year, but he's too young this year, so -- and then he will

17  compete in baseball during the spring.

18      Q.   Do you attend any other Bow sports events even if

19  you don't have your own kids competing in the events?

20      A.   Yes.

21      Q.   Could you give us some examples of the types of

22  events that you've in the past gone to?

23      A.   Yup.  I've -- I've attended girls' and boys'

24  basketball games.  I go to the hockey games.  I go to the

25  Everett Arena, watch Concord and Bow compete usually.

1          I've gone to the baseball games in the spring.  I

2    coach baseball in the spring and sometimes we have to use Bow

3    facilities.

4          And then my son is part of the band, so we go to

5    concerts and stuff like that.

6          Q.    And it's fair to say that at least some of the

7    activities you just listed occur at Bow School District

8    facilities; is that correct?

9          A.    That is correct.

10          Q.    And the facility -- and the events that you've just

11    discussed, do you intend to attend some of those events in the

12    near future, including in the next month or two?

13          A.    That is correct.

14          Q.    Okay.  Just to give a couple of specific events that

15    came up during the argument as an offer of proof earlier today,

16    do you intend to go to the Bow girls' basketball home game

17    against Bishop Brady High School at Bow on December 13th, 2024?

18          A.    That is correct.

19          Q.    And do you intend to attend the Bow girls'

20    basketball game, home game, against Souhegan on December 17th,

21    2024?

22          A.    That is correct.

23          Q.    All right.  And there are several other games later

24    in the schedule in January that are girls' basketball games

25    that are home games that you also intend to attend; is that

1    correct?

2        A.    Yeah.

3        Q.    And then your daughter swims for Bow; is that

4    correct?

5        A.    Yup.

6        Q.    And the Bow -- Bow doesn't have its own pool, but it

7    leases space from the YMCA in Concord; is that correct?

8        A.    Yes, that's correct.

9        Q.    Okay.  And you intend to attend some of your

10   daughter's swim meets; is that correct?

11       A.    That's my plan.

12       Q.    Including at least two swim meets that are scheduled

13   to occur in December of 2024; is that correct?

14       A.    Yup.

15       Q.    And if I could just have you say yes --

16       A.    Yes, I'm sorry.

17       Q.    -- instead of yup.  I understand what you're saying,

18   but it's easier for the court reporter if you use yes or no.

19            All right.  It's fair to say that you have strongly

20   held beliefs about the inclusion of biological boys or men in

21   women's or girls' sports; is that fair to say, Mr. Fellers?

22       A.    That is fair to say.

23       Q.    Could you, you know, without -- without writing a

24   novel, could you kind of summarize what your view is on that,

25   your sociopolitical view on that issue?

1      A.    Yeah, I -- I don't believe that biological boys

2  should be competing against women in women's sports.  I think

3  it's a competitive disadvantage for that to occur and there are

4  safety issues.

5      Q.    Do you have a problem with people being trans

6  outside of the athletic context when they're trying to compete

7  against people in the sex that they are identifying with?

8      A.    No, I have no -- no problem.

9      Q.    It's fair to say that you were aware of a state law

10  that had been passed in New Hampshire that was supposed to

11  reserve girls' high school athletics for biological girls only;

12  is that true?

13      A.    That is true.

14      Q.    And, again, without going into the details of the

15  case, you were aware in the summer and early fall that that was

16  subject to some litigation; is that correct?

17      A.    That is correct.

18      Q.    And it's fair to say that you were aware that --

19  that another court -- another judge in this courthouse had

20  issued an injunction -- I'm trying to avoid using too much

21  legalese -- essentially an order suspending the application of

22  that law, at least with respect to several players that claim

23  to be transgender and wanted to compete in girls' soccer; is

24  that correct?

25      A.    It's my understanding the court injunction allowed

1  two biological boys to compete against girls in women's sports,

2  yes.

3      Q.   Okay.  And one of those boys was playing for the

4  Plymouth girls' soccer team; is that correct?

5      A.   That is correct.

6      Q.   All right.  And the Plymouth soccer team was on the

7  schedule against the Bow High School girls' varsity team; is

8  that right?

9      A.   Repeat the question again.

10     Q.   Yeah.  The Plymouth team was scheduled to play the

11  Bow girls; is that right?

12     A.   That is correct, yup.

13     Q.   And your daughter, at the time, was playing for the

14  Bow girls' varsity team; is that right?

15     A.   Yes.

16     Q.   What did you think about that?

17     A.   I was upset about it.  I didn't think it was -- was

18  right.

19     Q.   Okay.  At that time did you, yourself, personally

20  email any school district officials?

21     A.   I did.  I -- I emailed our school board and the

22  superintendent.

23     Q.   All right.  What did you say?  And I'm just asking

24  to paraphrase.  You don't have to, like, recite the email from

25  memory.  If opposing counsel wants to get into it, he'll cross

1   you on that.  But ...

2        A.    Yeah.  Actually, I might have just emailed them

3   regarding the Olympic event.  I'm not sure if I did email them

4   about the court case.

5        Q.    I think that's fair.

6              And so the Olympic email occurred in August, a

7   little bit -- a month or two before this issue with the

8   Plymouth player came up; is that fair?

9        A.    That's fair, yup.

10       Q.    All right.  And, again, without going into a lot of

11  detail, just so the Court understands, what was it about the

12  Olympics, the gist of it, that you emailed some Bow school

13  officials about in about August of 2024?

14       A.    I just -- I expressed my frustration regarding a

15  biological man physically assaulting a woman and destroying her

16  Olympic dreams.

17       Q.    Was this the Algerian boxer that beat up the Italian

18  female boxer?

19       A.    That is correct.

20       Q.    All right.  Did you receive a response from any of

21  the Bow High School officials?

22       A.    I don't recall receiving a response from the

23  superintendent or the school board.

24       Q.    Did you make a decision to express your opinion

25  about supporting women's sports and about reserving women's

50

1   sports for biological women at the September 17th varsity

2   girls' soccer game, Plymouth High School versus Bow High

3   School?

4      A.   Yes, I -- I wore a pink wristband.

5      Q.   Okay.  Give us a little bit of background on how it

6   came to be that you wore a pink wristband.  Whose idea was it,

7   where did the wristbands come from, how did they get decorated?

8          So let's start with whose idea was it to get the

9   pink wristbands.

10      A.   Well, I had a conversation with my daughter about it

11   and, you know, based on our conversation, I thought it would be

12   good to support her as well as women's sports.  And so I

13   researched on Amazon and I found the pink wristbands online and

14   I ordered them.

15          MR. KOLDE:  Okay.  And if we could just have a --

16   the exhibit that's already been admitted into evidence shows a

17   picture of the pink wristband.  That's Plaintiff's 4.

