1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW HAMPSHIRE
2
    * * * * * * * * * * * * * * * *
3                                   *
    KYLE FELLERS, ANTHONY FOOTE,    *
4   NICOLE FOOTE, AND ELDON RASH,   *
                                    * No.  1:24-cv-311-SM-AJ
5             Plaintiffs.           * November 22, 2024
                                    * 1:20 p.m.
6   v.                              *
                                    *
7                                   *
    MARCY KELLEY, MICHAEL DESILETS, *
8   MATT FISK, BOW SCHOOL DISTRICT, *
    PHILIP LAMY & STEVE ROSSETTI,   *
9                                   *
              Defendants.           *
10                                  *
    * * * * * * * * * * * * * * * *
11
         TRANSCRIPT OF EVIDENTIARY HEARING -DAY TWO
12                  AFTERNOON SESSION
          BEFORE THE HONORABLE STEVEN J. MCAULIFFE
13

14
    APPEARANCES:
15

16  For the Plaintiffs:     Endel Kolde, Esq.
                            Brett Robert Nolan, Esq.
17                          Nathan John Ristuccia, Esq.
                            Institute for Free Speech
18
                            Richard J. Lehmann, Esq.
19                          Lehmann Major List PLLC

20
    For the Defendants:     Brian J.S. Cullen, Esq.
21  Marcy Kelley            Jonathan M. Shirley, Esq.
    Michael Desilets        Cullen Collimore Shirley PLLC
22  Matthew Fisk
    Philip Lamy
23  Bow School District

24
    For the Defendant
25  Steve Rossetti:         Dennis T. Ducharme, Esq.
                            Ducharme Resolutions PLLC

1

2

Court Reporter:          Brenda K. Hancock, RMR, CRR
                         Official Court Reporter
3                        United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
4                        (603) 225-1454

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I  N  D  E  X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| STEPHEN ROSSETTI | | | | |
| By Mr. Kolde | 4 | | | |
| By Mr. Ducharme | | 15 | | |
| | | | | |
| MATTHEW FISK | | | | |
| By Mr. Shirley | 20 | | | |
| By Mr. Kolde | | 26 | | |

1                    P  R  O  C  E  E  D  I  N  G  S

2          THE CLERK:  All rise for the Honorable Court.

3          THE COURT:  Okay.  Getting there, right?

4          MR. KOLDE:  Ready to roll, your Honor.

5          THE COURT:  All right.

6          MR. KOLDE:  If I may proceed, your Honor, plaintiffs

7    call Steve Rossetti.

8          THE COURT:  Last witness?

9          MR. KOLDE:  Last witness for us, yes, your Honor.

10   We'll, obviously, want to cross whoever they call.

11          THE CLERK:  If you would remain standing and raise

12   your right hand.

13          **STEPHEN ROSSETTI**, having been duly sworn by the Clerk,

14   was examined and testified as follows:

15          THE CLERK:  Thank you.  Please be seated, and please

16   state your full name for the record.

17          THE WITNESS:  Stephen Carl Rossetti.

18                    DIRECT EXAMINATION

19   BY MR. KOLDE:

20   Q.   Mr. Rossetti, we've never met, correct?

21   A.   Yesterday.

22   Q.   Oh.  I shook your hand, right?  And you live in Bow; is

23   that right?

24   A.   I do.

25   Q.   And you are a soccer referee for youth soccer games,

1    correct?

2    A.    Yes.

3    Q.    When you referee for the Bow High School girls' varsity

4    soccer team, are you there as an employee of the School

5    District, some kind of sporting body, or are you an independent

6    contractor or something else?

7    A.    As a referee, I'm an independent contractor.

8    Q.    All right.  But this September 17th game that we've been

9    talking about was an unusual game, is it fair to say?

10   A.    No.

11   Q.    Oh.

12   A.    You're talking about the game, correct?

13   Q.    I mean, you heard the question.

14   A.    Okay.  No, it wasn't unusual.

15   Q.    Is it normal for you to get an email ahead of time from

16   the athletic director at the high school warning you about

17   potential problems that are anticipated at the game?

18   A.    It is normal.  I get them from all the athletic directors

19   in the state, because I am the assigner for all the games in

20   the state.  So, it is normal to get emails and phone calls.

21   Q.    For every game?

22   A.    For a lot of games, when situations come up.

23   Q.    For the September 17th game you got an email from

24   Desilets; is that correct?

25   A.    I did.

1    Q.    What did that email say?

2    A.    That they were playing Plymouth, and Plymouth had a

3    transgender player, and they're going to have extra security at

4    the game.

5    Q.    What else did the email say?

6    A.    That's about it.  It's all I can remember.

7    Q.    What did that mean to you in terms of the actions you

8    would take?

9    A.    None.

10   Q.    At that point that you received the email from Mike

11   Desilets had you already assigned yourself to the game in

12   question?

13   A.    I did.  I already had, yes.

14   Q.    Do you go out of your way to assign yourself to games

15   where you know Parker Tirrell is playing?

16   A.    You know, I didn't know that person's name until

17   yesterday.

18   Q.    Did you have awareness that there was a trans player

19   playing on the Plymouth team prior to September 17th and go out

20   of your way to assign yourself to games where you knew a trans

21   player was playing, regardless of whether you knew the player's

22   name?

23   A.    Okay.  I'm sorry.  I don't understand the question.

24   Q.    I'm just trying to ask you, do you try to ref the games

25   where you know a trans player is on the field?

1    A.    Do I try to?

2    Q.    Yes.

3    A.    Well, I didn't know there was a trans player, transgender

4    player on the Plymouth team until the Thursday before, when I

5    was at Pembroke reffing the Plymouth game, and someone said,

6    There's a transgender player on the Plymouth team.  That's when

7    I knew.

8    Q.    And at that point had you already been assigned or

9    assigned yourself to the September 17th game?

10   A.    I had already been assigned, yes.

11   Q.    Is it fair to say that you knew there might be some kind

12   of an issue that the officials anticipated when you arrived to

13   referee the September 17th game?

14   A.    You know, I wish I had known all the stuff from yesterday,

15   because I wouldn't have refereed that game.  All those emails

16   and things that everybody was sending out and the, what do you

17   call it, social media that I don't look at, if I had known all

18   of that prior to I wouldn't have done the game.

19   Q.    Why?  Because it's not worth the hassle or some other

20   reason?

21   A.    Not worth any hassle.  There's enough hassle reffing the

22   game.

23   Q.    Is it fair to say that you were on the lookout during the

24   game for some kind of a free-speech activity or demonstration

25   on the sidelines?

