UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| Kyle Fellers, Anthony Foote, Nicole Foote, and Eldon Rash,<br><br>   Plaintiffs,<br><br>v.<br><br>Marcy Kelley, Michael Desilets, Matt Fisk, Bow School District & Steve Rossetti,<br><br>   Defendants. | Case No.  1:24-cv-311-SM-AJ |

**DEFENDANT BOW SCHOOL DISTRICT'S CLOSING BRIEF ON
PLAINTIFFS' REQUEST FOR A PRELIMINARY INJUNCTION**

NOW COMES Defendant Bow School District ("District"), through its attorneys Cullen Collimore Shirley PLLC, and respectfully submits this closing brief to address the evidence presented at the November hearing on Plaintiffs' request for a preliminary injunction.

**<u>INTRODUCTION</u>**

The Court is well familiar with the nature of the Parties' dispute, although the relief pursued by Plaintiffs has shifted during the pendency of the case. In their initial filings, Plaintiffs sought an injunction to broadly bar Defendants from enforcing school policy KFA (Public Conduct on School Property) and the Bow High School's Athletics Handbook to "prevent attendees at an extracurricular event from non-disruptively expressing disfavored viewpoints on political or social issues, including protesting against allowing biological boys playing in girls' and women's sports, by silently wearing and wristband on the sidelines or displaying a sign in the parking lot." Doc. 1, Complaint at 25; *see also* Doc. 14-1, Proposed Order at 2-3. Although Plaintiffs have twice amended their Complaint, that request remained unchanged. Doc. 35 at 37, Doc. 52 at 37.

1

In their Pre-Hearing Brief, Plaintiffs reframed their protest as one "in support of women's sports" while adding, incongruously, that they sought to conduct their protest not only at outdoor athletic events but indoor events such music concerts. Doc. 60 at 1. Plaintiff Anthony Foote testified that he had also planned to put up signs on the sidelines of the September 17, 2024, soccer match, and agreed that he would like to "walk around the parking lots at any time of the day with whatever political message [he] want[s]" held over his head. Tr. Day One PM at 60, 111.[1] Fellers felt that there should be no limits on people walking around the parking lot with signs "if they're not bothering anybody." Tr. Day One PM at 35. At the close of the evidentiary hearing, counsel seemed to refine the request somewhat, representing that Plaintiffs were "just talking about these public sporting events that are open to the public. We are not asking to go on campus." Tr. Day Two PM at 44.

Whatever Plaintiffs' actual intentions, the District was and is well within its rights to prohibit protests at school-sponsored student events, and to bar Plaintiffs' wearing of "XX" armbands and displays of signs in school parking lots.

## STATEMENT OF FACTS

The facts relevant to the current motion are found in the testimony and exhibits presented by the parties during the two-day evidentiary hearing held on November 21 and 22, 2024, as well as the Declarations filed in connection with Plaintiffs' Motion for Temporary Restraining Order. Doc. 22, Objection to Motion for Temporary Restraining Order, and Exhibits 1-4 thereto [Docs. 22-1, 4, 6 & 7]. Defendants incorporate those Declarations and exhibits as if fully set forth herein.

---

[1]   The hearing occurred over a two-day period and generated four transcripts designated as "Day One" and "Day Two" and further as "Morning Session" and "Afternoon Session." For ease of reference Defendants refer to the transcripts using the following format: "Tr. Day One AM at __."

*HB 1205 and Tirrell v. Edelblut*

On April 19, 2024, the United States Department of Education announced upcoming changes to the regulations under Title IX, including reemphasizing application of the law to transgender students. In July 2024 the New Hampshire legislature enacted House Bill 1205 ("HB 1205"), the general terms of which "prohibit[] transgender girls from participating in girls' school sports." *Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 DNH 069 (Aug. 22, 2024) ("*Tirrell* TRO Order") at 6. Two high school students, Parker Tirrell and Iris Turmelle, challenged the law's application to them. Parker, who had played soccer on Plymouth Regional High School's (winless) junior varsity team the previous year as a high school freshman, hoped to be able to play again this fall on the upper team. In her Complaint, Parker noted that she was just 15 years old and, because of hormone therapy, had not and will not undergo male puberty. As this court summarized:

> Sports have always been a big part of Parker's life. She has played in elementary, middle, and high school and in town recreational leagues. Sports are how Parker makes friends and connects with others. While she has participated in a variety of school sports, soccer is her passion. In eighth grade, she played on the girls' soccer and track teams at Plymouth Elementary School. In ninth grade, she played on the girls' soccer team at Plymouth Regional High School. Her high school soccer team is her primary social outlet, both on and off the field. Most of her friends are her teammates, and they have given Parker an important source of acceptance, belonging, and emotional support.

