## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KYLE FELLERS, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MARCEY KELLEY, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-311-SM-AJ |

**PLAINTIFFS' POST-HEARING BRIEF IN SUPPORT OF A PRELIMINARY INJUNCTION**

## INTRODUCTION

Bow School District prohibits adults attending extracurricular sporting events from expressing the common belief that biological boys should not play girls sports, because the district deems the expression of this viewpoint to be "trans-exclusionary." Even a symbolic, relatively innocuous expression of this idea—wearing a pink wristband adorned with XX —is, according to Bow school officials, dangerous "hate speech" that cannot be expressed or viewed on school property. The very idea that girls' sports should be reserved for biological girls—a view that many, if not most New Hampshire residents share—is too "dangerous."

What Bow school officials enforce is textbook viewpoint discrimination, which is prohibited in limited public fora. And *no case* has ever upheld a school's authority to censor *adult speech* in a limited public forum based on the sociopolitical viewpoint expressed. The school district is asking this Court to make new law by extending the student-speech cases and applying their framework to adults who attend school events open to the public.

This Court should decline the invitation to create a new legal standard for policing adult speech. Doing so would infantilize adult citizens and has the practical effect of declaring certain commonly held sociopolitical views to be entirely off-limits in a public setting where it is natural to express those views.

Plaintiffs are entitled to a preliminary injunction securing their fundamental First Amendment rights to protest at upcoming Bow School District extracurricular

1

events that are open to the public. Moreover, Defendants have not met *their burden* of showing that their undisputably viewpoint-based speech restrictions pass constitutional muster.[1]

**ARGUMENT**

I.     PLAINTIFFS WILL SUCCEED ON THE MERITS

    A.  Bow School District sporting events open to the public are limited public fora where viewpoint discrimination is illegal

As this Court has recognized, when a public school opens its sporting events and extracurricular activities to the general public, it establishes a limited public forum. Oct. 8 Hrg. Tr., Dkt. 24, at 13:22-24, 62:17-24; *see also Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 212 (D. Mass. 2023); *Hansen v. Watkins Glen Cent. Sch. Dist.*, 832 F. App'x 709, 712 (2d Cir. 2020). "A limited public forum . . . exists where a government has reserved a forum for certain groups or for the discussion of certain topics." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215 (2015) (cleaned up).

Bow School District admits that it allows people to wear clothing or display flags and bumper stickers supporting political and social causes on school property when open to the public. *See, e.g.*, Dkt. 42, ¶¶ 26, 52, 60; Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 24:1-15, 29:16-18. Indeed, Superintendent Kelley testified that Bow School District permits "inclusionary" messages expressing pro-LGBTQ+ viewpoints, such as a

---

[1] *Comcast of Me./New Hampshire, Inc. v. Mills*, 435 F. Supp. 3d 228, 233 (D. Me. 2019) (burden shifts to government to justify speech restrictions on PI motion).

2

Pride flag. Nov. 22 A.M. Hrg. Tr., Dkt. 66, at 67:13-68:22. Principal Fisk similarly agrees that many political and social messages such as Pride flags, Trump flags, or Harris bumper stickers are permitted on school property—so long as they are not "offensive" or "hateful." Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 29:9-18; 31:10-18.[2] School officials have thus established a limited public forum, where adults can engage in passive expression of sociopolitical views.

The government can restrict speech in a limited public forum only under two conditions. Restrictions must be (1) reasonable in light of the purpose served by the forum *and* (2) viewpoint neutral. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106-07 (2001). Reasonable speech restrictions in a limited public forum still violate the First Amendment when they discriminate based on viewpoint, and the district's blanket ban of "trans-exclusionary" messages is quintessential viewpoint discrimination, especially since the district allows the public to express "trans-inclusionary" messages that comport with the views of school officials. "If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831 (1995); *cf. Marshall v. Amuso*, 571 F. Supp. 3d 412, 422 (E.D. Pa. 2021) (school officials discriminate on

---

[2] The district has not provided a workable definition of "hateful symbol," but officials regard a pink field with black XX on it as a "hateful symbol" that may not be displayed by anyone at school events. Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 31:10-18.

viewpoint in limited public forum by allowing positive comments about school board, but censoring criticism). Yet that is exactly what the district has done and proposes to keep on doing.