18          Display it briefly.

19          And if we could scroll down to show the wristband on

20   the screen.

21      Q.   Is that -- is that a wristband with the XX added

22   later?

23      A.   Yeah, that is the wristband, but -- yeah, as you

24   indicated, the XX was added later.

25      Q.   Did you add the XX?

1        A.    I did not.

2        Q.    Okay.  And I have a wristband in my hand here.  I'm

3   not going to enter it into evidence, but there are -- you can

4   see there's a -- there's a white ribbon sewn into it.

5        A.    Yeah.

6        Q.    Did that come with the original wristband?

7        A.    It did.

8        Q.    And what does that symbolize, to your understanding?

9        A.    It symbolizes, in my opinion, just supporting women

10  and their causes and their health.

11       Q.    Is it consistent with your view that these -- you

12  ordered breast cancer awareness wristbands off of Amazon?

13       A.    Yes.

14       Q.    All right.  So you get these wristbands.  What do

15  you do with them?

16       A.    Well, once I got them, I had another conversation

17  with my daughter.  And I -- I thought it was -- would be an

18  appropriate idea to speak to -- that she would speak to the

19  captain of the soccer team and have a -- a discussion with the

20  team to determine if the team would want to wear them during

21  the game.

22       Q.    Did the team decide to wear the wristbands, from

23  what you understand?

24       A.    They did not.

25       Q.    Okay.  So the team decides not to wear the

1    wristbands.  What did you do with the wristbands?

2        A.    Well, I -- I had -- I had given the wristbands to

3    Andy Foote, because his daughter is the captain of the team.

4    So I figured that the captain of the team and my daughter could

5    utilize them at that point and have a conversation with the --

6    the rest of the team about it.  So at that point, once I found

7    out that they weren't going to wear them, I didn't have the

8    wristbands at that point.

9        Q.    So they were out of your possession?

10       A.    They were out of my possession.

11       Q.    All right.  Did you ask Andy to put the XX

12   chromosomes on there?

13       A.    I did not.

14       Q.    Okay.  Did you ask Andy or anyone else to put the

15   Greek female symbol, you know, the mirror symbol, on any of the

16   wristbands?

17       A.    I did not.

18       Q.    And what about NAD, did you ask them to put that on?

19       A.    I didn't know what that meant.  I did not.

20       Q.    Okay.  You have some understanding now, but you only

21   learned about it due to this lawsuit; is that correct?

22       A.    I found out after the fact, yes.

23       Q.    All right.  And do you have any reason to believe

24   that the -- did you have any reason to believe prior to the

25   September 17th soccer game that the XX was some kind of a hate

1    symbol?

2         A.    No.

3         Q.    Did you have any plan to show up to the soccer game

4    on September 17th and harass the trans player that you had been

5    told would be playing for Plymouth that day?

6         A.    Absolutely not.

7         Q.    Did you have any plans to heckle the trans player

8    that you had been told would be playing for Plymouth that day?

9         A.    No.

10        Q.    Did you have any plans to wear a dress to mock the

11   player?

12        A.    No.

13        Q.    Did you have any plans to bring a sign to the

14   sidelines of the game?

15        A.    I did.

16        Q.    Well --

17        A.    I planned on bringing a sign in my car.

18        Q.    Okay.  So you brought a sign in your car, but not to

19   the sidelines.

20        A.    Not to the sidelines.

21        Q.    All right.  What did that sign say?

22        A.    It said Protect Women's Sports for Female Athletes.

23        Q.    All right.  Did it say anything else?

24        A.    No.

25        Q.    Who made the sign?

54

```
1            A.    Me and my daughter did the night before.
2            Q.    Okay.  Did the sign -- and just so we're clear on
3    the record, did the sign come to the sidelines at the Bow
4    soccer field?
5            A.    It did not.
6            Q.    Okay.  So it stayed in or on your car or with you by
7    your car?
8            A.    It was -- it was in my car when I was at the game.
9            Q.    Okay.  And we'll get to this later.  At one point
10   you were in the parking lot, you took the sign out and you held
11   it over your head in the parking lot, correct?
12           A.    That is correct.
13           Q.    While you were standing by your own car?
14           A.    While I was standing in -- by my own car, after the
15   game had ended.
16           Q.    Okay.  Did you know who the trans player was?  I
17   mean, you know his name because he's the lead plaintiff in the
18   lawsuit, right?  You know it's Parker Tirrell.
19           A.    Well, I know now.  I don't necessarily remember if I
20   knew his name before the game or at the game, but I did not
21   know who he was or what he looked like.
22           Q.    Could you recognize him?
23           A.    No.
24           Q.    Did you see him on the field that day?
25           A.    I assume so, because he was playing in the game,
```

1    but, again, I couldn't pick him out of a lineup.

2            Q.    And you're not sure; is that right?

3            A.    That's correct.

4            Q.    Okay.  Did you ever talk to the trans player that

5    day?

6            A.    No.

7            Q.    Did you say anything to the trans player that day?

8            A.    Nope.  Nope.

9            Q.    All right.  Did you yourself arrive with the

10   wristbands on September 17th at the field?

11           A.    I did not.  I did not show up at the game with the

12   wristband on.

13           Q.    Okay.  How'd the first half go?

14           A.    Uneventful.

15           Q.    Typical game?

16           A.    Typical game.  Bow was up, leading in the game, by

17   halftime.

18           Q.    How many -- I know a regulation adult game is 45

19   minutes per side.  What's the length of the -- of the half for

20   high school girls' varsity, approximately, if you know?

21           A.    I'm more of a football fan, but I think it's 40

22   minutes.  I might be wrong.  It might be 45 minutes.

23           Q.    All right.  Maybe we can cover that with Andy

24   Foote's testimony.

25                 So the first 40 minutes or 45 minutes, there's --

56

1    there's no event.  You're not wearing your wristband?

2         A.    That's correct.

3         Q.    Where's the sign in the parking lot at this point?

4         A.    It's in my car, haphazardly on the -- my dashboard

5    of my -- of my car.

6         Q.    So it is visible to a passerby in the parking lot,

7    but not particularly prominently displayed; is that fair?

8         A.    Yeah, it's not prominently displayed.  I didn't have

9    any tape to tape it to the windshield, so it was dangling off

10   the dashboard.

11        Q.    You didn't come that prepared?

12        A.    I didn't come that prepared, no.

13        Q.    All right.  You weren't trying to conceal the sign,

14   but you also weren't doing a particularly good job of

15   displaying the sign?

16        A.    That is correct.

17        Q.    All right.  And that's during the first half,

18   correct?

19        A.    Yes.

20        Q.    All right.  Then there's halftime, 10 minutes, 15

21   minutes, something like that?