1    A.   No.

2    Q.   You heard Steve -- Mike Desilets, rather, testify about

3    your conversation with you in the middle of the field earlier,

4    correct?

5    A.   Yes.

6    Q.   All right.  It sounds like there were two conversations,

7    one at the beginning of the stoppage and one at the end of the

8    stoppage, correct?

9    A.   Yes.

10   Q.   All right.  Is it correct that you discussed with Mike

11   Desilets what to do about whether to resume the game or to

12   abandon the game?

13   A.   Yes.

14   Q.   And is it correct that you provided Mike Desilets options

15   for what you could do?

16   A.   Well, it was two different conversations.  In the second

17   one is when we talked about that.

18   Q.   All right.  So, let's talk about the first conversation,

19   and we don't need every detail, but basically what was talked

20   about on the first conversation?

21   A.   Well, he came out and mentioned that there was a commotion

22   going on and that one of the people they were trying to get to

23   leave, and that's when I said to the players, Go to your

24   benches.

25   Q.   And that was the conversation you had with him, correct?

1    A.    Yes.

2    Q.    All right.  And did you guys talk about anything else at

3    that point?  Did he tell you that it was about a pink wristband

4    with XX on it?

5    A.    No, not that I remember.

6    Q.    Had you seen the wristbands at that point?

7    A.    No.

8    Q.    You weren't even aware who was wearing the wristbands,

9    correct?

10    A.    Yes, I was not.

11    Q.    Just making sure, okay, that we understand the answer.

12    You were not aware, correct?

13    A.    Correct.

14    Q.    When you came over to the sideline and began addressing

15    Eldon Rash, you said something to the effect of, Is this the

16    person that's wearing the wristband?

17    A.    You know, that's not really how it happened.  Can I tell

18    you how it happened?

19    Q.    Okay.

20    A.    In a conversation with Mike Desilets he said that the

21    first person had left, but there's someone sitting at midfield

22    with a wristband on, and he won't take it off.  Now, there had

23    been at least ten minutes go by, and, as a referee, we need to

24    do something to get this game going again, so I walked over and

25    said, as you could see in the clip, Why don't you take the

1    wristband off, or the game's going to be over.

2    Q.    Did you, yourself, have any understanding of what the

3    meaning of the wristband was that Eldon Rash was wearing?

4    A.    Absolutely not.

5    Q.    Did you have any opinion about the wristband's meaning?

6    A.    Absolutely not.

7    Q.    Then, why did you say, You have no right to embarrass kids

8    like that?

9    A.    I don't remember saying that.

10   Q.    In the second conversation that you had on the field,

11   that's when you gave Mike Desilets options about stopping the

12   game, or abandoning the game, or figuring out what to do; is

13   that correct?

14   A.    Yes.  We talked about that, both of us, yeah.

15   Q.    All right.  He described the options that you provided,

16   and I just want to hear you say it in your own words.  What

17   were the options you provided to Mike Desilets in that second

18   conversation on the field after you had spoken to Mr. Rash and

19   directed him to remove the wristband?

20   A.    I told him that, Where there's 23 minutes left in the

21   game, and in New Hampshire high school soccer it's a legal

22   game, we can just leave, and he said, Why don't we just wait a

23   little bit longer, and within a couple of minutes he got a

24   walkie-talkie and he said to me that the person took his

25   wristband off, so we restarted the game.

1    Q.    Did Mike Desilets tell you in either of the conversations

2    that it was essential for both schools to have that wristband

3    removed before the gameplay was resumed?

4    A.    No.

5    Q.    Then, why did you walk over to ask Eldon Rash or to tell

6    him that the game was over if he didn't remove the wristband?

7    A.    Mike said, We have one person left wearing a wristband,

8    and I wanted to get the game restarted, so I walked over and

9    told him, Why don't you take it off.

10   Q.    I know, but there's no rule against wearing wristbands at

11   youth soccer games, so, Mr. Rossetti, please explain to us, if

12   you didn't know what the wristbands meant --

13          THE COURT:  I understand.  There's no jury.  No

14   objection is necessary.

15   Q.    -- why did you ask him to remove the wristband?  Why did

16   you care?

17   A.    I really didn't care, but it didn't look like the game was

18   going to start unless he took it off.  That was my impression.

19   Q.    And the reason the game wasn't going to start was because

20   Mike Desilets asked you not to restart the game until after the

21   wristband was taken off?

22   A.    Mike just said, There's one person still wearing a

23   wristband.

24   Q.    Why did you care?

25   A.    Well, I really don't care, but I wanted to get the game

1    started, so I went over.

2    Q.    I mean, you were the one deciding whether the game started

3    or not, right, so why did you care whether he was wearing the

4    wristband?

5    A.    Because Mike said, There's one guy still wearing a

6    wristband.

7    Q.    I understand Mike said that.  So, were you taking

8    directions from Mike about whether to restart the game, then?

9    A.    No.  We were just talking about what was going on.

10   Q.    Okay.  So, do you have any explanation for why it mattered

11   to you that Eldon Rash was still wearing a wristband, why that

12   was necessary for him to remove the wristband before you

13   restarted the game?  That's what you said, right?

14   A.    Right.  I did say that.

15   Q.    Why did you say that?

16   A.    Because it seemed to be that was what Mike Desilets

17   wanted.  He wanted it off.

18   Q.    If any of the school officials on the sidelines told my

19   client, Eldon Rash, that the game would be forfeited if it

20   didn't resume and could cost the Bow girls' team a playoff

21   spot, would that have been inaccurate?

22   A.    Yes.

23   Q.    Because of the rule that you explained earlier, that, if

24   you're in the second half and the game is abandoned, it's

25   completed with the score to that point; is that correct?

1  A.   Yes.

2  Q.   When you spoke to Eldon Rash and said something to the

3  effect of, The wristband comes off or this game is over, you

4  said that because you wanted him to remove the wristband; is

5  that correct?

6  A.   I wanted to restart the game.

7  Q.   Yeah, but you said that because you wanted him to remove

8  the wristband so you could restart the game; is that correct?

9  A.   Yes.

10 Q.   You heard testimony about what happened out on the parking

11 lot after the game.  Do you think you could have handled any of

12 that a little better?

13 A.   Absolutely.

14 Q.   In what way?

15 A.   Well, first of all, you don't have the whole story of what

16 happened out there.  I was provoked, and that's never been

17 brought up.

18 Q.   Okay.  I don't think we need to get into a ton of detail

19 on that, but in what way were you provoked to swearing at my

20 client?