*Tirrell* TRO Order at 5 (footnote omitted).

Parker filed simultaneously with her Complaint a motion for temporary restraining order and a motion for preliminary injunction. On August 19, 2024, this Court (McCafferty, J.) orally granted the motion for temporary restraining order, which was followed by a written decision on August 22, 2024. The Court held a further hearing on the motion for preliminary injunction and issued an order granting the injunction on September 10, 2024. Therein, the Court noted that Parker's mother attested that Parker would be devastated if she was not permitted to play on the

team, which has given her "an important source of acceptance, belonging, and emotional support." Order on Motion for Preliminary Injunction, Sept. 10, 2024, at 6.

Plaintiffs (other than Eldon Rash) were generally aware of the proposed changes to Title IX regulations, the passage of HB 1205, and the progress of Parker's challenge to the state law. Fellers, for example, wrote to the Superintendent and School Board on August 1, 2024, telling them about an injury at a female boxing match, noting that "[t]his happened on the same day the Biden/Harris administrations [sic] rewrites Title IX to appease a mentally ill crowd." Tr. Day One PM at 10-11 and Def. Ex. E. Anthony Foote acknowledged the Tirrell TRO Order the day after it was issued, emailing the Bow girls' soccer coach about the future game against Plymouth and asking if they could forfeit a game and still win the championship. Def. Ex. K. He noted at the time that the Plymouth game was "not one we have to deal with tomorrow." *Id*. Nicole Foote attended each of the hearings in the *Tirrell* litigation, Tr. Day One PM at p. 82 and met with Bow Athletic Director Mike Desilets on September 13, 2024, to discuss the upcoming game in light of the USDC ruling days before. Tr. Day Two AM at 97-98; Def. Ex. H.

*School District learns of planned protest*

Not all of the Plaintiffs were content to meet with administrators to express their views. The day after the *Tirrell* TRO Order, a parent of a Bow High School student told Desilets that she had overheard several Bow parents discussing plans to protest Bow's match against Plymouth – Parker's team – scheduled for September 17, 2024. Def. Ex. F. The plans discussed included wearing dresses to the game, buying anti-trans gear, making signs, and generally heckling and intimidating the player. *Id*. Even Plaintiffs agreed that at least the latter would be improper. *See, e.g.*, Tr. Day One PM at 16 (Fellers); Tr. Day Two AM at 88 (A. Foote). Shortly after, Anthony Foote took to Facebook and put out a call for people to attend the upcoming game, noting that

4

there would be a "biological male" on the Plymouth roster and the "biological males have no place in women's sports." Pl. Ex. 5.  He later posted photos of wrist bands Fellers had purchased, which he had emblazoned with symbols including "XX" and "NAD".  Pl. Ex. 4, 19.

Superintendent Marcy Kelly, Bow Principal Matt Fisk, and Desilets were concerned about the possibility of a protest directed against a student at the game.  Tr. Day Two AM at 39.[2]  Kelly holds a bachelor's degree from the University of Rhode Island, a master's degree in special education from Plymouth State University, and a certificate of advanced graduate studies in educational leadership from Southern New Hampshire University.  Tr. Day Two AM at 70-71.  Prior to becoming Superintendent, she was the Director of Student Services.  *Id*. at 71.  She received regular training on Title IX and RSA 354-A.  *Id*.  She paid attention to trends and has followed the development of the "XX" symbol, including its use by anti-trans activists at the Olympics and elsewhere.  *Id*. at 31-33, 73.  She views the "XX" as a "pretty well-known anti-trans symbol" and exclusionary in the context of women's sports.  *Id*. at 31, 63, 73-74.  In her judgment, the symbol is problematic when directed at a student.  Tr. Day Two AM at 72-73.