As for the parking lots, which are also open to the public during these events, Defendants concede those are at least nonpublic fora. Dkt. 59 at 8, 11. Indeed, parking lots at public events are often limited public fora. *See, e.g.*, *Hartman v. Thompson*, 931 F.3d 471, 479 (6th Cir 2019); *Embry v. Lewis*, 215 F.3d 884, 888 (8th Cir. 2000). But the difference here is immaterial because speech restrictions in a nonpublic forum must also be viewpoint neutral and reasonable in light of the purposes of the nonpublic forum. *Am. Freedom Def. Initiative v. Mass. Bay Transp. Auth.*, 781 F.3d 571, 581 (1st Cir. 2015). For this reason, the First Circuit treats "limited public forum" and "nonpublic forum" as rough synonyms. *See Curnin v. Town of Egremont*, 510 F.3d 24, 28 (1st Cir. 2007). Even in a nonpublic forum, "it is not enough that a law appear viewpoint-neutral on its face. A reviewing court must also determine that the rule is not a facade for viewpoint discrimination." *Boy Scouts of Am. v. Wyman*, 335 F.3d 80, 93 (2d Cir. 2003); *cf.* Dkt. 59 at 11 (citing *Wyman*). Here, there is no façade—district officials openly claim the power to censor messages that they deem "trans-exclusionary."

Consider, for instance, *Wandering Dago, Inc. v. Desisto*, a case that Defendants cite as an example of what qualifies as viewpoint neutral. *See* Dkt. 59 at 11. In *Wandering Dago,* the Second Circuit assumed, without deciding, that New York

4

created a nonpublic forum when it allowed food vendors to participate in an outdoor lunch program at a public plaza as long as vendors received prior approval from a state agency. *See* 879 F.3d 20, 26, 30 (2d Cir. 2018). New York had a consistent policy of only approving "family friendly" programming at the Plaza, so the state denied the plaintiff-vendor's application because of the vendor's use of offensive ethnic slurs in its name and on its menu. *Id.* at 26, 28. The Second Circuit held that this denial was unconstitutional viewpoint discrimination even though New York had "a legitimate interest in promoting family-friendly messages" to protect children. *Id.* at 31, 37. Even in a nonpublic forum, "[g]iving offense is a viewpoint." *Id.* at 24-25 (quoting *Matal v. Tam*, 582 U.S. 218, 243 (2017) (plurality)).

B. Defendants admit they discriminate based on viewpoint because they deem it offensive and "trans-exclusionary"

Bow School District officials admit that they prohibit Plaintiffs' speech because of the viewpoint expressed. According to Superintendent Kelley, the school allows "inclusionary" messages such as the Pride flag, but not "exclusionary" messages, such as Plaintiffs' pink wristbands with double Xs. Nov. 22 A.M. Hrg. Tr., Dkt. 66, at 31:10-32:2, 67:13-68:22. Kelley views double Xs as "a pretty well-known anti-trans symbol" and stated that it is the practice of Bow School District to prohibit the wearing of clothing with XX or other supposedly anti-trans symbols on it, regardless of whether any transgender student is present. *Id.* at 31:19-33:1, 67:13-68:17.

Similarly, Principal Matt Fisk considers a "pink field with the black XX on it" to be "a hateful symbol," an "anti-trans symbol," and "inappropriate to display

5

anywhere on Bow School District property or at a Bow School District event." Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 25:14-15, 31:10-18. Although the school permits Pride symbols, Trump symbols, and many other political and social symbols on school grounds, Dkt. 42, ¶¶ 26, 52, 60, Fisk stated that he "would take action" against "something offensive." Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 29:11-18. For instance, if parents owned a vehicle with a pink XX bumper sticker, Fisk would tell those parents that they cannot "come to our school with that displayed on their vehicle," as a previous principal did with a student's car displaying the Confederate Flag in the parking lot. *Id.* at 24:10-15, 29:20-30:15.

Fisk also noted that, in the past, he banned a student's display of the Confederate Flag on the school's email system while permitting the display of the Gadsden ("Don't Tread on Me") Flag. *Id.* at 24:1-15. Those actions are not at issue and may have been permissible as they involved student speech on school grounds or on the school's IT resources (a non-public forum).[3] But Plaintiffs here are adults, speaking non-disruptively about sports, at sporting events open to the public.