22        A.    Yup.

23        Q.    All right.  What happens during the halftime?

24        A.    Well, at halftime I realized I didn't have my cell

25   phone.  I left it in my car.  So I started walking towards my

1   car.  And that's when Andy, you know, reached out to me and

2   basically at that point, I believe, handed me the wristband.

3        Q.    And that's one of the XX wristbands?

4        A.    That's correct.

5        Q.    All right.  Were you expecting to get a wristband

6   from him?

7        A.    I wasn't.

8        Q.    Okay.  Did you have a problem with the wristband he

9   handed you?

10        A.    No.

11        Q.    Okay.  And I want to be clear.  It's an XX

12   wristband, not an NAD wristband, not a Greek symbol for female

13   wristband, correct?

14        A.    That's correct.

15        Q.    XX wristband.

16             What did you do with the wristband?

17        A.    I just put it on.

18        Q.    Was the wristband on your arm or on your wrist?

19        A.    It was on my wrist.

20        Q.    All right.  And we'll see it in the video, but were

21   you wearing a short-sleeve, long-sleeve shirt?

22        A.    I was wearing a short-sleeve shirt.

23        Q.    So it's fair to say that this hot pink wristband was

24   visible on your wrist, correct?

25        A.    That is correct.

1       Q.    And what did you do with the sign?

2       A.    I went -- I went to my car at that point and I tried

3   to attempt to prop it up a little better, but I didn't really

4   have a whole lot of luck, so ...

5       Q.    All right.  So still sort of --

6       A.    And I grabbed my cell phone.

7       Q.    And you grabbed your cell phone, which you had

8   forgotten?

9       A.    Yeah.

10      Q.    Okay.  And then you get the wristband from Andy and

11  you go to the -- go back to the sidelines?

12      A.    Yes.

13      Q.    Okay.  And if we could just have the map of the Bow

14  soccer field real quick, just for orientation.

15            And this has been marked for ID only at this point.

16  It's Plaintiff's 13.

17            MR. CULLEN:  Actually, I think this one's in for all

18  purposes.

19            MR. KOLDE:  Oh, it is?  Okay.  Good.

20            THE COURT:  I don't have it marked, no.

21            MR. KOLDE:  I do have it as ID only, but I'll take

22  the --

23            THE COURT:  No objection?

24            MR. CULLEN:  No objection.  Sorry.

25            THE COURT:  The ID may be stricken on 13.

```
1              (Plaintiffs' Exhibit 13 admitted.)

2              MR. KOLDE:  I'll offer 13, your Honor, and I

3    understand the Court's admitted it.

4              THE COURT:  I did.

5              MR. KOLDE:  Okay.  Very good.  Thank you, your

6    Honor.

7         Q.   Showing you what's been marked as 13, maybe we can

8    zoom a little bit on the green part.  We don't need the white

9    part.

10             I'll represent to you that this is a -- a -- zoom

11   out a little maybe.

12             This is a Google Maps overhead shot, satellite shot,

13   of the Bow High School soccer field and it has some annotations

14   on it.  Does that seem accurate to you?

15        A.   Yes.

16        Q.   Are you familiar with the Bow High School soccer

17   field?

18        A.   Yup.  Yes.

19        Q.   All right.  And it looks like, actually, there's

20   some lacrosse goals on the field right there.  Is that in

21   the -- true?

22        A.   Yeah, the -- they're not there when there's a soccer

23   game going on.

24        Q.   Right.  Do you see where the goal area is annotated

25   there, correct?
```

1          A.    Yes.

2          Q.    And then there's a marking for the parents'

3     sidelines; is that correct?

4          A.    Yes.

5          Q.    And then there's another sidelines or touchline.

6     The soccer nerds would say touchline.  That's the actual edge

7     of the field, correct?

8          A.    Yes.

9          Q.    And then give me your best estimate of the distance

10    between the touchline at the edge of the soccer field and the

11    actual parents' sidelines, where the parents are allowed to sit

12    or stand.

13         A.    Maybe seven to eight feet.

14         Q.    Okay.  And is it fair to say that that space there

15    is to give the assistant referees a chance to move back and

16    forth for the offsides calls and for the players to be able to

17    do their throw-ins and the like?

18         A.    Yes, that's correct.

19         Q.    All right.  And also fair to say that you and the

20    other parents on both teams were on the parents' sidelines, not

21    on the actual touchline; is that correct?

22         A.    That is correct.

23         Q.    All right.  So -- and then can you just gesture for

24    the -- if we could just show the parking lot here.  I don't

25    know that my laser pointer is picking up on this.  It doesn't

61

```
 1   matter.
 2              Can you pull it down?  No, down.  Okay.  Over.
 3              So the foot parking is up at the top.  Where were
 4   you parked at that time, Kyle?
 5        A.   I was actually parked over in this area.  I was on
 6   the lawn --
 7        Q.   Okay.
 8        A.   -- because I got there late.
 9        Q.   And later you moved your car, right?
10        A.   Yeah, later I moved.  After I got thrown out of the
11   game, I moved it down in this area.
12        Q.   Where it's marked now, Fellers parking --
13        A.   Yeah.
14        Q.   -- that's later on.
15              Okay.  All right.  When you're coming back to the
16   sidelines, it doesn't matter exactly where you were, but can
17   you show the Court where, approximately, on the sidelines you
18   were positioned when you were wearing the wristbands.
19        A.   All right.  So this is the half -- halfway line
20   right here, and I was -- I was in this vicinity.  I was
21   standing behind Eldon, who was sitting in a lawn chair with his
22   wife.
23        Q.   Okay.  So you're at about the midfield line on the
24   parents' sidelines as shown on that map; is that --
25        A.   That is correct.
```

1       Q.   -- fair?

2       And Eldon is your father-in-law or former

3  father-in-law; is that correct?

4       A.   That is correct.

5       Q.   All right.  And what's his age, approximately?

6       A.   I believe upper 70s, lower 80s.

7       Q.   Okay.  Fair enough.  And he was seated in one of

8  those portable camp chairs, a lawn chair that you carry around

9  with you?

10      A.   That is correct.

11      Q.   All right.  He's on the parents' sidelines?

12      A.   He is.

13      Q.   And is anyone with him?

14      A.   His wife.

15      Q.   All right.  Were you seated yourself?

16      A.   I was not.  I was standing right behind them.

17      Q.   Okay.  At that point was Eldon wearing a wristband?

18  At that point, when you first got back to the sidelines.

19      A.   No, he was not wearing a wristband.

20      Q.   And had you talked to him about the pink wristbands

21  at all?

22      A.   I had not had a chance to discuss it with him.

23      Q.   All right.  So what are you doing when you first

24  arrive back at the sidelines wearing the wristband and the

25  second half resumes?  Kind of describe for us what's going on.