21 A.   Okay.  My partner and I went walking out towards our car,

22 and I can't believe that there's some guy there holding a sign

23 next to my car, and I'm going, How does he know where my car

24 is?  And then I go -- then I realize, No, he doesn't know it's

25 my car; he's just there for some other reason.  Oh, was the

1    Plymouth school bus right there?  Yes, it was.  So, he's

2    eyeballing us, trying to stare us down, nodding his head at us,

3    and my partner gets into it with him, and I said, Don't talk to

4    that asshole.  And then we started to take our shirts off and

5    get ready to leave, and he provoked me into getting into a

6    banter with him, and I ended up saying and called him a fuckin'

7    asshole.

8    Q.    And the reason you called him that is because you

9    disagreed with the pink wristbands with XX on it, correct?

10   A.    You know, I don't even know what those wristbands were

11   until I came here.

12   Q.    And you disagreed with the sign that he was displaying out

13   in the parking lot?

14   A.    I didn't even know what the sign said, but he's holding up

15   a sign.  I found out what the sign said here.

16   Q.    Then why did you call him an asshole?

17   A.    You know, just an adjective.

18   Q.    I think I'm almost down here, Mr. Rossetti.

19         Why, if you didn't care what my client was saying, why

20   did you roll down your window and say to him, Your daughter is

21   going to hate you in 20 years?

22   A.    I did say that.

23   Q.    How come?

24   A.    Because he had provoked me, and I was upset.

25   Q.    His daughter's going to hate her dad because he provoked

1    some ref?

2    A.    You know, I don't know where it came from, but it came.

3              MR. KOLDE:    Nothing further.

4              THE COURT:    Mr. Cullen, or do you want to go with

5    Mr. Ducharme first?  It's your witness or your client.

6                        CROSS-EXAMINATION

7    BY MR. DUCHARME:

8    Q.    Mr. Rossetti, are you a political person?

9    A.    No.

10   Q.    Are you a social media person?

11   A.    No.

12   Q.    Do you take positions on issues in public?

13   A.    No.

14   Q.    How long have you been a ref?

15   A.    Fifty-three years.

16   Q.    How many sports?

17   A.    Three.

18   Q.    About how many games do you do a year between the three

19   sports you do or have done?

20   A.    About 170.

21   Q.    For 53 years?

22   A.    Mm-hmm.

23   Q.    So, thousands and thousands of games?

24   A.    Mm-hmm.

25   Q.    Okay.  Try to say "Yes."

1    A.    Yes.  I'm sorry.

2    Q.    That's okay.  Real quickly, because I don't think the

3    Court really cares about any of this right now, what's game

4    management?

5    A.    Making sure that the rules are enforced and the players

6    are protected.  Oh, game management at a certain field, it's

7    usually the athletic director, and if there's no athletic

8    director they usually have a teacher there taking their place,

9    and if there's neither it's usually the home coach.

10   Q.    And what's the interplay between game management and the

11   on-field or on-court officials?

12   A.    Well, before the game we always check in with game

13   management and ask them how things are and what's going on and,

14   Anything special going to happen today?

15   Q.    And in this case you did get the email?

16   A.    Mm-hmm.

17   Q.    Yes?

18   A.    Yes.

19   Q.    And you knew there could be some sort of activity going

20   on?

21   A.    Yes.

22   Q.    Okay.  What caught your attention that day?  We've seen

23   the video, but what caught your attention?

24   A.    I was on the fan side and going back -- up and down, and I

25   heard a commotion going on, which is hard for me, because I'm

1    focused on the game, but I heard a commotion that was loud

2    enough for me to look, and in the video you can see that I

3    look, and I saw the police officer being animated with a

4    person, and I'm going -- I went to myself, You know what?  This

5    isn't good for the players.  So, next chance I had, dead ball,

6    I stopped the game, went over to midfield to talk to my

7    partner, and that's when Mike came out and told me what was

8    going on.

9    Q.   So, that's the lead-up to everything we saw on the

10   bodycam?

11   A.   Yes.

12   Q.   And I think you've been pretty clear up until this all

13   sort of blew up you didn't know what these wristbands were all

14   about.

15   A.   I did not know.

16   Q.   Did you care what the cause of the commotion with the

17   police officer was?

18   A.   No.

19   Q.   Have you had to stop games during your career before

20   because of a commotion in the stands, a fight in the stands?

21   A.   Yes.

22   Q.   Is it a frequent thing, a once-in-a-while thing?

23   A.   Once in a while.

24   Q.   In terms of the interaction that's been described by

25   Mr. Desilets and that we saw on the video, is how this shook

1    out with you and him as game management any different than

2    you've had happen at other games?

3    A.    No, not at all.  It was good.

4    Q.    And, ultimately, is it fair to say that you're the guy who

5    made the call to stop the game?

6    A.    Yes.

7    Q.    But from thereon you're working, and he wants that

8    wristband off, right?

9    A.    Yes.

10   Q.    Do you care why he wants it off?

11   A.    No.

12   Q.    And you know that the wristband has something to do with

13   the police presence and the commotion?

14   A.    Yes.

15   Q.    Okay.  When did you assign yourself this game, this

16   September 17th game?

17   A.    In July.

18   Q.    You're assigning basketball right now?

19   A.    Yes.

20   Q.    What months are you assigning for basketball now?

21   A.    Right now I'm in February.

22   Q.    Mr. Kolde asked you some questions about you picking and

23   choosing and assigning yourself for games with trans athletes

24   in them?  Is that --

25   A.    No.

1   Q.    -- anything you've ever thought of doing?

2   A.    No, no.

3   Q.    Why did you assign yourself to this game back in July?

4   A.    Back in July I assigned myself to this game because Bow is

5   a very good team, and in past years Plymouth hasn't been very

6   competitive, and after reffing 53 years doing a

7   less-competitive game is a good thing to do for an old man like

8   me.

9           MR. DUCHARME:  That's all I have, sir.

10          THE COURT:  Mr. Cullen?

11          MR. SHIRLEY:  It will be me, and no questions, your

12   Honor.

13          MR. CULLEN:  I'm sorry, your Honor.

14          THE COURT:  Mr. Shirley, no questions.

15          No redirect, I assume.

16          Thank you, sir.  You may step down.  You're excused as

17   a witness in this case.

18                  (Witness stepped down)

19          THE COURT:  And next witness.

20          MR. KOLDE:  We're done with our part, your Honor.

21          THE COURT:  Excellent.

22          Mr. Shirley.

23          MR. SHIRLEY:  We're going to call Matt Fisk, your

24   Honor, as our potentially only witness.

25          THE CLERK:  Please remain standing and raise your

1    right hand.

2          **MATTHEW FISK,** having been duly sworn by the Clerk, was

3    examined and testified as follows:

4          THE CLERK:  Thank you.  Please be seated.  Please

5    state your full name for the record.