Fisk served as Bow High School's Assistant Principal for five years before being elevated to the role of Principal in September 2024.  Tr. Day Two PM at 20.  For the past two years he has been one of the advisors to the Gay Straight Alliance – a student group at the school.  *Id*. at 21-22.  The school has several transgender students.  *Id*. at 22.  Fisk is aware that transgender students suffer from a higher rate of depression and suicide than other students.  *Id*. at 22.  One such student known to Fisk has been hospitalized for self-harm, largely stemming from stress the child feels from peers and society.  *Id*. at 23.  Fisk's experience was consistent with testimony provided before

---

[2] Their concern was warranted:  Foote had previously been involved in a book challenge during which he had posted the identity of a student member of the school's Gay Straight Alliance ("GSA") after she spoke out at a board meeting.  Tr. Day One PM at 105-06.

5

the State Senate Education Committee in a public hearing on HB 1205 and information from The Center for Disease Control and Prevention ("CDC"). *See, e.g.* Pl. Ex. 31 at 13 (New Futures' Children's Behavioral Health Policy Coordinator testifies that discrimination directly corresponded to higher rates of suicide and depression). *Youth Risk Behavior Survey: Data Summary & Trends Report, 2011-2021*, Ctrs. for Disease Control & Prevention, 4, 60-64, (2023) (noting that LGBQ+ students have significantly higher incidents of depression, "poor mental health," and suicidal ideation than their peers and stating that schools bear "the responsibility to ensure that all learning is done in a safe and supportive school environment").[3]

The District views school athletics as "an extension of the classroom." Tr. Day Two AM at 99. In accordance, the District has a policy addressing conduct on school grounds entitled "Public Conduct on School Property" ("Policy KFA"). Pl. Ex. 1. The policy states that the District expects "mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." *Id.* It also prohibits visitors to school property from engaging in conduct that would "threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person" or "delay, disrupt, or otherwise interfere with any school activity." *Id.* The policy forbids persons from violating other school policies or regulations or the directive of an authorized District employee and puts visitors on notice that violation of the policy could lead to being ordered to leave school grounds and the issuance of a "no trespass" order. *Id.* The District also has an Athletic Handbook that includes expectations that fans will treat players, coaches, and officials with respect, and not attempt to communicate with or distract players. Pl. Ex. 3.

---

[3] https://www.cdc.gov/healthyyouth/data/yrbs/pdf/YRBS_Data-Summary-Trends_Report2023_508.pdf

Consistent with these policies, on September 16, 2024, Desilets emailed the soccer team parents to remind them of the rules that apply to those attending school sporting events. Pl. Ex. 2. He acknowledged "that there are some differing opinions regarding tomorrow's game," and further intoned "that is perfectly fine." *Id*. He advised, however, "that any inappropriate signs, references, language or anything else present at the game will not be tolerated." *Id*. The administrators testified that they did not act on their personal views on the issue of transgender girls playing on girls' teams. Kelley noted that the issue was nuanced and that there were many factors to consider in whether male-born athletes should be permitted to play on women's teams. Tr. Day Two AM at 38. Desilets did not express any opinion on HB 1205: "At that point . . . the determining piece of my job [was] to follow what the law is telling us to do." *Id*. at 86.

Anthony Foote responded to Desilets by email at 7:55 AM the next morning (September 17, 2024 – the day of the game). Pl. Ex. 18. Foote stated: "I'm a leader, and a real leader doesn't stand by while their players are thrown into harm's way. You don't let biological males – who are stronger, faster, and more physically dominant – compete against women. And you don't sit around waiting for someone to get hurt before you take action." *Id*. He added, "I'm sick of your cowardice and your pandering" and warned, "Stand up for women, for real women, or get out of the way." *Id*. Foote copied Fellers on the email. *Id*.[4]

---

[4] Fellers claimed he could not be sure he opened Foote's email at the time, testifying that he doesn't pay too much attention to his Yahoo account, Tr. Day One PM at 21, despite having used that same account to email administrators both before and after the game. *See* Def. Ex. E, J. Frankly, Fellers frequently displayed an arms-length relationship with the truth. For example, he testified that he did not even try to determine which player was Parker, a rather unlikely claim given that he had bought the wristbands the protesters would don at the September 17 match. *See also* Tr. Day One at 28-29 (claiming he was unaware where the visitors' large yellow bus was parked); Tr. Day One at 31-32 (maintaining that he merely "misspoke" when he repeatedly falsely told Lt. Lamy that he was providing his in-laws a ride home).