Moreover, although Policy KFA only bans speech that "[i]njure[s], threaten[s], harass[es], or intimidate[s] . . . any other person," Dkt. 14-7, Bow School District interprets this policy to forbid speech if the viewpoint expressed has a *potential* to

---

[3] Student speech at school is analyzed under the *Tinker* line of cases. *See* C., *infra.* Since this case is about parent speech on school property open to the public, this Court can grant an injunction protecting Plaintiffs, without requiring the school to permit students to display the Confederate Flag.

threaten, harass, or intimidate a person—including speech that is not targeted at any person at all. The school treats XX wristbands or signs with messages such as "Protect Women's Sports for Female Athletes" as automatically "targeting the school's transgender and gender nonconforming student population generally for harassment and intimidation, irrespective of whether those students are playing on the field, attending the games as spectators, or present at the games at all." Dkt. 59 at 13. No showing of specific harm to any individual student is necessary. *See* Nov. 21 A.M. Hrg. Tr., Dkt. 67, at 33:6-25, 37:2-10. In other words, *any* speech expressing the view that biological boys should not play girls' sports is prohibited.

Silently wearing a XX wristband or writing a message like "Protect Women's Sports for Female Athletes" is as subtle and nonconfrontational a way to advocate for the political position of reserving women's sports for biological females as possible. In practice, then, Bow School District prohibits *all* messages advocating this widely held sociopolitical position from school property, while permitting pro-transgender messages advocating the opposite. This is viewpoint discrimination in its most blatant and straightforward form. *See, e.g., Marshall,* 571 F. Supp. 3d at 422; *Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1350 (N.D. Ga. 2022) (school board policy impermissibly targets speech critical of the board, while permitting positive, praiseworthy, and complimentary speech).

7

C. Applying *Tinker* to adults in a limited public forum would make new law and contradict established precedent

Bow School District cannot justify its viewpoint discrimination by appealing to *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), and its progeny, such as *L.M. v. Town of Middleborough*, 103 F.4th 854 (1st Cir. 2024), because those are student-speech cases, not adult-speech cases. *Tinker* does not allow the government to restrict adult speech in a limited public forum, and this Court would make new law, conflicting with prior precedents, if it held otherwise.

*Tinker* is an exception to the protection the First Amendment ordinarily provides to adults. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 187-191 (2021).[4] But neither the Supreme Court nor the circuit courts have been shy about explaining *Tinker's* scope: it applies to *student* speech in the school context. *Id.* at 188-89.

Start with *Tinker*. The Supreme Court framed the "problem" as arising "where *students* in the exercise of First Amendment rights collide with the rules of the school authorities." 393 U.S. at 507 (emphasis added). The Court focused on student speech throughout the opinion. It discussed "a *student's* right" of expression "in the cafeteria, or on the playing field, or on the campus during the authorized hours." *Id.* at 512 (emphasis added). It explained that officials cannot forbid "the expression by *any student* of [a political message] anywhere on school property" without "a showing that the *students*' activities would materially and substantially disrupt the

---

[4] "B.L. uttered the kind of pure speech to which, were she an adult, the First Amendment would provide strong protection." *Id.* at 191.

work and discipline of the school." *Id.* at 513 (emphasis added). It distinguished a student's protected speech from "conduct by the *student* [that] materially disrupts classwork." *Id.* And it concluded that a rule banning "the expression by *any student* of opposition to [the Vietnam war]" would "obvious[ly] . . . violate the constitutional rights *of students.*" *Id.* at 513 (emphasis added). Every part of the Supreme Court's reasoning in *Tinker* is about student speech.

Justice Stewart's oft-quoted concurrence emphasizes this point. He explained that "the First Amendment rights of children" are not "co-extensive with those of adults" because "a child—like someone in a captive audience—is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees." *Id.* at 515 (Stewart, J., concurring); *cf. L.M.*, 103 F.4th at 881 (quoting Stewart's concurrence approvingly). In other words, the exception in *Tinker* exists only because "the First Amendment rights *of students* in the public schools are not automatically coextensive with the rights of adults in other settings." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotations omitted) (emphasis added).

Later Supreme Court cases reiterated *Tinker*'s focus on student speech in the school environment, explaining the unique relationship that arises when schools stand in loco parentis over minors. *See, e.g., Mahanoy*, 594 U.S. 180, at 189; *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 655-56 (1995). "[T]he question that [the Supreme Court] addressed in *Tinker*" was only "whether the First Amendment

9

requires a school to tolerate particular *student* speech." *Hazelwood*, 484 U.S. at 270 (emphasis added). "[T]he State's power over schoolchildren . . . is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Vernonia*, 515 U.S. at 655.