1       A.   So the second half resumes.  Teams are out on the

2  field.  They're playing soccer.  I would say roughly ten

3  minutes goes by in the game.

4       Q.   Okay.  Up until that point, did you do anything to

5  gesture with the wristband?

6       A.   No.

7       Q.   Did you say anything to any of the players on the

8  field?

9       A.   No.

10      Q.   Did you go, hey, look at my wristband?

11      A.   No.

12      Q.   Okay.  Did any of the players seem to notice your

13  wristband?

14      A.   No.

15      Q.   Okay.  So what happens ten minutes in?

16      A.   Well, ten minutes into the game, I'm standing there

17  watching the game and I felt a presence behind me.  And that

18  presence whispered into my ear that I need to take off the

19  wristband, there's no protests allowed.

20      Q.   Okay.  Who's that presence?

21      A.   Well, when I turned, it was Mike -- I always mistake

22  his last name.

23      Q.   Let's just say Desilets.

24      A.   Desilets.

25      Q.   But I think it might be Desilets in French, but

64

1    we'll go Desilets.

2         A.    Yes, it was Mike Desilets, the AD.

3         Q.    And for the Court's edification or just as a

4    reminder, what did -- what -- the AD is what?

5         A.    Athletic director.

6         Q.    All right.  So he's an official with athletic

7    program responsibilities from the Bow School District; is that

8    correct?

9         A.    That is correct.

10        Q.    All right.  And you know him?

11        A.    I don't know him personally, but I know of him.

12        Q.    Had you been talking to him that day, to your

13   recollection, up to that point?

14        A.    No.

15        Q.    Okay.  Well, what did you think when he came up to

16   you?

17        A.    Well, I thought it might have been a little bit of a

18   joke, so I kind of chuckled a little bit and I asked if he was

19   serious.

20        Q.    And what did he say?

21        A.    He said, yes, I need you to take it off because it's

22   a protest and protests is not allowed.

23        Q.    How did you respond to that?

24        A.    I again chuckled, thinking that he was just pulling

25   my leg.

1      Q.    I want to toggle over to an email that Mike Desilets

2    sent some of the soccer families prior to the September 17th

3    game.

4           2, Plaintiff's 2, which has been admitted already,

5    I'll just read it into the record real quick:

6           Good evening, soccer families.  Please read the

7    following attached messaging regarding Bow High School's status

8    as a member of the NHIAA as well as some information from our

9    athletics handbook regarding sportsmanship and sideline

10   behavior.

11          I understand that there are some differing opinions

12   regarding tomorrow's game and that is perfectly fine.  Please

13   understand that any inappropriate signs, references, language,

14   or anything else present at the game will not be tolerated.

15   This is a contest between high school student-athletes and

16   should be treated as such.

17          Thank you in advance for your attention to this

18   matter.  Signed, BHS administration.

19          I won't read the attachments, but there are some

20   attachments in there.

21          Did I read that accurately, Mr. Fellers?

22      A.    Yes, although I did not receive this email.

23      Q.    Okay.  You're answering the next question.

24          Did you receive this email, which is dated

25   September 16th, the day before the soccer game?

1          A.    I did not.

2          Q.    Okay.  You have seen this email after

3    September 17th; is that correct?

4          A.    That is correct.  I -- so I was cc'd on a reply to

5    this email.

6          Q.    Stop.  Just answer my question.

7          A.    Okay.

8          Q.    I want to focus your attention on the sentence that

9    says please understand that any inappropriate signs,

10   references, language or anything else present at the game will

11   not be tolerated.

12               Having reread that today, do you think that the pink

13   wristband with XX, the black XX on it that you wore on the

14   sidelines silently that day, was any of these things,

15   inappropriate?

16         A.    No.

17         Q.    An inappropriate sign, an inappropriate language, or

18   an inappropriate anything?

19         A.    I don't believe inappropriate is a proper

20   description of a wristband.

21               MR. KOLDE:  Okay.  All right.  So let's toggle back

22   to the -- you can leave that up.  Actually, let's toggle back

23   to the soccer field.

24               Had you noticed the police officer there at that

25   point?

1      A.    He might have been standing behind Mike and Matt

2  Fisk at that point.

3      Q.    Okay.  Had you seen Mike at other soccer games?

4      A.    Yeah.

5      Q.    Okay.  How about Fisk, did he come to some soccer

6  games?

7      A.    I can't -- I can't recall him being present at a

8  game, but that doesn't mean he wasn't.

9      Q.    Do you recall police in body armor with a sidearm

10 coming to other soccer games?

11     A.    No.

12     Q.    All right.  Did you notice any other school

13 officials present at that soccer game that you weren't used to

14 seeing at soccer games?

15     A.    Yes.

16     Q.    Could you just give us a summary description of what

17 you're talking about?

18     A.    Well, I noticed that some coaches from other sports

19 were there and some of them had walkie-talkies and -- but I

20 didn't necessarily notice it until after I was confronted at

21 that point to remove the wristband.

22     Q.    Okay.  Let's go back to your conversation with

23 Mike Desilets.  You were telling us that he came up behind you

24 and said you need to take off the wristband.  You thought he

25 was joking and then essentially says, no, I'm not joking.

1          What happens next with regard to you wearing the

2   wristband and your interaction with Mike Desilets?

3       A.   Well, I initially refused to remove the wristband

4   and I said that I was utilizing my First Amendment right or

5   something in that regard.

6       Q.   And what did Desilets say about that?

7       A.   I don't -- I don't recall him saying anything at

8   that point because there was banter from a couple other people,

9   you know, Matt and the police officer, stuff like that.

10      Q.   And this part isn't recorded in the body cam video;

11  is that correct?

12      A.   That is correct.

13      Q.   It is not recorded?

14      A.   It's not correct -- it's not recorded.

15      Q.   I'm trying to avoid the double negative and it's my

16  fault --

17      A.   Yeah.

18      Q.   -- but I just want the record to be clear.

19           Do you eventually take the wristband off?

20      A.   I do eventually take it off and I held it in my

21  hand.

22      Q.   Okay.  Is there -- to the best of your recollection,

23  and recognizing that we don't have video of this part of the

24  interaction, was there anything in particular that anyone said

25  that caused you to finally take it off?

1      A.    Well, the threatening of the girls having to forfeit

2    the game and then forfeiting their playoff chances.

3      Q.    You didn't want that to happen?

4      A.    I didn't want that to happen.

5      Q.    Okay.  Do you recall who said that?

6      A.    I -- I believe it might have been Matt Fisk, but it

7    could have been Matt -- Mike as well.