6          THE WITNESS:  Matthew Fisk.

7                    <u>DIRECT EXAMINATION</u>

8    <u>BY MR. SHIRLEY:</u>

9    Q.   No e?

10   A.   No e, just like Carlton.

11   Q.   Would you describe your position with Bow High School?

12   A.   I am the principal of Bow High School.

13   Q.   How long have you been principal?

14   A.   I became principal on July 1st of this year.

15   Q.   And have you been with Bow before that?

16   A.   Yes.  For five years I was the assistant principal.

17   Q.   Did you have any role before being assistant principal

18   with Bow?

19   A.   No.

20   Q.   What's your background before that, teacher?

21   A.   Yes.  I began my career teaching social studies at Concord

22   High School.  I then went to New Hampton school, a prep school

23   in the Lakes Region, where I taught social studies, and then

24   for the last six years of my tenure there I was the academic

25   dean.  I also coached both boys' and girls' varsity cross

1    country.

2    Q.    Where did you grow up?

3    A.    Right here in Concord.

4    Q.    Are there gay students at Bow High School?

5    A.    Yes.

6    Q.    Are there transgender students at Bow High School?

7    A.    Yes.

8    Q.    What is GSA?

9    A.    GSA stands for Gay-Straight Alliance.

10    Q.    What is it?

11    A.    The Gay-Straight Alliance is an extracurricular club that

12    the school offers.

13    Q.    Who attends a Gay-Straight Alliance club meeting?

14    A.    The club is open to any Bow High School student.

15    Q.    Where do the meetings take place?

16    A.    They vary, but this year they're taking place in one of

17    the special education teacher's classrooms.

18    Q.    What time of day?

19    A.    Either before or after school.

20    Q.    Do you have a capacity with respect to that organization?

21    A.    I do.

22    Q.    What is that?

23    A.    For the past two years I've been helping to advise that

24    group.

25    Q.    Can you just fill in what would that -- when you're doing

1    that job or that role what is called upon?  What are you called

2    upon to do?

3    A.    If the students want to watch a film, I help arrange a

4    space for them to be able to do so.  We have a club fair at the

5    beginning of the year, so I work with the student leaders in

6    the club to help organize posters, so as part of the fair that

7    we set up outside the school with the other clubs, so they can

8    find interested students, and then handle logistical things

9    that come up.

10   Q.    In your capacity as both principal and assistant principal

11   before that and in this advisory role have you come to

12   understand some of the issues that transgender students

13   struggle with?

14   A.    Yes.

15   Q.    Can you describe to the Court your experiences with that?

16   A.    Sure.  We have several transgender students who I have

17   talked with over the tenure at Bow High School.  I know that,

18   just like every student struggles, trans students suffer from a

19   higher rate of suicide and depression than other high school

20   students.  In direct conversation with some of these kids

21   they've shared heartbreaking stories about some of the things

22   that they've experienced.

23          MR. KOLDE:  Your Honor, I am going to just note an

24   objection that this is hearsay testimony about unidentified

25   students.

1          THE COURT:  Objection overruled.

2          MR. SHIRLEY:  Thank you.

3     Q.   Continue.

4     A.   I can think of one specific student who I've talked with

5     for the entirety of their time at Bow High School who has been

6     hospitalized for self-harm, and a leading cause of that is some

7     of the stress that this child feels from peers and society.

8     Q.   Thank you.  Shifting a little bit of the focus now, let's

9     talk just quickly about speech issues that you confront.

10    A.   Yes.

11    Q.   Do you have moments in time where you have to address

12    speech issues in the school setting?

13    A.   Yes.

14    Q.   Can you give me an example of something that would be --

15    where you've been involved?

16    A.   I mean, a basic one, if I'm walking the halls and I hear a

17    student swear, I'll tend to say, Watch your language.

18    Q.   Yeah.

19    A.   Right.

20    Q.   Any issues about race, sex, gender, any of these issues

21    that you have had to intervene with students on?

22    A.   Yes.

23    Q.   Okay.  Confederate flag, perhaps?  Is that an issue you've

24    had to be involved in?

25    A.   Yes.  Approximately four years ago -- we have gmail as our

1  email system, and you can have, like, your picture be your

2  background there.  One of the students had a Confederate flag,

3  so I'm a social studies teacher, so I brought him into my

4  office and asked him what was the message that he was intending

5  to send.  And he said, you know, I'm against -- I'm against

6  government.  And so, I talked to him about the symbol for many

7  people has come to have really racist undertones, and so we

8  talked about other symbols he could use, and he decided to

9  change the symbol to the Don't Tread on Me flag.

10  Q.    How about the parking lot?  Does any old symbol just come

11  walk into that parking lot or drive into that parking lot?  Do

12  you have no concerns about that?

13  A.    Prior to my arriving at Bow High School the principal did

14  deal with a truck that was flying the Confederate flag around

15  the parking lot, and he asked the student to take it down.

16  Q.    There was testimony earlier today about words you spoke to

17  Eldon Rash.  I'm now jumping way ahead, right to the September

18  17th game, in the middle of the game, and we saw some video

19  clips.  There's you, in terms of I'm speaking of the video,

20  talking to Mr. Rash, and I believe he testified today that you

21  told him specifically that the game would be forfeited if he

22  did not remove that wristband.

23        Do you remember that testimony today?

24  A.    I remember it, yes.

25  Q.    Can you describe what you said to Mr. Rash?

1   A.    At various points I said, Sir, could you please remove the

2   wristband that you're wearing.  I think I said "please" a

3   number of times.  I believe almost every time I addressed him I

4   addressed him as, Sir, could you please remove the wristband.

5   I did hear on the video somebody talk about the game being

6   forfeited.  That was not me.  I recognize the voice.  It wasn't

7   me.

8   Q.    Did you threaten that something bad would happen to his

9   granddaughter if he did not comply to your requests?

10  A.    No.

11  Q.    Let's just quickly, in your words, what is the problem

12  with this wristband or these wristbands on that day?

13  A.    On that day there was a transgender child playing for the

14  Plymouth soccer team.  We -- I believe that as an anti-trans

15  symbol, and, as such, did not want to subject the child to

16  intimidation or threats of harm, especially knowing what I do

17  about the challenges that trans kids go through.

18  Q.    Did you have concerns that there was something else that

19  might happen beyond wristbands that day?

20  A.    Yes.

21  Q.    Okay.  What basis did you have to believe that anything

22  more than wristbands was afoot?

23  A.    I had also read the same emails that have been shared

24  here.  At approximately 1:30 I received a phone call from a

25  parent who basically reiterated the exact same things that were

1  in the email.  So, I had seen emails talking about possible

2  demonstrations, and I received a phone call about a possible

3  demonstration.