As it happens, Fellers and Foote had no intention of just "standing by." Fellers had purchased the pink wristbands used in the protest earlier in the week. Tr. Day One AM at 50, 52. He had also prepared a sign the night before to bring to the game. Tr. Day One AM at 53-54. Foote used a sharpie to make each of them with the "XX" and other symbols or letters. Tr. Day One PM at 50.

Foote and Fellers both tried to claim that their actions were not intended as a protest against Parker's participation in the game but merely a benign display of support for women's causes generally and, when pushed, women's sports. *See, e.g.*, Tr. Day PM at 27 (Fellers); Tr. Day One PM at 49 (Foote). Their own emails and testimony quickly belied their claim. Foote referred to trans-rights proponents as "the transgender mob" and Fellers called them "mentally ill cult." Def. Ex. E, K. Although Foote and Fellers each knew about the Tirrell rulings before the season began, neither brought their "supportive" symbols or signs to any of the earlier games. Tr. Day One PM at 86-87, 99. Less calculated, perhaps, Rash simply admitted that Fellers told him it was "some sort of a protest of having biological males on the women's teams." Tr. Day Two AM at 10. Foote ultimately conceded that his protest could be viewed as communication opposition to transgender girls playing on girls' teams, Tr. Day One PM at 126, consistent with his September 17 email in which he declared "This isn't 'just another game' - not by a long shot." Pl. Ex. 18.

*Events at the Game*

Foote came to the game 90 minutes early to secure a parking spot near the field and set up at the midline on the sidelines. Tr. Day One PM at 100-101; Tr. Day Two AM at 95-96. He brought with him a bag of his protest armbands and a sign featuring Riley Gaines that he intended to put up by the sideline, too, returning it to his car only because he had forgotten to bring something to stand it up. Tr. Day One PM at 60, 100-101. Despite this preparation, Foote did not display either

the wristband or the sign in the first half of the game because he knew that his plan likely fell outside the scope of conduct permitted on the sidelines. Tr. Day One PM at 102-103.

Following the end of the first half of the match, Foote went to his Jeep and put a poster of Riley Gaines, an outspoken critic of trans participation in women's sports, on the windshield facing the field. Tr. Day One PM at 101; *see also* Pl. Ex. 5. He and Fellers then each sported their wristbands and stood prominently at the sideline. Tr. Day One AM at 56-57 (Fellers)' Tr. Day One PM at 102 (Foote). Some ten minutes later, Desilets noticed that Foote had put on his protest wristband. He approached Foote and quietly asked him to remove it. Tr. Day One PM at 66. Desilets used the same approach with Fellers thereafter, whispering to Fellers that he had to take the wristband off because "there's no protests allowed" or "it's a protest and protests is [sic] not allowed." Tr. Day One AM at 63, 64; *see also* Desilets Dec. ¶12. As Kelly explained, "we asked them to remove [the XX wristbands] because we believe that those are anti-trans symbols and they were targeting a player on the other team." Tr. Day Two AM at 63. Fellers and Foote both acknowledge that they did not immediately comply. Tr. Day One PM at 25-27, 66-67.

Rash was sitting in a chair approximately fifteen feet from the playing field. Fisk Dec. ¶ 9. Fisk saw that he was now wearing Fellers wristband and directed him to remove it, which he repeatedly refused to do. *Id*. Fellers, who had not been asked to leave the game, began to interrupt and argue with Desilets and Fisk on the sideline right behind Rash. *Id*. The ensuing events on the sidelines were captured by Lt. Lamy's body camera, which was shown repeatedly at the hearing and introduced as Pl. Ex. 20. Fellers continued to argue with administrators until he was asked to leave, and Rash refused to remove his wristband for some fifteen minutes. *See also* Desilets Dec. ¶¶ 15-16; Fisk Dec. ¶11.