In contrast, "[t]he First Amendment guarantees wide freedom in matters of adult public discourse," so "the use of an offensive form of expression may not be prohibited to adults making what the speaker considers a political point" even though this same usage could be prohibited to "children in a public school." *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682 (1986); *see also Mahanoy*, 594 U.S. at 191 (noting that L.M.'s speech would enjoy strong protection if she were an adult).

As a result, courts have repeatedly (and correctly) held that *Tinker*'s analysis does not apply to adult speech. *See, e.g., McElhaney v. Williams*, 81 F.4th 550, 558-59 (6th Cir. 2023) ("Parents, however, have a different relationship to school activities than do students"); *Barr v. Lafon*, 538 F.3d 554, 573, 576 (6th Cir. 2008); *J.S. v. Blue Mt. Sch. Dist.*, 650 F.3d 915, 938, 940 (3d Cir. 2011) (Smith, J. concurring); *DeJohn v. Temple Univ.*, 537 F.3d 301, 318 (3d Cir. 2008).

In *McElhaney*, for instance, the Sixth Circuit held that parents have a clearly established right to criticize school officials and their decisions regarding student athletics, although students themselves (under *Tinker*) may lack such a right. 81 F.4th at 554, 557-58. Thus, it was unconstitutional for a school to ban a parent from attending sporting events open to the public on the basis of the content—let alone

the viewpoint—of that parent's adult speech. *Id.* at 555, 559. Similarly, the Supreme Court itself has stated that that when a school creates a forum for speech, it is forum analysis, "rather than our decision in *Tinker*, that governs this case." *Hazelwood*, 484 U.S. at 270.

*L.M.* tracks this framework. It "recognized, post-*Tinker*, that '[it] does not follow . . . that simply because the use of an offensive form of expression *may not be prohibited to adults* making what the speaker considers a political point, the same latitude must be permitted to children in a public school.'" *See L.M.*, 103 F.4th at 878 (citing *Fraser* and *Tinker*) (emphasis added). In other words, the First Circuit started by distinguishing between adult speech that cannot be banned from student speech that (sometimes) can be. Thus, although *L.M.* allowed the school to ban some "demeaning" messages when they are "reasonably forecasted to poison the education environment" and "lead to symptoms . . . of substantial disruption," its holding was limited to when those messages are "expressed . . . *by students at school*." *Id.* at 873 (internal quotation marks omitted) (emphasis added).

That's why *L.M.* never even engaged in forum analysis—it did not need to engage in such analysis because the rules for student speech in school are not the same as the rules for adult speech in any forum.[5] Forum analysis provides the rules

---

[5] For example, *L.M.* explained that in a public forum, "an adult Christian can tell the Jew he is going to hell, or the adult Jew can tell the Christian he is not one of God's chosen," but "the overly zealous Christian or Jewish child in an elementary

for adult speech on government property.[6] And *Tinker*—which *L.M.* applied—is an exception to those rules. Defendants' assertion that *L.M.* empowers schools to restrict the speech of parents and adult spectators in a limited public forum to an even greater extent than schools can restrict the speech of students, see Dkt. 59 at 12, has no basis in the *L.M.* opinion whatsoever.

Consider how the First Circuit addressed viewpoint neutrality to see this point more clearly. The plaintiffs in *L.M.* argued that the school "unconstitutionally discriminate[d] in viewpoint between 'negative' and 'positive' messages." *L.M.*, 103 F.4th at 886 n.11. The First Circuit rejected that argument because it "[did] not read *Tinker* or any other Supreme Court or federal court *student-speech* decision to require 'positive messages' be prohibited if a 'negative' message is regulable because it materially disrupts or invades others' rights." *Id.* But in a limited public forum involving adult speech, treating positive messages and negative messages differently is unconstitutional. *Good News Club*, 533 U.S. at 106-07; *Marshall*, 571

---

school" can be restricted from saying "the same thing to his classmate." *Id.* at 871 n.5 (cleaned up).

[6] Some courts hold that schools must satisfy both *Tinker* and the forum-analysis rules when regulating student speech. *See, e.g.*, *Kristoffersson v. Port Jefferson Union Free Sch. Dist.*, No. 23-7232-cv, 2024 U.S. App. LEXIS 17098, at *8 (2d Cir. July 12, 2024); *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1127 n.6 (11th Cir. 2022). The First Circuit has so far not adopted this approach, holding that "student-speech" regulations do not necessarily require viewpoint neutrality. *L.M.*, 103 F.4th at 886 n.11. But should this case result in an appeal, Plaintiffs reserve the right to urge the Supreme Court to resolve this circuit split in favor of the less-censorial, more speech-protective test.