8      Q.    Okay.  And at this point is Lamy, Lieutenant Lamy,

9    part of the conversation or is he just sort of hovering nearby?

10     A.    Yeah.  I mean, he's -- he's definitely getting

11   involved in the conversation, yes.

12     Q.    Okay.  Do you have any recollection about what he

13   was saying before the body cam video was turned on?  And it's

14   okay if you don't, but ...

15     A.    No, I -- I can't say with certainty.

16     Q.    All right.  And the reason I'm asking you about this

17   is because this is what we don't have video for.

18     A.    Sure.

19     Q.    All right?

20           So you -- you took off the wristband and you're

21   holding it in your hand.  Did they ask you to put the wristband

22   away while you're holding it in your hand?

23     A.    No.

24     Q.    Okay.  And what happened with the wristband you had

25   been wearing but that you took off and you were holding in your

1   hand?

2       A.    Well, at that point, my in-laws, who, again, were

3   seated -- seated in front of me but facing away from me, my

4   mother-in-law turned her head and asked, very upset, like,

5   Kyle, what is -- what is happening, why are they harassing you.

6       Q.    And what did you tell her?

7       A.    I -- I leaned towards them and, you know, quietly

8   told them that I was -- they were harassing me because of this

9   pink wristband.

10      Q.    Okay.  What happened next?

11      A.    Well, they were incredulous.  They were like, well,

12  why -- why are they harassing you over this wristband.  Or

13  maybe they might have asked, is -- they're harassing you over

14  that wristband.  And I showed them and I go, yes, they're

15  harassing me, they're telling me I either have to leave the

16  game or take this off.

17      Q.    What happened with the wristband that was in your

18  hand?

19      A.    Well, at that point, Eldon took it from me and he

20  put it on.

21      Q.    Okay.  Had you asked him to do that?

22      A.    I did not.

23      Q.    Did you offer it to him?

24      A.    I did not.

25      Q.    But you didn't resist him when he took it from you?

1      A.    I did not.

2      Q.    Okay.  Did he stand up or was he just sitting down?

3      A.    He was just sitting down on his lawn chair.

4      Q.    Okay.  So at that point, your pink wristband with XX

5  on it has migrated to Eldon's wrist and Eldon is sitting down

6  at the parents' sidelines in his camp chair facing the field;

7  is that correct?

8      A.    That is correct.

9      Q.    All right.  And we're -- I think we're getting very

10  close to running the video here, the body cam video, but up

11  until the point that Mike Desilets came up to you to ask you to

12  remove the wristband, had you talked to anybody about the

13  wristband on the sidelines of the soccer field that day?

14      A.    No.

15      Q.    Okay.  After Eldon puts on the wristband, what

16  happens?  Do the -- do the officials let it go?

17      A.    No.  Essentially, Matt Fisk went right up to Eldon

18  and started demanding that he take the wristband off or leave

19  the game.

20      Q.    All right.  So you've got Matt Fisk standing behind

21  Eldon?

22      A.    Well, I would say he was standing over Eldon.  He

23  was on Eldon's right.

24      Q.    Okay.  And Matt Fisk is directing Eldon to take the

25  wristband off; is that correct?

1      A.    That is correct.

2      Q.    All right.  How does this make you feel?

3      A.    Well, it's -- it's upsetting that he is harassing a

4   grandfather who is there just to watch his granddaughter play

5   soccer.

6      Q.    What did you think about what was happening?

7      A.    Well, I -- I guess I didn't like it.

8      Q.    Did you express that opinion to the officials that

9   were present at the field who had asked you to remove your

10  wristband and were demanding that Eldon also remove the

11  wristband?

12     A.    Yeah, I -- I told them that this was ridiculous and

13  that we weren't doing anything, we were just standing here.

14     Q.    Okay.  It's fair to say that some further words were

15  exchanged between you and the officials and that led to Mike

16  Desilets instructing Lamy to send you off from the game; is

17  that correct?

18     A.    Yes.

19     Q.    All right.

20     A.    I think -- I think once I may have called Mike or

21  all of them cowards for doing this --

22     Q.    All right.

23     A.    -- that they should be supporting women's sports.

24     Q.    And since the filing of this lawsuit, you've seen

25  and listened to Lieutenant Lamy's body cam video; is that

73

1  correct?

2      A.    That is correct.

3            MR. KOLDE:  All right.  So at this point I will play

4  the video, with the Court's permission, it's already been

5  admitted, with the audio.

6            THE COURT:  All right.

7            MR. KOLDE:  And at some points, your Honor, I may

8  just pause to ask Mr. Fellers to indicate who's who.

9            THE COURT:  That's fine.  Uh-huh.

10           MR. KOLDE:  All right.  I would note to the Court

11 that Lamy does not turn on the audio until several seconds in.

12 We're just going to let it run, just so you see the context.

13           All right.  And the volume's on?  Yes?  Okay.  Thank

14 you.

15           So this is Plaintiff's 20 that's playing.

16                  (Video recording played.)

17     Q.    Who's the lady in the purple shirt on the left,

18 Mr. Fellers?

19     A.    That -- that's my special needs sister Courtney.

20     Q.    Okay.  Does she understand what's going on?

21     A.    She does not.  She's pretty -- getting pretty upset.

22     Q.    And who's the gentleman in the blue shirt with the

23 white mesh trucker baseball cap on?

24     A.    That is Matt Fisk.

25           MR. KOLDE:  All right.  And we'll respool the audio

1    in a second.

2            MR. CULLEN:  I think you actually had him describe

3    himself.

4            MR. KOLDE:  I did?

5            MR. CULLEN:  Yes.

6        Q.    That was you, right?

7        A.    What's that?  I missed that.

8        Q.    I'm sorry.  I wasn't listening to you.

9              Is that you right in the middle there?

10       A.    Oh, yes.  My back is to the audience.

11       Q.    You're wearing the white baseball cap?

12       A.    Yes, that's me.

13       Q.    Okay.  And who's on the right there with the Adidas

14   shirt on?

15       A.    That is Matt Fisk, the principal.

16       Q.    Okay.  He's got the blue shirt with the three white

17   stripes?

18       A.    Yes.

19       Q.    And for the Court's edification, can you just point

20   to the screen behind you and say who's you, who's Matt Fisk,

21   who's Courtney?

22       A.    Yeah.  So this is me, this is Matt Fisk, and this is

23   my special needs sister Courtney.

24       Q.    All right.  Can you see Eldon in this particular

25   view?

1      A.    You can't.  Eldon's basically sitting in this chair

2  and this is his wife.

3      Q.    Okay.  Eldon's wife is wearing the blue -- light

4  blue baseball cap; is that right?

5      A.    That is correct.

6      Q.    All right.  So at this point, just to place this in

7  the timeline, at this point you were no longer wearing the pink

8  wristband, but Eldon is wearing the pink wristband; is that

9  correct?