4          MR. SHIRLEY:  Thank you.

5          THE COURT:  Thank you, Mr. Shirley.

6          Why don't we go Mr. Kolde and Mr. Ducharme.

7                      CROSS-EXAMINATION

8  BY MR. KOLDE:

9  Q.   Mr. Fisk, do you consider yourself to be a trans ally?

10 A.   Yes.

11 Q.   You testified about your experience dealing with students

12 that were transitioning.  Were those students medically

13 transitioning, or socially transitioning, or both?

14 A.   Both.

15 Q.   Do you support gender-affirming care in your role as a

16 principal?

17 A.   I have no opinion on that.

18 Q.   I'm sorry.  I couldn't hear you.

19 A.   I have no opinion on that.  My apologies.

20 Q.   Do you, in your role as advisor to the Gay-Straight

21 Alliance, do you have any knowledge about what the term

22 "misgendering" means?

23 A.   I was familiar with that term prior to my arrival in Bow.

24 Q.   Okay.  And what does -- for those -- for the Court's

25 edification, the Court may know, but what does "misgendering"

1    mean?

2    A.   My understanding is, if a student identifies as male,

3    somebody referring to them as female.

4    Q.   Does that include using the person's dead name?  Is that

5    also a form of misgendering?

6    A.   I suppose so, but I think it also depends on the intent.

7    Q.   What is a dead name?

8    A.   A dead name is for a student who has transitioned from one

9    sex to the other oftentimes has a name change, and so that

10   would be using the name that they transitioned from.

11   Q.   Do you believe that it is wrong for citizens to engage in

12   misgendering a trans student?

13   A.   I believe if it's done on purpose, yes.

14   Q.   And my question wasn't whether it was done on purpose.  My

15   question is do you believe it's wrong?

16        THE COURT:  Wrong in what sense?  Legally wrong,

17   morally wrong, socially wrong, politically wrong?  What?

18        MR. KOLDE:  All of the above.

19        THE COURT:  Well, no.  It's totally irrelevant.

20        MR. KOLDE:  Well, it goes to his viewpoint in wanting

21   to censor the --

22        THE COURT:  Objection sustained.

23   Q.   Sexual orientation is different than gender identity,

24   right?

25   A.   Correct.

1    Q.    You understand, in your role as an advisor, that there are

2    many gay people who disagree with transitioning, correct?

3    A.    I know that it's a -- yes.

4    Q.    There are some gay people that think that the trans

5    community is preying on confused gay students, correct?

6    A.    Yes.

7    Q.    Do you disagree with that view?

8    A.    Which view, sir?

9    Q.    That view, that some in the trans community prey on

10   confused gay students.

11   A.    I have no problem with prayer.

12   Q.    I misunderstood your answer.

13   A.    I have no problem with prayer.

14   Q.    Prey, prey.  No.  Prey.  That they are --

15         THE COURT:  P-r-e-y.

16         MR. KOLDE:  Yes.

17   Q.    Yes?

18   A.    Oh, oh.

19   Q.    Yeah.  I don't think you're pro preying, I hope, in that

20   sense, p-r-e-y.

21   A.    Okay.  Thank you for the clarification.  I would disagree.

22   Q.    I thought you would.

23         You talked a little bit about the parking lot, and you

24   testified about a student that was displaying a Confederate

25   flag on their vehicle; is that right?

1    A.    Correct.

2    Q.    And was it a bumper sticker?

3    A.    It was a flag on a pole.

4    Q.    Like, a huge one or one of those little ones that sticks

5    out of your window?

6    A.    Approximately, what's this (indicating), like 3 by 5?

7    Q.    I see.  Okay.

8    A.    On a pole.

9    Q.    But you would agree that you don't make an effort to

10   patrol what parents put on their cars normally, do you?

11   A.    If I saw something offensive, I would take action on it,

12   yes.

13   Q.    Okay.  You saw some photographs in this case of vehicles

14   parked on Bow School District property with pride flags on

15   them.  You don't have a problem with that, correct?

16   A.    No.  Neither did I with Trump flags that were also

17   positioned, or Harris bumper stickers, or Kelly Ayotte bumper

18   stickers, or whatever.

19   Q.    All right.  So, let's orient it towards the issue in this

20   case.  What if tomorrow somebody parked a car with a bright

21   pink bumper sticker and two black Xs on it visible in the Bow

22   High School parking lot.  Would you have a problem with that?

23   A.    I would address the issue, and how I would address it

24   would depend on if it were a visitor to our school, if it were

25   a student who parked their car in our parking lot, if it were a

1    parent.  So, context would matter, but, yes, I would address

2    it.

3    Q.    So, if it was a parent, how would you address it?

4    A.    I would give them a phone call and ask them to come in and

5    talk to me and tell them what the symbol had come to represent

6    and ask that they don't come to our school with that displayed

7    on their vehicle.

8    Q.    And why would you do that?

9    A.    Because schools should be places of education, where

10   students are able to learn in an environment in which they're

11   able to take risks, and I don't think you can do that if you

12   are in a parking lot and you're walking into the school and you

13   see signs that you're not wanted, that you don't feel -- that

14   you feel like you should be excluded, that there's something

15   wrong with you.  I don't think that's helpful for any student.

16   Q.    Just briefly, I want to explore this, and then I'll be

17   done, I promise.  You must realize, Mr. Fisk, that there are

18   millions of Americans that don't believe you can change your

19   sex based on your beliefs about gender.  You understand that,

20   correct?

21   A.    Yes.

22   Q.    And you also understand that transgender students must

23   have some awareness that some people disagree on this issue of

24   gender identity and changing your sex and those trans issues,

25   correct?

1  A.   I know that they do, yes.

2  Q.   And you just talked about the Bow schools being a place of

3  learning.  Shouldn't you be able to talk about that

4  disagreement, which is very real, without banning the viewpoint

5  or the expression of the viewpoint?

6  A.   Again, I think it matters the context.  If we're talking

7  about a legal case, right, if this were a civics classroom, and

8  the cases that have come up, Title IX cases come up, I think it

9  would be entirely appropriate to have that conversation in the

10  course of a classroom.  I don't think it's ever appropriate to

11  show symbols that are regarded as hateful in a class, period.

12  Q.   And you regard the pink field with the black XX on it as a

13  hateful symbol; is that correct?

14  A.   Yes.

15  Q.   And you regard it as inappropriate to display anywhere on

16  Bow School District property or at a Bow School District event;

17  is that correct?