9

*Parking Lot Incident*

Fellers, as it happens, went only as far as his car, which he then drove to a more prominent position by the roadway. Kelley Dec. ¶ 8. There, he removed a handwritten sign from his car reading "Protect Women Sports for Female Athletes" and held it above his head. Complaint ¶ 46; Kelley Dec. ¶ 8. Fellers was situated in an area where his sign would be visible to the Plymouth girls' varsity soccer team as they left the school on their bus. *Id* . Learning of this, Desilets asked Lt. Lamy to instruct Fellers to leave the premises. Desilets Dec. ¶ 8. Lt. Lamy approached Fellers in the parking lot and asked him to leave. Lamy Dec. ¶ 7. This interaction was also recorded by Lt. Lamy, which recording was shown to the Court. *See* Pl. Ex. 21. As the Court saw, Fellers repeatedly refused Lamy's instructions to leave the area, often lying to the officer in the process. Kelly testified that the District never allows people to march around the parking lot holding signs, regardless of the content. Tr. Day Two AM at 82.

*No Trespass Orders*

Kelley issued no trespass orders to Anthony Foote and Fellers. Kelley Dec. ¶ 10; Complaint Exs. G & H. She based the Foote No Trespass order on the fact that he had been expressly reminded of the school policy on civility and had nevertheless organized and participated in a protest and behavior that targeted a specific opposing player, here 15-year-old Parker Tirrell. Kelley Dec. ¶10. Feller received a longer No Trespass Order – the remainder of the soccer season – because of his abuse of school administrators, his prolonged refusal to remove his wristband, his refusal to follow the directions of Lt. Lamy, and his targeting of 15-year-old Parker Tirrell both at the game and in the parking lot. Kelley Dec. ¶10. The Order was modified twice at Fellers' request. Kelley Dec. ¶11. Neither Order remains active.

10

## **ARGUMENT**

The standard of review on Plaintiffs' Motion for Preliminary Injunction is the same as they faced on their Motion for Temporary Restraining Order, requiring consideration of the following factors:

> the movant's likelihood of success on the merits; the movant's likelihood of irreparable harm in the absence of relief; the balance of equities; and whether injunctive relief is in the public interest.

*Tirrell v. Edelblut*, Case No. 24-cv-251-LM-TSM, 2024 DNH 069 (Aug. 22, 2024) ("*Tirrell* TRO Order") at 2. Like a restraining order, "[t]he grant of a preliminary injunction is 'an extraordinary remedy that may only be awarded upon a <u>clear showing</u> that the plaintiff is entitled to such relief.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 997 F.3d 395, 404 (1st Cir. 2021) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis added).

**I.   PLAINTIFFS' PRELIMINARY INJUNCTION REQUEST FAILS BECAUSE THEY ARE NOT LIKELY TO PREVAIL ON THE MERITS OF THEIR CLAIMS.**

Plaintiffs' request for a preliminary injunction should be denied because Plaintiffs cannot meet their burden to show that they have a likelihood of success on the merits of their claims. Plaintiffs do not have an unbounded right to engage in speech at school-sponsored events that, in the District's reasonable judgment, amount to the targeting and harassment of transgender students. The District's policies are reasonable and viewpoint neutral, and the District is entitled to enforce it policies to bar Plaintiffs' protests at school events because it has a compelling interest in protecting students and the Bow High School educational setting.

**A.   Schools as forums for public expression.**

"The public schools do not possess all of the attributes of streets, parks, and other traditional public forums that 'time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Hazelwood School*

11

*Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988).  "Hence, school facilities may be deemed to be public forums only if school authorities have 'by policy or practice' opened those facilities 'for indiscriminate use by the general public' or by some segment of the public, such as student organizations." *Id*. (internal quotations and citations omitted).  "If the facilities have instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id*.  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id*.

Moreover, "[i]n the context of the special characteristics of the school environment, …the government [has the power] to prohibit … actions which materially and substantially disrupt the work and discipline of the school." *Healy v. James*, 408 U.S. 169, 189 (1972) (internal quotations omitted).  "Associational activities need not be tolerated where they infringe upon reasonable campus rules, interrupt classes, or substantially interfere with the opportunity of other students to obtain an education." *Id*.