F. Supp. 3d at 422. The difference in *L.M.*, as the First Circuit explained, is that those rules do not apply to "student-speech." *L.M.*, 103 F.4th at 886 n.11. But this case is about adult speech.

Applying the ordinary forum rules to this case does not leave schools without any means to prevent harassment or disruption at school events. The government can prohibit discriminatory "conduct" and unprotected categories of speech like "fighting words" without banning speech because of the viewpoint expressed. *See Wandering Dago*, 879 F.3d at 32-33. And the government can impose content- and even speaker-based restrictions at a limited public forum as well. *See Good News Club*, 533 U.S. at 106-07. But if the government invites the public to its property, it cannot regulate speech based on the viewpoint of the message, including the XX wristband that school officials find "offensive" and "trans-exclusionary."

Defendants have not, and cannot, cite any case applying *Tinker* and its progeny to adult speech in a limited public forum. No such case exists. "[T]he 'disruption' standard applicable to student speech has not been applied to run-of-the-mill adult speech targeting school officials." *McElhaney*, 81 F.4th at 558. Instead, ordinary forum analysis applies, and the government has the burden of demonstrating that its restriction is viewpoint neutral and reasonable, just as it would in any limited public forum. This Court would be creating new law if it erroneously extended *Tinker* to adult speech and such a holding would constitute an extreme outlier.

13

D. **It is objectively unreasonable for public school officials to believe that silently displaying pink wristbands is potentially harassing and disruptive**

Even if *Tinker* and its progeny were applied to adults speaking in a limited

public forum, the speech here was neither demeaning nor reasonably forecasted to

poison the educational environment and lead to symptoms of substantial disruption.

*See L.M.*, 103 F.4th at 873. Bow officials have the burden of justifying their speech

restrictions and may only rely upon justifications originally provided to Plaintiffs

when they censored Plaintiffs' speech. *See id.* at 866. They cannot meet that burden.

Plaintiffs here wore, and testified they intend to wear again, pink XX wristbands

as a silent protest. *See, e.g.*, Nov. 21 A.M. Hrg. Tr., Dkt. 67, at 91:17-92:18; Nov. 21

P.M. Hrg. Tr., Dkt. 65, at 34:14-35:18; 47:1-10; Nov. 22 A.M. Hrg. Tr., Dkt. 66, at

16:20-17:5. They did nothing to call attention to the wristbands or disturb the

September 17 game, and the vast majority of spectators—let alone, the players—

would not have known that any protest was happening if not for Defendants'

actions. *See, e.g.*, Nov. 21 P.M. Hrg. Tr., Dkt. 65, at 64:9-20, 66:4-13; Nov. 22 A.M.

Hrg. Tr., Dkt. 66, at 8:23-9:7, 11:13-23. Plaintiffs' silent protest contrasts sharply

with the conduct in cases where courts have found disruption and harassment. *See,*

*e.g., Doe v. Hopkinton Pub. Schs.,* 19 F.4th 493 (1st Cir. 2021); *Doe v. Portland Pub.*

*Sch.*, 701 F. Supp. 3d 18, 36-37 (D. Me. 2023). The wristbands did not cause a

substantial disruption and will not cause substantial disruption in the future.

Bow School District claims that it expected Plaintiffs to become "actively

disruptive" at the September 17 game because officials had "heard that Plaintiffs

14

were mulling plans to dress in women's clothes, wave signs, and heckle from the sidelines." Dkt. 59 at 12. But those things did not happen, and their fears based on an unverified rumor cannot qualify as objectively reasonable.

Moreover, looking to the future, Plaintiffs have testified that their intention is just to wear XX wristbands silently. Defendants are not objecting to the style of Plaintiffs' protest, but rather to the ideas expressed. Superintendent Kelley, for instance, considers any "symbol of nonparticipation" expressing "opposition to players classified at birth as male participating on girls' team[s]" to be "anti-trans" and thus must be removed on school property. Nov. 22 A.M. Hrg. Tr., Dkt. 66, at 67:16-25, 73:23-74:7.