10      A.    That is correct.  I believe so.

11            MR. KOLDE:  Okay.  So let's start with the audio

12  again.

13                    (Video recording playing.)

14      Q.    That's Mike Desilets in the white shirt walking out

15  there?

16      A.    That is correct.

17      Q.    And the whistle is the referee interrupting the

18  game; is that correct?

19      A.    That is correct.

20      Q.    So right now, Mike Desilets and the referee are out

21  on the field; is that correct?

22      A.    Yes.

23      Q.    You are not able to hear what they're saying?

24      A.    That is correct.

25            MR. KOLDE:  Pause it.

1      Q.    Who was the individual that just said, we know what

2   you're doing, just take it off?

3      A.    That is an individual -- Coach Forbes, I believe his

4   last name is.

5      Q.    Ben Forbes?

6      A.    Ben Forbes.

7      Q.    And he's a Bow official also, a Bow employee also?

8      A.    Yeah, he's a Bow school employee.  He's a coach.  I

9   don't know if he's a teacher.

10     Q.    Okay.  But he was standing with the group there next

11  to Lamy and Fisk?

12     A.    Yes.

13     Q.    All right.  Did you know what he meant when he said,

14  it has XX on it, we know what you're doing?

15     A.    I -- I -- I'm not going to speculate on what he was

16  saying.

17     Q.    All right.  Did you -- did you understand XX to be

18  some kind of hate symbol?

19     A.    No.

20           MR. KOLDE:  Okay.  All right.  Play the video.

21               (Video recording played.)

22           MR. KOLDE:  Pause it, please.

23     Q.    All right.  So you were removed from the game.

24           That's Lieutenant Lamy, correct?

25     A.    Correct.

1     Q.   Did he say -- I mean, it's sort of obvious at this

2  point, but he says you're removed from the game, not you're

3  removed from the property, correct?

4     A.   That is correct.  That's what I heard.

5     Q.   All right.  In the video -- and I'll ask my

6  cocounsel to spool it back 20 seconds or so -- there is an

7  individual in a white top that you identified earlier as Mike

8  Desilets and he gestures with his thumb to Lamy, like, out of

9  here.  Is that an accurate statement?

10     A.   That's accurate.

11     Q.   All right.  Who were you calling a coward at that

12  point?

13     A.   Well, in that -- I think I -- I guess I was meaning

14  everybody who was forcing us out or removing the wristband was

15  a coward, but I guess -- listening to what I said, I guess I

16  was directing it towards Mike.

17     Q.   Okay.  And you say the wristband is about supporting

18  women's sports.

19     A.   I did.

20     Q.   There is somebody in the background who can be heard

21  down the sidelines saying, what, it's about supporting women's

22  sports.  Do you know who that was?

23     A.   I don't know.

24     Q.   Okay.

25     A.   I can speculate, but ...

1    Q.    Okay.  And then looking at the field, it looks like

2  during this point the game is not going on; is that correct?

3    A.    That is correct.

4    Q.    Where are the players for Plymouth and Bow at that

5  point?

6    A.    They're on the opposite side of the field.

7    Q.    Okay.  So there -- is it fair to say that they are

8  an entire field length plus the seven, eight feet of the

9  sideline buffer away from you all at that point?

10    A.    That is correct.

11         MR. KOLDE:  Okay.  Let's play that tape again.

12              (Video recording played.)

13         MR. KOLDE:  Objection.  Can we pause for a second?

14    Q.    So it's fair to say at this point you're away from

15  the sidelines, correct?

16    A.    That is correct.  I went to the parking lot.

17    Q.    And you did not return to the sidelines on that day;

18  is that correct?

19    A.    I do not.

20    Q.    Okay.  And I'm going to continue playing the

21  videotape and may ask you to identify who some people are.  You

22  know, the videotape's already in evidence, but just so we can

23  kind of complete that part of the story.

24         You go to your car.  What do you do?

25    A.    Well, I go in my car and I sit in my driver's seat

1   and watch from afar of what's going on.

2       Q.   Do you move your car at any point?

3       A.   At that point I -- I haven't moved it, but I

4   eventually do.

5       Q.   Okay.  What causes you to move the car?

6       A.   Well, there was a parking spot that opened up that

7   would give me a clearer view of the game, so I ended up moving

8   my car to that so I could watch the game from my car --

9       Q.   All right.

10      A.   -- and watch the rest of it.

11      Q.   Did you believe that being ejected from the game

12  meant you couldn't be in the parking lot?

13      A.   I did not believe that.

14      Q.   Okay.  Is that why you stayed?

15      A.   I'm sorry?

16      Q.   Is that why you stayed in the parking lot?

17      A.   Yes.  And also my daughter and my 13-year-old son

18  and my special needs sister was still there and they needed a

19  ride home.

20      Q.   Was the plan, the original plan, for you to give

21  them a ride home after the game?

22      A.   That is correct.

23      Q.   All right.  And your special needs sister is the

24  individual in the purple shirt who's sort of wandering around

25  in the middle of all this?

1       A.    Yes.

2       Q.    All right.  Did you end up giving them a ride home?

3       A.    I did not.

4       Q.    Okay.  And why is that?

5       A.    Well, as you'll see later, I was being harassed by

6   Officer Lamy in the parking lot and it caused both my children

7   to have a meltdown on the field.  And my other sister stepped

8   up to the plate and, without discussing it with me or arranging

9   it with me, she ended up taking my children and my other sister

10  home instead.

11      Q.    But that was not the original plan?

12      A.    That was not the original plan.

13      Q.    All right.

14      A.    It was out of her way to do that.

15      Q.    Did you move your car so that you would be in a

16  position to target, harass, or talk to the trans-identifying

17  player on the Plymouth team?

18      A.    No.

19      Q.    Did you know where the bus was going to drive?

20      A.    I didn't know where the bus was at that point.

21      Q.    Okay.  And as we'll see in the video, the second

22  video, in a few minutes, you did take the sign out of your car

23  at one point?

24      A.    I did.  I waited for the game to go -- to finish and

25  as people were leaving, I got out of my car and I held the sign

1    up.  I wasn't waving it.  I held it up above my head.

2        Q.    Did you yell anything?

3        A.    I did not.

4        Q.    Okay.  And, again, just as a reminder, what -- what

5    was the gist of what the sign said?

6        A.    It said Protect Women's Sports for Female Athletes.

7        Q.    All right.  Why'd you hold it up?

8        A.    I want to support women's sports and I believed what

9    was going on was a travesty.

10       Q.    Did you want to express yourself?

11       A.    Yes.

12             MR. KOLDE:  All right.  Let's go back and finish up

13   this video so everybody has seen it at least once.