18  A.   Correct, sir.

19           MR. KOLDE:  Nothing, your Honor.

20           THE COURT:  All right.  Thank you.

21           Mr. Shirley?

22           MR. SHIRLEY:  Nothing, your Honor.

23           MR. CULLEN:  Nothing, your Honor.

24           THE COURT:  Great.  Thank you.

25           You may step down, Mr. Fisk, and you're excused as a

1      witness.  Appreciate it.

2                        (Witness stepped down)

3            MR. SHIRLEY:  Your Honor, one proffer.  We have a --

4      excuse me -- we have a Mr. Brian Murphy.  He's actually the

5      stepson of Mr. Rossetti.  He was the other ref.  The proffer

6      would be --

7            THE COURT:  I'm not sure what --

8            MR. SHIRLEY:  And that's why we're asking.

9            THE COURT:  What role does Mr. Murphy have in this

10     case?  Why is he here?

11           MR. SHIRLEY:  Merely, he would testify to the fact

12     that, when he was exiting from the field to the parking lot,

13     which was near Mr. Rossetti, he witnessed Mr. Fellers --

14           THE COURT:  I'm asking a more fundamental question.

15     Why is he here?  Are we with done with Mr. Rossetti?  Is there

16     some theory that he conspired with the Bow administrators to

17     make these wristbands be removed because he's anti-anti-trans

18     or something?

19           MR. KOLDE:  Correct, correct.

20           THE COURT:  There's not much to that theory, is there?

21           MR. KOLDE:  No, I think there is, but it may not be

22     relevant, ultimately, for the Court making the decision here,

23     because it's very clear what the Bow School District thinks

24     about it.  But, yeah.

25           THE COURT:  We agree it's got nothing to do with the

1    preliminary injunction.

2            MR. KOLDE:  I didn't say "nothing."

3            THE COURT:  Well, tell me what it does have to do with

4    the preliminary injunction, then.

5            MR. KOLDE:  Well, because I think that it was --

6    because they utilized him to be able to -- he was following the

7    directives of the Bow School District to get my client --

8            THE COURT:  You understand conspiracy requires an

9    agreement --

10           MR. KOLDE:  Judge, you're not letting me answer.

11           THE COURT:  -- unlawful objective with the specific

12   intent to achieve the unlawful objective.  You understand that,

13   right?  Right?

14           MR. KOLDE:  I'm sorry, your Honor.  I didn't

15   understand the question.  Could you repeat it, please?

16           THE COURT:  Yes.  I don't understand why Mr. Rossetti

17   is involved in the case, and I thought you said, Well, he does

18   have something to do with the preliminary injunction hearing.

19   What is that, because I don't see it?

20           MR. KOLDE:  I was trying to answer, but you began

21   speaking over me, so if I could answer --

22           THE COURT:  Well, that happens with judges sometimes.

23           MR. KOLDE:  It does.

24           THE COURT:  Lawyers just put up with it.  It's part of

25   the deal.

1          MR. KOLDE:  All right.

2          THE COURT:  Okay.  They don't complain about it,

3   usually.  But go ahead.

4          MR. KOLDE:  Not the first time.

5          But, in any event, your Honor, the issue is that my

6   clients were censored in this game.  Part of the censorship was

7   done directly by the Bow School District officials, and some of

8   that censorship was aided and abetted by Mr. Rossetti,

9   including what we saw happen on the field in the video.

10          THE COURT:  But he has to have a conscious intent to

11   do that, and there's no evidence of that.

12          MR. KOLDE:  He said, You have no right to embarrass

13   kids.  He said --

14          THE COURT:  That was afterwards.

15          MR. KOLDE:  No.  He said that -- it's on the video,

16   and I understand the Court has only seen the video once so far,

17   but I would encourage the Court later to take another look.  On

18   the field, when he's talking to Eldon Rash, he says, You have

19   no right to embarrass kids.  That's when he's on the field.

20   Mr. Rossetti testified, I don't remember saying that.  He

21   clearly said that, and the reason he said that is because he

22   disagreed with Eldon Rash.

23          THE COURT:  Doesn't this turn -- isn't this a legal

24   issue that turns on the nature of, the limited public nature of

25   the forum and whether or not the person or the persons

1   operating that forum can restrict speech within that forum and

2   whether or not they did restrict the speech, which they did,

3   and whether or not that restriction is allowed under the First

4   Amendment?

5          MR. KOLDE:  Mostly, yes.  We mostly agree with that.

6          THE COURT:  Well, entirely.  That's certainly what the

7   preliminary injunction is involved with.  That's it, right?

8          MR. KOLDE:  I think the distance --

9          THE COURT:  So, Mr. Rossetti plays no role.

10         MR. KOLDE:  The distance between you and I on this,

11  your Honor, is I would say he plays a small role, you would say

12  he plays no role, but we agree that his role is not large.

13         THE COURT:  Okay.  File an appropriate motion at an

14  appropriate time.  Mr. Ducharme will deal with it.

15         MR. DUCHARME:  And it has been my intention from my

16  first effort to talk with Mr. Kolde, which he doesn't like to

17  do.

18         THE COURT:  Okay.  Well, we'll take care of it that

19  way.  We've got to slim this case up to what's relevant and

20  important.

21         MR. SHIRLEY:  Sorry.  If I may -- you're gathering

22  your papers -- I do have one small question for the Court.

23         THE COURT:  I thought you were done.

24         MR. SHIRLEY:  Almost, almost.  There's just this very

25  narrow issue.  There's this question about what happened after

1   the game breaks and there's Mr. Fellers with his sign.  We've

2   asserted that he was facing the bus with what we believe was an

3   intention to show the sign to the exiting Plymouth bus.  I have

4   Mr. Brian Murphy here.  He is the stepson of Mr. Rossetti.  He

5   was the other ref on the field.  He will, if put on the stand,

6   would testify that as he was exiting he saw Mr. Fellers facing

7   with his sign in the direction of the bus, which he estimated

8   to be about 30 to 50 feet away, and that that's what he

9   witnessed.

10          THE COURT:  Well, again, as I hear the evidence, Bow

11  doesn't allow the brandishing of signs on its property during

12  extracurricular school events, whatever they say.

13          MR. SHIRLEY:  And it is merely to say what followed

14  after Mr. Murphy's, what he perceived --

15          THE COURT:  No, but my point is, is that part of this

16  case?  You can't have a sign.  That's not viewpoint

17  discriminatory.  That's no-sign discriminatory.

18          MR. SHIRLEY:  And I wasn't sure what's hanging out

19  there with regard to what happened with Mr. Fellers when he's

20  approached by the police, because he's asked to leave.  That's

21  that whole second video the Court --

22          THE COURT:  Once again, that has nothing to do with

23  operating a limited public forum and restricting speech within

24  that forum and the purpose for restricting it.