Some courts have labeled certain school-sponsored events, like basketball games, to be limited public forums.  *See Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017).  There is no distinction in the speech restriction standards for limited public forums and nonpublic forums, however.  In both forums the restrictions must be reasonable and viewpoint neutral and, indeed, the Supreme Court and First Circuit view these forum labels as synonyms.  *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 76 n. 4 (1st Cir. 2004); *Am. Freedom Def. Initiative v. King County, Washington*, 577 U.S. 1202 (March 7, 2016) (Mem).  Satisfying this standard "is not a particularly high hurdle," *Ridley*, 390 F.3d at 90, and any restriction "need not be the most reasonable or the

only reasonable limitation," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 808 (1985). Thus, while restrictions in such forums must be viewpoint neutral, the law does not require the restrictions to be content neutral. *Am. Freedom Def. Initiative v. Mass. Bay Transit Auth.*, 781 F.3d 571, 578 (1st Cir. 2015); *Hurwitz v. Newton Pub. Sch.*, No. CV 17-10231-LTS, 2017 WL 3008886, at *3 (D. Mass. July 14, 2017).

### B. The District's Policies.

The District's Policy KFA governs public conduct on school property. Pl. Ex. 1. The policy applies to any land or facilities "used for school purposes or school-sponsored events, whether public or private." *Id*. The policy states that the District "expects mutual respect, civility, and orderly conduct among all individuals on school property or at a school event." The policy further states in relevant part that no person on school property or at a school event shall "[i]njure, threaten, harass, or intimidate a staff member, a School Board member, sports official or coach, or any other person;" "[v]iolate any Federal or New Hampshire law;" "[i]mpede, delay, disrupt, or otherwise interfere with any school activity or function;" or "[v]iolate other District policies or regulations, or an authorized District employee's directive." *Id*. at Nos. 1, 4, 7, and 10. The policy concludes by stating that "[a]ny person who violates this policy or any other acceptable standard of behavior may be ordered to leave the school grounds" and the District "reserves the right to issue 'no trespass' letters to any person whose conduct violates this policy, acceptable standards of conduct, or creates a disruption to the School District's educational purpose." *Id*.

Overlapping Policy KFA is the Bow High School Athletics Handbook, excerpted in Pl. Ex. 3. It announces the District's "expectation of every fan to maintain a positive attitude, to treat players, coaches and officials with respect, and to cheer for their teams as opposed to cheering

13

against the other team." *Id*. It further states that "[f]ans are not to use the names or numbers of opposing teams, nor should they be trying to directly communicate or distract other players." *Id*.

Title IX of the Education Amendments of 1972 is also an important backdrop. Title IX prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. Under the amended Title IX federal regulation that became effective on August 1, 2024, discrimination on the basis of sex "includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 CFR § 106.10. As an institution that receives Federal financial assistance, Bow High School is required to comply with Title IX.

On November 14, 2024, the District approved Policy ACAC, which sets forth its revised Title IX policy and grievance procedure following adoption of the amended Title IX federal regulation. Under Policy ACAC, "no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, co-curricular, extra-curricular, research, occupational training, or other education program or activity operated by the Bow School District." The policy further states that "[v]olunteers and visitors who engage in sex discrimination will be directed to leave the property and/or be reported to law enforcement and/or the NH Division of Children, Youth and Families (DCYF), as appropriate."

Policy KFA, the Athletics Handbook, and Policy ACAC are available on the District's website. In addition, student athletes and their parents must acknowledge receipt of the Athletics Handbook as a condition of enrollment into a Bow High School team. Tr. Day Two AM at 103.

### C. The District's policies are viewpoint neutral and reasonable in light of the special characteristics of the school environment and athletic competition.

The District's policies easily meet the "not [] particularly high hurdle" of viewpoint neutrality and reasonableness for speech restrictions in nonpublic and limited public forums. The policies are viewpoint neutral because, among other things, they restrict conduct aimed at intimidating or harassing others, disrupting events, or distracting players. The District is also obligated under Title IX to ensure during that students participating in school events do not suffer sex discrimination, which under current regulation includes discrimination on the basis of a student's gender identity. 34 CFR § 106.10. Antidiscrimination laws, while perhaps causing "viewpoint disparity," are generally considered viewpoint neutral. *Wandering Dago, Inc. v. Desisto*, 879 F.3d. 20, 32 (2d Cir. 2018); *see also Bd. Of Dirs. Of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987) and *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 93 (2d Cir. 2003).