Likewise, according to Bow's counsel, "a message that is exclusionary on the basis of the sex of these transgender students," even when pure speech expressed silently and non-disruptively, "borders on a harassment" and is a "message that [school officials] don't want to have coming forward" at school events. Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 42:1-19. If Plaintiffs "show up on the sidelines with this wristband, with their signs, we have a problem," regardless of whether any transgender player is present. *Id.* at 41:22-23; *see also* Dkt. 59 at 13. Bow officials consider the viewpoint itself as "exclusionary" and "offensive," and so no form of expressing that viewpoint is permissible.

But it is no secret that Americans disagree about transgender issues, including whether trans-identifying students should be allowed to compete with athletes that

are different than their biological sex. A state law on this issue was recently passed and then enjoined, so students—and especially Parker Tirrell—are frequently exposed to messages about this issue in a variety of settings.[7] Principal Fisk stated that Bow permits classroom discussions on transgender athletics and that transgender students are well-aware that many Americans disagree with their position on gender identity. Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 30:22-31:10. It is hard to understand how a message itself can be banned in all forms if the school already allows students to express that same belief during classroom discussions.[8]

"America's public schools are the nurseries of democracy" which "only works if we protect 'the marketplace of ideas.'" *Mahanoy*, 594 U.S. at 190. "Thus, schools have a strong interest in ensuring that future generations understand the workings in practice of the well-known aphorism, 'I disapprove of what you say, but I will defend to the death your right to say it.'" *Id.* Bow School officials appear to think otherwise, however, and now seek this Court's imprimatur.

Transgender students will not be shocked and mentally incapacitated merely by learning that people disagree with them about a controversial political topic—

---

[7] Indeed, Tirrell testified in opposition to HB 1205 at a hearing. Pl. Ex. 31 at 6.
[8] Nor does this message meet the same criteria that *L.M.* found problematic. Expressing the view that biological boys should not play girls' sports does not "express[] the view that students with different 'beliefs about the nature of [their] existence] are wrong." *L.M.*, 103 F.4th at 880. A belief that biological differences matter when organizing sports teams is not the same as a belief about the existence of transgender or nonbinary individuals.

something that is part of navigating life in a free and pluralistic society. Transgender students already do know this, and it is objectively unreasonable, and profoundly illiberal, for Bow School District to seek to prevent students from being exposed to a mere idea.

### E. A preliminary injunction is also needed because Plaintiffs are likely to succeed on their First Amendment retaliation claims

Adult citizens have a right to express sociopolitical views that differ from those of school officials, and the right to criticize censorship. Officials illegally retaliate when they act in a way that "would deter a reasonably hardy individual from exercising his constitutional rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011) (cleaned up). To prevail, a plaintiff must show that he or she (1) engaged in constitutionally protected conduct, (2) was subjected to adverse action, and that (3) the protected conduct was a substantial or motivating factor in the adverse action. *D.B. v. Esposito*, 675 F.3d 26, 43 (1st Cir. 2012). The burden then shifts to the government officials, who are liable unless they can prove they would have reached the same decision even in the absence of the protected conduct. *Id.*

Here, Defendants banned Fellers and Andy Foote from school grounds both because they wore the XX wristbands *and* objected to being censored. Dkt. 14-14; Dkt. 14-13. And Kelley banned Fellers for over a month longer because of his so-called "abuse" of school administrators. Dkt. 22-4, ¶ 10; Nov. 22 A.M. Hrg. Tr., Dkt. 66, at 64:15-65:18. Indeed, Fellers had already removed the wristband when he was removed from the game for calling Desilets a "coward" for not allowing people to

17

express support for women's sports. Pl. Ex. 20 at video time stamp 2:41-4:27; *see also* Dkt. 22-1, ¶ 16; Dkt. 22-4, ¶ 10.

"The right to criticize public officials is safely within [the] protected speech zone." *McElhaney,* 81 F.4th at 557 (cleaned up); *see also Marshall,* 571 F. Supp. 3d at 422 (cutting off those who criticize a school's decision is viewpoint discrimination). For her part, Kelley freely admits that Fellers' comments criticizing school administrators were one factor in the district's response, as was the officials' disagreement with the underlying message of the XX wristbands.[9]

Likewise, when Eldon Rash did not immediately remove his wristband, Fisk hovered behind him, stating, "Sir, if this game doesn't continue, it's going to have an adverse impact on your granddaughter." Pl. Ex. 20 at video time stamp 5:01-6:00. Ben Forbes, another school official, warned that Rash's actions would prevent the Bow girls' team from "be[ing] able to play in the postseason or today." *Id.* Although Fisk later testified that he did not "threaten that something bad would happen to