14             If we could resume, please.

15                  (Video recording played.)

16             MR. KOLDE:  Pause it for a second.

17       Q.    All right.  So we can hear sort of faintly Eldon

18   talking with Matt Fisk; is that correct?

19       A.    That's correct.

20       Q.    He's the principal?

21       A.    He is.

22       Q.    All right.  And Eldon will testify later and I don't

23   want to spend a lot of time on this, but is what you're able to

24   hear from what Eldon's saying consistent with what you

25   testified to earlier, that there was no interruption until the

1    officials came over and asked you to remove the wristband?

2        A.    That is correct.

3        Q.    Okay.  And who are Mike Desilets and Matt Fisk going

4    out onto the field to talk with?

5        A.    He's going out to talk to the two game officials.

6        Q.    And one of them is Mike Rossetti?

7        A.    Mike or Steve?

8        Q.    Steve, you're right.

9        A.    Steve, yeah.

10            MR. KOLDE:  All right.  And let's resume.

11                   (Video recording played.)

12            MR. KOLDE:  Please pause it for a second.

13        Q.    Mr. Fellers, who's the gentleman in the green

14    referee's jersey coming up to -- facing Eldon right now with

15    the soccer ball tucked in the crook of his arm?

16        A.    I believe that's Steve Rossetti.  I think that's how

17    you pronounce his name.

18        Q.    Okay.  And you've seen him referee games before?

19        A.    I have.

20            MR. KOLDE:  All right.  Play the video, please.

21                   (Video recording played.)

22        Q.    Who's saying just take it off, the girls are going

23    to lose the game?  Do you know these people or is this more of

24    an Andy Foote thing?

25        A.    I -- I believe there are other -- they're other

1    parents who are sympathetic to trans issues.

2        Q.    All right.  We're going to -- if you recognize any

3    of the particular voices, let me know.  Otherwise, I'll cover

4    that with Andy Foote in a couple of minutes.

5            Let's go ahead and roll the tape.

6                (Video recording played.)

7            MR. KOLDE:  Pause it for a second.

8        A.    I find it ironic that --

9            MR. CULLEN:  Objection, your Honor.

10       Q.    No commentary.  You can only say if you identify any

11   of the speakers.

12       A.    Yeah.

13           THE COURT:  Sustained.

14       Q.    All right.  Do you recognize who the bossy voice was

15   saying, take it off, the insistent command voice who was

16   commanding you to take it off or commanding Eldon to take it

17   off?

18       A.    I -- I do not.  I -- it's speculation.

19       Q.    Was that -- was that Karen McFadden (sic)?

20           MR. CULLEN:  Objection.  He said he didn't know.

21           THE COURT:  Sustained.

22           MR. KOLDE:  All right.  I'll cover that with Andy.

23   Colleen McFadden, excuse me.

24           All right.  Let's finish the tape.

25                (Video recording played.)

1             MR. KOLDE:  Pause it.

2        Q.   All right.  Who's the guy in the blue shirt with the

3   white baseball cap who's walking up from next to Lamy and

4   looking at Eldon right now?

5        A.   The guy with the blue shirt who's looking around and

6   doesn't see where the wristband is is Coach Forbes.

7        Q.   Okay.  So that's Ben Forbes and he's now looking,

8   correct?

9        A.   He's looking for a wristband that supposedly

10  disrupted the game.

11       Q.   Okay.  Just answer the question.  Okay?

12            Go ahead and play.

13                 (Video recording played.)

14       Q.   You're not a lip-reader, are you?

15       A.   I'm sorry?

16       Q.   You're not a lip-reader, are you?

17       A.   I am not a lip-reader.

18            MR. KOLDE:  All right.  So this part is silent and

19  we'll just let the tape run out for completeness.  There's less

20  than a minute left.  And then we'll talk about what happened in

21  the parking lot in the second body cam video.  And I think

22  we're done with the videos, your Honor.

23                 (Video recording played.)

24       Q.   So at this point where Eldon has, according to the

25  video, taken off --

1          Pause it.

2          I know you weren't present at the field here, but

3  just for sake of the narration, what's going on in the field at

4  this point from what you can see in the video?

5          MR. CULLEN:  Well, your Honor, I don't think we need

6  the witness to testify to what we can see, so I'd object.

7          THE COURT:  You were not there at the time?

8          THE WITNESS:  I was not there --

9          THE COURT:  Okay.

10          THE WITNESS:  -- at the time.

11          THE COURT:  Sustained.

12          MR. KOLDE:  Okay.  Fine.  We'll roll the tape.

13                   (Video recording played.)

14     Q.   Fair to say you watched the remainder of the second

15  half, 23 minutes or so, from your car; is that correct?

16     A.   That is correct.

17     Q.   All right.  And then after the game finished, you

18  got out of your car and silently held up the sign; is that

19  correct?

20     A.   Yeah.  I leaned on the front bumper of my car and

21  held up the sign.

22     Q.   All right.  And at some point, Lieutenant Lamy comes

23  out to confront you in the parking lot after the game; is that

24  correct?

25     A.   That is correct.

1    Q.    All right.  We'll watch the video in a second and I

2    don't need you to give us a detailed play-by-play, but just to

3    set the table, what's the gist of the interaction?  What does

4    he allow you to do and what happened?  And then we'll watch the

5    video of that.

6    A.    Well, he initially told me I needed to get out of --

7    get off the property, that I was thrown off the property.  I

8    told him I was thrown out of the game.  And then he mentioned

9    that I have to put the sign away or leave.  And we had some

10   back-and-forth and another police officer arrived and helped

11   deescalate the process at that point.

12   Q.    Did you explain to Lieutenant Lamy that you had

13   planned to give your children, minor children, and your special

14   needs sister a ride home?

15   A.    I did.

16   Q.    All right.  Did you and he argue or negotiate about

17   that?

18   A.    We did.

19   Q.    All right.  Did -- did Lieutenant Lamy ultimately

20   allow you to stay in the parking lot if you put the sign away?

21   A.    He eventually did, yes.  I put the sign away

22   pretty -- you know, and then -- but then he still insisted that

23   I should leave after I put the sign away because he told me,

24   put the sign away or leave.  I put the sign away, then he

25   changed his tune and said I had to leave.

1      I said, I'm not leaving my children and my special

2  needs sister behind and he said that they can walk.  And I said

3  that that's -- I'm not letting them walk.  And we went back and

4  forth and then the other -- the Sergeant Welch showed up and he

5  helped kind of deescalate.  And then Andy Foote came over and

6  helped deescalate things and Lamy ending up letting me go and

7  just walked away.

8      Q.   And at the end of the video, he says, you can stay

9  and --

10     A.   He said that, yeah.  He said I could stay and take

11  my kids home.