25          MR. SHIRLEY:  And you answered my question, which is,

1    it doesn't sound like you particularly care to know or have

2    Mr. Murphy go on the stand for that, which is fine.

3            THE COURT:  I'm happy to hear it, if you think it's

4    material evidence, but what is it material to?

5            MR. SHIRLEY:  And I'm going to say I don't think it

6    sounds like it is material, your Honor, so we're not going to

7    call him, and I think at that point we're done.

8            THE COURT:  Did we set a briefing schedule, or did you

9    want to just have oral argument?  Did we set it, or did we say

10   we were going to set it?

11           MR. KOLDE:  We did set a briefing schedule, your

12   Honor, and I did have a motion that I wanted to make,

13   preliminarily, if I could, briefly.

14           THE COURT:  Sure.

15           MR. KOLDE:  I believe the post-hearing briefs are due

16   December 13th, I'm welcome to be corrected by any of my

17   co-counsel, that are going to be filed simultaneously --

18           THE COURT:  I'd welcome them earlier, by the way.  No

19   requirement, but earlier is good, too.

20           MR. KOLDE:  Yeah, with optional reply briefs due a

21   week later.

22           One thing we would ask your Honor is to renew our

23   request for a temporary restraining order barring -- pending

24   the Court's ruling on the longer-term preliminary relief, to

25   allow my clients to wear the wristbands at the Bow

1    extracurricular events that are coming up here in the next few

2    weeks before our briefs or right after our briefs are due and

3    until the PI decision, so it would be very temporary.

4         Defendants admit that they have banned the wristbands

5    because of their belief that they express anti-trans or

6    trans-exclusionary messages, but they allow trans-inclusionary

7    messages.  That's viewpoint discrimination.  There's really no

8    argument that it's not.  Viewpoint discrimination is prohibited

9    in a limited public forum.  We all agree this is a limited

10   public forum.  There is no exception to that.  Viewpoint

11   discrimination in a limited public forum is per se illegal.

12        And there's no evidence of disruption or harassment

13   here, especially in future events that are the ones that are

14   coming up, for example, the Bow's girl high school basketball

15   games that we mentioned and some of the other events,

16   especially because there is no evidence that there are any

17   trans players playing at those events.  So, we would ask at

18   least for interim relief until this Court can craft what we

19   hope is a more longer-lasting remedy.

20        MR. SHIRLEY:  We object.  Taking the second issue

21   first in my mind, at least, your Honor, and this was what --

22   there's a vagueness problem just with the requested relief.

23   When they say "extracurricular activity," we've heard testimony

24   just now about a GSA club that meets at the school.  That's an

25   extracurricular activity, too, and it is -- the concern we have

1    is to craft an order that would say "all extracurricular

2    activities."  We don't want them then showing up at the school

3    door, I have an order that lets me into that GSA meeting so I

4    can wear my wristband and hold my sign.  Obviously, I don't

5    think the Court is going in that direction, but that's one of

6    the objections we have to any type of order that says just

7    "extracurricular activity."

8             THE COURT:  The extracurricular activity, that

9    extracurricular activity, as I understand the testimony, meets

10   within the school building.

11            MR. SHIRLEY:  It does.

12            THE COURT:  It is a much more controllable environment

13   than the limited public forum of an athletic event in a field.

14   I assume the basketball games are played in the gym.

15            MR. SHIRLEY:  They are played in the gym.

16            THE COURT:  Within the school building?

17            MR. SHIRLEY:  That is correct.  Yes.  I was bringing

18   to your attention a vagueness problem, which, at least by the

19   way that they have proposed, their TRO they propose, they have

20   not withdrawn it, originally filed back in October was too

21   loosely written, in our position.

22            THE COURT:  I'm not entirely clear -- I'm looking

23   forward to the briefings.  I'm not entirely clear what Bow's

24   position actually is, because is it that, We prohibit the

25   display of those wristbands only on games when a trans player

1    is participating, or is it broader than that?  Because there

2    was an event afterwards that it was no problem, or at least it

3    was allowed, it wasn't enforced.

4         MR. SHIRLEY:  "Allowed," I don't believe that would be

5    -- obviously, we don't have a witness on the stand yet, but I

6    think I can proffer that "allowed" would not be how they would

7    characterize that.  There was a very large population --

8         THE COURT:  Suffered.  They suffered it.

9         MR. SHIRLEY:  They suffered it.  They did not intend

10   to let that happen.  It was a group, a large group of people.

11   It happened.  It wasn't what they wanted to have happened.

12   They've been struggling with this issue for sure.

13        I think that their -- yeah.  You're asking a question

14   like what is their position?  And that's a very good question.

15   Certainly, looking backwards at what happened on the 17th,

16   we've heard testimony about the concerns.

17        THE COURT:  That's all right.  You don't have to go

18   into that.

19        MR. SHIRLEY:  Right.  Going forward, your Honor --

20        THE COURT:  I hear what you're saying.  We didn't

21   allow it; we just didn't take action.

22        MR. SHIRLEY:  Right.

23        THE COURT:  But what's your position with respect to

24   displaying this symbol?  I understood it to be this case turns

25   on whether or not the School District was acting on a

1   reasonable basis to protect a child with respect to immutable

2   characteristics that it is obligated to protect a child from,

3   from injury or -- so you're not going to allow the wristbands.

4          MR. SHIRLEY:  Today, backwards that's a large part of

5   how we explain what has happened.  Parker and the presence of

6   Parker on that field, absolutely.  Today forward we have now a

7   concern, and you heard that yesterday, when you were surprised

8   by Mr. Cullen's position.  We do take the position because

9   we --

10          THE COURT:  You were surprised by Mr. Cullen's

11   position?

12          MR. SHIRLEY:  No, no.  You were, sorry to say.  You

13   were.  I was a little bit, but anyway I wrote that brief, so we

14   were off each other's -- not on the same page there in terms of

15   the mootness question.  What I'm getting at, your Honor --

16          THE COURT:  Yes.  I was surprised by Mr. Cullen's

17   position on mootness.  Yes.