The policies are likewise reasonable given the compelling interest public schools have in protecting students and the educational setting. Schools may regulate speech during school-sponsored activities that administrators reasonably view as lewd, promoting drug use, or aimed at harassing other students. *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 682 (1986); *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 266 (1988); *Kutchinski v. Freeland Community School District*, 69 F.4th 350 (6th Cir. 2023). More importantly, schools are allowed to regulate speech during school-sponsored activities that may cause substantial disruption or material interference with the activities, or speech that collides with the rights of other students to be secure and to be let alone. *Tinker v. Des Moines Independent Comm. Sch. Dist*., 393 U.S. 503, 508 (1969). This authority extends not just to speech that directly threatens the orderly conduct of the activites, but to speech that strikes at the emotional well-being or sexual identity of students. *L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024).

While it is true that *Tinker* and *L.M.* arise in the context of student speech, the rationale for why schools have the authority to regulate certain speech during school-sponsored activities has nothing to do with the identity of the speaker. It is the threat posed to the school setting and interests of the student body that propels the analysis. Thus, it is of no matter whether the person walking the halls during school hours wearing *L.M.'s* "two genders" t-shirt is a student, parent, or visitor. The risk of disruption to the school environment posed by the speech is the same.

Equally important to observe is the deference courts grant school administrators to decide what conduct during school-sponsored events threatens substantial disruption or material interference. It is the school administrators, not federal judges, who are in the best position to evaluate conduct in the moment and forecast its impact on school activities. *See L.M.*, 103 4th at 886; *Governor Wentworth Sch. Dist. v. Hendrickson*, 421 F.Supp.2d 401, 425 (USDC- NH 2006) ("School authorities are generally in a far better position to understand their students and the students' likely response to various modes of intervention. They are entitled to a healthy measure of deference when exercising judgment, drawing inferences, and reaching conclusions about what is actually going on in their schools and classrooms.").

### D. The District's actions at the September 17 soccer game were reasonable and viewpoint neutral.

The District's actions at the September 17 soccer game and subsequent no trespass orders to Foote and Fellers were justified and constitutionally permissible. While Plaintiffs cast their conduct at the September 17 game as "silent protest," the District reasonably viewed the conduct as harassment and intimidation aimed at 15 year old Parker Tirrell. The District was on alert for Plaintiffs to become actively disruptive during the game, having earlier heard that Plaintiffs were mulling plans to dress in women's clothes, wave signs, and heckle from the sidelines. Indeed, on the morning of the September 17 game, Foote stressed to Mike Desilets that "[t]his isn't 'just

another game' – not by a long shot." Pl. Ex. 18.  With this Court declaring only days earlier that Parker Tirrell was entitled as a matter of constitutional right to play on the Plymouth girls varsity soccer team, the District intervened before Plaintiffs' conduct at the September 17 game grew more threatening or the circumstances devolved into disorder.

Significantly, the District does not allow protests or harassment at school events.  The fact that these Plaintiffs sought to protest a transgender student is of no significance to the District's decision to bar their wristbands and signs.  The District's policies equally bar harassment of a player who is slower or less fit than others, or is of a different race or background.  If the Plymouth team's starting forward were pregnant, the District would not permit protestors to waive abstinence signs at the game.  Moreover, as Desilets testified, he has repeatedly gone into the stands and sidelines of games to deal with spectators who are causing disruption or targeting players on the field. That fact that he was compelled to do the same on September 17 because of Plaintiffs' protest was no evidence of viewpoint discrimination.

The Districts actions were justified and constitutional even had it known that Plaintiffs were only planning to wear the "XX" wristbands.  The wristbands are no different and send the same message as LM's "two gender" t-shirt.  *L.M.,* 103 F.4th at 886.  If the t-shirt can be banned from the school grounds, certainly the XX wristbands (and "NAD" wristbands) can be too.  The fact that it is parents and spectators who voluntarily attend the school-sponsored events – as opposed to students compelled to be in school – only enhances the reasonableness of the speech restriction.

Plaintiffs have no First Amendment claim arising from the events of the September 17 game because the District properly exercised its duty to protect Paker Tirrell from intimidation and harassment during the game, and it issued reasonable sanctions against Foote and Fellers – in the

17

form of No Trespass Orders – for conduct they knew violated the school's policies governing athletic events.