---

[9] Kelley and Fisk also both explained that they *personally* disagree with the XX message and admitted to being "trans allies," a term that connotes adoption of gender ideology. Nov. 22 A.M. Hrg. Tr., Dkt. 66. at 33:3-8, 35:13-14; Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 26:9-10, 31:10-14; *see also, e.g.,* THE HUMAN RIGHTS CAMPAIGN, *Be an Ally – Support Trans Equality,* https://perma.cc/68TY-92S3 (discussing proper pronoun and "neo-pronoun" use, avoiding "microaggressions," and making spaces trans-affirming); ADVOCATES FOR TRANS EQUALITY, *Supporting the Transgender People in Your Life: A Guide to Being a Good Ally,* https://perma.cc/5KLG-FHHP (allies should be outspoken, push for inclusivity, and craft transgender-inclusive policies). Kelley and Fisk can be "trans allies" but forcing their personal ideological views on other adults by using official power to censor ideas is illegal.

[Rash's] granddaughter if he did not comply" (Nov. 22 P.M. Hrg. Tr., Dkt. 72, at 25:1-10), the bodycam video records otherwise. *See Scott v. Harris,* 550 U.S. 372, 380-81 (2007) (court should credit video evidence over contradictory testimony); *Underwood v. Barrett*, 924 F.3d 19, 20-21 (1st Cir. 2019) (same). Only after these adverse actions did Rash remove the wristband.

Defendants cannot meet *their burden* of showing that their actions to discourage sociopolitical expression by adults were lawful. Moreover, the officials' overreaction to a sociopolitical disagreement illustrates why a preliminary injunction is necessary now. Without one, Plaintiffs risk subjecting themselves to further unlawful retaliation if they attempt to wear the XX wristbands at upcoming girls' basketball, skiing, or swimming events, as they wish to do.

## II. DEFENDANTS IRREPARABLY DAMAGE PLAINTIFFS WHEN THEY BAR SILENT PROTESTS AT SPORTING EVENTS OPEN TO THE PUBLIC

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). Defendants have testified that their policies prohibit Plaintiffs from silently expressing their message because it is "hateful" and "trans-exclusionary" and would be enforced at upcoming district events, regardless of whether a trans player was competing or in the audience.

19

III.    ALLOWING ADULTS TO FREELY EXPRESS SOCIOPOLITICAL VIEWS ALWAYS
        PROMOTES THE PUBLIC INTEREST

"First Amendment rights are not private rights . . . so much as they are rights of
the general public." *Westfield High Sch. L.I.F.E. Club v. City of Westfield*, 249 F.
Supp. 2d 98, 128 (D. Mass. 2003) (citation omitted). "To deprive plaintiffs of the
right to speak will therefore have the concomitant effect of depriving the public of
the right and privilege to determine for itself what speech and speakers are worthy
of consideration." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1,
15 (1st Cir. 2012). Defendants have no legitimate government interest in
suppressing the public's right to listen and to deliberate in a free and informed
manner about matters of public concern.

## CONCLUSION

This Court should grant Plaintiffs' request for a preliminary injunction.

20

Dated: December 13, 2024                Respectfully submitted,

/s/ *Richard J. Lehmann*                 /s/ *Endel Kolde*
Richard J. Lehmann                       Endel Kolde*
New Hampshire Bar No. 9339               DC Bar No. 1782129
LEHMANN MAJOR LIST PLLC                  Brett Nolan*
6 Garvins Falls Road                     DC Bar No. 90014964
Concord, New Hampshire 03301             Nathan J. Ristuccia*[10]
Tel: (603) 731-5435                      Virginia Bar No. 98372
Fax: (720) 995-9156                      INSTITUTE FOR FREE SPEECH
rick@nhlawyer.com                        1150 Connecticut Ave., NW
                                         Suite 801
                                         Washington, D.C. 20036
                                         Tel: (202) 301-3300
                                         Fax: (202) 301-3399
                                         dkolde@ifs.org
                                         bnolan@ifs.org
                                         nristuccia@ifs.org

                                         *Pro hac vice*

                                         *Counsel for Plaintiff*

---

[10] Not a D.C. Bar Member but providing legal services in the District of Columbia exclusively before federal courts, as authorized by D.C. Ct. App. R. 49(c)(3).

21