12     Q.   And you had some interactions with the referee,

13  Rossetti, in the parking lot also; is that correct?

14     A.   I did.  This preceded the interaction I had with

15  Officer Lamy.

16                    (Video recording playing.)

17     Q.   Okay.  I'm going to need you to -- can somebody

18  silence the sounds or whatever?

19          Okay.  The interactions with Rossetti, when you

20  said, this, what are you talking about?  Did Rossetti -- the

21  interactions with Rossetti happen before or after you

22  interacted with Lamy?

23     A.   It happened before my second interaction with Lamy

24  on -- you know --

25     Q.   In the parking lot.

1    A.    The first one was in the field.  In the parking lot,

2    yes, I had an interaction with Steve prior to Officer Lamy

3    coming to me at the car.

4    Q.    Okay.  So before we roll the video, what did

5    Rossetti say to you in the parking lot?

6    A.    In the parking lot, he -- when there was some people

7    around me, including students, who actually were giving me

8    thumbs up and supporting my message, he screamed, probably from

9    20 feet away, that I was an -- excuse me my language -- an

10   F-ing A-hole.

11   Q.    Just say the words.

12   A.    You're a fucking asshole.

13   Q.    Did he actually say fucking?

14   A.    Yes.

15   Q.    Okay.  What else did he say?

16   A.    And I -- I think I might have said, why, because I'm

17   supporting women's rights?  And he said something to the

18   effect, you have no right to do this here, this is not a time

19   and a place.  And the other referee was trying to quiet him

20   down because he saw how angry he was.  And I asked for their

21   names and they refused to provide me their names.

22           And Steve ended up jumping in his car, pulled out of

23   the parking spot pretty quickly, not, in my opinion, looking,

24   there was people all around, including children, and then as

25   he's pulling away quickly, he rolls his passenger side window

1    down and screams out the car that my daughter is going to hate

2    me.

3         Q.    So who's he screaming that at out of the car window?

4         A.    He was screaming it at me.

5         Q.    And then he leaves?

6         A.    And then he just leaves.

7         Q.    And then Lamy comes over?

8         A.    Well, right before that, I had a -- I tried to talk

9    to the other referee, who wanted no -- no part of it and he

10   basically hustled out and got in his car and he took off --

11        Q.    All right.

12        A.    -- and then that's when Lamy showed up.

13        Q.    And we know from the declaration that Mike Desilets

14   filed in this case that he ordered Lamy to come talk to you; is

15   that correct?

16        A.    It's -- it's my understanding.

17             MR. KOLDE:  Okay.  So let's roll the video of your

18   interaction with Lamy on the sideline on -- in the parking lot.

19             And, for the record, this is Plaintiff's Exhibit 21.

20             May I roll the tape, your Honor?

21             THE COURT:  You may.

22                      (Video recording played.)

23             MR. KOLDE:  All right.  That's the end of that

24   video.

25        Q.    Fair to say that ultimately Lieutenant Lamy let you

90

1    stay to collect your kids; is that correct?

2         A.    That is correct.

3         Q.    But because your sister had intervened to give them

4    a ride, you didn't need to give them a ride; is that correct?

5         A.    I did not need to give them a ride because my other

6    sister ended up driving them home.

7         Q.    And did you end up leaving the parking lot without

8    any further incident?

9         A.    I -- there was no further incident, but I didn't

10   leave right away.  I ended up going to help Eldon and Norene

11   carry their stuff back to their car --

12        Q.    All right.

13        A.    -- which is what I normally do after games.

14        Q.    And did they talk to you about where your kids were?

15        A.    They -- they mentioned at that point that my other

16   sister had grabbed the kids and Courtney and were going home,

17   taking them to my house.

18        Q.    And what did you do after that?

19        A.    Well, I asked Eldon and Norene -- they were visibly

20   upset.  I asked them to just come back to my house so we could

21   have a family powwow.

22        Q.    All right.  And other than that, what did you do?

23        A.    I just got in my car and drove home.

24        Q.    Okay.  And there were no further interactions with

25   Lieutenant Lamy or school officials or any of the players from

1    Plymouth or anything like that; is that correct?

2          A.    That is correct.  Yes.

3                MR. KOLDE:  All right.

4                THE COURT:  All right.  It's probably a good time --

5    it's after noon.  We'll break for lunch.

6                MR. KOLDE:  Can I ask him one more question --

7                THE COURT:  Sure.

8                MR. KOLDE:  -- then I think we're probably close to

9    wrapping up with him.

10          Q.    With regard to the future and imminent Bow sports

11    events that you would like to wear the wristband at, are you

12    intending to wear the wristband in the same manner that you had

13    attempted to wear it at this September 17th game?

14          A.    Yes, although I'll be wearing a long-sleeve shirt,

15    I'm sure, in the winter, so -- but, yes, that's --

16          Q.    Okay.

17          A.    -- how I'll do it is just wear it quietly.

18          Q.    It would be visible at the edge of your shirt

19    collar -- sleeve?

20          A.    That's correct.

21          Q.    And would it be your intent to similarly just stand

22    on the sidelines or in the spectators area without saying

23    anything about the wristband?

24          A.    That is correct.

25          Q.    All right.  And with regard to the sign that you

1    would want to display in the parking lot, would it be the same

2    sign that you had that was shown in this video here today?

3        A.    Yes.  I mean, I -- I'm probably just going to wear

4    the wristband, but --

5        Q.    Okay.

6        A.    -- I would reserve the right, if I choose to, to

7    have a sign in my car.

8        Q.    Okay.  Also a message about protecting women's

9    sports for female athletes?

10       A.    That is correct.

11       Q.    All right.  And do you have any intent to wear the

12   wristband or display a sign at any of the future or imminent

13   Bow sporting events in a way that would disrupt the match or

14   target a specific player?

15       A.    I have no intention of disrupting matches or

16   targeting players.

17       Q.    Okay.  So a silent statement of your opinion?

18       A.    That is correct.

19            MR. KOLDE:  Okay.  Thank you, your Honor.

20            THE COURT:  All right.

21            MR. KOLDE:  We'll take a break.

22            THE COURT:  We'll break for lunch.  We'll resume at

23   1:15.

24            THE CLERK:  All rise.

25                (Lunch recess taken at 12:11 p.m.)

1                          C E R T I F I C A T E

2

3

4            I, Liza W. Dubois, do hereby certify that

5    the foregoing transcript is a true and accurate transcription

6    of the within proceedings, to the best of my knowledge, skill,

7    ability and belief.

8

9    Submitted: 12/2/24              */s/  Liza W. Dubois*
                                     LIZA W. DUBOIS, RMR, CRR
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25