18          MR. SHIRLEY:  What we're talking about, and this is

19   the reason for why his change of position, Mr. Cullen's,

20   yesterday, what I'm talking about right now to you is it would

21   be insincere of us not to tell the Court that, if they show up

22   at a basketball game, if they show up on the sidelines with

23   this wristband, with their signs, we have a problem, and we

24   have a problem with that because we were previously worried

25   about Parker Tirrell.  We are now more generally worried about

1   the trans community at the school and what this message does

2   mean to them, and the way that this message is being received,

3   at least from the administrators, is transgender girls are not

4   allowed on those fields, they don't get to be what they should

5   be allowed to be, which is to be transgender girls and accepted

6   as such, and that's the message that they don't want to have

7   coming forward.  And it is in the vein of the L.M. decision in

8   the sense that we can't quite know, necessarily, who's on the

9   sidelines.  We actually don't even know who's necessarily going

10  to be on the field, because, although we did have notice of

11  Tirrell, Parker Tirrell being on that field, that's not

12  necessarily going to be the case going forward, we're not going

13  to know who's on the field, necessarily, is transgender or not,

14  and so it is an environment where the school just can't quite

15  know who's going to be harmed.  They know it's a message that

16  they don't feel -- they've said inclusive, but we also feel

17  that it borders on a harassment -- it is a message that is

18  exclusionary on the basis of the sex of these transgender

19  students, and it is -- we already heard testimony today that

20  the original intent was to bring these signs to the sidelines,

21  but they had not planned ahead to have something to support the

22  signs on the sidelines, so they went on the cars.  That was

23  testimony from yesterday.

24          One sign, we don't like it, ten signs, not great, a

25  hundred signs, a hundred wristbands, at what point does this

1    become -- that's the problem they're trying to wrestle with,

2    that's the problem they're wrestling with, and they don't know

3    -- I mean this Court, gracefully, thankfully, is weighing in,

4    because it is a hard question to answer, but they're worried

5    about it, and that's why they're taking the position they don't

6    want to have this happening.

7          MR. KOLDE:  May I just be heard, briefly, your Honor?

8          THE COURT:  Of course, of course.

9          MR. KOLDE:  I want to be clear that we have alleged

10    only that we have a right to do this in a limited public forum.

11    Our view and the case law supports that a limited public forum

12    is a Bow School District event that is open to the public.  We

13    are not requesting to show up to a GSA event that is open only

14    to students and staff that is not open to the public.  Sporting

15    events are.  The case law on this is well established.  They

16    have not cited anything that stands for, that, properly read,

17    stands for a different conclusion.  They have argued it's a

18    nonpublic forum.  It's still the same test as a limited public

19    forum.

20          And, again, what Mr. Shirley just argued, very

21    heartfelt, and I understand that is the view of his clients, is

22    nevertheless textbook viewpoint discrimination.  Legally this

23    case is not at all close.  There is no viewpoint

24    discrimination --

25          THE COURT:  It's very close.

1        MR. KOLDE:  No.

2        THE COURT:  I disagree.

3        MR. KOLDE:  I understand, and you're the judge, but

4    this is my role as an advocate.  You know, there's no viewpoint

5    discrimination in a limited public forum.  In any event, we're

6    just talking about these public sporting events that are open

7    to the public.  We are not asking to go on campus.

8        And I think just, you know, to wrap this up, your

9    Honor, I think the evidence is clear that Bow's position is

10    they can ban these XX wristbands at any Bow High School event

11    that is open to the public.  It does not matter whether a trans

12    player is on the field, it does not matter whether they know

13    that a trans player is present in the audience or the

14    spectator's gallery.  That's what they've argued in their

15    briefing.

16        THE COURT:  You realize -- I know you know this,

17    because you're an astute scholar of these cases.  You know what

18    he's doing is paraphrasing Chief Judge Barron's opinion in L.M.

19    It's not Mr. Shirley's words; he didn't just make those up.

20        MR. KOLDE:  We don't think -- we don't think that --

21    we don't think that L.M. applies.

22        THE COURT:  I know you don't, but nevertheless there

23    are cases out there that say that.

24        I'm going to take a minute just -- no.  Motion for TRO

25    is denied.  You have not shown, nor can you at this point show,

1    a likelihood of success on the merits warranting a TRO of the

2    breadth and scope that you've argued for.

3            I'm just going to take a minute.  I don't usually do

4    this, and most judges probably don't.

5            Mr. Foote, Mr. Fellers, Mr. Rash, I want you to

6    understand I do understand your position.  I'm afraid these

7    things tend to degenerate into good-guy/bad-guy stuff.

8            I don't see it as good-guy/bad-guy stuff.  I

9    understand your position.  You have a legitimate sociopolitical

10   position.  You've articulated it.  I understand that you

11   sincerely do not believe, and there is no reason you should,

12   that you weren't going there to target Parker Tirrell, or

13   embarrass her, or humiliate her, or drive her off the field or

14   anything like that, so the case doesn't turn on that.  I

15   appreciated your testimony.  I understand your position.  You

16   do have a First Amendment right to hold that position.

17           However, they are not the bad guys either.  They don't

18   have some secret cabal aimed at running around, denying

19   people's First Amendment rights.  That's not what it's about.

20   They have an obligation to protect students and protect

21   students from harm, and that means harassment, targeting,

22   degradation, causing psychic harm, causing maybe even resultant

23   physical harm.  That's what they're operating from.

24           So, I want everybody to understand that's not what

25   this case is about.  It's not deciding who's a good guy, who's

1    a bad guy.  It turns on whether or not the person operating the

2    limited public forum has the authority under the First

3    Amendment to restrict speech as they've restricted it.  That

4    turns on what they could reasonably have thought the message

5    would be received as, okay, so it's not so much your subjective

6    intent in making the message, and that's what we're going to

7    decide.  So, I don't want anybody leaving this feeling like it

8    was a won-loss on who's a bad guy, who's a good guy.

9           And I'm sure you didn't mind being called all those

10   nasty names, Mr. Fellers, because you're a First Amendment

11   absolutist.

12          Okay.  So, we're going to get briefs on these issues.

13   It's legally nuanced.  And, contrary to Mr. Kolde's view, my

14   view is it is not an easy case, it's a close case, it's a

15   nuanced case, and it's going to turn a lot on law that maybe in

16   six months is going to be overturned by the Supreme Court.  Who

17   knows?  So, let's everybody take it in that spirit, and I'll

18   decide it just as soon as I get briefs.  Okay?

19          Thank you.  Thank you.  Appreciate it.

20          THE CLERK:  All rise.

21      (WHEREUPON, the proceedings adjourned at 2:22 p.m.)

22

23

24

25

1               C E R T I F I C A T E

2

3

4          I, Brenda K. Hancock, RMR, CRR and Official Court

5   Reporter of the United States District Court, do hereby certify

6   that the foregoing transcript constitutes, to the best of my

7   knowledge, skill, ability and belief, a true and accurate

8   transcription of the within proceedings.

9

10

11

12

13   Date:  ___12/2/24_____      /s/ Brenda K. Hancock
                                  Brenda K. Hancock, RMR, CRR
14                                Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25