### E. The District may prohibit Plaintiffs' protests at future school-sponsored events.

The District's refusal to allow Plaintiffs to protest at future school-sponsored events does not threaten a First Amendment violation either. The restriction does not prevent Plaintiffs from raising their concerns about biological males playing in female sports to the District by other means, such as through emails or in-person meetings like Plaintiffs have already done repeatedly. It merely restricts the time and place where Plaintiffs may raise the issue. While this may not be a content-neutral restriction, the law does not require a content neutral restriction for nonpublic or limited public forums like school-sponsored events. *Hurwitz*, 2017 WL 3008886, at *3.

Moreover, the District is justified in treating Plaintiffs' wristbands and signs when used at school-sponsored events as targeting the school's transgender student population generally for harassment and intimidation. This is no different than the determination in *L.M.* that "words that otherwise would not constitute 'fighting words' may be so deemed in the public-school setting because of the heightened psychological sensitivities of school children." *L.M.*, 103 F.4th at 876. The District is also entitled to deference in its finding that Plaintiffs' wristbands and signs are demeaning of transgender students, and that Plaintiffs' message is "no less likely to strike a person at the core of his being than it would if [they] demeaned the religion, race, sex, or sexual orientation of other students." *Id*. at 879. Accordingly, Plaintiffs have no constitutional right to "silently protest" school-sponsored events whether it is the girls' varsity soccer games or other events throughout the academic year.

Plaintiffs' claimed First Amendment right to protest by displaying signs in the school parking lot (or, as Foote proposes, marching around holding them aloft) is even more far-fetched.

18

The District does not allow protests of any kind on its grounds or in its parking lots and never has. The parking lots have never been opened as a public forum. The idea that schools must submit to having their parking lots converted to protest zones seems to enjoy no support in the law nor – to date – have Plaintiffs identified any such support. "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800 (1985); s*ee also United Food & C.W. 1099 v. City of Sidney*, 359 F.3d 432 (6th Cir. 2004) (declining to find that Ohio created public forum simply by allowing schools and adjacent parking lots be used for voting). It takes little imagination to picture the metamorphosis that would occur at Bow High School and other schools were the Court to grant Plaintiffs' request in this respect.

## II. PLAINTIFFS CANNOT DEMONSTRATED A LIKELIHOOD OF IRREPARABLE HARM, NOR DO THE BALANCE OF EQUITIES FAVOR PLAINTIFFS.

Because Plaintiffs cannot establish a likelihood that they have or will suffer an infringement of the First Amendment rights, they cannot demonstrate a likelihood of suffering irreparable harm should a preliminary injunction not be granted. As for balancing the equities, Plaintiffs do not come before the Court with clean hands. Plaintiffs insist that their protest at the September 17 game was not aimed at Parker Tirrell, yet Plaintiffs had not bothered to protest at any of the other Bow High School girls' varsity games prior to September 17. Plaintiffs would have the Court believe it was pure coincidence that their first protest occurred at the one game Bow High School played against Parker Tirrell's team.

It is also apparent from Plaintiffs' hearing testimony that they readily champion the regulation of speech, but only when it is done to others. Fellers was outraged that Rossetti cursed him in the parking lot after the September 17 game, and he demanded school administrators

19

sanction or fire Rosetti as a referee. Tr. Day One PM at 33; Def. Ex. J. When challenged to explain why Rosetti should be penalized for exercising his free speech rights, Fellers declared indignantly that it was "very inappropriate" for Rossetti to have used foul language against him "as well as around other parents and children." Tr. Day One PM at 34. Plaintiffs are not free speech absolutists. They are merely warriors for the speech they want.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for a Preliminary Injunction.

Respectfully submitted,

BOW SCHOOL DISTRICT

By its attorneys,

CULLEN COLLIMORE SHIRLEY PLLC

Dated: December 13, 2024    /s/ Jonathan M. Shirley
Brian J.S. Cullen, NH Bar 11265
Jonathan M. Shirley, NH Bar 16494
37 Technology Way, Suite 3W2
Nashua, NH 03060
(603) 881-5500
bcullen@cullencollimore.com
jshirley@cullencollimore.com

## CERTIFICATE OF SERVICE

I certify that a copy of this filing was served via the Court's ECF filing system upon counsel of record.

Dated: December 13, 2024    /s/ Jonathan M. Shirley
Jonathan M. Shirley